1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALDO MEDRANO AYALA,<br><br>                                    Petitioner,<br><br>          vs.<br><br><br>ROBERT L. AYERS, JR., Warden of<br>California State Prison at San Quentin,<br><br>                                    Respondent. | CASE NO. 01cv741 BTM<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART RESPONDENT'S<br>MOTION FOR SUMMARY JUDGMENT<br>ON GROUP THREE CLAIMS, DENYING<br>PETITIONER'S MOTION FOR<br>SUMMARY JUDGMENT, AND<br>GRANTING IN PART AND DENYING IN<br>PART PETITIONER'S MOTION FOR AN<br>EVIDENTIARY HEARING** |

        Respondent has filed a motion for summary judgment on the Group Three Claims
(Claims 17-36 and 68 of the Second Amended Petition).  Petitioner has filed a motion for
summary judgment, or, in the alternative, for evidentiary hearings on these same claims.  For
the reasons discussed below, Respondent's motion for summary judgment is **GRANTED IN
PART** and **DENIED IN PART**, Petitioner's motion for summary judgment is **DENIED**, and
Petitioner's motion for an evidentiary hearing is **GRANTED IN PART** and **DENIED IN PART**.

## I.  BACKGROUND

        On April 26, 1985, Ernesto Dominguez Mendez (a.k.a. "Chacho"), Marcos Zamora and

Jose Rositas were killed execution-style inside Dominguez's body shop.  Pedro Castillo, who was also at the body shop, was shot but survived.   In June 1985, Petitioner Ronaldo Medrano Ayala ("Petitioner" or "Ronaldo") and his brother Hector Ayala were arrested for the murders and attempted murder.  Petitioner's trial was severed from that of his brother.  A third man, Joseph Moreno, was also arrested and tried separately for the murders.

On October 12, 1988, a jury found Petitioner guilty of three counts of murder (Cal. Penal Code § 187), one count of attempted murder (Cal. Penal Code §§ 187/664), one count of robbery (Cal. Penal Code § 211), and three counts of attempted robbery (Cal. Pen. Code §§ 211/664).  The jury also found that Petitioner had used a firearm in the commission of these crimes in violation of Cal. Penal Code § 12022.5.  In addition, the jury found Petitioner guilty of the two special circumstances allegations – multiple murder (Cal. Penal Code § 190.2(a)(3)) and murder committed in the course of robbery (Cal. Penal Code § 190.2(a)(17)(i)).

The penalty phase commenced on November 14, 1988.  In connection with this phase, the parties stipulated that Petitioner had been convicted of the following six felonies over the prior 18 years: second degree burglary, unlawfully taking or driving a motor vehicle, robbery, possession of a dagger in prison, first degree burglary, and possession of heroin.

The prosecution also presented evidence of the following unadjudicated violent crimes: (1) the murder of John Casas, a fellow inmate at Folsom Prison, on February 21, 1980; (2) the robbery of the Pantry clothing store on November 24, 1972 and the use of a firearm in the commission of the robbery; (3) the stabbing of Wallace Williams, a fellow inmate at San Quentin, on November 23, 1975; (4) the stabbing of Richard Christiansen, a fellow inmate at San Quentin, on October 27, 1977; and (5) the stabbing of Alex Macugay, a fellow inmate at Soledad Prison, on November 30, 1982.

After the penalty phase of the trial, the jury returned three separate verdicts of death.  Petitioner was sentenced to death and a 22-year consecutive sentence.

In 1989, Hector Ayala was found guilty of the murders and also received a sentence of death.  Joseph Moreno was acquitted.  The record before the Court does not include

01CV741

1    transcripts from Hector's or Moreno's trial.

2           Petitioner filed his automatic appeal with the California Supreme Court.  On June 8,

3    2000, the California Supreme Court affirmed his conviction and sentence.  See People v.

4    Ayala, 23 Cal. 4th 225 (2000).

5           On July 27, 1998, Petitioner filed a habeas petition with the California Supreme Court.

6    On August 23, 2000, the California Supreme Court summarily denied the petition without

7    comment.  Subsequently, Petitioner filed a Petition for Writ of Certiorari in the United States

8    Supreme Court, which was denied on March 5, 2001.

9           On May 3, 2002, Petitioner filed his Petition for Writ of Habeas Corpus with this Court.

10   Shortly thereafter, the Court dismissed without prejudice certain claims presented in the

11   Petition so that Petitioner could exhaust the claims in state court.  The Court stayed the

12   federal proceedings pending the state court exhaustion.

13          On September 23, 2002, Petitioner filed a First Amended Petition for Writ of Habeas

14   Corpus in the California Supreme Court.  On September 10, 2003, the California Supreme

15   Court denied the petition.

16          On November 14, 2003, Petitioner filed his First Amended Petition for Writ of Habeas

17   Corpus in this case.  He subsequently filed a Second Amended Petition for Writ of Habeas

18   Corpus.

19

20                        **II.  STANDARD OF REVIEW AND APPLICABLE LAW**

21

22   **A.  Standard of Review under AEDPA**

23          Title 28, United States Code, § 2254(a), sets forth the following scope of review for

24   federal habeas corpus claims:

25                     The Supreme Court, a Justice thereof, a circuit judge, or a
                 district court shall entertain an application for a writ of habeas
26               corpus in behalf of a person in custody pursuant to the judgment
                 of a State court only on the ground that he is in custody in
27               violation of the Constitution or laws or treaties of the United
                 States.
28

                                                    3

28 U.S.C. § 2254(a) (emphasis added).

In <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the new provisions of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") "generally apply only to cases filed after the Act became effective."  In capital habeas actions, cases are typically commenced by the filing of requests for appointment of counsel and stays of execution of the petitioners' death sentences.  Petitioner filed his request for appointment of counsel and stay of execution on April 27, 2001 and filed his petition with this Court on May 3, 2002.  AEDPA became effective on April 24, 1996, when the President signed it into law.  <u>See</u> <u>id.</u>  Accordingly, AEDPA applies to this case.

Relevant to this case are the changes AEDPA rendered to 28 U.S.C. § 2254(d), which now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2).[1]

A decision is "contrary to" clearly established law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result.  <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000).  A decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle .

---

[1] Although the California Supreme Court denied Claims 18-24, 27-33, 35, 36, and 68 (Claims 18-25, 27, 29-33, 35, 36, and 62 in the state petition) on the merits as well as on procedural bar grounds, the court did not provide any reasoning for the denial on the merits (with the exception of Claim 18's claim that trial counsel were ineffective for failing to call Richard Savocchio as a witness).  Therefore, as to Claims 18 (to the extent it concerns potential witnesses other than Savocchio), 19-24, 27-33, 35, 36, and 68, the Court undertakes an independent review to determine whether the state court clearly erred in its application of controlling federal law.  <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000).

1  . . but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>; <u>Bruce v.</u>

2  <u>Terhune</u>, 376 F.3d 950, 953 (9th Cir. 2004).

3        Even when the federal court undertakes an independent review of the record in the

4  absence of a reasoned state court decision, the federal court must "still defer to the state

5  court's ultimate decision." <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).  If the state

6  court decision does not furnish any analytical foundation, the review must focus on Supreme

7  Court cases to determine "whether the state court's resolution of the case constituted an

8  unreasonable application of clearly established federal law." <u>Greene v. Lambert</u>, 288 F.3d

9  1081, 1089 (9th Cir. 2001).  Federal courts also look to Ninth Circuit law for persuasive

10  authority in applying Supreme Court law and to determine whether a particular state court

11  decision is an "unreasonable application" of Supreme Court precedent. <u>Davis v. Woodford</u>,

12  384 F.3d 628, 638 (9th Cir. 2004).

13

14  **B.  <u>Standard for Evidentiary Hearing</u>**

15        AEDPA also limited the circumstances under which district courts may grant an

16  evidentiary hearing.  Section 2254(e)(2) provides:

17              If the applicant has failed to develop the factual basis of a claim in State
            court proceedings, the court shall not hold an evidentiary hearing unless the
18          applicant shows that:
            (A) the claim relies on:
19                  (i)  a new rule of constitutional law, made retroactive to
            cases on collateral review by the Supreme Court, that was
20          previously unavailable; or
                    (ii) a factual predicate that could not have been previously
21          discovered through the exercise of due diligence; and
            (B) the facts underlying the claim would be sufficient to establish
22          by clear and convincing evidence that but for constitutional error,
            no reasonable factfinder would have found the applicant guilty of
23          the underlying offense.

24        Under AEDPA, when determining whether to grant an evidentiary hearing, the district

25  court must first ascertain whether the petitioner has failed to develop the factual basis of a

26  claim in state court. <u>Insyxiengmay v. Morgan</u>, 403 F.3d 657, 670 (9th Cir. 2005).  As

27  explained by the Supreme Court:

28              For state courts to have their rightful opportunity to adjudicate federal rights,
            the prisoner must be diligent in developing the record and presenting, if

01CV741

1
2
3

possible, all claims of constitutional error.  If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.

4   Williams v. Taylor, 529 U.S. 420, 437 (2000).

5          If the petitioner has *not* failed to develop the facts in state court, an evidentiary hearing

6   is required if (1) the petitioner establishes a colorable claim for relief – i.e., petitioner alleges

7   facts that, if proven, would entitle him to habeas relief; and (2) the petitioner did not receive

8   a full and fair opportunity to develop those facts.  Earp v. Ornoski, 431 F.3d 1158, 1167 (9th

9   Cir. 2005).  The second requirement is met by a showing that:

10
11
12
13

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

14   Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds by Keeney v.

15   Tamayo-Reyes, 504 U.S. 1 (1992).

16

17   **C.  Ineffective Assistance of Counsel**

18          The Group Three claims allege numerous instances of ineffective assistance of trial

19   counsel at both the guilt and penalty phases of trial, as well as one claim of ineffective

20   assistance of appellate counsel.

21          To establish that trial counsel was constitutionally defective, the petitioner must

22   demonstrate (1) that counsel "made errors so serious that counsel was not functioning as the

23   'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that "the deficient

24   performance prejudiced the defense."  Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1995)

25   (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).

26          To establish deficient performance, the petitioner must show that the representation

27   he received "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at

28   688.  Because of the difficulties inherent in evaluating the challenged conduct from

01CV741

counsel's perspective at the time, there exists a strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance." Id. at 689.  The petitioner must overcome the presumption that the challenged action might be considered sound trial strategy.  Id. at 689.

To establish prejudice, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.   Individual deficiencies that may not by themselves meet the Strickland prejudice standard may, when considered cumulatively, constitute sufficient prejudice to justify granting the writ.  Harris v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995).

The process of determining penalty phase prejudice requires courts to "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation." Williams (Terry Williams) v. Taylor, 529 U.S. 362, 397-98 (2000).  A court "must carefully weigh the mitigating evidence (both that which was introduced and that which was omitted or understated) against the aggravating evidence," and then determine whether there is a reasonable probability that the sentencer "would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Mayfield v. Woodford, 270 F.3d 915, 928 (9th Cir. 2001) (quoting Strickland, 466 U.S. at 695).  See also Pizzuto v. Arave, 385 F.3d 1247, 1248-49 (9th Cir. 2004) (B. Fletcher, J., dissenting).

///

///

///

///

///

///

///

7

01CV741

1

### III. <u>VOIR DIRE AND JURY ISSUES</u>

2

3 **A. <u>Claim 17 - Questioning Re: Mexican Mafia and Gangs</u>**

4      Claim 17 asserts that trial counsel violated Petitioner's Fifth, Sixth, Eighth and

5 Fourteenth Amendment rights by their failure to inquire whether prospective jurors had a

6 bias or prejudice regarding the Mexican Mafia and prison gangs, resulting in a jury whose

7 biases and prejudices were unknown.  The Court rejects this claim.

8      Petitioner presents the Court with the declaration of Attorney Steven Harmon, a

9 criminal law practitioner, who opines that the failure to voir dire the jury on the subject of

10 gangs constituted ineffective assistance of counsel.  However, the state court disagreed

11 with this assessment.  In the direct appeal opinion, the California Supreme Court noted:

12         Assuming that defendant's reference to counsel's reticence in the face
of the possibility of introducing references to the Mexican Mafia is a claim of
13 ineffective assistance of counsel, we see none.  It was a reasonable tactical
choice-indeed it was, as stated, probably a wise choice- for the defense to
14 avoid jeopardizing its victory regarding mentions of gangs.
        In sum, defendant's claim is without merit.

15

16 <u>People v. Ayala</u>, 23 Cal. 4th 225, 277 (2000).

17      Petitioner has failed to demonstrate that counsel's decision to refrain from making

18 any mention of gangs to the jury was not "sound trial strategy" under the circumstances of

19 this case.  <u>Strickland</u>, 466 U.S. at 689.  It was not unreasonable for counsel to take the

20 position that explicit references to gangs would prejudice Petitioner.  It was also not

21 unreasonable for counsel to believe that the issue of gangs could be kept in the

22 background.  As explained by the California Supreme Court, "As a result of the trial

23 court's efforts, the jury never heard the names Mexican Mafia or La Eme. . . . [T]he jurors

24 heard only sanitized references to other people or groups that might wish to influence a

25 witness's conduct or testimony or retaliate against the witness for harming the defense."

26 <u>Ayala</u>, 23 Cal. 4th at 277.

27      Even assuming deficient performance, Petitioner has not established that he

28 suffered prejudice.  Petitioner's allegations of prejudice are rooted in the assertions that

the jury's biases were "undiscovered and unknown," that this was defense counsel's first

1  capital case, and that there was an air or "fear and panic" due to state actions and

2  predictions of violence by Detective Chacon.  However, Petitioner has not shown that any

3  of the jurors was in fact biased and, therefore, has failed to make an affirmative showing

4  of prejudice.  See Fields v. Woodford, 309 F.3d 1095, 1108 (9th Cir. 2002) (explaining

5  that it is not enough that the petitioner shows the *possibility* that he was prejudiced by

6  counsel's errors; rather, he must demonstrate that the errors *actually* prejudiced him.).

7        The Court cannot say that the state court's denial of this claim was contrary to or

8  an unreasonable application of clearly established federal law.  Williams, 529 U.S. at 412-

9  13.  Therefore, Petitioner is not entitled to habeas relief on this claim.

10

11  **B. <u>Claim 34 - Peremptory Challenges</u>**

12        In Claim 34,  Petitioner asserts that trial counsel violated his rights under the Fifth,

13  Sixth, Eighth, and Fourteenth Amendments by using only nine of the twenty allotted

14  peremptory challenges during jury selection, resulting in a biased jury being empaneled.

15  Petitioner maintains he suffered prejudice as a result of trial counsels' failure to use all of

16  the peremptory challenges, because, due to this failure, the state court concluded

17  Petitioner had waived his claim that the court should have excused certain prospective

18  jurors for cause.  (Pet'r's Mem. of P & A at 112.)

19        The California Supreme Court held that Petitioner had waived his claim that

20  prospective jurors should have been excused for cause because he did not exhaust all of

21  his peremptory challenges and express dissatisfaction with the jury ultimately selected

22  and did not justify his failure to do so.  Ayala, 23 Cal. 4th at 261.  Instead, Petitioner told

23  the trial court that he was satisfied with the jury as constituted even though it included a

24  juror (James Cosgrove) whom he had previously challenged for cause.  The California

25  Supreme Court rejected Defendant's argument that his failure to express dissatisfaction

26  with the jury as constituted was justified because the trial court used the "struck jury"

27  selection system rather than the "jury box" method.  Furthermore, the California Supreme

28  Court held that *Petitioner was not prejudiced by the composition of the jury*.  The

9

California Supreme Court reasoned:

> In any event, the jury's composition did not prejudice defendant in any way.  The parties agree that only one seated juror, James C., was the subject of a challenge for cause by defendant.  Our review of James C.'s *Hovey* voir dire testimony satisfies us that the trial court properly denied the challenge.  James C. initially testified that he favored imposing the death penalty in 80 percent of murder cases, though "if there were mitigating circumstances, I would take them into [account] and weigh them."  And he agreed that the death penalty was, in counsel's words, "justified," in the abstract for the killings of three people execution style.  But he also testified that he would follow instructions to impose life imprisonment if he found that the mitigating and aggravating evidence was in balance, and to impose the death penalty only if he found that the aggravating evidence substantially outweighed the mitigating.  He further testified that he would be receptive to mitigating evidence at the penalty phase even if defendant had been convicted of three execution-style murders.  Following defendant's challenge for cause, the trial court ruled that James C.'s views on the death penalty did not substantially impair his ability to follow his oath as a juror.  The ruling was proper.

Id. at 261-62.

The California Supreme Court's conclusion that Petitioner was not prejudiced by the composition of the jury was not an unreasonable application of controlling federal law. The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961); Green v. White, 232 F.3d 671, 676 (9th Cir. 2000).  Establishing prejudice under Strickland in the realm of jury selection "requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased."  Davis v. Woodford, 384 F.3d 628, 643 (9th Cir. 2004); United States v. Quintero-Barraza, 78 F.3d 1344, 1349 (9th Cir. 1995).

The standard for determining whether a prospective juror should be excused for cause due to bias is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  Wainright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).  Although it is unlikely that a juror's bias will be "unmistakably clear," "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law."  Witt, 469 U.S. at 425-26. Accordingly, the Supreme Court cautions that "deference must be paid to the trial judge

10

1    who sees and hears the juror." <u>Witt</u>, 469 U.S. at 426.  "[T]he trial court, hopefully,

2    imbibed with a fair amount of common sense as well as an understanding of the

3    applicable law, views the questioning as a whole." <u>Id.</u> at 435.

4         During voir dire, Juror Cosgrove initially stated that he "would probably be 80

5    percent to 20 percent saying that if I felt somebody did commit murder, that the death

6    penalty should be applied." (RT 9199.)  During questioning by defense counsel, he

7    agreed that he could consider a penalty other than death, and that "if there were

8    mitigating circumstances, I would take them into effect and weigh them," and that he

9    would follow the court's instructions.  (RT 9201-02.)  Cosgrove admitted that he "would

10   still lean towards the death penalty if the aggravating evidence was greater than the

11   mitigating evidence and I had to make a decision between one of the two." (RT 9203.)

12        Juror Cosgrove, while admitting that he favored the death penalty, asserted that he

13   could judge the defendant with an open mind.  He stated "I think it would be open, but I'd

14   be predisposed towards the death penalty." (RT 9214.)  Cosgrove went on to affirm that

15   "I'd listen to, like I say, both the facts, both sides." (RT 9216.)

16        The trial court found that Cosgrove was a satisfactorily unbiased juror.  (RT 9224-

17   25.)  Considering Cosgrove's answers to all of the questions and paying deference to the

18   trial court's findings, the Court cannot say that the state court unreasonably applied

19   controlling federal law in determining that Petitioner was not prejudiced by the

20   composition of the jury.  Petitioner has not presented any evidence that Juror Cosgrove

21   (or any other member of the jury) "had such fixed opinions that they could not judge

22   impartially the guilt of the defendant." <u>Patton v. Yount</u>, 467 U.S. 1025, 1035 (1984).

23        Petitioner presents the Court with evidence that he believes demonstrates that the

24   jury pool was predisposed against Petitioner.  (Decl. of Warren O. Hodges.)  Petitioner

25   has submitted a chart, which calculates the "favorability rating" of each of the 12 jurors, 6

26   alternates, and 25 jurors remaining in the venire after the completion of <u>Hovey</u>

27   examination (where jurors answer questions concerning death qualifications outside the

28   presence of other prospective jurors) and exclusions for cause.  (<u>Id.</u> at ¶ 8.)  Habeas

counsel assigned a numerical rating to each juror in ten different categories, including (1) reluctance to impose the death penalty; (2)  a lack of reservation about the death penalty; (3) agreement that the death penalty was used "too seldom"; (4) belief that the death penalty should always be imposed for some crimes; (5) agreement that the criminal justice system is "too lenient" in California; (6) belief that the sentencing of a criminal defendant to life without possibility of parole suggests that the defendant may be released before completion of his sentence or an expressed resentment that the penalty costs the taxpayers too much money; (7)  opinions about gangs; (8) opinions about drugs; (9) ability to adhere to the presumption of innocence; and (10) ability to consider certain factors in mitigation of sentence, including sympathy.  (Id. at ¶¶ 10-11.)  Petitioner concludes that the seated jury panel garnered an average rating of 5.16, while the entire venire had an average rating of 4.8, with a lower score indicating a juror more palatable to the defense.  (Id. at ¶ 12.)  Petitioner argues that if trial counsel had employed this system and used peremptory challenges on certain prospective jurors with high ratings, the jury would have been substantially more favorable to the defense.  (Id. at ¶ 13.)

The reliability of these "favorability ratings" is questionable at best.  They are based on subjective interpretations of jurors' answers.  Moreover, the ratings take a simplistic view of "favorability."  In choosing a jury, trial counsel may consider a variety of factors, such as profession, age, gender, etc., and may be swayed by subjective criteria such as demeanor and believability.  The ten categories that form the basis of the "favorability ratings" do not take into account the complex and often subtle considerations that guide jury selection.  See People v. Freeman, 8 Cal.4th 450, 485 (1994) ("Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process.").

Even if the Court were to set aside the issue of the "favorability ratings" methodology, Petitioner's claim still fails.  In reviewing counsel's decisions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance."  Strickland, 466 U.S. at 689.  This deferential view

1   applies to jury selection.  Counsel may have had a reasonable and tactical rationale for

2   deciding not to exercise a peremptory challenge on Mr. Cosgrove and for deciding to

3   leave some of the peremptory challenges unused, including concerns regarding which

4   prospective jurors may have replaced any challenged jurors in the panel.  See People v.

5   Kipp, 18 Cal. 4th 349, 367-68 (1998).

6         As in Witt, the state court's finding in this case was "made under the proper

7   standard, was subject to § 2254(d), and was fairly supported by the record."  Witt, 469

8   U.S. at 435.  Therefore, Petitioner is not entitled to habeas relief on this claim.

9

10  **C. Claim 36 – Failure to Object to Juror Misconduct**

11        Claim 36 asserts that trial counsel violated Petitioner's rights under the Fifth, Sixth,

12  Eighth and Fourteenth Amendments by failing to investigate and object to jury misconduct

13  in the form of an inappropriate juror comment made during a break in the guilt phase

14  proceedings.  This claim has no merit.

15        The Sixth Amendment guarantees a criminal defendant a fair trial with "a jury

16  capable and willing to decide the case solely on the evidence before it."  McDonough

17  Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith v.

18  Phillips, 455 U.S. 209, 217 (1982)).  Petitioner must show that the alleged error "had

19  substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

20  Abrahamson, 507 U.S. 619, 627 (1993).

21        Petitioner alleges that the jury concluded he was guilty prior to beginning any

22  deliberations.  During the early stages of the guilt phase, while counsel were conferring

23  with the judge, a female juror was heard remarking, "This is the best jury he'll ever get."

24  (Pet. at ¶ 372.)  This resulted in laughter from a large portion of the jury and the bailiff

25  then cautioned them against making any further remarks of that type.  Petitioner alleges

26  that had trial counsel brought this incident to the attention of the judge, the court could

27  have instructed the jury appropriately or entertained a motion to excuse the juror who

28  made this remark.

1    Petitioner also points out that earlier in the proceedings, during jury selection,

2   prospective juror Bautista was dismissed from the panel because he loudly stated, "Just

3   hang him," which was overheard by at least one prospective juror seated near him during

4   the voir dire process.  (RT 11424.)  The court excused Mr. Bautista, and queried the

5   entire remaining jury venire to confirm that no other jurors had overheard any improper or

6   biased remarks.  (RT 11433-34.)  Petitioner equates prospective juror Bautista's

7   comment condemning Petitioner with the juror remark at issue and concludes that trial

8   counsel was ineffective for failing to object to and investigate this purported incident of

9   jury misconduct.

10   While the actual "presence of a biased juror cannot be harmless," Dyer v.

11   Calderon, 151 F.3d 970, 973 (9th Cir. 1998), and requires a reversal and new trial without

12   a showing of prejudice, the courts have not held that the failure to investigate potential

13   juror bias presents any such structural error.  United States v. Dutkel, 192 F.3d 893, 899

14   n.4 (9th Cir. 1999).  The courts have also held that it is paramount "not that jurors keep

15   silent with each other about the case but that each juror keep an open mind until the case

16   has been submitted to the jury."  Davis v. Woodford, 384 F.3d 628, 653 (9th Cir. 1994)

17   (quoting United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974)).

18   "[R]eversible error commonly occurs where there is a direct and rational

19   connection between the extrinsic material and a prejudicial jury conclusion, and where the

20   misconduct relates directly to a *material aspect of the case*."  Marino v. Vasquez, 812

21   F.2d 499, 506 (9th Cir. 1987)(emphasis added).  Petitioner presents no evidence to

22   suggest that any of the jurors relied on extrinsic statements or evidence in reaching a

23   verdict or that any juror reached a determination on defendant's guilt or innocence

24   prematurely.  As argued by Respondent, "Petitioner has failed to show that the juror's

25   jocular remarks revealed anything more than an *espirit de corps*."  (Ans. at 96.)

26   ///

27   ///

28   ///

14

1       The state court's denial of this claim was not contrary to or an unreasonable

2   application of clearly established federal law.  Therefore, Petitioner is not entitled to

3   habeas relief on this claim.

4

5

6                       **IV. <u>GUILT PHASE</u>**

7

8   **A.**     <u>**Evidence Presented During Guilt Phase**</u>

9       The Court refers the parties to the statement of the evidence by the California

10  Supreme Court in <u>People v. Ayala</u>, 23 Cal. 4th 225, 242-50 (2000).  The California

11  Supreme Court's factual findings are presumptively reasonable and entitled to deference

12  in these proceedings.  <u>See</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47 (1981).

13      Set forth below is a summary of evidence presented during the guilt phase that will

14  provide a context for Petitioner's guilt phase ineffective assistance of counsel claims.

15

16      **1.**  <u>**Overview**</u>

17      There was little physical evidence linking Petitioner with the homicides.

18  Petitioner's fingerprints were found on beer cans in the office where the murders took

19  place, and Hector's fingerprints were found on an orange juice bottle in the office.  (RT

20  13989-14007.)  However, the fingerprints did not establish that the Ayalas were present

21  at the time of the murders.  Although bullets (.38 caliber and .22 caliber) were recovered

22  from the victims,  there was no evidence that any firearms were found in the custody of

23  Petitioner, Hector, or Moreno.  Accordingly, the case turned upon the testimony of

24  witnesses.

25      The prosecution case-in-chief relied heavily on two witnesses:  Pedro Castillo and

26  Juan Meza.  Castillo was the sole survivor and identified the Ayalas and Moreno as the

27  perpetrators.  Juan Meza testified that the Ayalas had included him in a plan to steal

28  drugs and money from Dominguez and to kill the witnesses.

1    The defense case was primarily directed at discrediting Meza and Castillo and

2  raising the possibility that Castillo and/or other individuals committed the crime.  An

3  important witness for the defense was Rafael Mendoza Lopez, who testified that on the

4  day of the murders, he did not see the Ayalas or Moreno, but did see people he did not

5  recognize hanging around the body shop.  He also testified that Castillo said he was

6  waiting for some people from Mexico and showed him two guns hidden in the trunk of his

7  car.

8    In a startling turn of events, Mendoza subsequently recanted his testimony when

9  called by the prosecution on rebuttal.  Mendoza testified that he lied on the stand

10  because Petitioner had asked him to do so and he feared for his life.  Mendoza testified

11  that during a visit to Petitioner in prison, Petitioner held up a handwritten note that

12  outlined the story he wanted Mendoza to tell and included a statement to the effect that

13  what happened to Chacho (Dominguez) had to happen.

14

15    **2.    Prosecution Case-in-Chief**

16

17       **a.    Pedro Castillo**

18    Pedro Castillo worked with the other victims at the body shop.  He was shot and

19  stabbed on the night of the murders but survived.

20    Castillo testified that his job consisted of picking up cars at auctions to determine

21  whether they should be junked or repaired and sold.  (RT 11857.)  He also helped Marcos

22  Zamora distribute heroin that was being sold out of the shop.  (RT 11913-15.)  Castillo

23  admitted that he previously committed perjury at a preliminary hearing regarding his and

24  the victims' involvement in the drug business.  (RT 11916-19.)

25    According to Castillo, about a week before the murders, Hector came into the shop

26  and asked where Dominguez was.  (RT 12154-55.)  Castillo said that Dominguez was in

27  Mexico.  Hector warned that he better be telling the truth.  Castillo, thinking that Hector

28  might know the truth, said that Dominguez was in jail.  Hector responded by saying,

1  "Don't be lying to me.  Okay, well, then he's in Mexico then."  Previously, Dominguez had

2  told Castillo to treat the Ayalas right.  (RT 12154.)

3        On April 25, 1985, the day before the murders, Castillo saw Ronaldo, Hector, and

4  Moreno at the shop in the late afternoon.  (RT 12133-36.)  They were drinking with

5  Rositas, Zamora, and Dominguez and were talking about going to Mexicali to party.

6        On the day of the murders, Castillo got to work at 8:00 a.m.  (RT 11933-41.)  That

7  day, he was going to pick up an engine at the Red Baron, a junkyard at the bottom of the

8  hill.  A $50 or $60 downpayment had already been made, and Zamora gave Castillo $500

9  in cash to pay the balance.  Sometime in the morning, Castillo called Ray at the Red

10  Baron.  (RT 11971-76.)  Ray told Castillo that he would call Castillo back when the engine

11  was ready.  Ray never called.  After 5:00 p.m., Castillo gave the money back to Zamora.

12        Castillo saw Ronaldo, Hector, and Moreno (a.k.a. "Cucuy") pull up to the shop in

13  Moreno's van around 10:00 a.m.  (RT 11941-42.)  Ronaldo hung around the garage all

14  day.  (RT 11944.)  At some point, Castillo noticed that Hector and Moreno were gone.

15  (RT 12142-43.)  Zamora said they were getting clothes for Ronaldo.  Castillo did not

16  recall seeing any clothes when Hector and Moreno returned to the shop.

17        Castillo left the shop around noon to get methadone.  (RT 11944-48.)   He couldn't

18  find any, but purchased $25 worth of heroin and injected the drugs.  He returned to the

19  shop and worked on various vehicles, including a brown van parked in front.  (RT 11965.)

20        At some point in the afternoon, Castillo walked into the office where Ronaldo

21  seemed to be dozing.  (RT 11965-67.)  Ronaldo asked Castillo if Dominguez had come in

22  yet.  Castillo said, "No," and Ronaldo asked him to call Dominguez.  Castillo called

23  Dominguez's house and Ronaldo got on the phone with Dominguez.  Castillo left the

24  office and did not hear the conversation.

25        Castillo saw Dominguez arrive after 5:00 p.m.  (RT 11976.)  Dominguez and the

26  others continued to talk about going out because they had not gone to Mexicali the night

27  before.  (RT 12142-43.)  Castillo recalled that Hector was drinking vodka and orange juice

28  and Ronaldo was drinking beer.  (RT 12117-21.)

1   Castillo was working on a van in front of the garage when the sun was setting.  (RT

2   11988-93.)  Castillo went into the garage to get a tester, screwdriver, and pliers.   He saw

3   Moreno standing in front of the garage.  When he walked into the garage, he heard,

4   "Pete, you too," and saw Hector with a pistol aimed at his head.  (RT 11997-12004.)

5   Hector guided him into the office.  Zamora, Rositas, and Dominguez were already in the

6   office and had their hands bound behind their backs.  (RT 12005-11.)  Ronaldo was also

7   in the office and was holding a gun.

8   Hector said, "Yeah, Chacho, you thought you were real smart.  Didn't you know

9   you had to go through us?"  (RT 12012-15.)  Hector instructed Moreno to tie up Castillo's

10   hands.  Ronaldo demanded, "We want $10,000 or someone's going to die."  (RT 12018.)

11   Dominguez said, in Spanish, "Marcos has the money.  Hey, homeboy, I never did you

12   nothing."

13   Castillo claimed that he had some money in his pocket as well as some money

14   hidden in his tow truck.  (RT 12025-29.)  He did not have any money in his tow truck but

15   had $40 or $50 in his pocket.  Hector reached into Castillo's pocket and took the money.

16   Castillo indicated that the money in the tow truck was under the seat on the driver's side

17   in the corner.   Hector threatened to blow Castillo away if he was lying and told Moreno to

18   check it out.  (RT 12030-38.)  Hector also said something about them lying to him and

19   stabbed Castillo's upper left leg/buttock area.  Moreno returned and reported that he

20   didn't find any money.  (RT 12041-42.)

21   When Castillo insisted the money was there, Ronaldo picked Castillo up from the

22   back of his jacket and guided him out of the office.  (RT 12041-41.)  When they got to the

23   garage door, Castillo pretended that the door wasn't open enough for him to crawl out.

24   (RT 12049-60.)  Moreno opened the garage door to a point where the garage door gave

25   resistance and would slam back down if not opened beyond that point.  Castillo ducked

26   under the door and started running.  He felt the sting of a bullet on his left back.  He

27   continued to run, and then fell into the street.  He heard three series of shots (two shots

28   each) within the course of 4-5 seconds and saw three silhouettes moving away from the

1  garage.  The next thing he remembers is being on the hood of a police car.  (RT 12076-
2  84.)

3       When questioned by officers at the scene, Castillo said the perpetrators were
4  Mexican.  (RT 12805-07.)  He described one as wearing a red Pendleton jacket and
5  having dark curly hair.  In the ambulance, Castillo indicated that the suspects spoke
6  English and were not illegal aliens.  (RT 13088-89.)  Castillo mentioned a newer model
7  gray van in the upper lot.

8       After Castillo underwent surgery and was in the surgical intensive care unit,
9  Detective Padillo attempted to question Castillo but he was fading in and out of
10  consciousness.  (RT 13125-30.)  Padillo returned the next day.  Castillo said there were
11  three people involved.  (RT 13130-34.)  He described the first suspect as a male
12  Mexican, approximately 2 inches taller than himself and wearing a red Pendleton shirt.
13  He described the second suspect as a fat male Mexican wearing a black jacket and
14  Levi's.  The third suspect had an "old, long, black gun."  Castillo also gave very detailed
15  information about the gray van.  (RT 13135-36.)  Due to the detailed description of the
16  van and the sparse description of the suspects, Padillo thought Castillo was hiding
17  something from him and thought that Castillo was "very hesitant, a form of being scared."
18  (RT 13138.)  The following day, Padillo returned to the hospital, and Castillo told him the
19  persons responsible were Ronaldo and Hector Ayala and Moreno.  (RT 13140-44.)
20  Castillo said that the van belonged to Moreno.  Castillo refused to sign a statement
21  because he was afraid of "retaliation from a group."  Castillo was shown photographs of
22  handguns and he identified a six-inch lugar as Ronaldo's weapon and a blue steel 2-inch
23  service type revolver (a "chrome" gun with "one of those round things") as the type of gun
24  being held by Hector.  (RT 13171-74.)

25       Castillo testified that when the police were asking him questions in recovery, he
26  was worried about his family, including his wife and four kids.  (RT 12101-04.)  Sherwood
27  Roberts, an attorney for the Dominguez family, visited Castillo in the hospital.  (RT 15818-
28  22.)  Castillo sought his advice as to whether he should tell the police what he knew.

19

01CV741

1    Roberts advised Castillo to tell the police everything.  Subsequently, Castillo met with

2    Padillo and identified Hector, Ronaldo, and Moreno.

3

4              **b.  Juan Meza**

5              Meza testified that about a month or three weeks before the murders, he went to

6    the body shop with Hector and Ronaldo to buy heroin.  (RT 14376-79.)  Hector and

7    Ronaldo went into Dominguez's office.  Shortly afterwards, Hector, Ronaldo, and

8    Dominguez came out of the office and Dominguez said, "Come back later."  Ronaldo and

9    Hector looked like they didn't approve of what Dominguez had said.  Dominguez went

10   back into the office and came back with three balloons which he handed to Ronaldo.

11   While Meza and the Ayalas were driving back to Hector's house, Ronaldo said, "You

12   know what? F____ these mother-f____.  Let's take them off."  (RT 14385-87.)  Meza

13   understood Ronaldo's statement to mean that they should rob the shop.  (RT 14389.)  At

14   Hector's house, Ronaldo brought the subject up again.  (RT 14390-91.)  Hector teased

15   him about how stupid the idea was and the brothers argued about it for a little while.

16           A week later, Hector came to Meza's house.  (RT 14392-93.)  Hector sat on the

17   couch and said in a low voice that Dominguez had gone to Tijuana to score some drugs.

18   Meza didn't respond.  Meza's wife came in the room and they changed the subject.  A

19   few days later, he and Hector were at a mutual friend's house.  (RT 14393.)  Hector told

20   Meza to be at his house on Wednesday because he had something big going.

21           Meza went to Hector's house on Wednesday.  (RT 14394-14400.)  It was about a

22   week and a half before the murders.  Hector walked out of the bedroom with a .38

23   revolver – it was 6 inches long and an older gun.  Hector said he would like to use Meza's

24   guns for the robbery.  Meza agreed.  Ronaldo discussed how easy it would be for them to

25   go into the shop, line them all up, lay them down, tie them up and wait for the drugs.

26   Ronaldo asked Meza to do the tying up.  The plan was to get drugs from Dominguez who,

27   the Ayalas believed, was in Tijuana scoring a large amount of heroin.  They were going to

28   walk in the shop, tie the victims up, and force them to tell them where the drugs were.

Ronaldo said that the witnesses would be killed.  The Ayalas expected that Castillo,
Zamora, Tony Figueroa, and Dominguez would be at the shop.  Dominguez's wife was
expected to bring the drugs in an orange van.  (RT 14401-03.)  When she arrived, she
would be killed as well.

At some point, Hector told Meza that a pound of heroin was coming in from Mexico
and that there would be $10,000 in cash.  (RT 14405-08.)  The Ayalas mentioned that
part of the money would go to "Topo" in Los Angeles.  (RT 14419.)

The following weekend, Meza met Hector and Moreno at a liquor store.  (RT
14409-12.)  They started talking and decided to go to Hector's house because Hector had
some drugs.  After taking the drugs, Hector asked Moreno if he would do the driving for
the robbery.  Moreno responded, "Hell . . . hell, yes.  I'll even bring my little .22."  Moreno
did not look surprised.

The Wednesday before the killings, Hector came over to Meza's house and told
him to be home on Friday between 5:00 and 6:00 p.m.  (RT 14413.)  Hector told him that
they would come and pick him up.   On that Friday, Meza made it a point to be away from
the house from 1:00 or 2:00 - 10:00 p.m.

Meza did not actually intend to participate in the plan because he was afraid he
would end up dead.  (RT 14401-03.)  In an interview with Michael Rolan, an investigator
for the District Attorney's Office ("DA's Office") Meza explained that he "had been on the
cross with [the Ayalas] behind another incident, and . . . was more or less in fear of my
own life."  (RT 14610-11.)  (This part of the interview was read to the jury.)

Around the time of the murders, Meza was using between 1-2 grams of heroin a
day.  (RT 14537.)

Meza was arrested in 1987 for possession of drugs for sale.  (RT 14579-83.)  He
entered a plea of guilty on March 24, 1987.  The maximum sentence he was facing was
four years.  He met with the DA's Office after entering his plea.  Initially, Meza demanded
a number of things in exchange for his cooperation: immediate release, protection for his
family, and the return of a truck and $17,000 that had been seized.  (RT 14584-92.)

01CV741

Ultimately, Meza agreed to cooperate, and he received witness protection benefits, use-immunity, and a promise by the DA's Office to seek Meza's release after testifying.  (RT 14419; 14584-92.)  At the time of trial, Meza's expected release date was February, 1989.  (RT 14579-83.)

Maria Meza, Meza's wife, testified that on the day of the murders, Meza left the house around 5:00 a.m. and did not return until past 11:00 p.m.  (RT 14660-64.)  Hector came by the house looking for Meza two times – once at 10:00 a.m. and later at 5:00 p.m. (RT 14659-64.)  On the latter occasion, Hector seemed mad that Meza wasn't home and seemed in a hurry.

### 3.     Defense Case

#### a.     Discrediting Meza

On cross-examination, Meza testified that he had known Detective Chacon since he was young and trusted him.  (RT 14538.)  Meza also testified that he met with Chacon two to three times before meeting with the DA's Office in 1987.  (RT 14455-63.)

According to booking sheets, Meza was incarcerated from March 26, 1985 until April 8, 1985.  (RT 14807-10.)  In closing, defense counsel argued that this was inconsistent with Meza's testimony that he went to the body shop with the Ayalas three to four weeks before the murders.  (RT 16779.)

William Truman Peek, a supervising clerk for the Sheriff's Department, testified that Dominguez was in custody beginning April 10, 1985, and was not scheduled to be released until April 28, 1985.  (RT 14795-14801.)  The only reason he was released early was due to overcrowding.  The decision to release for overcrowding is made between midnight and 4:30 a.m. on the day of release, and a prisoner does not have prior warning that he will be released.   Defense counsel argued that this evidence went against Meza's testimony because Hector could have and would have checked to see if Dominguez was in jail or Mexico if he was actually planning something.  (RT 16783-87.)

1    Evidence was introduced that Ronaldo submitted to drug testing on March 14 and

2    28 and April 11 and 25 and that there were no positive results.  (RT 14943-48.)  Defense

3    counsel argued that this evidence contradicted Meza's testimony about Ronaldo doing

4    drugs during the time when the plans were allegedly being laid.  (RT 16779.)

5    Debra Ann Duesler, a probation officer, testified that in 1985, she conducted an

6    interview of Meza for purposes of preparing a presentence report.  (RT 14789-91.)  Meza

7    said that he had a serious drug problem which caused him to "lie about everything."

8    Meza also remarked that he had gotten in the habit of lying so he was frequently unaware

9    when he was lying.

10    Defense counsel proffered that Richard Savocchio would testify that in 1987 or

11    early 1988, he was in prison with Meza.  (RT 15485-92.)  Meza allegedly told him that he

12    didn't know anything about the case but was going to cut a deal and testify because the

13    defendants were going down anyway.  Trial counsel chose not to call Savocchio as a

14    witness because prison records indicated that Savocchio had reported problems with the

15    EME (Mexican Mafia).  Savocchio explained that he had lied about having problems with

16    the EME so that he could get transferred to a different facility.  (RT 15475-77.)  The court

17    ruled that the prosecution could inquire into the fact that Savocchio had lied about having

18    problems with the EME if the defense called his as a witness before the jury.  (RT 15485.)

19

20                **b.   Discrediting and Shifting Blame on Castillo; Rafael Mendoza Lopez**

21

22    Defense counsel asked Dr. Van Strum about a preoperative note he prepared

23    regarding Castillo.  (RT 15005.)  This note indicated that Castillo's last heroin injection

      was at approximately 7:30 p.m.  This information contradicted Castillo's testimony about

24    his whereabouts at the time.

25    Rafael Mendoza Lopez ("Mendoza" or "Rafa") testified that Castillo was working for

26    Dominguez selling drugs at the shop by day and from the back of Castillo's house by

27    night.  (RT 15135-37.)  Mendoza had a deal with Castillo that in exchange for drugs, he

28    would fill up cars with gasoline.  (RT 15150-53.)

On April 26, 1985, Mendoza went to the body shop around 2:00 p.m. to fill up a car with gas so that he could get some drugs from Castillo.  (RT 15156-62.)   He saw Castillo as well as Bobby Garcia, Bobby's brother, and Miguel Lopez ("Pelon") (men who worked at the tire shop next door).  He also saw other people he didn't recognize.  They were speaking in Spanish, had beer-bellies, and were drinking.  They appeared to be from Mexico.

Castillo came up to Mendoza and was acting friendly.  (RT 15163-71.)  Castillo seemed drunk.  Castillo and Mendoza walked to the upper lot and Castillo gave him the keys to a light blue Nova or Malibu.  Castillo opened the trunk of the car with a screwdriver.  There was clothing in the trunk.  As Castillo looked through the clothing, two guns were revealed.  One of the guns had chrome on it.  Castillo put the guns in the clothes again and took them out of the trunk.  Castillo said he was waiting for some people from Mexico.  Castillo told Mendoza to exit the lot through a carport in the rear onto Logan.  Mendoza drove the car to a Chevron station and put gas in the tank.  When he returned, Castillo gave him some balloons of heroin.

Bertha Huerta, Mendoza's sister, testified that she dropped her brother off at the shop on the day of the murders at noon or 1:00 p.m.  (RT 15536-38.)  She called him later in the day after she saw the news story about the murders.

Javier Hernandez, a brother-in-law of Dominguez, testified about Castillo's involvement in Dominguez's drug business in 1983 and early 1984.  (RT 15559-66.) (When Castillo testified, he indicated that he and Dominguez did not go into business together until the latter half of 1984 and were not involved in the sale of drugs prior to that time.  (RT 12581-88; 12768-74.))  In a proceeding outside of the jury's presence, defense counsel claimed that Hernandez had a conversation with Castillo in 1984 during which Castillo complained that he and Hernandez were doing all the work and Dominguez was getting all the money.  (RT 15587-93.)  Castillo asked Hernandez if he had ever thought about taking over.  Hernandez responded that the only way to accomplish that would be to get rid of Dominguez.  Castillo responded, "nothing is impossible."  In a subsequent

01CV741

1    conversation, Castillo allegedly reminded Hernandez about the "opportunity" they had

2    previously talked about.  The court ruled that this evidence was not sufficient to go to the

3    jury on the issue of third-party culpability.

4       Miguel Lopez testified that a week before the shootings, he heard Castillo talking

5    with Zamora.  (RT 13426-28.)  Zamora asked him why he didn't retire from the body shop

6    so he could make some money.  Castillo indicated that he would do so "next week."

7       Alfredo Briseno testified that he bought heroin from Dominguez in 1983, 1984, and

8    1985.  (RT 15686-91.)  Briseno would call the shop, and Castillo would answer the

9    telephone and deliver the drugs to him.  Castillo would drive to his house in a light blue

10    Volkswagen or a dark blue American car.  (RT 15692-94.)  The blue American car had a

11    trunk that didn't work.  Sometimes Castillo would ask him for a screwdriver to open the

12    trunk.  Castillo actually asked Briseno to fix it because he didn't know too much about

13    body work.

14

15          **c.**      **Shifting Blame on Other Individuals**

16       Traci Pittman testified that on the night of the murders, she was at Swafford's

17    liquor store at the corner of 43rd and National.  (RT 14854.)   She saw a young Mexican

18    male, approximately 5'8," 22-25 years old, with a slight mustache, collar-length straight

19    hair combed straight back, and wearing a red plaid Pendleton-type overshirt and dark

20    jeans.  (RT 14860-62.)  His right hand was under his shirt and held to his side around the

21    waist area.  This area was "bulky."  The bulk was more consistent with a gun than a six

22    pack.  (RT 14923.)

23       She saw another man in the area, a Mexican male, 5'6," early 20's, wavy hair, and

24    wearing a dark jacket with a collar.  (RT 14863.)  This man was holding a brown paper

25    bag.  The first man she saw approached this man, and they had a conversation in

26    Spanish.   Both of these men, one after the other, crossed the street and walked to the

27    right side of the tire shop where they disappeared from sight.  (RT 14864-70.)  Shortly

28    afterwards (about 5 minutes later), she saw a man running from the body shop and heard

1    two gun shots.  (RT 14871-76; 14901.)  The man fell into the street.

2

3    **4.**     **Rebuttal/Surrebuttal and Mendoza's Recantation**

4       On rebuttal, the prosecution called Mendoza as their witness.  Mendoza recanted

5    his prior trial testimony and testified that Ronaldo asked him to lie for him and that he

6    complied because he feared for his life.

7       On the Friday after Mendoza testified for the defense, Detective Chacon met with

8    Mendoza.  (RT 16210-39.)  Mendoza admitted to Chacon that he had lied on the stand.

9    The next day, the DA's Office met with Mendoza and tape-recorded the interview.

10    Mendoza testified that when he met with Chacon alone, Chacon told him that he was

11    aware that he was involved with the "group" associated with Southern California and

12    knew that he had been in some kind of a fight with an inmate associated with the

13    "northern group."  (RT 16378-80.)  Chacon said he was aware that inmates in the

14    "southern group" at Donovan State Prison weren't happy with Mendoza because of the

15    incident.  Mendoza denied that Chacon told him that inmates from the south might want

16    to retaliate against him.  Mendoza said that Chacon did tell him that he believed Mendoza

17    had lied and that Mendoza's lies would not put him in a better position with the southern

18    group.  (RT 16381-86.)  After Mendoza admitted that he had been lying out of fear for his

19    and his family's lives, Chacon said he would talk to the DA's Office about protection.

20       Mendoza testified that what actually happened on the day of the murders was that

21    he drove himself to the shop.  (RT 16333-35.)  He did not see Castillo with guns and did

22    not see strangers who looked like they were from Mexico.  Although he did get gas for

23    Castillo, Castillo did not tell him to drive out the back way.

24       He saw Ronaldo and Hector at the shop that afternoon.  (RT 16339.)  He also saw

25    a gray van parked in the back lot.   He lied previously because Ronaldo asked him to.

26       In June or July 1985, he went to see Ronaldo in County Jail.  (RT 16340-43.)  He

27    heard through other people that Ronaldo wanted to see him.  When he visited Ronaldo

28    he was accompanied by "Rudy Green Eyes" and "Martha."  When he got on the phone

1   with Ronaldo, Ronaldo pulled out a piece of paper and held it to the window so Mendoza

2   could read it.  (RT 16344-50.)  The paper told him to deny seeing Ronaldo or Hector at

3   the shop and to shift the blame on Castillo by saying that he saw Castillo with a .38 and a

4   .22.  Mendoza winked his eye and said, "Don't worry, I'll take care of it."  The paper also

5   said that what happened to Chacho had to happen.  Hector was visiting with his wife two

6   phones down and was looking at Mendoza.

7        After the prison visit, Ronaldo frequently called Mendoza and would send

8   messages through other people.  (RT 16404).  Rudy Green Eyes conveyed a message

9   that Mendoza was supposed to make up a story about Sara Dominguez (Dominguez's

10  wife) being involved with the drug business.  He was also supposed to make it seem like

11  Castillo hired Mexicans from across the border to carry out the hit.

12       Mendoza testified that after his visit with Ronaldo, he got in touch with a defense

13  investigator, Eric Hart, and told him the basic story he told during the defense case.  (RT

14  16351-53.)  From 1985 until the time he testified, he was interviewed by defense

15  investigators a number of times.  He continued to lie because he didn't want to "get killed

16  or anything."  (RT 16354.)  He believes the first time he met with Hart was a week or a

17  few days after meeting Ronaldo in jail.  (RT 16358.)  They did not really have a

18  conversation because Mendoza had to attend Dominguez's funeral.

19       Although Mendoza was in jail, he was afraid because a lot of people knew the

20  Ayalas and are willing to do favors for them.  (RT 16355-56.)  The people he is afraid of

21  are in his prison and, he believes, will kill you if you don't do what you're told.  (RT

22  16357.)  Mendoza said he decided to come forward with the truth because he never

23  wanted to help Ronaldo in the first place.  (RT 16355-56.)  Mendoza explained that after

24  he testified, "these people" called his wife and wanted her to take drugs to someone in

25  prison.  He realized they did not respect him and that the only reason he had not gotten

26  stabbed or hit was so that he could testify in Ronaldo's favor.  He said that he believed

27  Ronaldo had influence over what other people in the "southern group" might do to him.

28  (RT 16415-18.)

The DA's Office promised Mendoza and his family protection.  (RT 16336-38.)
Mendoza also received use-immunity.  Mendoza did not receive any other promises or
benefits.

On surrebuttal, the defense put on evidence casting doubt on Mendoza's
testimony regarding when things happened.  Rudy Green Eyes (Ybarra) could not have
accompanied Mendoza on a prison visit in June or July 1985 because Rudy was
incarcerated in Arizona from 1/26/82 until 10/28/85.  (RT 16488.)   On 10/28/85, Rudy
was transferred to a half-way house in San Diego.  (RT 16488.)  He was at the half-way
house until 12/6/85.  Rudy died in 1987.  (RT 16485.)  Dominguez's funeral was on
4/30/85.  (RT 16530.)

**B.  Guilt Phase Claims**

      **1.  Claim 18 - Exculpatory/Impeachment Witnesses**

Petitioner claims that his trial counsel failed to call numerous exculpatory and/or
materially relevant impeachment witnesses because trial counsel were unreasonably
afraid of calling anyone who might have any affiliation, association, and/or membership in
the Mexican Mafia ("EME").  Specifically, Petitioner claims that trial counsel should have
called the following witnesses: Richard Savocchio, Ernesto Blanco, Rex Crawford,
Reagan Estrada, Luis Garcia, David Paez, Benjamin Peters, Daniel Sesma, Roland
Talamantez, Alphonso Valles, and Raul Garcia.

Petitioner also claims that trial counsel were ineffective for failing to present
exculpatory evidence regarding (1) the nature and extent of Dominguez's drug operation,
the nature and extent of his drug suppliers from south of the border, the history of his
conflicts with those suppliers and others in his business, and his attempts to branch out
away from those suppliers; (2) the animosity that his actions engendered from his
suppliers, Robert ("Bobby") Garcia (allegedly a competing drug dealer), and his own
"employees" Hector Figueroa, Pedro Castillo, and Miguel Lopez; and (3) the threats and

01CV741

1   fear Dominguez felt and received from these people and others just prior to his murder.

2

3                    **a. <u>Savocchio</u>**

4            According to Richard Savocchio, Meza admitted to him that he was lying about the

5    Ayalas' involvement in the murders because they were "going down" anyway, and he was

6    going to get something out of it.  (Ex. O to Belter Decl.)  Savocchio told the defense

7    investigator that he was not affiliated with any gangs.  However, prison records showed

8    that Savocchio had previously reported "EME problems" because he owed EME

9    members in excess of $1,100 for drugs.  Savocchio was placed in protective custody as a

10   result of his reported problems.

11           When examined during a hearing (out of the presence of the jury), Savocchio said

12   that he made up the story to get protective custody because he was in Folsom and had

13   12 years to do.  (RT 15469-84.)  He said that he reported problems with the EME twice -

14   during classifications in 1980 and 1984.  The court ruled that the prosecution could

15   impeach Savocchio with the evidence that he claimed to have problems with the EME

16   and then later admitted that he was lying.  Based on the court's ruling, the defense chose

17   not to call Savocchio.

18           Petitioner's claim that trial counsel were ineffective for failing to call Savocchio as a

19   witness was rejected on the merits by the California Supreme Court.  The California

20   Supreme Court explained:

21                  Defendant acknowledges that counsel's initial decision not to present
             Savocchio's testimony was reasonable.  Indeed, he must concede that
22           point, as he argues in this court that the decision was necessary to keep the
             jury from hearing any mention of the Mexican Mafia.  But he asserts that
23           once the prosecution, in its rebuttal case, had presented Rafael Mendoza
             Lopez's recantation, the jury had to be aware of his connection to the
24           Mexican Mafia, and no harm would have resulted from Savocchio's
             testimony.
25                  On this record, we discern no deficient performance by counsel.
             Before Mendoza testified on rebuttal, the parties and the trial court
26           discussed at length how to have him tailor his testimony to avoid any
             mention of prison gangs, specifically the Mexican Mafia.  The parties agreed
27           that Mendoza would refer to "groups" and so he did when he testified, using
             that or other euphemisms such as "people."  Nothing in this record shows
28           that it would have been wishful thinking for counsel to believe that the jurors
             would not understood [sic] "group" or "people" to refer to the Mexican Mafia

                                              29

1
2
3
4

> or any other prison gang.  Of course, a particularly knowledgeable juror
> might have guessed that some or all of the euphemisms referred to prison
> gangs, but we cannot say that counsel was unreasonable in believing she
> had kept the inflammatory subject from the jury.  Indeed, it was probably a
> wise choice for the defense to avoid jeopardizing its victory regarding
> mentions of gangs.  There was no ineffective assistance of counsel.

Ayala, 23 Cal. 4th at 274.

5
6

        The Court concludes that the California Supreme Court's decision was an

7       unreasonable application of Strickland.  The California Supreme Court reasoned that it

8       was probably a sound decision of trial counsel to refrain from calling Savocchio so that

9       there would be no mention of gangs.  However, this Court does not see how the mention

10      of gangs in the context of impeaching Savocchio would link Petitioner to the EME.

11      Indeed, the California Supreme Court rejected Petitioner's challenge to the trial court's in

12      limine ruling permitting Savocchio to be impeached with his stories about the EME on the

13      ground that the impeachment evidence *would not* draw a connection between Petitioner

14      and the EME:

15
16
17
18

> Defendant asserts that courts must be exceptionally careful in admitting
> evidence, including for impeachment, of gang membership.  As stated, he
> also urges that the jury, having heard Savocchio's testimony, would have
> associated him, defendant, with the Mexican Mafia.  But Savocchio would
> have been impeached, if at all, with evidence that he was *not* in a prison
> gang.  He would have been impeached solely with evidence that he lied
> about belonging to such a gang.  We fail to discern how that would link
> defendant with the Mexican Mafia in the jurors' minds.

19      Ayala, 23 Cal. 4th at 274.[2]  This reasoning cannot be reconciled with the court's

20      reasoning for denying the ineffective assistance of counsel claim.

21              Upon review of the record, it appears that initially, the prosecution was interested

22      in Savocchio's claims of EME problems as evidence that Savocchio owed a debt to the

23      EME and had motivation to provide testimony that would help the Ayalas.  (RT 15405.)

24      However, after hearing Savocchio's testimony that he lied about having problems with the

25      EME to obtain transfers and did not know the Ayalas, the prosecutor argued that the

26      evidence was relevant because it would show that Savocchio was a liar:

27

28      ────────────────────
        [2]  Actually, Savocchio never claimed that he was a member of the EME.  He claimed
        that he had a conflict with the EME because he owed them money for drugs.  He would have
        been impeached with evidence that he had fabricated his problems with the EME.

1

2

3

4

> The fact that he's been living a lie since 1980, according to his testimony here, is certainly something that would be highly probative of whether the jury should believe him, if he's a person that can accomplish his own ends or whatever he wishes, as he's demonstrated for the Court here, and the character of his testimony and the substance of that testimony certainly is the sort of thing that this jury has a right to hear in deciding whether he's a person who is to be believed.

5   (RT 15486.)

6   The trial court ruled that it would allow the prosecution to impeach Savocchio with

7   the evidence that he had lied about the EME conflict: "[T]he purpose of the Court is

8   certainly not to create a shield to stop impeachment of witnesses.  Mr. Savocchio quite

9   candidly acknowledges the accuracy of the information.  He is a person that the jury

10  needs to judge.  If he takes the stand, that area will be opened."  (RT 15488.)   Viewing

11  the court's statement in context, the "accuracy of the information" referred to by the court

12  is the fact that he made up a story about having problems with the EME.

13  The trial court did not rule that the prosecution could introduce evidence regarding

14  Savocchio's actual dealings, if any, with the EME.  Therefore, there was no danger that

15  Savocchio's testimony would link Petitioner with gang activity.  If defense counsel was

16  confused about the scope of impeachment allowed by the trial court's in limine ruling,

17  defense counsel should have sought clarification or a ruling limiting the scope.

18  Petitioner is entitled to an evidentiary hearing on this claim if he has presented a

19  "colorable claim for relief."  Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005);

20  Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005).  "In showing a colorable

21  claim, a petitioner is 'required to allege specific facts which, if true, would entitle him to

22  relief.'"  Earp, 431 F.3d at 1167 n. 4 (quoting Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir.

23  1998)).  In other words, Petitioner must "demonstrate by his evidence the potential of a

24  colorable claim that, if proven true at the hearing, would show that his former counsel's

25  [error] amounted to ineffective assistance of counsel, and that, but for such deficient

26  representation, there is a reasonable probability that the outcome of the proceeding

27  would have been different."  Id. at 1173.

28  Although Savocchio's credibility would have been challenged with the evidence of

1  his lies about the EME, his testimony would have been powerful impeachment evidence
2  when viewed together with the testimony of Raul Garcia (discussed in connection with
3  Claim 19), who also claimed that Meza revealed to him that he did not know anything
4  about the murders and just wanted to get his custodial time reduced.  Assuming the truth
5  of the facts presented by Petitioner, Petitioner has made out a prima facie case of
6  deficient performance.  This potential error, considered together with other potential
7  deficiencies in performance identified in this order, establish a colorable claim of
8  prejudice.  Therefore, the Court grants an evidentiary hearing on this issue.  At the
9  evidentiary hearing, Respondent may present evidence rebutting any initial showing of
10 deficient performance and/or prejudice by Petitioner.

11
12                              **b.  Other Witnesses**

13        Petitioner also claims that trial counsel were ineffective for failing to call Ernesto
14 Blanco, Rex Crawford, Reagan Estrada, Luis Garcia, David Paez, Benjamin Peters,
15 Daniel Sesma, Roland Talamantez, Alphonso Valles, and Raul Garcia.  Respondent
16 argues that Petitioner's claim as to these individuals has not been exhausted.

17        Petitioner's Claim 18 in the First Amended Petition for Writ of Habeas Corpus
18 before the Supreme Court of California does not name any of these additional witnesses,
19 but, rather, alleges that "trial counsel excluded and failed to call numerous exculpatory
20 and/or materially relevant impeachment witnesses, including Richard Sovacchio [sic]."
21 Attached as exhibits to the First Amended Petition were the declarations of Eric Hart and
22 Steve Harmon, neither of which provided information regarding these potential witnesses.
23 In support of his motion for summary judgment and/or for an evidentiary hearing,
24 Petitioner submitted reports by defense investigators regarding these individuals.  On the
25 day before oral argument, Petitioner also filed a Supplemental Declaration of Eric Hart.

26        To exhaust state judicial remedies, a prisoner must present the California Supreme
27 Court (or the highest state court with jurisdiction over the claims) with a fair opportunity to
28 rule on the merits of every issue raised in his or her federal habeas petition.  28 U.S.C.

01CV741

1  § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987).  Petitioner must have

2  presented the same factual basis and legal theory in state court for the claim that he

3  presents in federal court.  Gray v. Netherland, 518 U.S. 152, 163 (1996).  The exhaustion

4  requirement is satisfied once the "substance of the claim has been fairly presented" to the

5  state's highest court.  Duncan v. Henry, 513 U.S. 364 (1995); Vasquez v. Hillary, 474

6  U.S. 254, 257 (1986).  A "fair presentation" means that the state court must have had the

7  opportunity to apply controlling legal principles to the facts bearing upon the claim.  Picard

8  v. Connor, 404 U.S. 270 (1971).

9       New factual allegations do not render a claim unexhausted unless they

10  "fundamentally alter the legal claim already considered by the state court."  Vasquez, 474

11  U.S. at 260.  The federal petition may not be supported by facts that put the claim in a

12  "significantly different and stronger evidentiary posture" than that addressed by the state

13  court.  Aiken v. Spalding, 841 F.2d 881, 883 (9th Cir. 1988) (quoting Dispensa v.

14  Lynaugh, 826 F.2d 375, 377 (5th Cir. 1987)).

15       Here, it cannot be said that the state court had a fair opportunity to rule on the

16  merits of Petitioner's claims regarding witnesses who were not named and whose

17  potential testimony was not described.  The new facts regarding these witnesses certainly

18  places Claim 18 in a substantially different and stronger evidentiary posture.

19       However, it is clear that the state court would deem Petitioner's claims

20  procedurally barred as untimely, successive, and repetitive.  See In re Robbins, 18 Cal.

21  4th 770 (1998); In re Clark, 5 Cal. 4th 750 (1993); In re Harris, 5 Cal. 4th 813 (1993); In re

22  Waltreus, 62 Cal. 2d 218, 225 (1965).  Because the exhaustion requirement refers only to

23  remedies still available at the time of the federal petition, Petitioner has satisfied the

24  exhaustion requirement.  Gray v. Netherland, 518 U.S. 152, 161 (1996).  As discussed in

25  the Court's 9/23/07 order denying Respondent's motion to dismiss, the procedural bars

26  are not "adequate and independent," and, therefore, do not bar review.

27       However, the Court does not believe that it can expand the record to include the

28  new evidence.  The requirements of 28 U.S.C. § 2254(e)(2) apply to a petitioner seeking

1   to expand the record under Rule 7 of the Rules Governing § 2254 cases, unless the

2   petitioner exercised diligence in his efforts to develop the factual basis of his claims in

3   state court.  Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005).  Here,

4   Petitioner did not exercise diligence.  The investigator reports were in trial counsels' file

5   and could have been submitted with the state petition.  At the very least, Petitioner should

6   have identified the witnesses and what information they could provide.  See Baja v.

7   Ducharme, 187 F.3d 1075 (9th Cir. 1999) (holding that petitioner had failed to develop a

8   factual basis for his claim in state proceedings because he had the opportunity to come

9   forward with affidavits and other evidence in support of his claim but failed to do so).

10        Relying on Horton v. Mayle, 408 F.3d 570, 582 n. 6 (9th Cir. 2005), Petitioner

11  argues that because the California Supreme Court summarily denied his habeas petition,

12  he never reached the stage of the proceedings at which an evidentiary hearing should be

13  requested and, therefore, has not shown a lack of diligence at the relevant stages of the

14  state court proceedings.  However, Horton is distinguishable.  In Horton, the petitioner's

15  state habeas petition included a claim that the prosecution violated Brady by failing to

16  disclose a deal between the police and McLaurin, a key witness for the prosecution.  It

17  appears that the petitioner set forth the basis of his claim with specificity and, in

18  connection with his second habeas petition before the California Supreme Court,

19  submitted a declaration from McLaurin regarding the existence of a deal.  Id. at 581 n. 1.

20  Therefore, the California Supreme Court had ample information before it to determine

21  whether to allow the case to progress to the point where evidentiary hearings could be

22  requested.  The fact that the case was summarily denied was not due to lack of diligence

23  on the petitioner's part.  The same cannot be said here.  By failing to identify and provide

24  supporting factual allegations regarding 10 potential witnesses, the California Supreme

25  Court did not have a fair opportunity to assess the merits of Petitioner's claim and cannot

26  be faulted for summarily denying the claim.

27        Because Petitioner failed to exercise diligence to develop the factual basis of his

28  claim, Petitioner is subject to the requirements of § 2254(e)(2).  To satisfy the

1   requirements of § 2254(e)(2), Petitioner must show that his claim was either based on a

2   new retroactive rule of constitutional law, or on "a factual predicate that could not have

3   been previously discovered through the exercise of due diligence."  Petitioner has not

4   made either showing.  Therefore, the Court cannot expand the record by considering the

5   new evidence presented regarding witnesses Ernesto Blanco, Rex Crawford, Reagan

6   Estrada, Luis Garcia, David Paez, Benjamin Peters, Daniel Sesma, Roland Talamantez,

7   Alphonso Valles, and Raul Garcia.

8        Even if the Court were to consider the new evidence regarding these witnesses,

9   with the exception of Raul Garcia, the claims would fail on the merits.  As discussed

10  below, most of these witnesses would have had credibility problems because of their

11  relationships to the EME, in which the Ayalas allegedly held positions of power, or had

12  nothing more to offer than hearsay and speculation.

13

14                    **i. Ernest Blanco**

15       Ernesto Blanco claims that before Meza testified at trial, he heard Mario Marin and

16  Meza talking about how they wanted the Ayala brothers killed.  (Ex. A to Ritt Decl.)  He

17  says that Marin and Meza both claim to be EME but are not because they have too much

18  "s___" in their jacket.  However, Blanco has been placed as an EME member, giving him

19  a reason to lie for the Ayalas, who were also members of the EME.  Blanco was

20  sentenced to 23 years for kidnap, robbery, burglary, and assault with a deadly weapon.

21  Given Blanco's credibility problems and EME involvement, it would have been a

22  reasonable tactical decision for trial counsel to refrain from calling him as a witness.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

### ii. **Rex Crawford**

According to Rex Crawford, Meza told Mike Donahoe that he had failed to do what the EME had told him to do regarding a hit, so he dropped out and was on their s__ list. (Ex. B to Ritt Decl.)   This alleged statement is actually consistent with Meza's interviews with defense investigators and Meza's trial testimony.

Crawford also told the defense investigator that according to Donahoe, Meza showed no emotion or concern when the murders took place.  However, Meza's alleged lack of emotion or concern does not mean that Meza was not included in the planning of the crime.  Meza could have been feigning indifference to disassociate himself from the crime.  Therefore, trial counsel had reasons for refraining from calling Crawford as a witness.

### iii. **Reagan Estrada**

Reagan Estrada claims that Meza was a "dope fiend" and could not be trusted. (Ex. C to Ritt Decl.)  He feels that Meza cannot be trusted because he heard from a reliable source that Meza either had done something or had failed to do something.  He was told that the Ayalas did not want to have anything to do with Meza for the same reason.  Estrada's "knowledge" about Meza is based on inadmissible hearsay.  Estrada does not reveal his sources of information.  Furthermore, it is likely that the defense would not want to get into what it was that Meza allegedly did or failed to do.  Meza told defense investigators that he was supposed to kill Jesus Matola, who had beat up Ronaldo and shot him in the behind.  (Ex. P to Belter Decl.)  Trial counsel were not ineffective for failing to call Estrada.

### iv. **Luis Garcia**

Luis Garcia (a.k.a. "Boo Boo") claims that Meza is lying and actually does not know anything about the homicides.  (Ex. D to Ritt Decl.)  Garcia does not reveal how he knows this.  He says that Meza never said anything to him about the murders or being involved

01CV741

1  in the planning stages of the homicides.  However, just because Meza did not talk to

2  people about his involvement does not mean that it never happened.

3        Garcia also claims that while they were at Honor Camp together, Meza wanted

4  Garcia to "pipe" a black trustee who had confronted them previously.  Even if true, this

5  prior bad act probably would not be admissible because it does not bear upon the issues

6  in this case.  See Cal. Evid. Code §§ 787, 1101.

7        Garcia makes an additional claim that in February 1985, Castillo asked him if he

8  knew anybody that could "take someone out."  However, Castillo did not identify who he

9  wanted to take out.

10        Garcia is a problematic witness because, according to Mendoza, Garcia was doing

11  favors for the Ayalas.  Mendoza said that Garcia was the one who conveyed the message

12  from Ronaldo that Mendoza was to get in touch with him in prison.  (Ex. J to Belter Decl.

13  at 2-3.)  Also, Rudy Green Eyes gave Mendoza the idea of getting Garcia involved in a

14  story that Garcia was buying large quantities of drugs from Dominguez's drug business.

15  (Id. at 20-21.)  Ultimately, calling Garcia as a witness would have played into the

16  prosecution's hands.  The prosecutor could have portrayed Garcia as yet another person

17  who did whatever the Ayalas told him to do, including lying.

18

19                        **v.  David Paez**

20        David Paez says that Meza is not a member of the Mexican Mafia and is a liar and

21  a dope fiend.  (Ex. E to Ritt Decl.)  Paez says he has heard from a "reliable informant"

22  that Chacon and Meza grew up together and are manufacturing this story to get the

23  Ayalas off the street.  However, Paez is an admitted member of the Mexican Mafia who

24  has a motive to lie for the Ayalas.  In addition, what he heard about Chacon and Meza is

25  inadmissible hearsay.

26  ///

27  ///

28  ///

1

#### vi. __Benjamin Peters__

2       Benjamin Peters (a.k.a. Topo) claims that Ronaldo could not have committed the

3   murders because he was somewhere else - Peters allegedly knows this because he

4   assisted in making these arrangements.  (Ex. F to Ritt Decl.)  The information Peters

5   provided to the defense investigator is very vague.  It is also problematic for a couple of

6   reasons.  Peters was in jail at the time of the murders so it is unclear how he knew where

7   Ronaldo was.  (RT 14712-13.)  Also, Meza implicated Peters in the plan.  Meza said that

8   part of the plan was that "Topo" was going to get some money. (RT 14422).

9       The parties stipulated that the "Topo" referenced by Meza is Benjamin "Topo"

10  Peters, the son of Mrs. Gutierrez (the woman who let Ronaldo stay at her house shortly

11  before the murders and afterwards).  (RT 14712-13.)  As suggested by the prosecution in

12  its closing argument, Topo was expecting some financial gain from the crime and helped

13  Ronaldo secure a place to hide after the murders.  (RT 16660.)  Given these facts, it was

14  not error for trial counsel to refrain from calling Peters as a witness.

15

16

#### vii. __Daniel Sesma__

17      Daniel Sesma told defense investigators that Detective Chacon grew up a block

18  from his house.  (Ex. G to Ritt Decl.)  He said that before the Ayalas were apprehended,

19  Chacon would come to the neighborhood looking for them and would say that he "didn't

20  like Ronny on the Street."  Sesma speculated that Chacon was so involved in the Ayala

21  case because he was related to Bugzy, Julian, and Mano Sosa, members of the Nuestra

22  Familia.  Sesma also speculated that Chacon bore a grudge against the Ayalas because

23  he was never part of their group or the other peer groups in the area.  According to

24  Sesma, the word out on the street was that a lot of people were looking for Meza in the

25  "joint."

26      The fact that Chacon said he "didn't like Ronny on the Street" does not help the

27  defense.  If Chacon  knew about Ronaldo's criminal history and gang involvement, he

28  would have good reason to be concerned about Ronaldo being "on the Street."  Sesma's

thoughts on Chacon's motivation for seeking out the Ayalas is based on speculation. (Whether trial counsel had independent evidence regarding Chacon's connection with the Sosa family and La Nuestra Familia is a separate issue raised in Claim 24.)  Sesma's "knowledge" that other unidentified people were looking for Meza in the joint for unknown reasons appears to be based on hearsay.

Sesma had little to offer in the way of testimony other than speculation and hearsay.  Therefore, Petitioner has not shown that trial counsel were ineffective for not calling Sesma as a witness.

### viii.  Roland Talamentez

Roland Talamentez told defense investigators that he knew Meza in prison and thought that he was "bulls__ing" about the murders.  (Ex. H to Ritt Decl.)  However, Talamentez did not provide specific reasons - such as statements by Meza - for reaching this conclusion.  His unsupported opinion that Meza was lying carries little, if any, weight. Furthermore, it appears that Talamentez was trying to ingratiate himself to Ronaldo. Talamentez said that he was in protective custody because someone had been using his name and a "try" was made on him.   He told the investigators to "tell Ronnie to leave me alone," and said that he wasn't going to harm Ronaldo and didn't want Ronaldo hurting him.  Testimony to this effect would be very damaging for the defense.

### ix.  Alphonso Valles

Alphonso Valles was a close friend of Meza's.  (Ex. I to Ritt Decl.)  He said that Meza never talked to him about the murders or the Ayalas.  According to Valles, Chacon grew up in the same neighborhood and liked to "practice his karate on the other kids."  The fact that Meza did not mention the murders to Valles does not mean that Meza was not actually included in the planning.  Meza would not necessarily want to tell his friends about his involvement.  That Chacon may have practiced his karate on the other kids is clearly irrelevant.

01CV741

### x.  Raul Garcia

Raul Garcia told defense investigators that he was a cellmate of Meza's in South Bay Detention Facility in November 1985.  (Ex. J to Ritt Decl.)  Garcia said that he was approached by other inmates and told to step aside so they could get to Meza.  He believes these inmates thought Meza had ripped them off.  Garcia doesn't remember who the inmates were.  Garcia also claims that Meza approached him and asked him to join him in saying that Ronaldo came to them with a plan about the murders.  Meza allegedly proposed 2-4 different stories about how they had inside information that Ronaldo had committed the murders.  Meza allegedly revealed that he didn't really know anything about the murders and just wanted to get his custodial time reduced.  Garcia's "jacket" associates him with the "Texas Syndicate," but Garcia denies an association with any group.

Garcia's claims, if true, discredit one of the prosecution's most important witnesses. It is unclear why defense counsel did not call Garcia as a witness.  As already discussed, due to Petitioner's failure to exercise diligence in developing the factual basis of this aspect of Claim 18, Petitioner is barred from obtaining an evidentiary hearing or expanding the record in connection with this claim.  However, as discussed infra, Petitioner sufficiently developed the facts regarding Raul Garcia in Claim 19.

### c.  Evidence re: Dominguez

Petitioner also claims that trial counsel were ineffective for failing to present exculpatory evidence regarding (1) the nature and extent of Dominguez' drug operation, the nature and extent of his drug suppliers from south of the border, the history of his conflicts with those suppliers and others in his business, his attempts to branch out away from those suppliers; (2) the animosity that his actions engendered from his suppliers, the animosity that Dominguez generated from Robert Garcia (a competing drug dealer), his own "employees" Hector Figueroa (a.k.a. "Tony"), Pedro Castillo, and Miguel Lopez (a.k.a. "Pelon"); and (3) the threats and fear Dominguez felt and received from these people and

1    others just prior to his murder.  Petitioner is not entitled to habeas relief on this aspect of

2    Claim 18.

3         In the original Hart Declaration, Hart declared that he believed trial and appellate

4    counsel failed to investigate and present exculpatory evidence on the issues identified

5    above.  However, Hart did not state what exculpatory evidence of this nature existed.

6         It appears that Mendoza was the main source of Hart's information regarding

7    conflicts Dominguez may have had with other people as the result of his drug business.

8    Mendoza told various stories regarding Chacho and potential enemies.  Mendoza claimed

9    that Chacho had told him he was investing in a couple of kilos of cocaine, that Bobby

10   Garcia ran a cocaine operation out of the tire shop and did not like Chacho, that the

11   nearby A-Z towing shop also dealt in cocaine, and that there was jealousy in the area of

12   the body shop because all the customers were going to Chacho.  (Exs. B, C, and E to

13   Belter Decl.)  Mendoza also claimed that Chacho had fired Tony and owed Tony money

14   and that Chacho was unhappy with Castillo and wanted to fire him.  (Id.)  In addition,

15   Mendoza claimed that Chacho and Jesus, a brother-in-law in Tecate, were enemies (Ex.

16   B. to Belter Decl.), that a close relative of Sara's had burned Chacho in the past (Ex. F. to

17   Belter Decl.), and that alien smugglers in the area were mad at Chacho and Pete for

18   cutting in on the alien-smuggling business.  (Ex. D to Belter Decl.)

19        Mendoza later admitted that he lied to defense investigators.  He specifically

20   admitted to lying about Chacho being mad at Castillo.  (Ex. J to Belter Decl. at 61.) Trial

21   counsel may very well have avoided questioning Mendoza about Dominguez's conflicts

22   because they realized that Mendoza lacked personal knowledge, was relying on

23   inadmissible hearsay statements, or was telling lies.

24        At trial, defense counsel tried to get into evidence that Chacho beat up Miguel

25   Lopez in October or November 1984 because Chacho thought Lopez had stolen drugs.

26   The court properly did not allow this evidence because it was more prejudicial than

27   probative.  (RT 13418-21.)

28        Hart's Supplemental Declaration makes more detailed assertions regarding Castillo

41

1    and Robert Garcia.  However, this evidence falls short for the reasons discussed in
2    connection with Claims 20 and 21, <u>infra</u>.

3          In the federal petition, Petitioner points to trial counsel's failure to elicit testimony
4    from Armando Sanchez regarding Tony's involvement in selling drugs.  Petitioner explains
5    that "Armando Sanchez testified later in one of the subsequent trials that he believed his
6    nephew and another man – Tony – had been selling drugs at the 43rd Street location
7    within a few weeks after the murders and he saw Tony and his nephew with guns of the
8    same caliber as the murder weapons."  (Second Amended Petition, ¶ 256.)  However,
9    Petitioner did not present any evidence regarding Sanchez's subsequent testimony.
10   Furthermore, Tony's alleged involvement in the sale of drugs and his possession of a .22
11   and/or .38 caliber weapon would not meet California's requirements for the admission of
12   evidence regarding third-party culpability.  "[E]vidence of mere motive or opportunity to
13   commit the crime in another person, without more, will not suffice to raise a reasonable
14   doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the
15   third person to the actual perpetration of the crime."  <u>People v. Hall</u>, 41 Cal. 3d 826, 833
16   (1986).

17         Similarly, even if there was evidence that Robert Garcia was a cocaine dealer and
18   was in competition with Dominguez, the evidence would not raise a reasonable doubt of
19   *Petitioner's* guilt.  Garcia and Miguel Lopez testified that they and Tony were in the ice
20   cream truck at the time of the murders.

21         Claim 21 of the Petition alleges that trial counsel failed to impeach Robert Garcia
22   with specific evidence and/or testimony regarding his alleged dealings in cocaine,
23   suspicious behavior, and intimidation of witnesses.  Claim 21 is addressed separately
24   below.

25   ///
26   ///
27   ///
28   ///

**2.** **Claim 19 - Impeachment of Juan Meza**

Petitioner contends that trial counsels' performance was deficient because trial counsel failed to impeach Juan Meza with the following evidence and/or testimony:

A.   Meza's claim he had "dropped out" of the Mexican Mafia and therefore was fearful of retribution was disprovable with prison records and witness testimony, including the testimony of Richard Savocchio and many others, demonstrating that he had never been a member of the Mexican Mafia and was fabricating the story to lend credence to himself;

B.   Meza had a long history of being a prosecution informant, he had a relationship with Detective Carlos Chacon and he expected consideration for testifying for the prosecution;

C.   Meza had met with Detective Chacon as early as mid 1985 regarding the 43rd street murders, and had had many unannounced meetings with him after that time;

D.   Meza had a long-standing relationship with Detective Chacon which had roots in their youths going back to 1965; and

E.   Meza had confessed to numerous witnesses, including Richard Sovacchio among many others – known to Petitioner's counsel – that he had no idea whether Petitioner had actually participated in the 43rd street murders and that he had put together his story with Detective Chacon in order to arrange for an early release from prison.

Petitioner contends that trial counsels' deficient cross-examination was the result of an ill-informed strategy to avoid any mention of the Mexican Mafia and that Petitioner was thereby deprived of his rights to due process, confrontation, and equal protection of the law in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

Petitioner's argument that trial counsel should have put on evidence that Meza was never, in fact, a member of the EME fails because Meza did not testify that he was an EME drop-out or that he feared the EME.  Furthermore, whether Meza was ever actually in the EME, Meza claims that the EME had a contract out on him because he refused to carry out a hit on an old friend that had gotten into a fight with Petitioner.  Accordingly, it was sound trial strategy for defense counsel to refrain from examining Meza regarding his relationship with the EME and whether he had reason to fear them.

Trial counsel actually did question Meza and others about what Meza wanted in exchange for testifying.  Evidence came in that Meza initially demanded the return of a

truck and $17,000 that had been seized from him, immediate release, and protection for his family.  (RT 14584-92.)  Ultimately, the DA's Office agreed that Meza would receive witness protection benefits and use immunity and that the DA's Office would try to get Meza released after he testified (shaving several months off his sentence).  (RT 14419-21; 14579-83.)  Thus, evidence was presented regarding benefits received by Meza.  In closing argument, defense counsel argued that Meza was motivated by the deal he made with the DA's Office.  (RT 16790-94.)

Meza's "long history" of being a prosecution informant would not necessarily have helped the defense case.  As argued by Respondent, this evidence could be interpreted as establishing that Meza proved to be a reliable informant.

As for Meza's relationship with Chacon, Meza admitted on cross-examination that he had known Chacon since he was young and trusted him.  (RT 14538.)  Trial counsel was not ineffective for failing to go into the fact that Chacon met with Meza a number of times between 1985 and April, 1987.  Contrary to the defense theory that Chacon coerced or intimidated Meza into testifying, Meza denied that Chacon ever expressed concern for his safety or offered to protect him or provide him with any other sort of benefit.  (RT 14254-76.)

Furthermore, it appears that in 1985, Meza gave Chacon some information about the murders without getting or asking for anything in exchange.  (Ex. R to Belter Decl.; RT 14254-63.)  According to Chacon, in 1985, Meza told him that he was aware of the killings and their reason because he had spoken to the Ayalas before and after the murders.  (Ex. R to Belter Decl.)  Although Meza did not provide any details, he said that he was to have provided the guns for the killings.  Evidence that Meza told a story consistent with his testimony as far back as 1985 would bolster his credibility.

Trial counsel proffered that in 1986, when Meza was arrested for simple possession, Chacon called the DA's Office and asked that he be given a concurrent sentence because he had been providing information.  (RT 14540-61.)  However, there was no evidence that Meza asked Chacon to approach the DA's Office or that Meza even

44

1  knew that Chacon had done this.  Meza denied asking Chacon to contact the DA's Office

2  and said that he had no recollection of that occurring.  (RT 14562.)

3      To the extent Petitioner claims that trial counsel should have impeached Meza with

4  the testimony of Richard Savocchio, the Court grants an evidentiary hearing for the

5  reasons discussed in connection with Claim 18.

6      In the Group Three briefing, Petitioner, for the first time, identifies Raul Garcia as

7  another witness who could have testified that Meza made up the story implicating the

8  Ayalas and Moreno.  It is arguable whether the identification of another witness places this

9  claim in a stronger evidentiary posture than it was when it was before the state court.

10  However, even if it does, the exhaustion requirement does not bar review of the claim

11  because the state court would deem Petitioner's claim to be procedurally barred.

12      Accordingly, the Court turns to whether it can expand the record and whether an

13  evidentiary hearing is warranted.  Although Claim 19 did not specifically name Raul

14  Garcia, the claim did specify what Savocchio and the "other witnesses" could testify to –

15  namely, that Meza fabricated the entire story regarding the Ayalas involving him in the

16  plan to commit the murders.  The claim was stated with sufficient specificity to allow the

17  state court to determine whether the claim should go forward.  Petitioner acted with due

18  diligence to develop the factual basis of his claim.  Therefore, the requirements of §

19  2254(e)(2) do not apply, and the relevant inquiry is whether Petitioner has established a

20  colorable claim for relief.

21      According to Raul Garcia, Meza admitted to him that he did not know anything

22  about the murders and just wanted to get his custodial time reduced.  (Ex. J to Ritt Decl.)

23  He tried to get Garcia involved in fabricating a story implicating Ronaldo and proposed

24  various stories regarding how they had inside information that Ronaldo had committed the

25  murders.  These facts, if proven to be true, support a prima facie case of deficient

26  performance by trial counsel.  There is no apparent reason why counsel would not

27  confront Meza with this critical information and, if he denied it, to call Garcia to the stand.

28  ///

Viewing trial counsels' failure to call Garcia as a witness in conjunction with other potential deficiencies in performance identified in this order, Petitioner has raised a colorable claim that he was prejudiced.  Accordingly, the Court grants an evidentiary hearing on the claim regarding Raul Garcia.  Habeas relief is denied as to the remainder of Claim 19.

### 3.  Claim 20 - Impeachment of Pedro Castillo

Petitioner claims that trial counsel failed to impeach key prosecution witness Castillo with the following evidence and/or testimony:

A.   Castillo had lost his home to foreclosure because of his reliance upon Dominguez's untrue promises regarding profits he would make in Dominguez's drug dealing business;

B.   Dominguez had, a few days before he was murdered, threatened to fire Castillo from his drug dealing operation for losing money and drugs to prostitutes;

C.   After the 43rd street murders, Castillo hid drugs and Dominguez's drug scales in a car behind the shop;

D.   After he was released from the hospital, Castillo returned to the 43rd street location to look for the drugs and scales, and then blamed Hector Figueroa (a.k.a. Tony) when he could not find them;

E.   Castillo had, prior to the murders, solicited two different witnesses to kill victim Zamora;

F.   After the murders, Castillo threatened witness Maria Soto, telling her friend that someone named "Sosa" would kill her if she testified in Petitioner's case;

G.   Castillo's contention that Joseph Moreno was present and assisted Petitioner in the murders was directly contradicted by scores of witnesses who were willing to testify that Mr. Moreno was gardening during the murders; and

H.   Castillo had been paid and was paid, approximately $15,000 per year by the prosecution as of the time of his testimony.

As for the $15,000 Castillo received for living expenses, trial counsel chose to forgo this evidence because the court ruled that the prosecution could introduce evidence regarding *why* he was getting the money – i.e., the witness protection program.  (RT 12535.)  Trial counsels' strategic choice to avoid raising questions as to why Castillo needed witness protection was not unreasonable.

46

Evidence regarding Castillo looking for scales, some hidden drugs, and Tony was brought out at trial.  During direct examination by the defense, Miguel Lopez testified that about a week after the murders, Castillo returned to the area of the shops looking for Tony.  (RT 13421-26.)  Lopez testified that Castillo was looking for scales and a bit of heroin.  Lopez helped Castillo look in two old cars in the upper lot, but they did not find the scales and heroin.  According to Lopez, Castillo returned more than once looking for Tony in the month after the murders.  In closing argument, defense counsel reminded the jury about evidence that Castillo came to look for Tony as he was searching for scales and drugs.  (RT 16760.)

In his Supplemental Declaration, Hart states that he learned from interviewing "the Sanchezes," witnesses who lived behind the tire shop, that Castillo hid drugs and Dominguez's drug scales in a car behind the body shop just before the murders, and returned to look for the drugs and scales after he was released from the hospital.  (Supp. Hart Decl. ¶ 17.)  According to Hart, when Castillo could not find the drugs and scales, he blamed Tony.  (Id.)  This information does not add significantly to what was already presented at trial.

Petitioner has not presented any reliable evidence that Dominguez had threatened to fire Castillo from his drug-dealing operation.  As previously discussed, during some interviews with defense investigators, Mendoza claimed that Dominguez was unhappy with Castillo and wanted to fire him.  (Exs. B and E to Belter Decl.)  However, later, Mendoza said that he was lying about Dominguez being mad at Castillo for using drugs and losing profits and that Dominguez liked and trusted Castillo.  (Ex. J to Belter Decl. at 61.)  In his Supplemental Declaration, Hart states that he also learned that Dominguez threatened to fire Castillo for losing money and drugs to prostitutes from interviewing the Sanchezes, Lopez, and Jaime Clark.  (Supp. Hart Decl. ¶ 15.)  However, Hart did not attach reports or transcripts of any of these interviews.  It is unclear exactly what these individuals said to Hart or what the source of their information was.  Hart's unsupported claims of what he learned as a result of his investigations are insufficient to warrant relief.

01CV741

1    Petitioner has also failed to present specific facts that Castillo lost his home to

2  foreclosure because of his reliance upon Dominguez's untrue promises regarding profits

3  he would make from the drug business.  (Supp. Hart Decl. ¶ 14.)  Hart explains that he

4  learned this information by reviewing documents from county recorders and from

5  interviewing the Sanchezes and Lopez.  Again, Hart did not attach summaries or

6  transcripts of the interviews, raising the question whether the information provided by the

7  Sanchezes and Lopez was based on anything other than speculation and hearsay.

8    Petitioner's strongest claim of ineffective assistance of counsel with respect to the

9  impeachment of Castillo concerns information that Castillo had solicited people to kill

10  Marcos Zamora.  According to the Supplemental Hart Declaration, Hart interviewed

11  Johnny Mendez, who told Hart that Castillo had approached him to kill "Marco."  (Supp.

12  Hart Decl. ¶ 18.)  Hart also learned from Paul Pickering, an investigator for Hector Ayala,

13  that Pickering had learned of yet another witness who wanted people killed and who put

14  Castillo in contact with Johnny Mendez.  (Id.)

15    Part of the defense strategy was urging the jury to suspect that Castillo was lying to

16  cover up his own involvement in the deaths.  If there was evidence that Castillo asked

17  Mendez to kill Zamora, trial counsel should have cross-examined Castillo regarding his

18  solicitation of the hit and should have called Mendez as a witness if Castillo denied it.

19  Based on the limited information before the Court, trial counsel's failure to do so

20  constitutes a prima facie case of deficient performance.  Viewing this instance of potential

21  deficient performance in combination with the other potential errors in this order, Petitioner

22  has established a colorable claim of prejudice.  The Court grants an evidentiary hearing on

23  Petitioner's claim regarding Mendez.[3]

24  ///

25  ///

26  _____

27    [3] Although the name "Johnny Mendez," was not mentioned in the petition, the petition
stated that "Castillo had, prior to the murders, solicited two different witnesses to kill victim
28  Zamora." The claim was stated with sufficient particularity to support a conclusion that
Petitioner acted with due diligence to develop the factual basis of his claim.

1    Hart states, "I learned from interviewing Maria Soto that, after the murders, Castillo

2    threatened witness Maria Soto, telling her that the Mexican Mafia had a contract to kill her

3    and the killer's name was 'Sosa.'  This caused her to refuse to cooperate as a witness."

4    (Supp. Hart Decl. ¶ 19.)  Although Petitioner claims that Castillo told Soto that her life

5    would be in danger if she testified, based upon what Soto told Hart, Castillo did not

6    actually link the threat on her life to *testifying at trial*.

7    Hart also claims that "Castillo's contention that Joseph Moreno was present and

8    assisted Petitioner in the murders was directly contradicted by around a half dozen

9    witnesses who were willing to testify that Mr. Moreno was gardening and visiting his

10   mother during the murders.  I learned this from Gina Moreno and Joe Moreno, who told

11   me that they could give me the names of these witnesses."  (Supp. Hart Decl. ¶ 20.)

12   Petitioner has not demonstrated that there is an actual witness who could have testified

13   that Moreno was elsewhere during the murders.  Despite the alleged existence of "half a

14   dozen" of these witnesses, Petitioner has not offered a statement from any of them.

15   Hart claims that the testing of the pants worn by Castillo at the time of the murders

16   would have demonstrated how far Castillo was from the shooter, and would have reflected

17   that his story of an escape attempt was concocted.  (Supp. Hart Decl. ¶ 11.)  Hart declares

18   on information and belief that Detective Padillo intentionally destroyed Castillo's pants by

19   giving them to Castillo's wife, whom he reasonably expected to destroy or "lose" the pants.

20   (Id.)  Hart states that he took some of the reports of the physical evidence, including

21   Castillo's medical records, to a medical doctor, Dr. Schechter, who told Hart that Castillo

22   could not have been shot the way he claimed.  (Id.)  Hart claims that he unsuccessfully

23   tried to focus trial counsel on this issue.

24   The state and federal petitions do not allege that trial counsel were ineffective for

25   failing to impeach Castillo with expert testimony that he could not have been shot the way

26   he claims.  (Claim 13 alleges destruction of evidence by the prosecution).  Moreover,

27   setting aside the issues of failure to plead, exhaustion, and lack of diligence, Hart's

28   declaration is based on speculation and hearsay.  The declaration does not reveal what

49

1   information Dr. Schechter was given, what Dr. Schecter's qualifications were, or what Dr.

2   Schechter's exact conclusions were.

3          In sum, the Court grants an evidentiary hearing as to the claim that Petitioner was

4   denied effective assistance of counsel by the failure to impeach Castillo with evidence that

5   he wanted to have victim Zamora killed. Petitioner is not entitled to relief on the remainder

6   of Claim 20.

7

8          **4.  Impeachment of Robert Garcia**

9          Petitioner claims that counsel failed to impeach Robert ("Bobby") Garcia with

10  the following evidence and/or testimony:

11   A.    Robert Garcia dealt cocaine from the tire shop located directly next to the
           victims' office at the 43rd street location;
12
     B.    Victim Dominguez had recently tried to arrange for a large purchase of
13         cocaine so that he, too, could begin selling cocaine from the 43rd street
           location, in competition with Garcia, which had angered Garcia;
14
     C.    Within one hour of the killings, Garcia made a long-distance telephone call to
15         Mexico;

16   D.    Garcia's claim that he was watching the Padres/Dodger game in order to see
           Fernando Valenzuela pitch for the Dodgers was untrue given that Fernando
17         Valenzuela did not pitch for the Dodgers that night, nor was he scheduled to;

18   E.    Within minutes prior to the murders, Garcia maneuvered witness Ignacio
           Vejar away from the 43rd street body shop by uncharacteristically offering to
19         buy him beer and ice cream; and

20   F.    After the murders, Garcia intimidated and threatened defense investigators
           and percipient witnesses, including Hector Figueroa, Miguel Lopez and
21         members of the Sanchez family, in an effort to preclude them from speaking
           with defense investigators and otherwise testifying regarding the murders.
22

23         Mendoza told defense investigators that Bobby Garcia ran a big cocaine operation

24  out of the tire shop and didn't like Chacho.  (Ex. B to Belter Decl.)  Mendoza also told

25  defense investigators that Chacho had recently invested in a couple of kilos of cocaine.

26  (Exs. A and B to Belter Decl.)  However, as already discussed, Mendoza subsequently

27  admitted he had lied to defense investigators about many things.

28  ///

1        In his Supplemental Declaration, Hart states that witnesses told him that Garcia

2   dealt cocaine from the tire shop.  (Hart Supp. Decl. ¶ 22a.)  Hart also states that he

3   learned that Dominguez had arranged for a large purchase of cocaine prior to his murder.

4   (Hart Supp. Decl. ¶ 22b.)  However, there is no evidence that Dominguez ever received

5   the cocaine.  Furthermore, even if Dominguez was in fact poised to be a competitor in the

6   cocaine business, only speculation supports the conclusion that Garcia wanted

7   Dominguez dead.

8        The remaining evidence presented by Petitioner is flimsy.  Even assuming Garcia

9   made a long-distance call to Mexico within an hour of the killings, this evidence would not

10   be probative evidence that Garcia was somehow involved in the crime.  He could have

11   been calling anybody for any reason.

12        Garcia's claim that he wanted to watch the baseball game because he wanted to

13   watch Valenzuela pitch was not necessarily untrue.  The evidence shows that Valenzuela

14   did not pitch on the 26th, but, rather, pitched at the next game on the 28th.  (RT 15102.)

15   However, he could have been confused regarding the day Valenzuela was pitching.

16   Miguel Lopez also had some confusion regarding when Valenzuela pitched.  (RT 13373-

17   79.)  Garcia testified that he does not know if Valenzuela actually pitched because he fell

18   asleep and did not watch the game.  (RT 13538.)  His *intention* to watch Valenzuela pitch

19   has not been proved false.

20        According to Hart's Supplemental Declaration, minutes before the murders, Garcia

21   maneuvered Ignacio Vejar away from the body shop by uncharacteristically offering to buy

22   him beer and ice cream across the street.  Hart also states that after the murders, Garcia

23   intimidated and threatened defense investigators and witnesses including Hector

24   Figueroa, Miguel Lopez, and members of the Sanchez family to preclude them from

25   talking with defense investigators/testifying.

26        Even if all of Hart's assertions are true, there is insufficient evidence of third party

27   culpability.  To be admissible, evidence of third-party culpability need not show "substantial

28   proof of a probability" that the third person committed the act; it need only be capable of

1   raising a reasonable doubt of defendant's guilt.  Hall, 41 Cal. 3d at 833.  However, "there

2   must be direct or circumstantial evidence linking the third person to the actual perpetration

3   of the crime."  Id.  Evidence of mere motive or opportunity, without more, will not suffice to

4   raise a reasonable doubt about a defendant's guilt. Id.  "At a minimum, the evidence must

5   tend to exclude the defendant as the perpetrator of the crime."  People v. Jackson, 110

6   Cal. App. 4th 280, 289 (2003).

7         Garcia's alleged threatening of witnesses and defense investigators does not link

8   him to the actual perpetration of the murders.  According to Garcia's and Miguel Lopez's

9   testimony, Garcia went into the ice cream truck around 7:45 p.m. with Pelon and Tony to

10  see the Dodgers/Padres game.  According to Miguel Lopez, they were still in the ice

11  cream truck when the shots were fired.  There are a number of reasons why Garcia may

12  have wanted to stymy the investigation besides being guilty of the murder himself – e.g.,

13  loyalty to those who did commit the murder or fear that the investigation would uncover

14  evidence of his involvement in other criminal activity such as drugs, etc.  As for Garcia's

15  behavior toward Vejar, one must make a great inferential leap to conclude that Garcia's

16  offer to buy Vejar beer and ice cream was evidence of Garcia's involvement in the

17  murders.  (The Court also notes that according to Respondent, Vejar was dead by the time

18  of trial.)

19         Furthermore, Garcia's actions are not inconsistent with Petitioner's guilt.  See

20  People v. DePriest, 42 Cal. 4th 1, 44 (2007) (explaining that evidence that someone else

21  was seen with defendant in the victim's car was not inconsistent with defendant killing,

22  sexually assaulting, and robbing the victim earlier that night, and did not tend to link

23  anyone other than defendant to the actual perpetration of the crime.).  The purported

24  evidence would not contradict or disprove the testimony of Castillo, Meza, and Mendoza

25  Lopez – the heart of the prosecution's case.

26         The state court's denial of this claim was not contrary to or an unreasonable

27  application of clearly established federal law.  Therefore, Petitioner is not entitled to

28  habeas relief on this claim.

**5.  Impeachment of Rafael Mendoza Lopez**

Petitioner claims that due to an unreasonable concern about the Mexican Mafia as well as defense counsel Elizabeth Semel's personal assurance to Rafael Mendoza Lopez not to reveal his status as a California Department of Corrections ("CDC") informant, trial counsel failed to impeach witness Mendoza with the following evidence and/or testimony:

A.   Mendoza Lopez had reiterated his initial testimony many times to defense investigators, over many months, and the defense investigators had documented his testimony in written form.  Counsel did not call numerous defense investigators, other counsel or witnesses to refute any and all implications that the defense investigators and counsel were complicit in the fabricated testimony;

B.   Despite Mendoza Lopez's recanted testimony that his testimony had evolved over many months, in fact, his testimony to the defense investigators was strikingly consistent and had not changed significantly over time;

C.   CDC documents reflected that Mendoza Lopez was a jailhouse snitch who had previously testified against inmates in exchange for favors from the state;

D.   In an effort to convince Mendoza Lopez to testify on behalf of the prosecution, Mendoza Lopez's wife had been threatened by Detective Chacon with imprisonment shortly after Mendoza Lopez testified favorably to Petitioner; and

E.   According to prison documents, Mendoza Lopez had strong ties to prison gangs.

Mendoza admitted upon cross-examination that when interviewed by defense investigators, he repeatedly told the same basic story - he hadn't seen the Ayalas at the shop, Castillo asked him to put gas in the car, Castillo pulled out two guns, Castillo said he was waiting for some people from Mexico, and Castillo gave him some heroin upon his return.  (RT 16363-76.)  The written reports of the investigators would not necessarily have strengthened Ayala's case.  As pointed out by Respondent, the reports reveal that there were a multitude of inconsistencies as well.

At first, Mendoza claimed that he saw two guns in a rusted blue Malibu Castillo often drove - a .38 with a chrome handle and a gun with a brown handle.  (Ex. A to Belter Decl.)  In the next interview, Mendoza claimed that Castillo asked him to put gas in a 2-door blue Chevy he had never seen before.  Castillo pried the trunk open with a

1   screwdriver and took out a .38 with a chrome handle and a small .22.  He said he was

2   going to be meeting some guys from Tijuana.  (Ex. B. to Belter Decl.)  Later, Mendoza

3   added that he saw three guys who were in their 30's and Mexican.  He said that Castillo

4   opened the trunk of the Nova or Malibu, with a screw driver, removed some clothes from

5   the trunk, and then pulled two guns from under the seat and put them inside the clothes –

6   a .38 automatic chrome with a pattern on the handle and a .22 blue steel revolver.  (Ex. E

7   to Belter Decl.)  Still later, Mendoza said that he saw guys at the shop who were maybe in

8   their 40's and Spanish.  Castillo got a blanket, clothes, and guns out of the trunk of the car.

9   Castillo opened the blanket then covered the guns back up and made a joke about having

10   a .38.  Mendoza saw the guns quickly – he thinks he saw a .22 revolver and a .38

11   automatic.  One was chromed.  (Ex. H. to Belter Decl.)

12       The differences in these stories could support Mendoza's claim that he was lying to

13   investigators.  Mendoza testified that he kept adding things to his story and ended up

14   getting confused about the details of the gun.  (RT 16351-54.)  Mendoza also explained in

15   his tape-recorded interview with Rolan that he added the detail of Castillo going through

16   the clothes, allowing him only a quick peek at the guns, because he was asked to identify

17   the gun in a photo.  (Ex. J to Belter Decl. at 28.)  Mendoza hedged and said that the gun in

18   the photo could be the one he saw.

19       In addition, details of the prior interviews could hurt the defense case because they

20   would reveal that Mendoza was first interviewed on December 11, 1985.  Mendoza

21   remembered that he met Hart a week or a few days after meeting Ronaldo in jail, meaning

22   that he visited Ronaldo in early December 1985.  Rudy Green Eyes, who Mendoza says

23   came to the jail with him, was at a half-way house in San Diego from 10/28/85 until

24   12/6/85.  (RT 16488.)  However, Mendoza testified that he saw Ronaldo in jail in June/July

25   1985.  This testimony was not consistent with records that Rudy Green Eyes was

26   incarcerated in Arizona at this time.  Trial counsel made the jury aware of this

27   inconsistency, which could have been explained (as a misremembered date) if the reports

28   had come into evidence.

1    There was no need to put on evidence that defense counsel and the defense

2    investigators had nothing to do with Mendoza's fabricated testimony.  Contrary to

3    Petitioner's claim, there was never any implication that the defense investigators and/or

4    counsel were complicit in Mendoza's false testimony.  Mendoza did not make any such

5    suggestion in his rebuttal testimony, and no argument was made to that effect.

6    That Mendoza was a jailhouse snitch was not evidence that would necessarily help

7    the defense.  Indeed, one prison record dated October 1, 1987 says that "[Mendoza]

8    Lopez has proven himself a reliable source in the past . . . ."  (Ex. I to Belter Decl.)  Details

9    about what information Mendoza provided in the past could have bolstered his credibility.

10   Petitioner argues that the fact that Mendoza was an informant is important because

11   Chacon allegedly had this information prior to the tape-recorded recantation.  Petitioner

12   *speculates* that Chacon used this information to threaten and intimidate Mendoza.  In an *in*

13   *camera* hearing, Semel told the Court that she had learned that Chacon had visited Javier

14   Ochoa Hernandez in jail and threatened him by saying, "I know your carnales, your

15   brothers in the EME.  Ayala has no power left.  You better tell the truth.  You're going to

16   need a lawyer and she [Semel] can't protect you anymore."  (RT 16266-67.)  Semel

17   argued that she believed Chacon similarly threatened Mendoza but did not have any

18   evidence that this was so.  After the *in camera* hearing, the trial court ruled that Petitioner

19   had not established the need for a hearing regarding the voluntariness of Mendoza's

20   statements.  (RT 16256-76.)  Because there is no evidence showing a nexus between the

21   informant information and the voluntariness (or lack thereof) of Mendoza's recantation, trial

22   counsel were not ineffective for not introducing evidence regarding Mendoza's informant

23   status.  At any rate, defense counsel elicited testimony that Mendoza had met with

24   Chacon prior to changing his testimony and that Chacon told Mendoza that his lies would

25   not put him in a better position with the inmates in the "southern group."  (RT 16378-86.)

26   ///

27   ///

28   ///

55

1    Petitioner argues that trial counsel were ineffective for failing to impeach Mendoza

2   with evidence that Mendoza's wife, Jennifer,  had been threatened with imprisonment by

3   Chacon.  According to a report, on November 17, 1988, Jennifer was interviewed by a

4   defense investigator.  (Ex. K to Belter Decl.)  Jennifer said that Chacon had contacted her

5   to convince Mendoza to talk to the DA's Office.  She said that Chacon had become angry

6   and stated that maybe it was time to take her "off the street."  She said that she didn't

7   know whether Chacon could bust her for delivering drugs to prison.  The problem with this

8   evidence is that the interview was conducted *after* the guilt phase of the trial.   Therefore,

9   the evidence could not have been used to impeach Mendoza.

10    Petitioner argues that trial counsel should have impeached Mendoza with prison

11   documents indicating that he had strong ties to prison gangs.  Petitioner does not explain

12   how bringing up prison gangs would have helped the defense case.  Upon review of the

13   file, there is mention of Mendoza belonging to the "Logan Heights" street gang and

14   information that Mendoza had knowledge regarding activities of the Southern Hispanic

15   (SUR) gang.  (Ex. I to Belter Decl.)  As noted by the trial judge, there was nothing in the

16   file affiliating Mendoza with the EME.  (RT 16231.)

17    Petitioner contends that trial counsel were ineffective for failing to personally

18   examine Mendoza's records.  Even if Petitioner could demonstrate deficient performance,

19   this claim fails because Petitioner cannot show prejudice.  Other than Mendoza's

20   informant activities, Petitioner does not specify what information counsel would have

21   learned and how this information could have been used to impeach Mendoza.

22    Petitioner's claim that trial counsel were ineffective for failing to advise him of their

23   knowledge that Mendoza was an informant fails because he cannot show that he suffered

24   prejudice from the lack of this knowledge. The Court rejects Petitioner's argument that

25   Mendoza's informant status indicated a risk that Mendoza would change his story.  This

26   argument is supported by hindsight only.  As already discussed, Mendoza was a critical

27   witness for Petitioner's case, and the Court has no reason to believe that Mendoza's

28   informant status would have dissuaded Petitioner from calling him as a witness.

1    The Court notes that Semel attacked Mendoza's credibility in closing argument.

2  (RT 16796-16802.)  Among other things, she challenged the plausibility of Mendoza's

3  claim that  Petitioner held up a note in the visiting room, pointed out inconsistencies in

4  Mendoza's testimony, and argued that Mendoza changed his story only after Chacon

5  visited him in jail and frightened him with the prospect of harm from the "southern group."

6  Semel's approach to attacking Mendoza's credibility was not deficient.  Petitioner is not

7  entitled to habeas relief on this claim.

8

9    **6.  Claim 23 - Failure to Declare a Conflict**

10    Petitioner claims that trial counsel were ineffective for failure to declare a conflict of

11  interest as a result of the recanted testimony of Mendoza Lopez.  Petitioner argues that

12  this failure resulted in an inability to fully impeach Mendoza as to all particulars of his

13  rebuttal testimony as well as the destruction of trial counsels' credibility before the jury.

14    As already discussed, Mendoza's trial testimony did not implicate the defense team

15  in his wrongful conduct.  Mendoza did not suggest that trial counsel had any knowledge of

16  or involvement in his false testimony.  Trial counsel Elizabeth Semel expressed concerned

17  to the court about statements Mendoza had made during the tape-recorded interview

18  about Semel showing him some pictures and telling him to deny having ever seen them

19  and Semel's reaction when Mendoza said he had talked to Rolan.  (RT 16240-52.)  Semel

20  argued she was conflicted between protecting her credibility and independently

21  representing Ayala's best interests.  She also argued that to the extent Mendoza indicated

22  that the defense had engaged in wrongdoing, defense counsel had a problem arguing the

23  penalty phase.  The prosecutor, William Woodward, explained that he did not intend to ask

24  Mendoza about the actions of defense counsel.  Woodward kept to his word and Mendoza

25  did not say anything that would place defense counsel in a bad light or raise a concern

26  about conflict of interest.

27    Petitioner claims that due to a conflict of interest, trial counsel could not "fully

28  impeach Mendoza as to all particulars of his rebuttal testimony [primarily as to statements

1    provided to counsel without an investigator present] . . . ."  This claim fails because

2    Petitioner does not identify what statements he is referring to and why the statements

3    were important.

4         Furthermore, Petitioner is unable to show prejudice.  Semel moved for a mistrial

5    based on Mendoza's recanted testimony and her perceived conflict of interest.  The court

6    denied the motion for mistrial and most certainly would have denied a motion to withdraw

7    as counsel.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

8

9         **7.  Claim 24 - Impeachment of Chacon**

10        In Claim 24, Petitioner argues that trial counsel were ineffective for failing to present

11   evidence of Detective Chacon's bias.  The Court grants an evidentiary hearing on the

12   specific issues identified below because Petitioner has presented evidence that raises the

13   potential of a colorable claim of ineffective assistance of counsel.  See Earp, 431 F.3d at

14   1173; Insyxiengmay, 403 F.3d at 670.

15        The evidence supporting Claim 24 is presented in Hart's Supplemental Declaration.

16   Although this specific evidence was not presented to the state court, the original Hart

17   Declaration set forth the nature of the evidence and what it would show.  The Court finds

18   that the claim was sufficiently exhausted and that Petitioner acted with diligence to

19   develop the factual basis of his claim.

20        Set forth below are excerpts from Hart's Supplemental Declaration, followed by the

21   Court's analysis of the evidence.

22            3.  I earlier testified in Paragraph 9 regarding Detective Chacon and
         his long-standing personal grudge against Petitioner and his brother, which
23       went back many years prior to the 43rd street murders.  I learned the
         information in Paragraph 9 from interviews by me and by Paul Pickering, the
24       lead investigator for Hector Ayala, of witnesses, including Daniel Sesma.  I
         learned Mauro Gonzalez was Ronnie Ayala's brother-in-law, and I found out
25       that Mauro was convicted of killing Eddie Cruz, by research and reviewing
         the court records and the coroner's report.  I learned that Mauro pled guilty,
26       and I found out Mauro went to prison and was released after a few years.  I
         researched that Eddie Cruz lived on [the] same street as Carlos Chacon;
27       indeed, they lived next door.  Many witnesses told me they were tight.  Other
         witnesses told Paul Pickering and me that Chacon blamed Ronnie Ayala for
28       ordering Mauro to kill Eddie Cruz.  I also met with Carlos Chacon in 1990
         when he found out that I was still investigating the case in 1990.  I talked with

                                              58                                      01CV741

1    him for at least a couple of hours at a restaurant called "Antonio's" in El
     Cajon.  During that conversation, he admitted that he was close with Eddie
2    Cruz and lived next door to him.  He denied being upset at Mauro Gonzalez
     for killing Cruz, but I did not believe him.  He also said that if the Ayalas ever
3    got out of jail he would kill them.

4
     That the murder of Eddie Cruz provided a motive for Chacon to frame Petitioner is
5
speculative.  However, Chacon's own statement to Hart that if the Ayalas ever got out of
6
jail he would kill them is evidence that Chacon had strong feelings against the Ayalas on a
7
personal level.  Viewed together with other evidence discussed below, this evidence is
8
sufficient to warrant an evidentiary hearing.
9

10
         4.  As part of my investigation, I learned that, prior to the 43rd street
11   murders, Detective Chacon attempted without success and falsely to blame
     Petitioner for many other murders.  I based this conclusion on the following
12   facts.  First, there were my interviews, and the interviews conducted by the
     other investigators (whose memos I have reviewed) with many witnesses
13   during the course of the case regarding Detective Chacon's hatred for the
     Ayalas, including Daniel Sesma.  Second, Detective Carey – the forensic
14   homicide detectives on [the] Ayala case – told me of some men who he said
     Ronnie Ayala had personally killed.  Because Detective Chacon was in
15   intelligence, the gang unit in charge of investigation, I concluded he must
     have told Carey.  When I asked Detective Carey how he got this information,
16   he wouldn't tell me.  I proceeded to investigate these killings which Detective
     Carey identified for me and concluded that the allegations of Ronnie Ayala's
17   involvement were totally false.  With respect to two of the alleged murders
     identified by Detective Carey, I interviewed Gina Moreno – wife of Joe
18   Moreno – who told me that she knew Ronnie didn't do it because Ronnie
     was on his way to Tracy and got a speeding ticket at the times of the alleged
19   murders.  By telephone, I obtained a certified copy of the speeding ticket
     showing Ronnie heading northbound within 12 hours of the alleged murder.
20   I interviewed a woman who was in his vehicle who verified Ronnie received
     the ticket and that she and Ronnie stayed in Tracy and Fresno about two
21   days after he got the ticket, giving a sound alibi for both killings.

22       Hart's conclusion that Chacon told Detective Carey that Petitioner had personally

23   killed other people is not based on anything other than speculation.  Furthermore, it would

24   have been too prejudicial for trial counsel to bring out this evidence.  Trial counsel would

25   not want to introduce the notion that Petitioner could be connected in any way with these

26   other murders.

27   ///

28   ///

1

2          5.  As part of my investigation, I learned that Detective Chacon
       maintained a close personal relationship with the Sosa family, including Julio
3      Sosa.  I learned that Bobo Sosa was the documented leader of the Nuestra
       Familia prison gang, rivals of the Mexican Mafia prison gang, to which
4      Petitioner was alleged by Detective Chacon to be affiliated with.  My
       knowledge of the Nuestra Familia came from a complete background check
5      on the Sosa family I performed in Santa Barbara and San Diego, including a
       review of documents regarding criminal cases involving Julio and Bobo
6      Sosa.  I reviewed transcripts and documents from a large federal RICO case
       in Fresno, as well as transcripts and documents from a state case in Salinas.
7      Carlos Chacon admitted to me with pride that he partied with the Sosas in
       the 1970's.

8      It is unclear from whom Hart learned that Chacon had a close relationship with the

9      Sosa family, rivals of the Mexican Mafia.  However,  Chacon also allegedly admitted to

10     Hart that he had a social relationship with the Sosas.  If Chacon indeed had ties to the

11     Sosa family, that evidence would tend to show that Chacon had a personal bias against

12     the Ayalas.  Although this evidence relates to Petitioner's EME connections, the evidence

13     could have been somewhat sanitized (e.g. referring to a "competing group").  Accordingly,

14     this evidence considered together with other evidence of Chacon's alleged bias and

15     involvement in the case against Petitioner warrants an evidentiary hearing.

16

17          6.  As I testified at Paragraph 13 of my initial declaration, within
       minutes after learning that the 43rd street murders had occurred, Detective
18     Chacon told his partner that he believed Petitioner and Petitioner's brother
       were the likely killers, and he immediately contacted homicide detectives to
       make his purported "identification" of Petitioner.  Detective Chacon made this
19     purported identification of Petitioner before visiting the crime scene, before
       reviewing any evidence or reports and before interviewing any witnesses,
20     including Pedro Castillo, who would be the first "witness" to purportedly
       identify Petitioner as the killer, but who did not do so until nearly three days
21     later, after initially describing assailants who did not come close to meeting
       Petitioner's physical description.  I learned these facts from numerous
22     sources.  First, there was my review of the police discovery, which had a
       half-page report reflecting that Detective Chacon opined that the Ayalas had
23     to be involved immediately upon hearing about the murders.  He also
       bragged to me personally that he turned to his partner that night and said
24     that the "Ayala's [sic] had to be involved."   He also made the same
       statement publicly at a Public Defender's seminar in 1990 or 1991 at which I
25     attended.

26     ///

27     ///

28     ///

01CV741

1

2

3
       7.  Detective Chacon – a gang detective and not a homicide detective – led the investigation into the 43rd street murders.  Subsequently, and in the course of the investigation and the trial, Detective Chacon had contact with nearly every single witness, and he sat through the trial in its entirety.  I learned this fact from my review of the interview memos of witnesses and my own interviews with these witnesses.

4

5
This evidence, if true, combined with evidence of Chacon's alleged preexisting bias

6
against the Ayalas, supports Petitioner's claim that Chacon was determined to pin the

7
murders on him and injected himself into the investigation and case against Petitioner to

8
achieve this purpose.  It is undisputed that Chacon had contact with two major witnesses

9
for the prosecution  – Mendoza and Meza.  Mendoza talked to Chacon before changing

10
his testimony.  Meza knew Chacon since he was young and met with him a number of

11
times between 1985 and 1987.  Whether there is evidence that Chacon actually influenced

12
the testimony of Mendoza and/or Meza shall be explored at the evidentiary hearing.

13

14

15

16

17
       8.   Regarding my testimony in Paragraph 15 about Detective Chacon's relationship with Juan Meza, I based much of my statements on a number of facts.  First, my interviews of witnesses.  Second, I saw Meza and Chacon together in jail in early 1986 when I was at the jail on the Ayala case.  After Detective Chacon left, I called Meza down and asked him if he was talking to Chacon about the 43rd Street murders and asked him if he had any info about the 43rd Street murders and he said no to both questions.  When I learned later that Meza claimed to have knowledge about the murders, I told trial counsel for Ronnie about my conversation with Meza and offered to testify to it, but I was not called as a witness.

18

19

20

21

22
As discussed above, Chacon's prior relationship with Meza is relevant to this claim.  However, the fact that Meza denied knowledge of the murders when asked by Hart in 1986 is of little significance.  Whether or not Meza knew that Hart was an investigator for the defense, Meza probably had good reason to be careful about admitting knowledge of the murders and the fact that he was providing information to the authorities.

23

24

25

26

27
       9.  On information and belief, Detective Chacon attempted to develop a friendly relationship with Barbara Ayala, Petitioner's sister (and the widow of Mauro Gonzalez).  Chacon admitted to me that he used to drive Barbara to see Mauro Gonzalez in Mexico when Mauro was in prison in the 1970's.  Chacon said he did it out of his great respect for Mauro Gonzalez, which I found impossible to believe given Mauro's killing of Eddie Cruz.  In 1990, Chacon said he still considered Mauro a "man" and that he had no rancor against him for killing Eddie Cruz.

28
This alleged evidence regarding Barbara Ayala is odd but does not help Petitioner's

case in any significant way.

10.  In the course of my "investigation" of the 43rd street murders, I learned that Detective Chacon threatened, coerced, manipulated, and/or intimidated potential and actual witnesses, including but not limited to, Rafael Mendoza-Lopez, Joseph Moreno, Moreno's daughter, Gina Moreno, Tracy Pitman [sic], Jennifer Mendoza, Maria Soto, Sara Castro, Ochoa Hernandez, and Richard Buchanan, as well as Petitioner himself, whom Detective Chacon threatened to kill as he was transporting him to San Diego from Los Angeles in 1985.

Petitioner has not made any showing that trial counsel had knowledge of the alleged threats and intimidation before the end of the guilt phase.  Absent knowledge, trial counsel could not have been ineffective for failing to present the evidence.   Chacon's alleged intimidation and threats to witnesses is the basis of Claim 4 in the federal petition, a prosecutorial misconduct claim in Group Five, which the Court has not yet reached. Chacon's alleged threats towards Petitioner are the basis of Claim 14, also in Group Five. Specific evidence of Chacon's intimidation of witnesses is addressed below.

a.  As for threats to intimidate Rafa Mendoza-Lopez, I learned of this from my discussions with Paul Pickering, who interviewed Rafa's wife.  She told him about Detective Chacon's threats to her made in an effort to get Rafa to change his testimony.  Jennifer Mendoza, Rafa's wife, told Pickering that Chacon specifically tampered with her by threatening her to get Rafa to change his story.  The threat was based on the fact that Jennifer had smuggled drugs into Rafa who was incarcerated and Chacon had been monitoring her drug smuggling.  He used it to say that he could take her off streets and she would lose her children.  After this interview, Paul discussed it with Hector's trial counsel , as well as, I believe, trial counsel for Ronnie Ayala, and told them to call Jennifer Mendoza and/or seek an new trial based on the testimony, but they did not follow up on it.

///

///

///

///

///

///

///

1    Jennifer Mendoza was not interviewed until after the jury returned their guilty

2    verdict.  (Ex. K to Belter Decl.)  Therefore, trial counsel did not know about Chacon's

3    alleged threats towards Jennifer Mendoza and could not be ineffective for not presenting

4    this evidence. [4]

5              b.  As for Joe Moreno, when I first began working on the
     case, Moreno was wanted but had not been apprehended.  At
6    some point, he was apprehended and was later tried and
     exonerated in a subsequent trial.  Before he had been
7    apprehended, I interviewed Joe Moreno's daughter who told
     me that she had been approached by Detective Chacon, and
8    that Chacon told her that Joe Moreno's life was in danger, but
     that if Joe surrendered and admitted he was involved in the
9    killings then Chacon would make sure he would not be
     assassinated in jail.  Essentially, he tried to coerce her into
10   obtaining a false confession from her father with threats of fear
     and intimidation.
11
              c.  I also spoke many times with Joe Moreno's wife,
12   Gina Moreno, who told me she had constantly been harassed
     by the police.  She told me that at one point, the police had
13   raided Joe's house and took items.  Then, she said, Detective
     Chacon subsequently came to her house, holding pants and
14   announced to her there's Joe's pants with blood on it, it's been
     tested and it was the blood of the victim.  Gina was there with a
15   family friend and they both openly laughed at Chacon.  The
     friend announced that the pants were his.  Detective Chacon
16   retreated and there was never any reference again to the
     pants.  It was apparently a clumsy effort by Chacon to frame or
17   coerce Joe Moreno and, by extension, the Ayalas.  I told trial
     counsel about my interview with Gina Moreno and that Ms.
18   Moreno said she would testify to it.  Trial counsel did not use
     that information.
19
         It is unclear whether trial counsel were told of the alleged intimidation of Moreno's
20
     daughter and wife prior to the end of the guilt phase.  If trial counsel had knowledge of this
21
     evidence *before* the end of the guilt phase, Petitioner may present evidence of the
22
     threats/intimidation of Moreno's wife and daughter at the evidentiary hearing.  Otherwise,
23
     the  Court will consider the evidence in connection with Claim 4 in Group Five.
24
     ///
25
     ///
26
     _____
27        [4]  Neither Petitioner's state petition nor Petitioner's federal petition includes a claim
     that trial counsel were ineffective for failing to move for a new trial based on newly
28   discovered evidence that Chacon intimidated Jennifer Mendoza.  Therefore, the Court does
     not address such a claim.

1
2
3
4
5
6
7

       d.  I also talked to Tracy Pitman [sic] and her parents. She was very fearful.  Her father told me he had been contacted by San Diego Detectives in 1985, whom I took to include Chacon and was told that the EME had a contract out to kill Tracy Pitman [sic].  This threat hampered our investigation, although it was inherently unbelievable.  Ms. Pitman's [sic] testimony was very helpful to the defense – the alleged EME members, since we wanted her only to verify the police reports of her earlier statements which essentially exonerated Ayalas.  It appeared that the police officers had tried to convince her that she was in danger in an effort to drive her away.  She actually went into hiding for months before the preliminary hearing in 1985.

8         Again, Hart does not say that trial counsel were aware of the alleged intimidation of

9   Pittman prior to the end of the guilt phase.  If trial counsel was informed of this evidence

10  during or before the guilt phase, Petitioner may present the evidence at the evidentiary

11  hearing.  Otherwise, the Court will consider this evidence in connection with Claim 4.

12
13
14
15
16
17
18

       e.  Maria Soto was an important witness (along with Ignacio Vehar and Ismael Maldonado), and before I first interviewed her, Chacon had for months paid her as a protected witness, which I learned by reviewing memos that reflected payments by Chacon.  Maria Soto was an important witness because she links Tony Figueroa to the murders.  Soto was told by Pete Castillo and Tony Figueroa that a hit man by the name of Sosa was going to kill her if she testified.  Based on Chacon's relationship with Sosa and his threats to other witnesses, I took this threat to have eminated from him as well.  I discussed this issue with trial counsel and the tampering of witnesses, but I was precluded from following up on it.

19        Hart's conclusion that the threats toward Soto emanated from Chacon are purely

20  speculative and do not warrant an evidentiary hearing.

21        In sum, Petitioner has presented evidence that trial counsels' performance was

22  deficient in that trial counsel did not impeach Chacon with evidence that he had a strong

23  bias against the Ayalas, that he immediately fingered the Ayalas as the likely killers, that

24  he inserted himself into the investigation and prosecution of Petitioner, and that he had

25  contact with the witnesses in the case - particularly Mendoza Lopez and Meza.  Viewing

26  this evidence in combination with the evidence regarding Savocchio and Raul Garcia

27  (impeaching Meza) and the evidence regarding Johnny Mendez (impeaching Castillo),

28  Petitioner has raised a colorable claim of prejudice.  Therefore, Petitioner is entitled to an

evidentiary hearing on this claim.  Of course, whether the facts presented by Petitioner will

01CV741

1   ultimately be proven to be true and whether prejudice will actually be established remains

2   to be seen.  At previously explained, at the evidentiary hearing, Respondent may present

3   evidence rebutting any initial showing of deficient performance by counsel and/or

4   prejudice.

5

6      **8.  Claim 25 - Limiting Instruction on Gang Affiliation**

7          In Claim 25, Petitioner argues that trial counsel were ineffective for failing to request

8   a limiting instruction on gang affiliation.  Petitioner argues that the jury should have been

9   advised that such evidence was not received for the truth of the matter, but only as it

10  related to the witnesses' state of mind.

11         This claim fails because no mention of gangs was made during the guilt phase.

12  Mendoza testified that he was afraid to tell the truth because a lot of people know the

13  Ayalas and are willing to do favors for them.  (RT 16355-56.)  On cross-examination,

14  Mendoza testified that when he met with Chacon alone, Chacon told him that he was

15  aware that Mendoza was involved with the group associated with Southern California.  (RT

16  16378-80.)  Chacon told Mendoza that his lies wouldn't put him in a better position with the

17  inmates in the "southern group."  (RT 16381-86.)  On redirect, Mendoza testified that he

18  believed that Ronaldo had influence over what other people in the "southern group" might

19  do.  (RT 16415.)

20         As explained by the California Supreme Court, although some jurors might have

21  been able to figure out that the "southern group" was a euphemism for "gang," it cannot be

22  said "that counsel was unreasonable in believing that she had kept the inflammatory

23  subject from the jury."  <u>Ayala</u>, 23 Cal. 4th at 275.   Thus, trial counsel were not ineffective

24  for failing to request a limiting instruction on gang affiliation, which would have brought the

25  subject to the foreground.  Furthermore, an instruction limiting the evidence to state of

26  mind would have focused the jury's attention on the issue of whether people feared the

27  Ayalas.  Petitioner is not entitled to relief on this claim.

28  ///

9. **Claim 26 - Prosecution Misconduct During Closing Argument**

Petitioner contends that trial counsel failed to object to prosecution misconduct in closing argument.  Petitioner argues that in his closing argument, Woodward repeatedly characterized Petitioner as a man to be feared and suggested that various witnesses were afraid of Petitioner and his "group," thereby improperly invoking racial prejudice and anti-gang bias.   As discussed below, there was no prosecutorial misconduct during closing argument and, therefore, trial counsel were not ineffective for failing to object.

a. **Castillo**

Petitioner takes issue with the following portions of the prosecution's closing argument:

> You've heard, through the testimony of Detective Padillo and through Mr. Castillo himself, Mr. Castillo was very much frightened.  He was frightened of the defendant.  He was frightened of what the defendant stood for.  He was frightened of those people who associated with the defendant, and he recognized he had a major decision to make.
>
> * * *
>
> He was taking his life into his hands, he felt, to name the defendant and his brother and Mr. Moreno, three people who at that time were still at large, three people at that time about whom he was very much frightened.
>
> * * *
>
> He didn't recognize, when he told Detective Padillo and when he came into court, that in addition to risking his family and his own survival to name the defendants, he was also going to be required to essentially divulge the fact that there was dope being sold, that he was involved in selling dope, that Chacho was a person who was involved in selling dope.

(RT 16607-09.)

This argument was not improper.  Castillo testified that while in the hospital he was afraid for the safety of his wife and four children.  (RT 12101-02.)  Det. Padillo testified that when he questioned Castillo at the hospital, Castillo seemed "very hesitant, a form of being scared."  (RT 13138.)  After he was released from the hospital, Castillo and his family stayed at his mother-in-law's house while Castillo waited for the police to provide some protection.  (RT 12116.)  Based on this evidence, the prosecution's argument that

Castillo was afraid for his and his family's lives was accurate. The prosecution's remark about Castillo risking his family and his own survival, when read in context, refers to Castillo's *perception* that he and his family were in danger and was not argument that Castillo and his family were *actually* in danger.

The prosecution's remarks that Castillo was "frightened of what the defendant stood for" and was "frightened of those people who associated with the defendant" were vague statements that did not necessarily refer to Petitioner's unspoken gang affiliation. What "defendant stood for" in Castillo's mind could be violence and cold-blooded murder. The "people who associated with the defendant" included Moreno and Hector, who Castillo certainly feared.

### b. **Meza**

Petitioner claims that the prosecution mischaracterized the evidence by improperly arguing that Meza was afraid of the defendant, just as Mr. Castillo was, and testified in exchange for nothing more than "protection." The Court does not find any misconduct by the prosecution.

Woodward explained that Meza did not go forward with the plan because he was afraid of the defendant - that he was going to get killed if he went along with the plan. (RT 16613.) This is consistent with Meza's prior statements that he did not go through with the plan because he "had been on the cross with [the] Ayalas and . . . was more or less in fear of my own life." (RT 14611.)

Later in the closing argument, Woodward talked about how, in the end, all Meza wanted was protection: "He's concerned about his safety in exchange for his testifying, safety that he would never have to even put into jeopardy if he just simply didn't testify; but he did." (RT 16658.) Again, the focus of these statements was on Meza's perception that he needed protection. Woodward did not discuss the reasons why Meza wanted protection.

1

   ### c. Dominguez (a.k.a. "Chacho")

2        Petitioner argues that the prosecutor improperly implied that Petitioner "and his

3   group" received "deferential treatment" from Chacho, not because they were friends, but

4   because they were a group.  Petitioner is incorrect.  In the portion of the closing argument

5   upon which Petitioner relies, Woodward discussed "the deferential treatment that the

6   defendant Ronaldo Ayala and his group, Hector Ayala and Mr. Meza and Moreno

7   received."  (RT 16628.)  Woodward was discussing a specific group of people and was not

8   using the term "group" in its euphemistic sense.  There was no suggestion that this

9   specific group of people received preferential treatment by virtue of the fact that they

10  belonged to a larger "group."

11

12

   ### d. Mendoza

13       Petitioner takes issue with the prosecution's statements that Mendoza was afraid

14  he was going to be killed either by the defendant "or by those with whom the defendant

15  associates," and knew he was placing his life on the line by coming forward and testifying.

16  (RT 16659.)  Again, the prosecution's characterization of the evidence was not improper.

17  Mendoza testified that he was afraid that he could be killed inside or outside of jail

18  because a lot of people know the Ayalas and are willing to do favors for them.  (RT 16355-

19  56.)  Mendoza also testified that he believed Ronaldo had influence over what other

20  people in the "southern group" might do to him.  (RT 16415-18.)  When the prosecutor

21  talked about Mendoza being in danger or risking his life, it was clear from the context of

22  the argument that the prosecutor was talking about Mendoza's perceptions.

23

24

   ### e. Eduardo Sanchez (a.k.a. "Lalo")

25       Petitioner challenges Woodward's suggestion during closing argument that

26  Eduardo Sanchez testified untruthfully out of fear and concern.  (RT 16674-79.)  Petitioner

27  argues that the prosecutor blatantly and erroneously argued that the jury could place fear

28  in Sanchez's mind.

1    Based on the evidence, Woodward's suggestion that Sanchez was lying out of fear

2  was not improper.  "It is not misconduct for the prosecutor to argue reasonable inference

3  based on the record."  United States v. Atcheson, 94 F.3d 1237, 1244 (9th Cir. 1996).  In

4  addition, a prosecutor may express doubt about the veracity of a witness's testimony.

5  United States v. Cabrera, 201 F.3d 1243, 1250 (9th Cir. 2000).

6    Here, the issue of threat and intimidation was raised by the evidence.  On redirect,

7  Sanchez confirmed that on one occasion, an investigator called "Paul" (Paul Pickering)

8  told him something to the effect that if he didn't tell the truth, something could happen to

9  him while he was waiting for the bus.  (RT 13259, 13272.)  Paul was accompanied by Eric

10  Hart.  (RT 13274.)  Sanchez denied that this threat made him afraid to tell the truth and

11  insisted that he had testified truthfully.  (RT 13263-64.)

12    Woodward did not go out of bounds when he asked the jury to draw the reasonable

13  inference that Sanchez lied about not being afraid and testifying truthfully.  As argued by

14  Woodward, this inference could be drawn from the material differences between his and

15  his uncle's testimony,[5] the way in which Sanchez volunteered that he did not hear anything

16  on the night of the shootings, the exaggerated manner in which he looked around the

17  room when asked to identify Petitioner, and his response that he did not recognize

18  Petitioner because "all Mexicans look alike."  (RT 16675-79.)

19  ///

20  ///

21  ///

22

23    [5] Sanchez lived on Logan Street near the body shop and was at home watching a
baseball game on the night of the murders.  (RT 13231-32.)  He had 6-7 dogs which,
24  according to Sanchez, probably were barking around the time of the murders because they
were always barking.  (RT 13235-36.)  Sanchez testified that he did not look outside of the
25  window because he did not notice anything unusual.  (Id.)  Sanchez's uncle, Carlos, testified
that he was at his nephew's house on the night of the murders.  (RT 13483-85.)  He was
26  playing cards in the kitchen while Sanchez was in his bedroom.  (Id.)  Sometime after 8:00
p.m., Carlos heard what sounded like a pistol shot.  A few minutes later, the dogs made a
27  big ruckus.  (RT 13486.)  About 5-10 minutes after hearing the dogs, he looked outside and
saw the police.  (RT 13486, 13490.)  According to Carlos, the dogs did not act up on a
28  regular basis.  (RT 13487-88.)  They would bark at a noise or disturbance and have barked
at intruders.  (Id.)

1

### f. "Protecting" the witness

2     Petitioner argues that the prosecutor essentially urged the jury to "protect" the

3  witnesses.  Petitioner points to these closing statements of the prosecution:

4           Now, you've heard from Rafa, you've heard from Mr. Meza, you've
       heard from Mr. Castillo.  You've seen the example as it applies to Bobby
5      Garcia.  You've seen the example as . . . it pertains to Lalo, the real
       reluctance people have to come forward and to trust our court system to do
6      the right thing, but the evidence has now been presented to you.
            Those people who now are willing to come forward have done so, and
7      they have taken a substantial risk to come forward and tell you about their
       lives, the good or bad, be it a life that you approve of or disapprove of, be it a
8      life style that you would embrace or reject.
            Don't forget that we in the justice system and you as jurors are not
9      sitting as champions of Chacho or Rafa or Mr. Meza or the witnesses.
            You are champions of the truth and of justice, and of finding what the
10     facts are in this case, and putting your heads together as jurors, listening to
       the actual evidence, not the innuendoes, not the insinuations, but the actual,
11     physical evidence that you've heard in this trial from the testimony of a great
       number of witnesses who put a great deal of faith in our system to come
12     forward and say what they have said.  They have done so at great peril to
       themselves, they feel.
13          It is now your job as jurors to take that evidence, analyze it, work
       together with it and apply the standards of reasonableness, non-conjecture,
14     non-speculation . . . .

15  (RT 16685-86.)

16     Petitioner's interpretation of the above-quoted statements – i.e., that the jury needs

17  to "protect" the witnesses– is unfounded.  The prosecution's point was that Mendoza,

18  Meza, and Castillo had acted courageously by testifying despite their subjective fears and

19  that the jury should reward their trust in the system by carrying out their duties properly.

20  Moreover, as a practical matter, an objection to these statements would not have

21  accomplished anything - an instruction telling the jurors to not consider these statements

22  would not have had any significant impact. Therefore, whether or not trial counsel should

23  have objected, Petitioner did not suffer any prejudice.

24

25  ### 10.  Claim 27- Counsel's Failure to Step Aside

26     In Claim 27, Petitioner argues that after Mendoza's recantation, Semel should have

27  stepped aside and let co-counsel, Robert Boyce, take over the remainder of the guilt-

28  phase and the penalty phase.   According to Petitioner, Semel failed to cross-examine and

impeach Mendoza with the evidence discussed in Claim 22 because she was conflicted due to the nullification of her credibility before the jury and her personal assurance to Mendoza that his informant status would not be revealed.

To the extent that Petitioner argues that Semel should have stepped aside due to her promise to Mendoza not to reveal his informant status, this claim was not pled in the state or federal petitions.  The state petition (Claim 25) and federal petition (Claim 27) allege only that Boyce should have taken over because Semel's credibility was damaged by Mendoza's recantation.

At any rate, the claim fails on the merits.  As discussed in connection with Claim 22, there were reasons why the defense might not have wanted to bring out the fact that Mendoza had been an informant.  Furthermore, the defense's suspicion that Chacon had used this information to threaten Mendoza was not supported by evidence.

As for Petitioner's argument that Semel's credibility was damaged, Mendoza's testimony did not suggest that Semel was involved in or knew about his false statements.  In addition, trial counsel was not ineffective for failing to cross-examine/impeach Mendoza with the evidence discussed in Claim 22.  Petitioner is not entitled to habeas relief on this claim.

### 11.  <u>Claims 32 & 68 – Ishmael Maldonado</u>

Petitioner has submitted evidence that on May 2, 1985, Ishmael Maldonado told police that on the day of the murders, he was drinking with Dominguez, Castillo, and three other men he did not know.  (Ex. 1 to Hodges Decl.)  One man was plump with a brown T-shirt and was 30-32 years old.  Another man had a big mustache and was wearing a red shirt.

Petitioner has also submitted evidence regarding what Elizabeth Maldonado, Maldonado's daughter, saw and heard on the evening of the murders and the following morning.  According to Hart's Supplemental Declaration, on the evening of the murders, Elizabeth overheard her father tell his girlfriend, "the mechanics are going to get what they

71

1    deserve . . . it should be done tonight . . . so if they come around here, tell them I was here

2    all evening." (Hart Supp. Decl. ¶ 25.)  Elizabeth also heard her father mention that two

3    brothers from Mexico had agreed to do something for him.  (Id.)  Later that evening,

4    Elizabeth overheard her father on the phone saying, "I just want her face slashed . . . I

5    already paid you.  Do it after you do whatever you have to do to the mechanics." (Id.)  The

6    following morning, Maldonado saw her father and girlfriend laughing as they watched TV

7    coverage of the murders.  Maldonado said, "They got what they deserved." (Id.)  He then

8    drove to the location of the murders and removed a piece of yellow police tape from the

9    site.  (Id.)  When interviewed by Rolan, an investigator with the DA's Office, Maldonado

10   admitted that he may have talked to someone at the shop on the night of the murders

11   regarding someone slashing his wife's face.  (Ex. 1 to Hodges Decl.)  In his motion papers,

12   Petitioner claims that on the night of the murders, Maldonado's ex-wife spent the night

13   away from her home, but the paws of her dog were slashed.  (Pet'r's Mem. of P. & A. at

14   107.)

15        In Claim 32, Petitioner claims that trial counsel were ineffective for failing to call

16   Ishmael Maldonado as an exculpatory witness.  In Claim 68, Petitioner claims that he was

17   denied due process when his trial counsel failed to call Maldonado due to Boyce's prior

18   representation of Maldonado in another criminal proceeding.

19        Petitioner's claims fail because the Court cannot expand the record to include the

20   evidence discussed above. In his state petition, Petitioner merely stated that Maldonado

21   was a "material exculpatory witness" who "had information that implicated persons other

22   that Petitioner, or his alleged accomplices." (Claims 32 and 62.)  Petitioner did not provide

23   any other facts regarding what Maldonado (or his daughter) might be able to testify to.

24   Therefore, Horton, 408 F.3d at 582 n. 6, is distinguishable, and the Court concludes that

25   Petitioner did not exercise the requisite diligence to develop the factual basis of his claim.

26   Petitioner is therefore subject to the requirements of § 2254(e)(2), which he has not

27   satisfied.

28   ///

1    Even if the Court were to consider the newly submitted evidence, Petitioner's claims

2   would fail on the merits.  Maldonado would hardly be a credible witness.  According to the

3   evidence, he was an unsavory character who wanted his wife's face slashed and thought

4   the murder victims "got what they deserved."  If Maldonado wanted the victims dead,

5   Maldonado might lie about seeing strange men at the shop to protect whoever committed

6   the murders.

7    Furthermore, the statements that Elizabeth allegedly overheard could implicate the

8   Ayalas instead of exculpating them.  Maldonado said that "two brothers from Mexico" had

9   agreed to do something for him.  This evidence presents the danger that a jury would

10   conclude that the two brothers were the Ayalas (Hector Ayala is a Mexican national).

11

12    **12.  Claim 33 - Hector Figueroa (a.k.a. "Tony")**

13    Petitioner contends that trial counsel were ineffective for failing to call potentially

14   exculpatory witness Hector Figueroa (a.k.a. "Tony").  According to Petitioner, Figueroa

15   was possibly involved in the plotting or execution of the killings.

16    In his Memorandum of Points and Authorities, Petitioner makes the following claims

17   about Figueroa:  Figueroa had a motive to kill the victims because he worked for

18   Dominguez until just before the killings, when Dominguez fired him without cause;

19   Dominguez refused to pay back money that he owed to Figueroa and also took back a car

20   he had allowed Figueroa to drive while making deliveries; on the evening of the murders,

21   Figueroa acted suspiciously, hiding documents concerning the drug trade under the

22   mattress and telling Miguel Lopez to tell the police that Figueroa's name was Armando;

23   Figueroa gave a false name to police when they took him to the station and questioned

24   him; Figueroa took up Dominguez's drug trade after the murders; witnesses linked

25   Figueroa to the removal of drug scales and heroin from the vehicles behind the body shop;

26   and Castillo blamed Figueroa when he could not find the drugs and scales.  (Pet'r's Mem.

27   of P. & A. at 106-07.)

28    Armando Sanchez, in police interviews and a subsequent trial, testified that he

73

believed his nephews and "Tony" were selling drugs out of his nephew's house to the tune of two to three thousand dollars a day. (RT 233.) Sanchez told the police officer that his nephew Oscar carried a .38 caliber police special in his waistband. Tony was known to always be armed with a .22 caliber, long-barreled revolver. (RT 235-36.) Sanchez came to the police because he was worried about his nephews. (RT 235.)

Petitioner did not present the factual basis of this claim to the state court. The state petition alleged that Figueroa was a "material exculpatory witness" who had "information" that implicated persons other than Petitioner. The petition did not give any particulars as to the information. The declaration of Eric Hart attached to the state petition stated that "Figueroa had information that implicated persons other than Petitioner, and/or his alleged accomplices, for the subject crimes." (Hart Decl., ¶ 66.) Because Petitioner failed to exercise diligence to develop the factual basis of his claim, § 2254(e)(2) applies. Petitioner has not satisfied § 2254(e)(2)'s requirements. Therefore, the Court cannot expand the record to include the newly submitted evidence.

Moreover, even assuming trial counsel had access to the purported evidence regarding Tony, Petitioner's ineffective assistance claim fails on the merits. As already discussed, to be admissible, evidence of third-party culpability need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. Hall, 41 Cal. 3d at 833. However, "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." Id. Evidence of mere motive or opportunity, without more, will not suffice to raise a reasonable doubt about a defendant's guilt. Id.

The purported evidence regarding Tony does not raise a reasonable doubt of Petitioner's guilt. This evidence would establish a motive for Tony to kill Dominguez but does not link Tony to the actual perpetration of the crime. According to Miguel Lopez and Robert Garcia, Tony was in the ice cream truck at the time of the murders. The fact that Tony may have carried around a .22 revolver before and/or after the murders and that one of his friends, Oscar, carried a .38, is insufficient to tie Tony to the commission of the

1    crime.  The evidence regarding Tony was not inconsistent with any of the evidence that

2    Petitioner was one of the perpetrators.

3           At any rate, trial counsel did try to cast suspicion on Tony during closing argument.

4    Trial counsel referred to Tony's behavior on the night of the murders (hiding the drug lists

5    and giving a false name) and the evidence that Castillo was looking for Tony in connection

6    with the missing scales and drugs.  (RT 16760.)  Trial counsel may have made the tactical

7    decision to avoid placing too much emphasis on the possibility of Tony's involvement in

8    the murders.  When a defense attorney blames the crime on too many people, the more

9    convincing possibilities are diluted.

10          For these reasons, trial counsel were not ineffective for failing to call Hector (Tony)

11   Figueroa as a witness, and Petitioner is not entitled to relief on this claim.

12

13                                    **V. PENALTY PHASE**

14

15   **A.  Evidence Presented During Penalty Phase**

16

17          **1.  Prosecution's Case**

18          The prosecution opened the penalty phase by emphasizing Petitioner's numerous

19   past felony convictions and previewing the expected testimony of victims to unadjudicated

20   crimes committed by Petitioner.  After noting the facts surrounding the triple murder of

21   which Petitioner had just been found guilty, the prosecution argued "[e]nough is enough"

22   and urged the jury that "the only appropriate penalty is execution."  (RT 17174.)  The

23   defense declined to make an opening statement. (RT 17175.)

24

25                 **a.  Prior Felony Convictions**

26          The parties stipulated that Petitioner had six prior felony convictions: auto theft,

27   robbery, possession of a weapon in prison, possession of heroin, and two convictions for

28   burglary.  (RT 17175.)  These stipulations were announced to the jury at the start of the

1    penalty phase.  (RT 17176-77.)

2

3              **b.**   **Unadjudicated Crimes**

4

5                   **i.**   **Williams Assault**

6         Prisoner Wallace Williams testified that he received injuries from a "commotion" on

7    the yard at San Quentin Prison in November 1975.  (RT 17180.)  Williams did not identify

8    Petitioner as the assailant, but admitted that Petitioner was also on the yard that day.  (RT

9    17187.)  Correctional Officers Kennedy and Jordan also testified to the events surrounding

10   the assault on Williams.  Sergeant Kennedy described the altercations that broke out and

11   stated that he observed an inmate throw the weapon over the prison yard fence.  (RT

12   17227-34.)  Sergeant Jordan testified to the retrieval of the weapon and of his

13   identification of Petitioner as the individual who threw the weapon.  (RT 17245-52.)  The

14   testimony regarding this incident is further detailed in the discussion of Claim 31.

15

16                   **ii.**   **Christiansen Assault**

17        Richard Christiansen testified that Petitioner attacked him on the yard at San

18   Quentin in October 1977 by grabbing his hair, pulling his head back, and stabbing him in

19   the face with a knife.  (RT 17259-62.)  Christiansen told correctional officers that he had

20   "slipped and fell" and was sent to the infirmary, where he received seven stitches for the

21   wounds.  (RT 17263.)  Christiansen stated that he did not tell the officers what had really

22   happened, as "it just wasn't done."  (RT 17264.)  Correctional Officers Larry and

23   Blasingame took the stand and confirmed Mr. Christiansen's account.  (RT 17312, 17331-

24   33.)  Officer Spoon testified about locating the weapon used in the assault.  (RT 17381.)

25

26                   **iii.**   **Macugay Assault**

27        Alex Macugay testified that Petitioner stabbed him with a shank in the halls of

28   Soledad Prison in November 1982, stating that the attack ended when a correctional

officer shot into the altercation, wounding Macugay and Petitioner with birdshot.  (RT 17398-17406.)  Correctional Officer Castro and Lieutenant Pope confirmed Macugay's account.  (RT 17424-27, 17443-45.)  Officer Castro added that the birdshot was necessary to cease Petitioner's attack on Macugay.  (RT 17427, 17436.)

### iv.    Pantry Store Robbery

Hilda Paul testified that Petitioner and another individual robbed the Pantry store in 1972 at gunpoint.  (RT 17489-91.)  The robbers forced employees to open a floor safe and stole jackets from the clothing store.  (RT 17492-98.)  Ms. Paul identified Petitioner as the individual holding the gun during the robbery.  (RT 17492.)

### v.    Casas Murder

Glenn Albrecht testified that he was incarcerated at Folsom with both Petitioner and John Casas, and ate dinner with Casas on the day of his death.  (RT 17522.)  Albrecht and Casas saw Petitioner looking at them in the dining hall.  Later that evening, all three men were in the shower area when Petitioner directed Albrecht to call Casas over to where they were standing.  (RT 17523-24.)  Albrecht complied, and Petitioner then hit Casas in the chest several times with his left hand.  (RT 17527.)  Albrecht testified that "Ronny stabbed him," but admitted that he did not see a weapon in Petitioner's hand.  (RT 17528, 17529-30.)  After the assault, Casas was lying dead in a pool of blood, and Albrecht observed a knife lying on the rail near the showers.  (RT 17534.)  Albrecht stated that when he initially called Casas over, he had no idea what was going to happen.  (RT 17533.)

On cross-examination, Albrecht admitted that he did not mention Petitioner looking at him during dinner in his statement to the D.A.'s Office.  (RT 17555-56.)  Albrecht also admitted pushing the knife under a cell with his foot after Casas was stabbed.  (RT 17557.)  Defense counsel brought out the fact that Albrecht had testified against other inmates in the past, provided information to San Quentin prison staff about inmates, and at

1  the time of his third prison sentence, was concerned about the "snitch" reputation he had

2  garnered for himself.  (RT 17590-95.)

3      Walter Lewis testified that he knew Petitioner at Folsom and had played handball

4  with him in the weeks prior to the stabbing.  (RT 17629-30.)  On the night of the murder,

5  Lewis testified that he noticed a light-skinned Hispanic man looking intently at the gun rail

6  and then making a signal with his head.  (RT 17643-49.)  Lewis saw several inmates break

7  away from a group; one man threw his hands up, walked toward the steps, then fell.  (RT

8  17650-51.)  Prior to the man falling, Lewis saw another inmate, who he identified as

9  Petitioner, lunge toward that man and reach down with his left hand for a towel with a

10  weapon in it.  (RT 17653.)  After Petitioner lunged, Lewis saw the victim stagger toward

11  the stairs and fall, with blood everywhere.  (RT 17655.)  When Lewis was interviewed by

12  guards the next day, he denied seeing anything.  Lewis waited until a year prior to his

13  testimony to write a letter to officials at Tehachapi to inform them of what he had

14  witnessed.  (RT 17661.)

15      On cross-examination, defense counsel countered Lewis's assertion about playing

16  handball with Petitioner in January 1980 with records showing that he was in lockup for

17  several days during that month.  (RT 17670-74.)  Lewis was also questioned regarding his

18  violent acts against other inmates and his affiliation with the Aryan Brotherhood in 1980.

19  (RT 17686.)  Defense counsel also elicited testimony that Lewis had begun informing on

20  other inmates in 1986.  (RT 17668.)

21      Officer Klein testified that he was on duty outside the shower area the day of the

22  Casas homicide when he heard a loud thud, looked over when an inmate yelled, and saw

23  a body lying on the floor.  (RT 17735, 17741.)  Klein activated an alarm, went over to the

24  body, and saw a "gaping wound" in Casas's back.  (RT 17743.)  He and another officer put

25  the body on a stretcher, noted the profuse bleeding, and assumed the victim was dead.

26  (RT 17744.)  Klein testified that during the incident, the gun rail officer was the only officer

27  available to control movement of the other inmates because everyone else was occupied

28  with the victim.  (RT 17746.)  Another officer discovered a weapon under the front edge of

an occupied cell, right in front of the shower area.  (RT 17748.)  On cross-examination, defense counsel elicited the fact that there were approximately 60 inmates out of their cells during the shower period.  (RT 17753.)

Officer Stuckey testified that he located the weapon used in the altercation.  (RT 17757-58.)  Stuckey testified that he came upon the scene once the body had been removed, followed a trail of blood, and discovered a bloody knife concealed in a white towel under a cell door.  (RT 17759-60.)

Dr. Cunha, a forensic pathologist, testified that he examined the body of John Casas the day after the homicide.  (RT 17772.)  Dr. Cuhna testified that Casas sustained two stab wounds to his upper torso, one each to the front and back of his chest area.  (Id.) He testified that the wounds were caused by a sharp cutting instrument and were consistent with a knife wound and that the front of the victim's chest had an abrasion mark consistent with an abrasion from the handle or hilt of a knife.  (RT 17775-77.)  Dr. Cuhna also testified that it was possible that the wound to the front of the chest was due to two thrusts of the knife rather than just one.  (RT 17778.)  On cross-examination, the doctor conceded that he could not conclude whether the wounds had been caused by two instruments or only one.  (RT 17782.)  The doctor added that the wounds would have resulted in a great deal of blood and that the victim would have been able to move for a short amount of time, at least ten to fifteen seconds.  (RT 17783.)

## 2. Defense Case

The defense's penalty phase opening explained that Petitioner "was not born violent, but he was born into a world of violence, and he lived even as a young child in a world of violence" and urged the jury to keep their minds open when considering the aggravating evidence.  (RT 17786-89.)  The defense introduced evidence on prison life to the jury, and offered evidence about gangs as a "powerful fact of prison life" to place the aggravating evidence in context. (RT 17790-91.)  In a bench conference prior to the start of the penalty phase, defense counsel announced their intention to abandon the strategy

1   of avoiding any mention of gangs, explaining that their penalty phase strategy made such

2   a change necessary.  (RT 17193, 17281.)  Finally, the defense called several family

3   members and friends as witnesses.

4

5                    **a.  Concessions to Prior Convictions and Other Crimes**

6       The defense not only conceded the six prior felony convictions, but added a

7   concession to the Pantry store robbery and to the stabbing of several inmates in prison.

8   Petitioner denied responsibility for the murder of John Casas.

9

10                 **b.  Prison Life and Aggravating Circumstances**

11      Correctional Officer Hamilton testified regarding the "extreme racial tension" in

12   existence at San Quentin Prison in the 1970's and the high rate of violence in the prison at

13   that time.  (RT 17797-99.)  Officer Hamilton characterized the 1975 assault on Wallace

14   Williams as just one of many racially-charged and motivated incidents during that time

15   period, but admitted he was not present at the time of the assault.  (RT 17823-26.)

16      Correctional Sergeant Garcia testified that Glenn Albrecht, who testified as a

17   witness to the Casas homicide, was a leader of the "northern Hispanics" in Avenal Prison,

18   where the witness worked.  (RT 17900.)  Officer Garcia stated that Albrecht would be

19   hostile to an inmate, such as Petitioner, who was allied with the southern group.  (RT

20   17901-02.)

21      Correctional Officer Amaro testified that Petitioner worked for him in 1981 as a tier

22   tender and was a good worker.  (RT 17942-46.)

23      Dr. Craig Haney, a psychology professor, testified as a prison conditions expert.

24   (RT 18594.)   He testified specifically on the conditions in San Quentin and likened

25   Petitioner's incarceration to a form of torture.  (RT 18612.)  Dr. Haney detailed Petitioner's

26   history of incarceration, particularly his time spent in high-security housing, and testified

27   regarding the severely negative psychological effect those conditions had on Petitioner.

28   (RT 18608-17, 18753-76.)

1          Dr. John Irwin, a sociology professor and former inmate at Soledad Prison, testified

2   as an expert in prison conditions and prison culture.  (RT 17961-63.)  He testified

3   regarding the rise of prison gangs and the creation and increased use of high-security

4   housing for inmates.  (RT 17967-72.)  He also testified regarding racial tensions and the

5   poor conditions in San Quentin's North Block where Petitioner was housed.  In addition, he

6   gave his opinion on the reliability of prison informants.  (RT 17972-95.)

7          Jackie Hilliard, a reverend and former correctional officer at San Quentin, described

8   the racial violence and harsh conditions in that institution.  (RT 18923.)  Hilliard testified

9   that Petitioner was always respectful towards him and only "gassed" him once with water

10  after pressured to do so by other inmates.  (RT 18924-26.)

11         Robert Marquez, an investigator for the DA's Office, testified regarding his

12  interviews of Glenn Albrecht and Walter Lewis in relation to the Casas homicide.  Marquez

13  testified that he did not take notes at the initial interviews, and that he did know that any

14  notes would have to be turned over to the defense.  (RT 18131.)  He testified that he took

15  no initial notes in order to build rapport with the interviewees, but recorded the statements

16  of both Albrecht and Lewis.  (RT 18132, 18142.)

17         William Han, a health services official with the Department of Corrections, testified

18  that although he signed the forms regarding the injuries sustained by inmates Macugay

19  and Petitioner, he did not remember the incident.  (RT 18585.)  The defense took the

20  position that the report described lacerations rather than pellet wounds due to birdshot.

21  (RT 18588-89.)

22

23                    **c.  Mendoza Lopez and Meza**

24         Deputy Sheriff Valdez testified about a request received on September 26, 1988 to

25  place defense-turned-prosecution witness Rafael Mendoza Lopez in protective custody, in

26  a unit also occupied by prosecution witness Juan Meza.  (RT 17924.)  San Diego County

27  Jail officers asked the DA's Office whether the two inmates could be escorted together to

28  activities such as the exercise area and television area.  (RT 17925.)  On cross-

1  examination, the prosecution pointed out that Mendoza was not called in rebuttal by the

2  prosecution until September 29.  In addition, Mendoza had already made his recorded

3  statement on September 24, which was two days before his placement in protective

4  custody alongside Meza.  (RT 17937-38.)

5

6              **d.  Family Life and Childhood**

7          Dr. Richard Cervantes, a clinical psychologist, testified as an expert on the effects

8  of stress on the Hispanic community.  (RT 19179.)  Dr. Cervantes spoke with Petitioner

9  and members of his family, reviewed his juvenile record, and testified on the negative

10  effects a turbulent family life had on Petitioner.  (RT 18184-85.)  Dr. Cervantes testified

11  that Petitioner's parents would have physical altercations after his father drank and that

12  some arguments resulted in physical violence against Petitioner.  (RT 18191-94.)  Dr.

13  Cervantes also testified that Petitioner began to use and abuse alcohol and drugs when he

14  was a teenager, which led to his first violent offense.  (RT 18200.)

15          William Underwood, a former employee of the California Youth Authority, testified

16  as an expert in the juvenile justice system at the time Petitioner was under its supervision.

17  (RT 18345.)  Mr. Underwood testified that Petitioner had been treated harshly by what he

18  characterized as an inadequate system for dealing with juvenile offenders.  (RT 18438-

19  39.)

20          Doris Stein, Petitioner's sixth grade teacher, testified that Petitioner was a good boy

21  who occasionally got into fights on the playground, but never caused a disturbance in

22  class.  (RT 18167-68.)  Stein testified that other students taunted Petitioner, who had

23  trouble reading, was poor, and was often at a disadvantage.  (RT 18169-71.)

24          Barbara Moreno, Petitioner's sister, testified that Petitioner was a good brother

25  growing up and described their father's alcohol problems.  (RT 18218, 18222.)  Ms.

26  Moreno blamed Petitioner's problems on his drug abuse.  (RT 18226.)  Ernestina Meyer,

27  Petitioner's cousin, testified that Petitioner was a happy child.  (RT 18294.)  Meyer also

28  described the family violence Petitioner grew up with, and talked about her visits with

1    Petitioner during his periods of incarceration.  (RT 18295-97.)

2         Richard and Marjorie Suarez, Petitioner's nephew and half-sister respectively, each

3    testified regarding their memories of Petitioner, and both stated that they favored a verdict

4    of life rather than the death penalty.  (RT 18815-18, 18840.)

5         Rita Jenkins, a San Diego probation officer and the aunt of Petitioner's deceased

6    wife, testified that Petitioner had placed his daughter Victoria in the care of Jenkins and

7    her husband.  (RT 18865-66.)  She added that Petitioner wants to see his child raised in

8    an environment totally different from the one in which he was raised.  (RT 18875-76.)

9         Geraldine Moses, a frequent visitor to Petitioner in jail, testified that over the last

10   three years she has met with him for Buddhist study and has come to know him as a

11   caring and respectful person.  (RT 18967-71, 18981.)

12

13        **3.  Prosecution Rebuttal**

14        On rebuttal, the prosecution read into evidence a letter Petitioner wrote to friend

15   while in San Quentin, in which Petitioner minimized the effect prison had on him and

16   stated that he was "jailing first class."  (RT 18986-89.)

17

18   B.    **Penalty Phase Claims**

19

20        **1. Claims 28 (John Casas) and 29 (Pantry Robbery)**

21        Claim 28 alleges that trial counsel was ineffective in their failure to competently

22   investigate and present a defense or evidence in mitigation of the prison murder of John

23   Casas, denying Petitioner of his rights under the Fifth, Sixth, Eighth and Fourteenth

24   Amendments.  Claim 29 asserts that trial counsel made an unreasonable decision to

25   stipulate that Petitioner participated in and held a gun during the robbery of the Pantry

26   store.

27        Petitioner requested that he be permitted to withdraw Claims 28 and 29 from the

28   Second Amended Petition, and on June 8, 2006, the Court entered an order granting that

1    request.

2

3         **2. Claim 30 - References to Prison Gangs**

4         Claim 30 asserts that during the penalty phase, trial counsel violated Petitioner's

5    rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by unreasonably

6    abandoning their attempts to avoid references to prison gangs.  The Court rejects this

7    claim.

8         During the testimony of state witness Richard Christiansen, trial counsel conceded

9    that the prosecutor could refer to gangs rather than merely using the generic terms

10   "groups."  Later, witness Kenneth Blasingame placed the initials EME, which stand for

11   Mexican Mafia, on a diagram of the prison yard to designate where Petitioner went to

12   stand after an assault.  Petitioner claims that these incidents, among others, were

13   prejudicial.

14        Respondent argues that trial counsels' decision to allow gang references during the

15   penalty phase was likely a tactical move, designed to demonstrate to the jury the

16   "environment" of racial tension in prison.  Respondent adds that Petitioner fails to show

17   that this tactical decision was unreasonable or that it prejudiced Petitioner.

18        The transcripts show that defense counsels' decision to allow gang references was

19   designed to demonstrate the racial tensions and fear inherent in the prison environment.

20   (RT 17193.)  In fact, it was defense counsel who first elicited the term "gang" during the

21   penalty phase cross-examination of Wallace Williams.  (RT 17200.)

22        In evaluating the performance of trial counsel, there exists a "strong presumption

23   that counsel 'rendered adequate assistance and made all significant decisions in the

24   exercise of reasonable profession judgment.'"  United States v. Palomba, 31 F.3d 1456,

25   1460 (9th Cir. 1994) (quoting Strickland, 466 U.S. at 690).  Defense counsel explained

26   their decision to allow gang references during a conference outside the presence of the

27   jury:

28              I should make it clear, I think, as a matter of record, that as a tactical
                decision I think the defense has decided to present evidence in this regard

84                                                                    01CV741

1    because it is our position essentially that the – that the way in which the
2    climate of fear was created by the evidence presented at the guilt phase I
     think is worse than simply fully presenting this issue to the jury and allowing
     the jury to decide what it will with a full understanding of the circumstances
3    that existed in prison during the 70's and the early 1980's."  (RT 17281.)

4    Petitioner has not overcome the presumption that this deliberate strategy was

5    sound.  Strickland, 466 U.S. at 689.  Based on the record before the Court, this strategy

6    was completely reasonable and did not result in a failure to subject the prosecution's case

7    to "meaningful adversarial testing."   United States v. Cronic, 466 U.S. 648, 656 (1984).

8    Therefore, Petitioner is not entitled to relief on this claim.

9

10       **3. Claim 31- Wallace Williams**

11       Claim 31 alleges that trial counsel violated Petitioner's rights under the Fifth, Sixth,

12   Eighth and Fourteenth Amendments by failing to make a motion to dismiss the

13   aggravating factor of the Wallace Williams attack, or to preclude the introduction of this

14   evidence at the penalty phase of the trial.  This claim lacks merit.

15       According to Petitioner, none of the witnesses called by the state during the penalty

16   phase could identify Petitioner as the perpetrator, and there was no physical evidence

17   linking Petitioner to the attack.  Wallace Williams, the victim, only testified that he knew

18   Petitioner, that both inmates were housed in North Block, and that Petitioner was on the

19   exercise yard with him the day the incident occurred.  (RT 17187, 17191-92.)  Williams

20   added that it was not uncommon for inmates to fail to identify those who assaulted them

21   due to the "living conditions" in San Quentin.  (RT 17208.)

22       Lieutenant Bobby Jack Kennedy testified that a melee broke out on the prison yard,

23   and he saw inmate Williams retreating with a Hispanic inmate assaulting him.  (RT 17228.)

24   Kennedy then saw this same Hispanic inmate throw something toward the fence.  (RT

25   17229.)  Although Officer Kennedy did not know this inmate, he wrote a report on the

26   incident that very day and made an identification for his report.  (RT 17230.)  Officer

27   Kennedy did not make an identification of Petitioner in court.

28       Sergeant Cecil Jordan testified that he saw Officer Perkins chasing an inmate and

85

01CV741

1   that Officer Perkins yelled, "Ayala," before this inmate threw something over the fence.

2   (RT 17246.)  Officer Jordan testified that he retrieved the knife and described it in the

3   report.  (RT 17247-48.)  Officer Jordan also testified that he made an identification of

4   Petitioner through prison photos and records and that his incident report identified

5   Petitioner by his last name only.  (RT 17250-52.)  Officer Jordan did not make an

6   identification of Petitioner in court.

7        The evidence offered in support of the Williams assault was circumstantial in

8   nature.  The victim of the stabbing failed to identify Ayala as the perpetrator of the assault.

9   The officers in question identified an inmate named "Ayala" in their reports, but neither

10  made an identification in court.  However, even if counsel's performance in failing to move

11  to dismiss this aggravating factor was deficient, Petitioner's claim fails due to his inability to

12  demonstrate any resultant prejudice.  See Strickland, 466 U.S. at 691 ("An error by

13  counsel, even if professionally unreasonable, does not warrant setting aside the judgment

14  of a criminal proceeding if the error had no effect on the judgment.")

15       As previously discussed, there was a substantial amount of evidence offered in

16  aggravation during the prosecution's penalty phase presentation.  In addition to the facts

17  and circumstances of the crime, which the jury was allowed to consider in weighing their

18  decision, the parties stipulated to numerous prior felony convictions and the Pantry store

19  robbery.  The state also presented evidence in support of the prior unadjudicated Casas

20  homicide and evidence in support of two other prior unadjudicated prison assaults on

21  inmates Christiansen and Macugay.

22       In light of the strength of the prosecution's penalty phase case, there exists no

23  reasonable probability that, but for counsel's failure to make a motion to dismiss this

24  aggravating factor, "the sentencer would have concluded that the balance of aggravating

25  and mitigating circumstances did not warrant death."  Pizzuto, 385 F.3d at 1248-49 (B.

26  Fletcher, J., dissenting).  Petitioner did not suffer any prejudice and is not entitled to relief

27  on this claim.

28  ///

86

## VI.  APPELLATE INEFFECTIVE ASSISTANCE OF COUNSEL

Claim 35 alleges that appellate counsel was ineffective in his failure to investigate, research, prepare and present numerous issues during the appeal in state court.  In the merits briefing for the Group Three claims, Petitioner, for the first time, specifically cites to thirty-two separate claims which he contends should have been presented to the state court.

The thirty-two claims that Petitioner contends should have been raised on appeal are Claim 75 (from Group One), Claims 55-66 (from Group Two), Claim 68 (from Group Three), Claims 10-11, 48-49, 67, and 70 (from Group Four) and Claims 2-3, 5-6, 8-9, 12-16, and 69 (from Group Five).[6]  Petitioner admits that he has not fully briefed the merits of Claim 35, explaining, "Although the claims for which Petitioner claims IAAC [Ineffective Assistance of Appellate Counsel] are specifically listed, Petitioner has not exhaustively discussed the merits of these claims, or provided full factual support for them at this time, believing that [to] do so would be premature until the Court first rules on the underlying claims."  (Pet'r's Mem. of P. & A. at 120.)

The Court will consider this claim when it has been fully briefed on the merits.  At this time, the Court denies without prejudice Respondent's motion for summary judgment on this claim and also denies without prejudice Petitioner's Motion for summary judgment and/or an evidentiary hearing.  The parties may include this claim in their Group Five motions.

///
///
///
///
///
///
///

---

[6]  In his motion papers, Petitioner erroneously identifies Claim 15 as Claim 11.

## VII. CONCLUSION

For the reasons discussed above, Respondent's motion for summary judgment [183] is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** as to Claims 17, 21-23, 25-27, 30-34, 36, 68.  The motion is **DENIED WITHOUT PREJUDICE** as to Claim 35.

Petitioner's motion for summary judgment [188] is **DENIED**.  The motion is **DENIED WITHOUT PREJUDICE** with respect to Claim 35.  Petitioner's motion for an evidentiary hearing [188] is **GRANTED IN PART** and **DENIED IN PART**.  The Court will hold an evidentiary hearing in connection with Claims 18, 19, 20, and 24 on the issues identified in this Order.  The evidentiary hearing will be held after the Court has ruled on the Group Five motions.

To prevail on his claims that are the subject of the evidentiary hearing, Petitioner must do more than put Hart or Pickering on the stand to testify about their interviews with witnesses.  Petitioner must establish that the evidence that forms the basis of his claims actually existed at the time of trial, could have been presented at trial, and was known by trial counsel.  Furthermore, Petitioner must show that trial counsel's failure to present such evidence fell below an objective standard of reasonableness and that trial counsel's mistakes, individually or collectively, were so serious that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  Respondent may rebut any initial showing of deficient performance and/or prejudice with evidence that, inter alia, the evidence at issue did not exist, the evidence could not have been presented at trial, and/or trial counsel was not aware of the evidence.  Respondent may also present evidence regarding what actions the prosecution would have taken and what evidence would have been introduced in response to trial counsel's use of the impeachment evidence at issue.

The Court will, in the final judgment, **DENY** a certificate of appealability as to Claims 17, 21, 22, 23, 25, 27, 30, 31, 36 and **GRANT** it as to Claims 19, 20, 26, 32, 33, 34, 68. With respect to Claim 18, the Court will grant a certificate of appealability on the claims

01CV741

regarding trial counsels' failure to call Raul Garcia and failure to present third-party culpability evidence regarding Hector ("Tony") Figueroa.  The Court will deny a certificate of appealability as to the remaining aspects of Claim 18, with the exception of the claims that are the subject of the upcoming evidentiary hearing.  With respect to Claim 24, a certificate of appealability will be denied as to those parts of the claim on which an evidentiary hearing was not granted.

**IT IS SO ORDERED.**

DATED:  February 1, 2008

Honorable Barry Ted Moskowitz
United States District Judge

01CV741