# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

RONALDO MEDRANO AYALA,

                 Petitioner,

vs.

ROBERT L. AYERS, JR., Warden of
California State Prison at San Quentin,

                 Respondent.

CASE NO. 01cv0741 BTM

**ORDER GRANTING IN PART AND
DENYING IN PART RESPONDENT'S
MOTION TO DISMISS GROUP FOUR
CLAIMS; GRANTING RESPONDENT'S
MOTION FOR SUMMARY JUDGMENT;
DENYING PETITIONER'S MOTION
FOR SUMMARY JUDGMENT; AND
DENYING PETITIONER'S MOTION
FOR AN EVIDENTIARY HEARING**

      Respondent has filed a motion for summary judgment on the Group Four Claims (Claims 10-11, 37-50, 67, and 70-71 of the Second Amended Petition). Respondent has also filed a motion to dismiss the majority of the Group Four Claims on the basis of state procedural bars and/or pursuant to <u>Teague v. Lane</u>, 489 U.S. 288 (1989). Petitioner has filed a motion for summary judgment, or, in the alternative, for evidentiary hearings on these same claims. Given the very extensive briefing and the nature of the claims, the Court finds these motions fully suitable for decision on the papers without oral argument. For the reasons discussed below, Respondent's motion for summary judgment is **GRANTED**, Respondent's Motion to Dismiss is **GRANTED** in part and **DENIED** in part, and Petitioner's motion for summary judgment and/or an evidentiary hearing is **DENIED**.

# I. **BACKGROUND**

On April 17, 1997, Petitioner filed his automatic appeal with the California Supreme Court, and filed a reply brief on April 27, 1998.  On July 23, 1998, Petitioner filed a habeas petition with the California Supreme Court.  On June 8, 2000, the California Supreme Court denied the appeal.  See People v. Ayala, 23 Cal. 4th 225 (2000).  On June 8, 2000, the California Supreme Court also summarily denied the habeas petition without comment.  Subsequently, Petitioner filed a Petition for a Writ of Certiorari in the United States Supreme Court, which was denied on March 5, 2001.

On May 3, 2002, Petitioner filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court.  Shortly thereafter, the Court dismissed without prejudice certain claims presented in the Petition in order to permit Petitioner to exhaust those claims in state court.  The Court stayed the federal proceedings pending the exhaustion of state court remedies.

On September 23, 2002, Petitioner filed a First Amended Petition for a Writ of Habeas Corpus in the California Supreme Court.  On September 10, 2003, the California Supreme Court denied the petition.

On November 14, 2003, Petitioner filed his First Amended Petition for a Writ of Habeas Corpus in this case.  He subsequently filed a Second Amended Petition for a Writ of Habeas Corpus, the operative pleading in this action.

# II. **PROCEDURAL DEFAULT**

When a state court's rejection of a federal claim is based on a violation of a state procedural rule that is adequate to support the judgment and independent of federal law, a habeas petitioner has procedurally defaulted his claim.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  A state procedural rule is adequate if it has been "firmly established and regularly followed" by the state court.  Ford v. Georgia, 498 U.S. 411, 424 (1991).  The procedural rule is independent if it is not "interwoven with the federal law."  Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  If a state procedural ground is

01cv0741

1  an adequate and independent ground for dismissal, habeas corpus relief is unavailable in

2  federal court unless a petitioner can show cause for the default and resulting prejudice,

3  or show that a failure to consider the claims would result in a fundamental miscarriage of

4  justice.  See Coleman, 501 U.S. at 750.

5        In the instant case, Petitioner filed his automatic appeal on April 17, 1997, and

6  filed his first state habeas petition on July 23, 1998.  Petitioner then raised the contested

7  claims in a second state (exhaustion) petition, filed on September 23, 2002.  The

8  September 10, 2003 California Supreme Court order denying the second state petition

9  concluded that Claims 10, 11, 38, 40, 41, 42, 45, 46, 48, 49, 50, 70, and 71 are

10 "procedurally barred, separately and independently, as untimely.  In re Robbins, 18 Cal.

11 4th at 780-781 (1998); In re Clark, 5 Cal. 4th 750, 763-799 (1993)."  The California

12 Supreme Court also barred Claim 39 as untimely, excluding "insofar as it refers to

13 permitting evidence to be introduced of other unadjudicated prior crimes."  The court also

14 found that Claims 10, 11, 38, 40, 41, 42, 45, 46, 48, 49, 50, 70, and 71 are "procedurally

15 barred, separately and independently, as successive.  In re Clark, 5 Cal. 4th at 767-768;

16 In re Horowitz, 33 Cal. 2d 534, 546-547 (1949)."  The court also barred Claim 39 as

17 successive, again excluding from the procedural bar a portion of that claim "insofar as it

18 refers to permitting evidence to be introduced of other unadjudicated prior crimes."

19        The California Supreme Court additionally found Claims 11, 38 ("insofar as it

20 refers to Walter Joe Lewis and invokes the Sixth and Fourteenth Amendments to the

21 United States Constitution"), 39 ("insofar as it refers to permitting evidence to be

22 introduced of petitioner's killing John Casas in prison"), 42, and 46 "procedurally barred,

23 separately and independently, as repetitive of a claim raised on appeal.  In re Harris, 5

24 Cal. 4th at 824-849; In re Waltreus, 62 Cal. 2d 218, 225 (1965)."  Finally, the court found

25 Claims 10, 38 ("under the Fifth Amendment to the United States Constitution as applied

26 to the states through the due process clause of the Fourteenth Amendment and under

27 California constitutional provisions, insofar as it refers to not permitting adequate cross-

28 examination of Walter Joe Lewis, and also insofar as it refers to Richard Christiansen"),

01cv0741

40, 41, 45, 48, 49, 50, and 71 "procedurally barred, separately and independently, as pretermitted because they could have been, but were not, raised on appeal. In re Harris, 5 Cal. 4th 813, 824-829; In re Dixon (1953) 41 Cal. 2d 756, 759." The California Supreme Court also denied all of Petitioner's claims on the merits.

## A.   **Repetitive (In re Waltreus)**

Waltreus provides that "in the absence of strong justification, any issue that was *actually* raised and rejected on appeal cannot be renewed in a petition for habeas corpus." In re Harris, 5 Cal. 4th at 829. In Waltreus, the California Supreme Court stated "habeas corpus ordinarily cannot serve as a second appeal." Waltreus, 62 Cal. 2d at 225.

The Ninth Circuit has repeatedly held that the rule announced in Waltreus "is not sufficient to bar federal relief." Calderon v. United States District Court (Bean), 96 F.3d 1126, 1131 (9th Cir. 1996); Maxwell v. Sumner, 673 F.2d 1031, 1034-35 (9th Cir. 1982); LaCrosse v. Kernan, 244 F.3d, 702, 705 n.11 (9th Cir. 2001). In Forrest v. Vasquez, 75 F.3d 562, 564 (9th Cir. 1996), the Ninth Circuit explained, "[A] Waltreus denial on state habeas has no bearing on [a habeas petitioner's] ability to raise a claim in federal court." The Ninth Circuit reiterated this conclusion in Hill v. Roe, 321 F.3d 787, 798 (9th Cir. 2003), stating, "[t]he California Supreme Court's reliance on *In re Waltreus* does not bar federal review."

In accordance with Ninth Circuit precedent, the Court holds that the Waltreus rule is not sufficient to bar federal review of Petitioner's claims.

## B.   **Untimely and Successive (In re Robbins and In re Clark)**

In their briefing on Respondent's Motion to Dismiss Group Three Claims based on procedural bars, the parties relied upon the motion papers previously submitted in support of the Group Two claims. In the Court's Order dated September 27, 2007, the Court conducted an analysis of the California Supreme Court's application of the

1  untimeliness and successiveness procedural bars  (In re Clark and In re Robbins) and

2  found that California's untimeliness and successiveness procedural bars were

3  inadequate to bar consideration of Petitioner's Group Three claims on the merits.

4       In the briefing filed in support of the motions on the Group Four claims, the parties

5  again rely primarily on the papers previously submitted in support of the Group Two

6  Motions.  Therefore, as with the Group Three claims, this Court cannot conclude that the

7  application of these procedural rules is sufficient to prohibit the consideration of these

8  claims on the merits.  Therefore, the procedural bars imposed by the California Supreme

9  Court in its September 10, 2003 order on the grounds of untimeliness and

10 successiveness will not bar this Court from considering those claims on the merits.

11

12 **C.    Pretermitted (In re Dixon)**

13      The California Supreme Court has held that "[t]he general rule is that habeas

14 corpus cannot serve as a substitute for an appeal, and, in the absence of special

15 circumstances constituting an excuse for failure to employ that remedy, the writ will not lie

16 where the claimed errors could have been, but were not, raised upon a timely appeal

17 from a judgment of conviction."  In re Dixon, 41 Cal. 2d at 759.

18

19      **1.    Independence**

20      A state procedural rule is "independent" if it is not interwoven with federal law.

21 LaCrosse, 244 F.3d at 704.  "A state law ground is so interwoven if 'the state has made

22 application of the procedural bar depend on an antecedent ruling on federal law [such as]

23 the determination of whether federal constitutional error has been committed.'"  Park v.

24 California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Ake v. Oklahoma, 470 U.S. 68,

25 75 (1985)).

26      In 1998, the California Supreme Court declared that it would no longer consider

27 federal law when denying a habeas claim as procedurally defaulted.  In re Robbins, 18

28 Cal. 4th at 811-12.

1    Moreover, in Bennett v. Mueller, 322 F.3d 573, 582-83 (9th Cir. 2003), the Ninth

2    Circuit stated:

3         [W]e respect the California Supreme Court's sovereign right to interpret its
          state constitution independent of the federal law.   Applying Robbins
4         prospectively, we [conclude] that the California Supreme Court's post-Robbins
          denial of [a] state petition for lack of diligence (untimeliness) was not
5         interwoven with federal law and therefore is an independent procedural
          ground.
6

7    Although Bennett concerned only the untimeliness (Clark) bar, the analysis in that case

8    compels the same result for claims barred pursuant to the rule established by Dixon.  The

9    pre-Robbins application of the two procedural bars was similar in that the invocation of

10   either Dixon or Clark required the state court to determine if there existed fundamental

11   constitutional error that would excuse the petitioner's default, and such an analysis

12   necessarily involved the consideration of federal law.  Bennett, 322 F.3d at 581-82.  See

13   also LaCrosse, 244 F.3d at 707 (observing that consideration of federal law in barring

14   claims as pretermitted is "analogous" to consideration of federal law in barring claims as

15   untimely).

16        While the Ninth Circuit has yet to specifically determine whether a post-Robbins

17   application of the Dixon rule is independent of federal law, the Ninth Circuit has generally

18   stated, "[t]he California Supreme Court has adopted in Robbins a stance from which it will

19   now decline to consider federal law when deciding whether claims are procedurally

20   defaulted."  Park, 202 F.3d at 1152.  Furthermore, in Protsman v. Pliler, 318 F. Supp. 2d

21   1004, 1007-08 (S.D. Cal. 2004), the court found a post-Robbins application of Dixon to

22   be independent of federal law.  The Court agrees with that conclusion.

23        Petitioner's state habeas petition was filed in the California Supreme Court on

24   September 23, 2002, and the court denied the petition on September 10, 2003, well after

25   the Robbins decision was issued in 1998.  Thus, the state court's decision invoking Dixon

26   was independent of federal law.

27   ///

28   ///

6

1

## 2.    Adequacy

2     A state procedural rule is "adequate" if it is "clear, consistently applied, and well-

3  established" at the time of the default.  Calderon (Bean), 96 F.3d at 1129.  In Bennett, the

4  Ninth Circuit adopted a new burden-shifting test for determining the adequacy of a state

5  procedural bar.  The Ninth Circuit held that:

6          [T]he ultimate burden of proving the adequacy of the California state bar is
           upon the State of California. . . . Once the state has adequately pled the
7          existence of an independent and adequate state procedural ground as an
           affirmative defense, the burden to place that defense in issue shifts to the
8          petitioner.  The petitioner may satisfy this burden by asserting specific factual
           allegations that demonstrate the inadequacy of the state procedure, including
9          citation to authority demonstrating inconsistent application of the rule.  Once
           having done so, however, the ultimate burden is the state's. [¶]  Accordingly,
10         because it is the State who seeks dismissal based on the procedural bar, it is
           the State who must bear the burden of demonstrating that the bar is
11         applicable . . . .

12  Bennett, 322 F.3d at 585-86.

13     A court cannot prevent a petitioner from seeking habeas relief on alleged

14  violations of his federal constitutional rights unless the state procedural rule that purports

15  to bar adjudication on the merits is a "firmly established and regularly followed state

16  practice."  Ford, 498 U.S. at 423-24 (quoting NAACP v. Alabama ex rel. Patterson, 357

17  U.S. 449, 457 (1958)).  If a state procedure is not consistently applied *before* a petitioner

18  runs afoul of it, then the rule cannot fairly prevent federal review of that petitioner's

19  claims, for a procedural bar "must be sufficiently clear as to put a petitioner on notice that

20  he must raise all claims or risk default . . . ."  Bargas v. Burns, 179 F.3d 1207, 1212 (9th

21  Cir. 1999).

22     While the independence of a procedural rule is examined at the time at which it is

23  to be applied, (see Park, 202 F.3d at 1151, 1153), the adequacy of a rule is determined

24  at the time of a petitioner's default.  See Fields v. Calderon, 125 F.3d 757, 760-61 (9th

25  Cir. 1997).  See also Calderon v. United States District Court (Hayes), 103 F.3d 72, 75

26  (9th Cir. 1996).

27  ///

28  ///

### a. Respondent's Initial Pleading Requirement

Under <u>Bennett</u>, the state must first "adequately ple[a]d the existence of an independent and adequate state procedural ground as an affirmative defense." <u>Id.</u> at 586. Respondent's initial burden is modest, and he is required only to plead the existence of a procedural bar that is applicable to the claims at issue. <u>See</u> <u>King v. LaMarque</u>, 464 F.3d 963, 967 (9th Cir. 2006). <u>See also</u> Rule 5, Rules Governing Section 2254 Cases in the United States District Courts (providing that a respondent's answer to a petition "must state whether any claim in the petition is barred by . . . a procedural bar.").

In the Answer to the Second Amended Petition, Respondent identified each of Petitioner's claims that he asserts was procedurally defaulted under <u>Dixon</u>. (Answer at 52, 103-04, 112-13, 114-15, 127, 135-36, 138, 141-42, 171.) He repeated his assertions of procedural default for each of these claims in his Motion to Dismiss the Group Four Claims. (Respondent's Motion to Dismiss Group Four Claims ["Resp.'s MTD."] at 2,16-17, 30, 38-39, 78, 97, 100, 106, 114.)

Respondent has therefore satisfied his initial burden of pleading the "affirmative defense" of a procedural bar for these claims. <u>Bennett</u>, 322 F.3d at 586.

### b. Petitioner's Interim Burden

Once the state properly pleads the existence of an independent and adequate procedural bar, the burden shifts to the petitioner to place that defense in issue, and "[t]his must be done, at a minimum, by specific allegations by the petitioner as to the adequacy of the state procedure. The scope of the state's burden of proof thereafter will be measured by the specific claims of inadequacy put forth by the petitioner." <u>Bennett</u>, 322 F.3d at 584-85.

In measuring the effectiveness of any procedural bar, the state must establish that the bar was truly adequate on the date the default was "committed." <u>Calderon (Hayes)</u>, 103 F.3d at 74. In <u>Hayes</u>, the Ninth Circuit found that a petitioner defaulted when he had

01cv0741

the opportunity to raise the claims on direct appeal or in a first state habeas petition but failed to do so.  Id.  In this case, Petitioner's procedural default with respect to the Dixon bar occurred on April 17, 1997, the date on which Petitioner filed his opening brief on direct appeal.

The Ninth Circuit has held that the procedural bars relating to untimely and successive claims "were not firmly established and consistently applied at least prior to 1993."  Cooper v. Calderon, 255 F.3d 1104, 1111 (9th Cir. 2001).  See also Fields, 125 F.3d at 765.  Petitioner has noted that where the Ninth Circuit has previously found a procedural rule to be too ambiguous to bar federal review during a specific time period, simply "contesting the adequacy" of that rule is sufficient to meet a petitioner's burden under Bennett.  King, 464 F.3d at 967.  However, the Ninth Circuit found that the Dixon bar was inadequate *prior* to the issuance of Harris in 1993, rendering the King decision of limited use to the instant issue of whether the Dixon rule was adequate at the time of Petitioner's default in 1997.  The Ninth Circuit's decision in Park v. California, 202 F.3d 1146 (9th Cir. 2000), lends no support to Petitioner's argument because the Park court held that the Dixon rule was not independent at the time of the petitioner's default and made no ruling on whether the rule was adequate.  Id. at 1152-53.

In the Group Four merits briefing, Petitioner specifically refers the Court to the procedural default arguments he previously advanced in connection with the Group Two Claims.  (See Petitioner's Group Four Opposition ["Petr's Opp."] at 130.)  In the Group Two Reply brief, Petitioner details the outcomes of a number of capital habeas cases in an attempt to demonstrate inconsistent application of the procedural bar rules in California. (Petr's Group Two Reply at 54-56, 65-66.)  Petitioner presented the Court with citations to 94 capital habeas petitions decided by the California Supreme Court in which procedural defaults due to *untimeliness* and *successiveness* occurred or arguably could have occurred between 1985 and 2004.  (Petr's Group Two Reply at 54-55.)

Petitioner asserts that the California Supreme Court was *also* inconsistent in applying the Dixon procedural bar in capital habeas cases as demonstrated by the state

01cv0741

court's inconsistent application of the untimeliness and successiveness procedural bars. Petitioner explains, "At the outset, it should be noted that at least as a practical matter, it is not possible to undertake the same sort of study of the court's practice with regard to Dixon defaults as can be conducted with respect to Clark defaults." (Petr's Group Two Reply at 66.)  Petitioner acknowledges that he does not offer any case citations to support his allegations regarding Dixon, maintaining that "[a]scertaining whether a Dixon default could have been imposed, but has not been, is an entirely different matter [from the untimeliness and successiveness defaults].  Each claim in the petition must be reviewed and analyzed to determine whether it is based entirely on the trial record.  And, this would not be limited to the 94 cases identified above, but would necessarily include the far greater number of petitions filed during the pendency of the automatic appeal.  This undertaking would not only be time-consuming and expensive, but is precisely the sort of undertaking Bennett prohibits."  (Petr's Group Two Reply at 66-67.)  Petitioner adds, "It strains credulity to suggest, as Respondent must, that despite the overwhelming evidence that the California Supreme Court does not apply Clark evenhandedly, it applies Dixon in an altogether evenhanded manner."  Id.

The Court disagrees with Petitioner's contention that Dixon is not amenable to the analytical framework set forth by the Ninth Circuit, and takes judicial notice of several cases in which California district courts have found the state court's application of the Dixon bar to be inconsistent.  See Vaughn v. Adams, 2006 WL 1439400 (E.D. Cal. May 22, 2006) (explaining, "Petitioner cites fourteen cases wherein the California Supreme Court issued a silent 'postcard' denial, without reference to the Dixon bar, despite the fact that the Petitioners had failed to raise all the claims in the direct appeal," and finding this showing sufficient to meet petitioner's interim burden under Bennett); Monarrez v. Alameda, 2005 WL 2333462 (C.D. Cal. Sept. 22, 2005) (noting that in addition to citing an appellate court decision that failed to apply Dixon when it should have been applied, "Petitioner also directs the court's attention to his own survey of 210 non-capital habeas corpus petitions . . . showing inconsistent application of the Dixon rule by the California

01cv0741

Supreme Court in that the <u>Dixon</u> bar was applied in only 19 cases, less than 10 percent of those decided," and finding that the petitioner had met his interim burden under <u>Bennett</u>).

Based on these cases, the Court is persuaded that the interim burden has been satisfied in this case.

               c.  <u>Respondent's Ultimate Burden to Prove Adequacy of Procedural Bars</u>

The Ninth Circuit has stated the government holds the "ultimate burden" of pleading and proving the independence and adequacy of the state procedural bar. <u>Bennett</u>, 322 F.3d at 585-86. Respondent has not provided the Court with any evidence to demonstrate that the <u>Dixon</u> procedural bar is consistently applied, and thus has not met the "ultimate burden" under <u>Bennett</u> of proving the adequacy of the procedural rules relied on by the California Supreme Court in the denial of Claims 10, 38, 40, 41, 45, 48, 49, 50, and 71. Thus, the Court cannot conclude that the application of the procedural rules in question is sufficient to prohibit the consideration of these claims on the merits.

**D.**   **<u>Conclusion</u>**

The Court finds that the <u>Waltreus</u> rule is not sufficient to bar federal review of claims 11, 38, 39, 42 and 46. The Court further finds that Respondent has failed to carry his ultimate burden of demonstrating that the untimeliness, successiveness, and pretermitted (<u>Dixon</u>) bars are consistently applied. Therefore, the Court cannot conclude those procedural bars are sufficient to prohibit the consideration of Claims 10, 11, 38, 40, 41, 42, 45, 46, 48, 49, 50, 70, and 71 on the merits.

///

///

///

///

///

01cv0741

### III.  TEAGUE V. LANE

The United States Supreme Court, addressing perceived inconsistencies in its prior retroactivity jurisprudence, held that "new" constitutional rules of criminal procedure will not be applied retroactively to cases on collateral review unless they fall within two narrow exceptions.  Teague v. Lane, 489 U.S. 288 (1989).  A new rule is one that "breaks new ground or imposes a new obligation on the States or the Federal Government" or one whose "result was not dictated by precedent existing at the time defendant's conviction became final."  Id. at 301.   The two exceptions to the Teague rule are: (1) rules placing certain kinds of private individual conduct beyond the power of the criminal law to prohibit, and (2) procedures implicit in the concept of ordered liberty without which the likelihood of an accurate conviction is seriously diminished.  Penry v. Lynaugh, 492 U.S. 302, 305 (1989), abrogated on other grounds, Atkins v. Virginia, 536 U.S. 304 (2002); Graham v. Collins, 506 U.S. 461, 478 (1993).

When the state *properly* argues that a "defendant seeks the benefit of a new rule of constitutional law, the court must apply Teague v. Lane before considering the merits of the claim."  Caspari v. Bohlen, 510 U.S. 383, 389 (1994).  Under Teague, habeas relief is generally unavailable if based "on a rule announced after [a petitioner's] conviction and sentence became final."  Id.  The first step in a Teague analysis, therefore, is to determine whether a petitioner is seeking the benefit of a constitutional rule announced after his or her conviction became final.  Id. at 389-90.

In the Answer to the Second Amended Petition ("Answer"), Respondent asserts the Teague bar for eighteen claims - every claim in Group Four except for Claim 44.  However, the state only makes brief mention of Teague in regard to Claims 38, 41, 42, 45, 46, 50, and 70.  Respondent's argument on those claims (in the combined pleadings and briefs filed with this Court) generally consists of the contention that "Petitioner fails to show that the claim does not rest upon a new rule barred under Teague v. Lane."

The Ninth Circuit recently expressed its view on the duties placed on the state to properly raise and plead a claim made under Teague:

01cv0741

1
2
3
4

   If a state seriously wishes to press <u>Teague</u> upon us, at a minimum <u>Teague</u> should be identified as an issue (indeed the first issue) on appeal, the new rule of constitutional law that falls within its proscription should be articulated, the reasons why such a rule would not have been compelled by existing precedent should be explained with particular reference to the appropriate universe of precedent, and an argument should be made why the rule contended for is not within one of <u>Teague</u>'s exceptions.

5 <u>Arredondo v. Ortiz</u>, 365 F.3d 778, 781-782 (9th Cir. 2004).

6    Respondent first references <u>Teague</u> in the Answer.  However, Respondent fails to

7 properly develop his <u>Teague</u> argument with respect to Claims 38, 41, 42, 45, 46, 50, and

8 70 in the merits briefing.  The Ninth Circuit places the burden on the state to articulate

9 and present this argument, and Respondent's burden to raise and plead a <u>Teague</u> claim

10 is not satisfied by little more than a one-line citation to <u>Teague</u>.  Therefore, the Court will

11 not conduct an analysis on whether the above seven claims are barred under <u>Teague v.</u>

12 <u>Lane</u>.

13    The Court points out that despite Respondent's assertions to the contrary,

14 Petitioner *does not* have the burden of demonstrating that each claim pled in his habeas

15 petition does not rest upon a new rule barred under <u>Teague v. Lane</u>.  (<u>See</u> Answer at 52,

16 52-53, 53, 101, 104, 106, 113, 115, 119, 120, 127, 132, 134, 136, 138, 142, 163, 169,

17 171.) ("Petitioner fails to show that the claim does not rest upon a new rule barred under

18 <u>Teague v. Lane</u>.")  The Ninth Circuit clearly and squarely places the duty to raise *and*

19 prove any <u>Teague</u> issues in the lap of the *state*.   Additionally, the Ninth Circuit has been

20 unwilling to require a Petitioner to present a case "involving identical facts, circumstances

21 and legal issues" in order to clear the <u>Teague</u> threshold.  <u>Keating v. Hood</u>, 191 F.3d

22 1053, 1061 n.11 (9th Cir. 1999); <u>abrogated on other grounds</u>, <u>Mancuso v. Olivarez</u>, 292

23 F.3d 939 (9th Cir. 2002).

24    Applying Ninth Circuit case law, it is arguable whether Respondent's arguments in

25 connection with Claims 10, 11, 37, 39, 40, 43, 47, 48, 49, 67, and 71 are sufficient to

26 "press <u>Teague</u> upon us."  <u>Arredondo</u>, 365 F.3d at 781.  Nevertheless, in the interest of

27 providing a thorough record for the Court of Appeals, and being mindful of the Court's

28 role as a fact-finding body, the Court will engage in a <u>Teague</u> analysis on these claims.

01cv0741

The <u>Teague</u> issue will be independently examined for each of these claims in the merits section of this order.

The Court notes the California Supreme Court denied Petitioner's direct appeal on June 8, 2000, and denied rehearing on August 23, 2000.  The United States Supreme Court denied certiorari on March 5, 2001, at which time Petitioner's conviction became final.  <u>Snook v. Wood</u>, 89 F.3d 605, 612 (9th Cir. 1996.)  Under <u>Teague</u>, Petitioner may not avail himself of a decision announced after his conviction was finalized, nor may he advocate a decision by this court which would create a new rule of criminal procedure.

# IV. <u>STANDARD OF REVIEW</u>

## A.   <u>Standard of Review under AEDPA</u>

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in *violation of the Constitution or laws or treaties of the United States.*

28 U.S.C. § 2254(a) (emphasis added).

In <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the new provisions of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") "generally apply only to cases filed after the Act became effective."  In capital habeas actions, cases are typically commenced by the filing of requests for appointment of counsel and stays of execution of the petitioners' death sentences.  Petitioner filed his request for appointment of counsel and stay of execution on April 27, 2001 and filed his petition with this Court on May 3, 2002.  AEDPA became effective on April 24, 1996, when the President signed it into law.  <u>See</u> <u>id.</u>  Accordingly, AEDPA applies to this case.

Relevant to this case are the changes AEDPA rendered to 28 U.S.C. § 2254(d), which now reads:

01cv0741

1
2

     (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

3
4
5

     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5
6

     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

7    28 U.S.C.A. § 2254(d)(1)-(2).

8         A decision is "contrary to" clearly established law if it fails to apply the correct

9   controlling authority, or if it applies the controlling authority to a case involving facts

10  materially indistinguishable from those in a controlling case, but nonetheless reaches a

11  different result. See Williams v. Taylor, 529 U.S. 362, 413 (2000).  A decision involves

12  an "unreasonable application" of federal law if "the state court identifies the correct

13  governing legal principle . . . but unreasonably applies that principle to the facts of the

14  prisoner's case." Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004).

15         Even when the federal court undertakes an independent review of the record in

16  the absence of a reasoned state court decision, the federal court must "still defer to the

17  state court's ultimate decision." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  If

18  the state court decision does not furnish any analytical foundation, the review must focus

19  on Supreme Court cases to determine "whether the state court's resolution of the case

20  constituted an unreasonable application of clearly established federal law." Greene v.

21  Lambert, 288 F.3d 1081, 1089 (9th Cir. 2001).  Federal courts also look to Ninth Circuit

22  law for persuasive authority in applying Supreme Court law and to determine whether a

23  particular state court decision is an "unreasonable application" of Supreme Court

24  precedent. Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

25

26  **B.**    **Standard for Evidentiary Hearing**

27         AEDPA also limited the circumstances under which district courts may grant an

28  evidentiary hearing.  Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing unless the applicant shows that--
> (A) the claim relies on--
> (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Under AEDPA, when determining whether to grant an evidentiary hearing, the district court must first ascertain whether the petitioner has failed to develop the factual basis of a claim in state court. Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005). As explained by the Supreme Court:

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.

Williams v. Taylor, 529 U.S. 420, 437 (2000).

If the petitioner has *not* failed to develop the facts in state court, an evidentiary hearing is required if (1) the petitioner establishes a colorable claim for relief – i.e., petitioner alleges facts that, if proven, would entitle him to habeas relief; and (2) the petitioner did not receive a full and fair opportunity to develop those facts. Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005). The second requirement is met by a showing that:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

01cv0741

# V. DISCUSSION

The Group Four claims consist of allegations of a multitude of trial court errors at all stages of Petitioner's case - during pre-trial hearings and motions, voir dire, the guilt and penalty phases of trial, and in post-trial proceedings.  The Court incorporates the Group Three Order's overview of the evidence presented during the guilt and penalty phases of trial.  (Doc. No. 236.)  For the reasons set forth below, the Court finds that none of the Group Four claims merits habeas relief.

## A.    Claim 10 -  Acts of Prison Violence as Penalty Phase Aggravation

Claim 10 alleges that the trial court erred in admitting evidence of unadjudicated prison assaults and murder in the penalty phase, and that the prosecutor engaged in misconduct in introducing those crimes into evidence, in violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  Petitioner alleges that these acts, which included the Williams, Christiansen and Macugay assaults and the Casas murder, were actually the product of the state's intentional encouragement and/or conditioning of prison violence among inmates.

### 1.    Teague

Respondent asserts, "Petitioner's new rule, which would foreclose the admission of penalty phase evidence based on the creation of a 'hostile environment,' is not dictated by existing precedent."  Respondent adds, "Specifically, Petitioner fails to point to any established rule of criminal procedure that prohibits the admission of penalty phase evidence of a defendant's prior acts of violence because the state indirectly allowed such acts by creating a hostile environment."  (Resp.'s MTD at 2-3.)

Petitioner responds, "Here, the question is whether Respondent has met his burden of demonstrating that Petitioner is seeking to apply a 'new rule' to the facts of this claim.  He cites no authority for that proposition, and does not purport to rely on any case at all; rather, he simply conclusorily states that there is no 'rule of criminal procedure'

01cv0741

1    which requires the exclusion of jailhouse-created acts of violence from consideration by

2    the jury as aggravating factors.  While there may not be a statutory criminal rule of

3    procedure, long-held Constitutional law is readily applied to these facts."  (Petr's Opp. at

4    11.)

5         The Supreme Court explains that "[s]entencing courts have not only taken into

6    consideration a defendant's prior convictions, but have also considered a defendant's

7    past criminal behavior, even if no conviction resulted from that behavior."  Nichols v.

8    United States, 511 U.S. 738, 747 (1994).  The Ninth Circuit has held that a sentencer

9    may rely on prior criminal conduct not resulting in a conviction if the evidence in question

10   has "some minimal indicium of reliability beyond mere allegation."  McDowell v. Calderon,

11   107 F.3d 1351, 1366 (9th Cir. 1997), amended 116 F.3d 364 (9th Cir. 1997), vacated in

12   part by 130 F.3d 833, 835 (9th Cir. 1997) (en banc).

13        In this claim, Petitioner asserts the trial court erred in allowing evidence of his prior

14   criminal conduct, not because of any failure to meet the "minimal indicium of reliability,"

15   but because the acts were the product of the state's encouragement of prison violence

16   among inmates.   Petitioner is seeking to create a new rule of criminal procedure, one

17   whose "result was not dictated by precedent existing at the time defendant's conviction

18   became final."  Teague, 489 U.S. at 301.  Furthermore, Petitioner's proposed rule does

19   not satisfy either exception to Teague.  See Penry, 492 U.S. at 305; Graham, 506 U.S. at

20   478.

21        However, even assuming Claim 10 would not be barred under Teague, it is without

22   merit for the reasons set forth below.

23

24        **2.    Merits**

25        Petitioner asserts that his Constitutional rights were violated when the prosecution

26   was allowed to present in aggravation acts of prison violence that prison authorities

27   knowingly created or allowed to occur.  Petitioner alleges that the prisons in which he was

28   housed at the time of the Williams, Christiansen, and Macugay assaults and the Casas

murder encouraged and condoned racial violence, which led to these assaults.

In support of this contention, Petitioner relies on a portion of Wallace Williams'

penalty phase testimony, in which Williams testified:

> Q:    After the incident of November 23rd, 1975, that you had been
> describing, were you approached by any officers in the course of
> investigating what had happened on that day?
>
> A:    If I recall correctly there was a Sergeant Perkins approached me,
> and from my understanding it was like he was trying to agitate me
> because he thought that I was resisted upon. So it was a thing like
> trying to get me to do something else in return.
>
> Q:    In your experience was that kind of agitation by - - well, did that kind
> of agitation by staff occur in the tension that existed in lockup in
> 1975?
>
> A:    From what I could witness from my own point of view, yes.

(RT 17208.)

The Court is not persuaded that, as Petitioner contends, this claim posits "nothing

more than an extension of the kinds of prosecutorial misconduct which has been found to

be constitutionally infirm." (Petr's Opp. at 12.) The legal authority Petitioner cites in

support of this claim is distinguishable. Unlike the facts of <u>United States v. Henry</u>, 447

U.S. 264, 274 (1980), this case does not involve a situation where the government

created a situation to induce Petitioner to make incriminating statements outside the

presence of counsel. <u>See also</u> <u>Massiah v. United States</u>, 377 U.S. 201 (1964); <u>Maine v.</u>

<u>Moulton</u>, 474 U.S. 159 (1985). Moreover, Petitioner has failed to establish that the state

engaged in any "outrageous government conduct." <u>Greene v. United States</u>, 454 F.2d

783 (9th Cir. 1971).

Petitioner has failed to establish that the government engaged in behavior as to

the assaults and murder, requiring the preclusion of the evidence at issue. The

testimony from Williams alone was vague and speculative. Furthermore, there was no

evidence that prison officials encouraged the other assaults or Casas's murder. In any

event, the jury heard and considered Williams's allegation of officer agitation.

///

///

01cv0741

1  The state court's denial of this claim was neither contrary to nor an unreasonable

2  application of clearly established federal law.  Williams, 529 U.S. at 412-13.  Therefore,

3  habeas relief is not warranted on this claim.

4

5  **B.    Claim 11 -  Non-Statutory Aggravation**

6  Claim 11 asserts the prosecutor introduced non-statutory factors in aggravation

7  during both the guilt and penalty phase proceedings, in the form of references to

8  Petitioner's alleged membership in or affiliation with the Mexican Mafia prison gang, in

9  violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

10

11  **1.     Teague**

12  Respondent contends that "[t]o the extent Petitioner could show the prosecution

13  was precluded from introducing evidence that bore upon an aggravating factor because it

14  constituted a 'bad act,' such a conclusion would constitute a prohibited new rule barred

15  under Teague v. Lane, 489 U.S. at 288."  (Resp.'s MTD at 6.)

16  The Supreme Court has held that the introduction of a defendant's gang affiliation

17  at trial may establish a constitutional violation if the introduction of the evidence was

18  irrelevant to the charged offenses or the evidence offered in aggravation.  Dawson v.

19  Delaware, 503 U.S. 159 (1992).  Petitioner alleges that arguments and testimony

20  regarding his affiliation with a prison gang, referred to at trial as the Mexican Mafia, EME

21  or the "Southern Group," was erroneously introduced during the guilt and penalty phases

22  of his trial.  The Supreme Court has held that a decision is not new if "it has simply

23  applied a well-established constitutional principle to govern a case which is closely

24  analogous to those which have been previously considered in the prior case law."  Penry,

25  492 U.S. at 314.  Dawson was clearly established federal law at the time Petitioner's

26  conviction was finalized, and the fact pattern proposed here is not "so novel" that it seeks

27  to extend United States Supreme Court precedent.  See Stringer v. Black, 503 U.S. 222,

28  229-32 (1992).  Petitioner's claim is not barred under Teague.

2.      **Merits**

Petitioner alleges that "[d]uring closing argument in the guilt phase of Petitioner's trial, the prosecution made numerous references to facts not in evidence, including Petitioner's affiliation with the 'Southern Group' of a prison gang, that certain witnesses feared retribution from this 'Southern Group' and that Petitioner had influence over this 'Southern Group.'" (Petitioner's Memorandum in Support of Motion for Summary Judgment and/or Evidentiary Hearing ["Petr's Mem."] at 42.)

Petitioner's claim is not supported by citation to the record, and the Court's examination of the prosecutor's closing guilt phase arguments find no references to any "Southern Group." However, Petitioner's claim is not entirely without factual foundation. During the guilt phase of trial, witness Rafael Mendoza-Lopez testified that Petitioner had influence over a "southern group" of inmates. (RT 16415-18.) However, the prosecutor only elicited this testimony after defense counsel opened the door by inquiring after Mendoza Lopez's own gang affiliation. (RT 16378-80.) During the guilt phase closing, the prosecution stated that witness Castillo was "frightened of what the defendant stood for" and was frightened "of those people who associated with the defendant." (RT 16607-08.) Later in the closing arguments, the prosecutor stated that Mendoza Lopez was afraid of being killed "either by the defendant or by those with whom the defendant associates." (RT 16659.)

During the penalty phase presentation, the prosecution called a witness who testified that Petitioner went to stand with other members of the Mexican Mafia after the Christiansen assault. (RT 17350.) Alex Macugay, the victim of a prison assault, testified that he tried to stay away from the Southern Group of inmates, which included Petitioner, because Macugay was himself from the North. (RT 17392.) During penalty-phase closing arguments, the prosecutor stated that after the Christiansen attack, Petitioner went to stand "where there were a group of other members of the Mexican Mafia standing around," implying that Petitioner was a member of the group. (RT 19060.)

However, it is clear that defense counsel made a tactical decision to allow

01cv0741

1   references to gangs during the penalty phase.  During a conference outside the presence

2   of the jury, defense counsel explained:

3           I should make it clear, I think, as a matter of record, that as a tactical
        decision I think the defense has decided to present evidence in this regard
4       because it is our position essentially that the – that the way in which the
        climate of fear was created by the evidence presented at the guilt phase I
5       think is worse than simply fully presenting this issue to the jury and allowing
        the jury to decide what it will with a full understanding of the circumstances
6       that existed in prison during the 70's and the early 1980's.

7   (RT 17281.)  Given defense counsels' deliberate strategy to allow gang references during

8   the penalty phase and the fact that any explicit references to gangs in the case came

9   only after the defense opened the door, there was no trial court error in admitting the

10  evidence.

11          Relying on Dawson v. Delaware, 503 U.S. 159 (1992), Petitioner argues that

12  evidence of his gang membership was irrelevant to the issues in his penalty phase

13  proceedings and that the introduction of the evidence violated his constitutional rights.

14  However, in addition to trial counsels' express decision to introduce the evidence of

15  gangs during the penalty phase, the jury was instructed on the circumstances in

16  aggravation they were allowed to consider.  The trial court specifically informed the jury:

17  "You are not permitted to consider any factor as aggravating unless it is specified on the

18  list of factors you have been given previously."  (RT 19032; CT 5375.)

19          In Dawson, the Supreme Court found that the introduction of a defendant's gang

20  affiliation at trial constituted a violation of that petitioner's constitutional rights because

21  the gang evidence was irrelevant to the charged offenses or the evidence offered in

22  aggravation.  However, the Supreme Court allowed that "evidence concerning a

23  defendant's associations might be relevant in proving other aggravating circumstances."

24  Dawson, 503 U.S. at 166.  Evidence of Petitioner's gang affiliation was not offered as a

25  non-statutory factor in aggravation; instead, it was offered as context for the statutory

26  aggravating factors of the Christiansen and Macugay assaults.  Upon consideration of the

27  legitimate purpose of the gang references, coupled with the fact that defense counsel

28  opened the door to these references, the Court concludes that the state court did not err

01cv0741

1  in rejecting this claim on appeal.

2  Petitioner makes an additional argument that the prosecution failed to provide him

3  with notice of the aggravating evidence prior to trial, as required under California Penal

4  Code § 190.3.  However, according to Respondent, nine months prior to jury selection,

5  the prosecution apprised Petitioner they would seek to introduce the Casas homicide and

6  the three prison assaults as factors in aggravation.  (CT 2159.)  Petitioner does not

7  dispute this.

8  Petitioner has failed to establish a violation of his constitutional rights, and the

9  state court adjudication of this claim was neither contrary to, nor an unreasonable

10  application of, clearly established federal law.  Williams, 429 U.S. at 412-13.   Petitioner

11  is not entitled to habeas relief on this claim.

12

13  **C.    Claim 37 -  Use of Magnetometer Outside Courtroom**

14  Claim 37 alleges that the trial court erred in ordering heightened security

15  measures in the courtroom without first conducting an evidentiary hearing where a proper

16  record could be created regarding the need for such measures, resulting in a violation of

17  Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

18

19  **1.    Teague**

20  Respondent's argument primarily consists of the contention that "[t]o the extent

21  Petitioner could show the State must justify the use of a magnetometer, such a rule

22  would constitute a new rule of criminal procedure barred under Teague v. Lane, 489 U.S.

23  at 288."  (Resp.'s MTD at 12.)

24  However, Petitioner contends that the placement of a metal detector outside a

25  courtroom should be examined under the same rules that govern other security

26  measures – e.g., the use of a security courtroom, the placement of security personnel in

27  the courtroom, or shackling of the defendant during court proceedings - and that the state

28  must justify the use of such measures prior to their implementation.

1    The use of "security measures" in a courtroom is governed by the Supreme

2    Court's decision in Holbrook v. Flynn, 475 U.S. 560 (1986), which is not a "new" rule

3    under Teague.  In Holbrook, the Supreme Court held that an "inherently prejudicial"

4    security practice must be justifed by an essential state interest, but did not specifically

5    require a trial court to conduct an evidentiary hearing to reach such a conclusion.  In the

6    instant claim, Petitioner's argument centers on his assertion that due process required a

7    hearing before the magnetometer was used.  Because clearly established federal law

8    does not currently require such a hearing, it appears that "granting the relief sought would

9    create a new rule because the prior decision is applied in a novel setting, thereby

10   extending the precedent."  Stringer, 503 U.S. at 228.  Therefore, Petitioner is advocating

11   a decision by the Court that would constitute a new rule of procedure barred under

12   Teague.

13       However, even assuming Claim 37 would not be barred under Teague, it is without

14   merit for the reasons set forth below.

15

16       **2.    State Court's Decision**

17       The California Supreme Court considered this claim on direct appeal, rejecting it

18   as follows:

19       Defendant contends that placing a magnetometer (i.e., a metal detector) at the
         public entrance to the courtroom violated his rights under the Fifth, Sixth,
20       Eighth, and Fourteenth Amendments to the United States Constitution, and
         their equivalent guaranties [sic] in the California Constitution.
21
22       The prosecution, stating that defendant had a history of violence and was
         reported to be a member of a well-known prison gang, some of whose
         members might wish to attend the trial, moved to have a magnetometer placed
23       outside the courtroom.  The motion stated that the security measure was
         needed to safeguard defendant himself and those who might testify against
24       him.  It stated specifically that "Castillo is, as a matter of record, in the witness
         protection program and past solicitations to kill him are a matter of record."
25       The prosecution noted that it was not requesting that defendant be shackled
         as long as "there is some reasonable assurance that spectators who may
26       attend the court proceedings are not armed . . ."

27       Defendant responded to the request on procedural and substantive grounds.
         He requested an evidentiary hearing to refute the motion's factual allegations.
28       He asserted that his constitutional right to due process of law compelled the
         trial court to convene such a hearing.  And, arguing as a matter of state law,

he maintained that a magnetometer's presence would prejudice the jury against him.

Without calling witnesses, the trial court conducted a hearing. After hearing argument, it stated that "[t]his court would be naive, and I think counsel would be naive, to assume that this court has not become aware of allegations that have surfaced concerning the membership in various gangs of various potential witnesses in this case. It's also a known fact that threats allegedly were made as to Mr. Castillo." The court also noted that one potential witnesses had claimed to have been a member of the Mexican Mafia (a prison-based gang also known as La Eme, the Spanish word for the letter "M," and frequently referred to in the trial proceedings by that term), and that another may have been a member of the Aryan Brotherhood, a different prison gang. Describing a magnetometer as "unobtrusive" and "nondiscriminatory," the court decided that it would order one to be used during the evidentiary portion of the trial. It implicitly denied defendant's request for an evidentiary hearing.

Defendant apparently sought a writ of mandate against the order in the Court of Appeal, which rejected it. Thereafter he moved for the trial court to reconsider its decision, but it also refused. Instead, at his request, it instructed the jury, immediately after the alternate jurors had been sworn, to disregard the magnetometer's presence. "[I]t is my policy in serious felony cases to have everyone except jurors pass through a metal detector before entering the courtroom. [¶] Therefore, you can expect that a metal detector will be placed outside the courtroom when the trial begins, and it will remain throughout the course of the trial. [¶] The practices of other judges in this courthouse differ from courtroom to courtroom. You should not view the presence of a metal detector outside this courtroom, or the absence of one outside other courtrooms, as a reflection on either party or any of the witnesses. [¶] It is solely a matter of my personal policy."

In bringing his claim, defendant relies, as he did at trial, on *People v. Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]. Though he labels his claim one of constitutional error, its substance is one of state law error, namely a violation of *Duran*.

Through *Duran* and its progeny, it has become settled that "because of its potentially prejudicial impact on the jury, shackling should be ordered only as a last resort and only upon a showing of a manifest need for such restraints. [Citations.] Any restraints should be as 'unobtrusive as possible, although as effective as necessary under the circumstances.' [Citation.] Although these restrictions make the trial court's discretion to order restraints 'relatively narrow' [citation], the court's ruling will be upheld on appeal absent a showing of a manifest abuse of that discretion." (*People v. Livaditis* (1992) 2 Cal.4th 759, 774 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

But *Duran* is inapposite. Here, unlike the situation in *People v. Duran, supra,* 16 Cal.3d 282, defendant was not shackled. Rather, a magnetometer was placed by the courtroom door. Unlike occasions on which the government can be accused of creating a public spectacle or directing suspicion at a criminal defendant by parading him or her in shackles, or driving him or her to court in an ostentatious manner, the trial court's use of a magnetometer was, as it observed, "nondiscriminatory." (Cf. *Holbrook v. Flynn* (1986) 475 U.S. 560, 567 [106 S.Ct. 1340, 1344-1345, 89 L.Ed.2d 525].)

In *People v. Duran*, *supra*, 16 Cal.3d 282, we stated that the presence of armed guards ordinarily "need not be justified by the court or the prosecutor." (*Id.* at p. 291, fn. 8; see also generally *Holbrook v. Flynn*, *supra*, 475 U.S. 560 [discussing the presence of uniformed and armed personnel].) "We believe that the use of a metal detector outside a courtroom, like the use of additional security forces within the courtroom, is not . . . inherently prejudicial . . . Unlike shackling and the display of the defendant in jail garb, the use of a metal detector does not identify the defendant as a person apart or as worthy of fear and suspicion." (*People v. Jenkins* (2000) 22 Cal.4th 900, 996 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

To the extent the metal detector's use focused attention on the proceedings, it pointed to the nature of the case, not to defendant's character. (See *People v. Miranda* (1987) 44 Cal.3d 57, 114-115 [241 Cal.Rptr. 594, 744 P.2d 1127].) The distinction is crucial. Nor did the magnetometer *improperly* highlight the nature of the case. The jurors already knew they were hearing a multiple murder trial and that "the defendant appearing before them did not arrive there by choice or happenstance." (*Holbrook v. Flynn*, *supra*, 475 U.S. 560, 567 [106 S.Ct 1340, 1345].) Hence the magnetometer's presence did not objectionably dramatize the proceedings. The device was, in its neutrality, akin to that of, and indeed likely less dramatic than, the use of armed guards in the courtroom.

"A trial court has broad power to maintain courtroom security and orderly proceedings." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269 [91 Cal.Rptr.2d 211, 989 P.2d 645].) Accordingly, we review the court's decisions regarding security measures in the courtroom, including deploying a magnetometer at the entrance, for an abuse of discretion. (*Ibid.*; *People v. Jenkins*, *supra*, 22 Cal.4th 990, 997.) We find none. The court was entitled to rely and act on the prosecutor's representations, as an officer of the court, that bringing the case to trial posed certain risks. There was no violation of state law, and because defendant's constitutional claims are predicated on his assertion that state law was violated, they too must fail.

We turn next to defendant's procedural claim: that it violated due process to install a magnetometer without an evidentiary hearing. We do not agree that due process requires a contested evidentiary proceeding. It is well known that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." (*People v. Tilbury* (1991) 54 Cal.3d 56, 68,69 [284 Cal.Rptr. 288, 813 P.2d 1318].) [Internal quotation marks omitted.] We have already explained that defendant's interest in a fair trial was unaffected by installing a magnetometer outside the courtroom: it was a neutral measure that did not focus attention on him. Holding a contested evidentiary hearing would not have been useful: it would have imposed a needless burden on the trial court, which, as we have explained, enjoys wide discretion to maintain courtroom security. It might have resulted in a wasteful minitrial at which witnesses would have had to testify about their gang affiliations or other potential for generating security problems. Neither the federal nor the state Constitution requires such consumption of the parties' and the trial court's time. Indeed, by holding a hearing of any kind, the trial court gave defendant more than he was entitled to. (*People v. Hayes*, *supra*, 21 Cal.4th 1211, 1268.)

Ayala, 23 Cal. 4th at 250-53.

**3.** **Merits**

In Holbrook v. Flynn, 475 U.S. 560 (1986), the Supreme Court held:

> Where a petitioner challenges security measures imposed by a state trial court, the task of a federal court considering a habeas petition is not to determine whether it might have been feasible for the State to have employed less conspicuous security measures in the courtroom. . . . All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

Id. at 572.

Following Holbrook, the Ninth Circuit held that while shackling was an inherently prejudicial practice, the use of a security courtroom was not, and, as a result, no essential state interest was required to justify the practice. See Morgan v. Aispuro, 946 F.2d 1462, 1465 (9th Cir. 1991). The Ninth Circuit later ruled that the presence of three sheriffs guarding a defendant at trial also was not an inherently prejudicial measure. See King v. Rowland, 977 F.2d 1354, 1358 (9th Cir. 1992). A fortiori, use of a magnetometer does not constitute an inherently prejudicial measure.

With respect to the issue of whether the court was required to hold an evidentiary hearing, in Jones v. Meyer, 899 F.2d 883 (9th Cir. 1990), the Ninth Circuit emphasized, "[W]e have never held, and we refuse to hold now, that a trial court must conduct a hearing and make findings before ordering that a defendant be shackled." Id. at 886. If due process does not require a trial court to conduct a formal hearing prior to implementing an "inherently prejudicial practice" such as shackling, certainly the implementation of a less conspicuous security measure cannot require a hearing to satisfy due process.

California state law under Duran requires trial courts to put their reasons for shackling on the record. Although the trial court in this case did not order shackling, the trial court nonetheless articulated the reasons for the metal detector's placement outside the courtroom on the record. See Duran, 16 Cal. 3d 282 (1976). The Court can see no violation of due process in this procedure.

27

1    Furthermore, Petitioner was not deprived of his constitutional right to a fair trial,

2   which includes the presumption of innocence.  See Norris v. Risley, 918 F.2d 828, 831

3   (9th Cir. 1990).  Although certain courtroom conditions may prejudice this presumption –

4   see Estelle v. Williams, 425 U.S. 501 (1976) (defendant clothed in prison clothes may

5   affect judgment of the jury); Illinois v. Allen, 397 U.S. 337 (1970) (prejudice may ensue

6   from defendant appearing before the jury bound and gagged) – mere use of a

7   magnetometer does not.

8    In rejecting this claim on appeal, the California Supreme Court distinguished the

9   shackling of a defendant from the placing of a metal detector at the entrance to the

10   courtroom.  The California Supreme Court noted that the trial court, after hearing

11   argument from both the prosecutor and defense counsel, deliberately chose the metal

12   detector as a less potentially prejudicial means of securing the courtroom and declined to

13   utilize shackling.  Petitioner's contention that the failure to conduct a full evidentiary

14   hearing on this issue resulted in a deprivation of due process is without merit.

15    Moreover, the trial court gave a curative instruction to the jury, on defense

16   counsel's request, offering a neutral reason for the metal detector.  Any potential

17   prejudice Petitioner may have suffered from the court's decision to utilize a

18   magnetometer outside the courtroom was ameliorated by the trial court's instruction to

19   the jury:

20         A final thing I would like to leave you with is that it is my policy in serious
     felony cases to have everyone except jurors pass through a metal detector
21   before entering the courtroom.  Therefore, you can expect that a metal
     detector will be placed outside the courtroom when the trial begins, and it will
22   remain throughout the course of the trial. The practices of other judges in this
     courthouse differ from courtroom to courtroom.  You should not view the
23   presence of a metal detector outside this courtroom or the absence of one
     outside other courtrooms, as a reflection on either party or any of the
24   witnesses.  It is solely a matter of my personal policy.

25   (RT 11581-82.)

26   ///

27   ///

28   ///

01cv0741

1    Petitioner has failed to show the state court's rejection of this claim was contrary to

2   or an unreasonable application of federal law, or that it was based on an unreasonable

3   determination of the facts.  Williams, 529 U.S. at 412-13.  Petitioner is not entitled to

4   habeas relief on this claim.

5

6   **D.    Claim 38 - Penalty Phase Cross-Examination**

7    Claim 38 alleges that the trial court erred in denying Petitioner the right to confront

8   and cross-examine penalty phase prosecution witnesses, including Walter Lewis and

9   Richard Christiansen, with evidence of prior acts of misconduct, in violation of his rights

10  under the Fifth, Sixth and Fourteenth Amendments.

11

12  **1.    State Court's Decision**

13   The California Supreme Court considered this claim on direct appeal, rejecting it

14  as follows:

15  Defendant claims that the trial court erred under Evidence Code section 352
    and that the proceedings violated his rights under the Sixth and Fourteenth
16  Amendments to the United States Constitution when the court refused to allow
    him to inquire of Walter Joe Lewis, whose testimony is summarized *ante*, 96
17  Cal.Rptr.2d page 725, 1 P.3d page 42, whether he had made threats and
    committed violent acts.
18
    Defendant wanted to ask Lewis on cross-examination whether he had
19  committed murder and assaults in prison.  He asserted that if his character
    was on trial in the penalty phase, so should be the adverse witnesses'; but the
20  trial court disagreed.  It ruled that impeaching character evidence in the form
    of specific instances of Lewis's conduct was unduly prejudicial character
21  evidence, and that "we're not going to try Mr. Lewis."

22  Though it did not cite a statute in the record, the trial court may have made its
    ruling under Evidence Code section 787, which provides that "evidence of
23  specific instances of his conduct relevant only as tending to prove a trait of his
    character is inadmissible to attack or support the credibility of a witness."  The
24  trial was completed before we filed *People v. Harris* (1989) 47 Cal.3d 1047,
    255 Cal.Rptr. 352, 767 P.2d 619, in which we held that the California
25  Constitution forbade applying section 787 in criminal cases.  (*Harris*, at p.
    1081, 255 Cal.Rptr. 352, 767 P.2d 619.)  Our holding responded to the
26  People's argument that "the statutory limitations on the admission of evidence
    relevant to a *witness's* honesty or veracity are no longer applicable in criminal
27  cases, except to the extent that exclusion is ordered pursuant to Evidence
    Code section 352."  (*Ibid.*)  Our holding that section 787 could no longer be
28  applied in criminal cases should be viewed in the context of that argument.
    (See also *People v. Wheeler, supra,* 4 Cal.4th 284, 299, fn. 10, 14 Cal.Rptr.2d

418, 841 P.2d 938 [limiting and clarifying *Harris*].)

Defendant did not raise the claim at trial that Evidence Code section 787 had been abrogated. He thus failed to preserve it for review. (*People v. Von Villas* (1992) 10 Cal.App.4th 201, 267-268, 13 Cal.Rptr.2d 62.) In any event, as implied by the context of *Harris*, *Von Villas* correctly held that the California Constitution did not, notwithstanding the limitation of Evidence Code section 787, forbid excluding evidence that fell within that statute's ambit if a trial court properly ruled that the evidence should also be excluded under Evidence Code section 352. (*Von Villas*, supra, 10 Cal.App.4th at pp. 268-269, 13 Cal.Rptr. 2d 62.) Implicitly, the trial court here ruled that the evidence would "mislead [ ] the jury" (Evid.Code, § 352) because it would be confusing to appear to place Lewis on trial with side issues regarding credibility. We review the ruling accordingly.

The trial court did not abuse its discretion. (Evid.Code, § 352) "[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler, supra,* 4 Cal.4th 284, 296, 14 Cal.Rptr.2d 418, 841 P.2d 938.) Impeaching Lewis with inquiries into his own violent conduct – an inquiry that would not have borne on any question of veracity or honesty – would have been collateral. Moreover, the jury already knew that Lewis had committed two murders and that he had been a member of a prison gang. There was no abuse of discretion.

As for defendant's constitutional claim, we have repeatedly held that "not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance." (*People v. Frye*, *supra*, 18 Cal.4th 894, 946, 77 Cal.Rptr.2d 25, 959 P.2d 183.) The constitutional claim is without merit.

Ayala, 23 Cal. 4th at 300-01.

## 2.  **Merits**

Although the opportunity of cross-examination is central to a defendant's

constitutional rights under the Confrontation Clause, the right is not boundless. The

United States Supreme Court has held that while a trial court may not prevent the

defendant from cross-examining a prosecution witness, the court may place reasonable

limits on cross-examination based on the need for fairness and order in the proceedings.

Delaware v. VanArsdall, 475 U.S. 673, 679 (1986). "The Confrontation Clause

guarantees an opportunity for effective cross-examination, not cross-examination that is

effective in whatever way, and to whatever extent, the defense might wish." Id. (quoting

1  Delaware v. Fensterer, 474 U.S. 15, 20 (1985)).

2      To determine whether a criminal defendant's Sixth Amendment right to confront a

3  witness against him has been violated by the exclusion of evidence on cross-

4  examination, a court "must inquire whether: (1) the excluded evidence was relevant; (2)

5  there were other legitimate interests outweighing the defendant's interest in presenting

6  the evidence; and (3) the exclusion of evidence left the jury with sufficient information to

7  assess the credibility of the witness."  United States v. Beardslee, 197 F.3d 378, 383 (9th

8  Cir. 1999).  Upon consideration of these three factors, the Court concludes that

9  Petitioner's Sixth Amendment right was not violated.

10     Walter Lewis testified at the penalty phase that he had seen Petitioner kill fellow

11  inmate John Casas.  (RT 17652-53.)  Defense counsel sought to cross-examine Lewis

12  about "various acts of misconduct" that he had committed, including threats to other

13  inmates and extortion attempts.  The trial court held that the desired cross-examination

14  constituted collateral impeachment and excluded the evidence under Evidence Code §

15  352.  (RT 17724-25.)  Petitioner contends that the trial court erred in foreclosing defense

16  counsel's attempt at impeaching Lewis's statement that he came forward to testify

17  against Petitioner in an attempt to engage in "positive activities."  (RT 17719.)

18     Although this excluded evidence was arguably relevant, the trial court voiced the

19  legitimate interest of preventing the jury from confusion over collateral matters.  See

20  Beardslee, 197 F.3d at 383.  Further, the jury knew that Lewis was a twice-convicted

21  murderer.  (RT 17626.)  The jury was also informed that Lewis was previously affiliated

22  with the Aryan Brotherhood prison gang.  (RT 17694.)  Lewis testified that he wrote a

23  number of letters to prison officials and made offers to inform on inmates in an attempt to

24  receive a transfer out of the Security Housing Unit (SHU).  (RT 17693-95.)  Lewis also

25  stated that he threatened to refuse to testify if he was not transferred.  (RT 17699.)

26  Lewis testified that "they [prison officials] believed me, but I couldn't pass the polygraph"

27  and that was the reason he had not yet received his desired transfer.  (RT 17696.)

28  Taking into account the numerous areas of cross-examination, the jury was provided with

01cv0741

1  sufficient evidence to evaluate the credibility of Walter Lewis.  See Beardslee, 197 F.3d

2  at 383.  The trial court did not abuse its discretion in precluding trial counsel from cross-

3  examining Lewis on the other acts of misconduct.

4       Regarding the testimony of Richard Christiansen, Petitioner does not provide the

5  Court with any argument, nor does he assert any facts that demonstrate the defense was

6  precluded from cross-examining Christiansen at trial.  Petitioner's allegation, unsupported

7  by any factual basis, is insufficient to merit relief on this claim.

8       Petitioner has also failed to demonstrate that the alleged error had a "substantial

9  and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at

10  637.  With respect to the Casas homicide, the additional testimony Petitioner sought to

11  produce would not have further affected Lewis's credibility.  Lewis had already been

12  impeached, and Albrecht had also testified to the events surrounding the murder.

13  Petitioner fails to show that the state supreme court's rejection of this claim was an

14  unreasonable application of clearly established law, or involved an unreasonable

15  determination of the facts.  Therefore, Petitioner is not entitled to relief on this claim.

16

17  **E.   Admission of Murder of Casas in Penalty Phase**

18       Claim 39 alleges that the trial court erred in admitting the unadjudicated murder of

19  John Casas into evidence as an aggravating factor during the penalty phase

20  proceedings, violating Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth

21  Amendments.

22

23       **1.   Teague**

24       Petitioner asserts a due process violation arising from the eight-year delay in

25  presenting evidence of the Casas murder against him.  Respondent counters that

26  Petitioner fails to identify any clearly established federal law requiring the exclusion of

27  penalty phase evidence regarding criminal offenses which could have been charged at

28  an earlier time.  Petitioner relies largely on the Supreme Court's decision in United States

32

1   v. Marion, 404 U.S. 307 (1971), arguing that due process is implicated whenever there is

2   a pre-indictment delay that creates prejudice at trial.

3       In Marion, the Supreme Court considered the significance, for constitutional

4   purposes, of a lengthy pre-indictment delay, holding that proof of actual prejudice to the

5   defense could constitute a meritorious due process claim.  Id. at 326.  Petitioner urges

6   this Court to apply Marion to the prosecution's introduction of evidence of an

7   unadjudicated crime during the penalty phase of his trial, claiming that "it simply cannot

8   be denied that the same Due Process considerations which apply to a pre-indictment

9   delay before an ordinary trial are only heightened when applied to a pre-indictment delay

10  in connection with the use of unadjudicated crimes in a penalty phase."  (Petr's Opp. at

11  32.)

12      Respondent contends that Marion does not extend to the presentation of penalty

13  phase evidence and asserts that "unlike the constitutional concerns present in the

14  context of pre-indictment delay, evidence of prior criminality presented at the penalty

15  phase acts as background for the sentencer and does not provide an independent basis

16  for punishment," and notes that Petitioner uses a considerable portion of his argument to

17  "assail generally against the use of any unadjudicated offenses."  (Resp.'s Reply at 10.)

18      The Court acknowledges that this issue presents a close question, but declines to

19  reach a ruling on the Teague issue, as this claim clearly fails on the merits.

20

21      **2.      State Court's Decision**

22      The California Supreme Court considered this claim on direct appeal, rejecting it

23  as follows:

24          As stated *ante*, 96 Cal.Rptr.2d at page 725, 1 P.3d at page 42, John Casas
            was killed in 1980.  Defendant claims that failing to try him at the time and
25          presenting evidence of the killing eight years later violated his rights under the
            Fifth, Sixth, Eighth and Fourteenth Amendments to the United States
26          Constitution, and [A]rticle I, section 15 of the California Constitution.  He
            asserts that because an exculpatory witness was lost in the interim and he
27          suffered other disadvantages through the passage of time, the law invalidly
            "required him to defend against stale acts."  (*People v. Stanley* (1995) 10
28          Cal.4th 764, 822, 42 Cal.Rptr.2d 543, 897 P.2d 481.)  At oral argument, his
            counsel emphasized the evidence's probable severe impact: the prosecution

1
2
3

> was presenting the jury with evidence suggesting that, as someone who had already murdered while in prison, he was highly unsuitable for life imprisonment.  Nevertheless, we have repeatedly rejected this claim.  (*Ibid.*) We decline to reconsider our prior decisions.

Ayala, 23 Cal. 4th at 300.

4
5

**3.  Merits**

6
7
8
9
10

In McDowell v. Calderon, the Ninth Circuit upheld a conviction, finding that the admission of previously unadjudicated prior offenses did not in that case violate due process.  Id. at 1366.  In rejecting the petitioner's due process argument, the Ninth Circuit noted, "A sentencer may rely on criminal conduct not resulting in a conviction if the evidence has 'some minimal indicium of reliability beyond mere allegation.'"  Id.

11
12
13
14
15
16
17
18
19

The evidence of the Casas homicide introduced during the penalty phase of Petitioner's trial bore at least the "minimal indicium of reliability" required to satisfy due process.  Glenn Albrecht, a fellow inmate, testified that he saw Petitioner hit Casas several times in the chest and then saw Casas lying on the ground in a pool of blood. (RT 17527-34.)  Walter Lewis, another inmate, testified that he saw Petitioner lunge toward the victim with a weapon in a towel, after which the victim staggered toward the stairs and fell down bleeding.  (RT 17650-55.)  A correctional officer testified that after the incident, officers recovered a bloody knife concealed in a towel in the area of the murder. (RT 17759-60.)

20
21
22
23
24
25
26
27
28

Petitioner argues that there was no legitimate justification for the eight-year delay in prosecuting the Casas homicide and that he suffered actual prejudice from the delay because of the loss of "highly" exculpatory witness Robert Dufton.  Notes of an interview conducted with Dufton shortly after the murder show that Dufton claimed to have seen the knife used to kill Casas in the cell of an inmate called Mancha at some point before the murder.  About ten minutes prior to the killing, Dufton allegedly saw another inmate, Victor Murillo, give the knife to Mancha when he picked up his towel.  Dufton claimed that he was in the area of the murder, saw Casas fall to his side, and thought Casas was

///

34

01cv0741

1    having a seizure until he saw the hole in his back.  According to Dufton, only inmates

2    Murillo and Mancha were involved in the murder.

3          Defense counsel's attempts to locate Dufton were unsuccessful.  However, the

4    trial court denied defense counsel's motion to exclude evidence of the Casas murder,

5    reasoning:

> Clearly, prejudice, assuming prejudice, has to be weighed against
> any justification for the delay . . . [A]nd really I guess the bottom line is that
> it has to be shown that the delay is purposeful or oppressive, and even
> smacks of deliberate obstruction on the part of the prosecution in order to
> justify the relief sought by [the defense] . . . [¶] Clearly, there is a
> reasonable basis for the delay in this case.  Witnesses have changed their
> minds, agreed to testify now against Mr. Ayala.  Certainly the record is clear
> that that's something they would not do in 1980.
>
> The People, in point of fact, as compared to the documents reviewed
> by the court, would appear to have a significantly improved case as
> opposed to that in 1980.  The reasons for the delays, at the very least,
> appear to be very legitimate, and certainly, there's no hint of obstruction or
> bad faith, and the motion will accordingly be denied.

14   (RT 17070-71.)

15         The Court agrees with the California Supreme Court that Petitioner fails to

16   demonstrate actual prejudice from the loss of Robert Dufton as a witness.  Dufton never

17   claimed to have witnessed the actual murder or to have seen the perpetrator.  Dufton

18   only claims he saw another inmate with a knife shortly before the stabbing, which does

19   not exculpate Petitioner, nor does it contradict the testimony of Albrecht or Lewis.

20   Furthermore, because Dufton apparently did not witness the murder, his assertion that

21   only inmates Murillo and Mancha were involved in the attack is factually unsupported.

22         Petitioner also asserts constitutional error arising from the trial court's failure to

23   instruct the jury that it could consider evidence of the Casas homicide in aggravation only

24   if it found beyond a reasonable doubt that Petitioner had committed the offense.

25   (Second Amended Petition ["Pet."] at 137; Petr's Mem. at 57.)  However, immediately

26   after listing the potential aggravating circumstance of the Casas homicide during penalty

27   phase instructions, the court explained: "Before you may consider any of such criminal

28   acts as an aggravating circumstance in this case, *you must first be satisfied beyond a
     reasonable doubt* that Ronaldo Ayala did commit such criminal acts."  (RT 19029)

01cv0741

1   (emphasis added).

2          The California Supreme Court's rejection of this claim was neither contrary to, nor

3   did it involve an unreasonable application of, federal law.  Petitioner is not entitled to

4   habeas relief on this claim.

5

6   **F.     Claim 40 - Mendoza Lopez Rebuttal Testimony**

7          In this claim, Petitioner asserts the trial court "failed to properly evaluate the

8   admissibility of the proffered evidence before permitting [Rafael] Mendoza Lopez to

9   testify" and erred in denying Petitioner's objections to this testimony and request for a

10  Evidence Code § 402 hearing, in violation of his Fifth, Sixth, Eighth, and Fourteenth

11  Amendment rights.

12

13         **1.     Teague**

14         Respondent argues that Petitioner "fails to point to any controlling authority

15  disallowing rebuttal testimony of a witness who has previously testified," and that granting

16  relief on this claim would require the creation of a new rule of criminal procedure barred

17  under Teague.  (Resp.'s Opp. at 30.)  In response to the Teague assertions by

18  Respondent, Petitioner argues that he "seeks to impose no new obligation on the state

19  but simply asks the state to implement federal constitutional guarantees as set forth in

20  then-existing decisional law."  (Petr.'s Reply at 5.)

21         The Court could plausibly conclude that this claim is barred as a "new rule"

22  because Petitioner asks the Court to hold that the admission of rebuttal testimony by a

23  witness who previously testified amounts to a violation of the United States Constitution,

24  a result that was not dictated by precedent at the time Petitioner's conviction was

25  finalized.  However, bearing in mind the Ninth Circuit's unwillingness to require a

26  Petitioner to present a case "involving identical facts, circumstances and legal issues" in

27  order to clear the Teague threshold, Keating, 191 F.3d at 1061 n.11, the Court takes the

28  more sensible approach of concluding that Petitioner does not seek to impose a new

1   rule, but, rather, seeks to apply to the facts of his case established law that an improper

2   admission of evidence at trial may, in certain circumstances, constitute a due process

3   violation.  See Payne v. Tennessee, 501 U.S. 808, 824 (1991).  Therefore, Petitioner's

4   claim is not barred under Teague.

5

6           **2.    Merits**

7           Petitioner alleges that the trial court failed to properly evaluate the admissibility of

8   the proffered recantation evidence before permitting Mendoza Lopez to testify.  Petitioner

9   further alleges that the trial court erred in denying defense counsel's objections to the

10  admissibility of the recantation as well as their request for an Evidence Code § 402

11  hearing on the voluntariness of the rebuttal testimony.  Petitioner claims that as a

12  consequence of the court's actions, unreliable and prejudicial testimony was presented to

13  the jury, resulting in a violation of Petitioner's due process right to a fair trial and reliable

14  penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

15          On direct appeal, the California Supreme Court rejected Petitioner's claim that

16  Mendoza's recantation constituted improper rebuttal evidence.  The California Supreme

17  Court explained:

18              Far from being improper, Mendoza's testimony was, in respect of its
                evidentiary effect and importance, the ideal rebuttal: the witness repudiated his
19              own testimony.  Moreover, as the People observed at oral argument, it was
                among the most justifiable of all rebuttals, because it could not have been
20              presented during the prosecution's or even the defense's case-in-chief.  There
                was no error under state law in admitting the evidence. . . . Moreover, to the
21              extent defendant argues that the trial court should have screened Mendoza's
                proposed rebuttal testimony so as to decide its reliability *in limine*, he failed to
22              seek such clearance from the court in any meaningful way, notwithstanding his
                fleeting reference to the admissibility of the testimony, and he has failed to
23              preserve the claim for review.

24  Ayala, 23 Cal. 4th at 275.

25          The California Supreme Court's decision was not contrary to, nor did it involve an

26  unreasonable application of, clearly established federal law.  Mendoza's testimony was

27  significant and could only have been presented during rebuttal.  As pointed out by the

28  California Supreme Court, trial counsel did not ask the trial court to screen Mendoza's

1   proposed rebuttal testimony beforehand for purposes of determining reliability.

2   Therefore, contrary to Petitioner's assertions, the court was not aware of the alleged

3   inconsistencies between Mendoza's rebuttal testimony and Mendoza's taped testimony

4   or other evidence presented at trial.  Similarly, the evidence regarding Rudy "Green Eyes"

5   Ybarra was presented on surrebuttal and was not known to the court previously.

6          At any rate, even if the court knew about the inconsistencies alleged by Petitioner,

7   it would not have been error for the court to allow the rebuttal testimony.  As explained by

8   the California Supreme Court: "Generally, 'doubts about the credibility of [an] in-court

9   witness should be left for the jury's resolution.'"  People v. Mayfield, 14 Cal. 4th 668, 735

10  (1997) (quoting People v. Cudjo, 6 Cal. 4th 585, 609 (1993)).   Petitioner's counsel were

11  free to point out any inconsistencies in Mendoza's rebuttal testimony, leaving it to the

12  finder of fact to weigh the evidence.  There does not appear to be any legal authority

13  supporting the proposition that a trial court violates a defendant's due process rights by

14  allowing a witness to recant his prior testimony on rebuttal in the face of inconsistencies

15  that call into question the truthfulness of the rebuttal testimony.

16         Petitioner's argument that the trial court should have granted a voluntariness

17  hearing under Cal. Evid. Code § 402 fails because the trial court was not presented with

18  evidence indicating that Mendoza was coerced into changing his story.  Trial counsel

19  speculated that Detective Chacon used information that Mendoza was an informant to

20  pressure Mendoza into changing his testimony.  However, trial counsel did not have any

21  evidence to this effect.

22         During an in camera hearing (Supplement to Record of Trial Volume 81-1), trial

23  counsel explained to the court that after Mendoza changed his story, Chacon and Gloria

24  Michaels of the District Attorney's Office, visited Javier Hernandez ("Pelon").  Chacon

25  allegedly told Pelon, "I know your carnales, your brothers in the EME.  Mr. Ayala has no

26  power left.  You had better tell the truth.  You're going to need a lawyer . . . She [Semel]

27  can't protect you anymore."  Trial counsel stated that Hernandez had no gang affiliation,

28  did not know the Ayalas, and felt threatened and intimidated by what occurred.  Based on

1   what happened to Hernandez, trial counsel believed that Mendoza might have been

2   frightened into changing his testimony.

3          However, based on Mendoza's taped statements, Detective Chacon and the

4   prosecution had reason to believe that Hernandez had lied on the stand and had

5   conspired with Mendoza to make up stories to protect the Ayalas.  Although Chacon

6   applied some pressure to Hernandez to tell the truth, there is no evidence that he did

7   anything improper.  Chacon's statement about Semel not being able to "protect"

8   Hernandez anymore does not necessarily have a sinister meaning.  It seems that Chacon

9   was talking about protection from prosecution for perjury, an interpretation that is

10  supported by Chacon's preceding statement that Hernandez was going to need a lawyer.

11         During his taped statement, Mendoza insisted that his decision to change his story

12  was completely voluntary.  There was no evidence to the contrary that would form the

13  basis of a § 402 hearing.

14         The admission of Mendoza's rebuttal testimony did not violate state law, and

15  Petitioner has failed to establish that any of his constitutional rights were violated.

16  Therefore, the state court's decision was not contrary to, or an unreasonable application

17  of, clearly established federal law, and Petitioner is not entitled to habeas relief on this

18  claim.

19

20  **G.    Claim 41 - Gang Evidence in Guilt and Penalty Phase**

21         Petitioner alleges that the trial court erroneously allowed the admission of

22  irrelevant and prejudicial gang evidence during the guilt and penalty phases of the trial.

23  Petitioner claims that he was denied his constitutional rights to a fair trial and to present

24  evidence in his own defense due to the trial court's erroneous rulings in violation of the

25  Fifth, Sixth, Eighth and Fourteenth Amendments.

26  ///

27  ///

28  ///

01cv0741

**1.   State Court's Decision**

On direct appeal, the California Supreme Court rejected Petitioner's claims that the trial court erred in failing to exclude evidence relating to gang affiliation or involvement, and that the court's failure to set out clear rules regarding the admissibility of gang-related evidence caused defense counsel to become "gun-shy."  The California Supreme Court explained:

> Various witnesses against defendant feared the Mexican Mafia, and that fear at times explained their prior conduct, their motivation to testify, or their accepting government protection - items that bore on the witnesses' credibility, and thus items that they needed to explain.  The trial court agreed that evidence of defendant's involvement in the Mexican Mafia would be unduly prejudicial, thus giving itself and the parties the task of excluding inflammatory references to the gang while enabling witnesses to explain the basis for their testimony. [Footnote omitted.] The court made diligent efforts to try to achieve this balance, ordering that witnesses refer by various euphemisms to pressures from others unless the defense opened the door to naming the Mexican Mafia.
>
> The result was successful. We have already explored this issue at some length *ante*, 96 Cal.Rptr.2d at pages 712-714, 1 P.3d at pages 30-33, in our review of issues surrounding Richard Ortiz Savocchio and Rafael Mendoza Lopez.  And as alluded to in the statement of facts, the prosecution needed to explain Pedro Castillo's reticence and evasions when the police first interviewed him, and why he changed his mind and decided to denounce the murderers.  So it was also with other witnesses, such as Juan Manuel Meza, who needed to explain the consideration, in the form of protection for his family, that the state was extending him.
>
> There was no error in presenting such evidence, which affected the witnesses' credibility.  And the parties and trial court succeeded in doing it without exposing the jury to testimony about the Mexican Mafia or about prison-based gangs in general - the very thing about which defendant expressed concern before and during the trial.
>
> As a result of the trial court's efforts, the jury never heard the names Mexican Mafia or La Eme.  As stated *ante*, 96 Cal.Rptr.2d at pages 712-714, 1 P.3d at pages 31-33, the jurors heard only sanitized references to other people or groups that might wish to influence a witness's conduct or testimony or retaliate against the witness for harming the defense.

Ayala, 23 Cal. 4th at 276-77.

**2.   Merits**

As explained by the California Supreme Court, there were no explicit references to gangs or Petitioner's membership in a gang during the guilt phase.  The trial court properly allowed Castillo to testify regarding his fear for himself and his family to explain

40

why he did not identify the Ayalas and Moreno immediately.  Similarly, it was necessary for Meza to testify about his fear for his life to explain why he did not go along with the Ayalas' proposed plan and to explain the reason for the protection the state was providing him.  As for Mendoza, the prosecution had to elicit the reason why Mendoza lied on the stand in the first place.  Because Petitioner was incarcerated in a different institution than Mendoza at the time Mendoza testified on direct, it was necessary for Mendoza to explain his belief that Petitioner had influence over a group of people who existed inside and outside of prison.  Although jurors may have been able to guess that the "southern group" was a euphemism for a gang, there was little more the court could do to sanitize the testimony.

     Petitioner contends that as a result of the introduction of evidence relating to gangs, his defense was crippled because his trial counsel were faced with the choice of fully examining Castillo, Meza, and Mendoza and introducing additional gang-related evidence, or foregoing examination in crucial areas.  To the extent trial counsel chose not to impeach with certain evidence to avoid the introduction of other gang evidence, trial counsels' decisions were a matter of trial strategy and cannot be blamed on the trial court.  See, e.g., Edwards v. United States, 265 F.2d 909 (6th Cir. 1959) ("There is no warrant of course for relieving the accused of the consequences of what appears to have been a planned defense stratagem, by the device of condemning as 'clear error' of the trial court a seemingly calculated risk of defense counsel which happened not to achieve the intended result with the jury.")  For example, trial counsel could have chosen to inquire about Castillo's receipt of $15,000 per year from the San Diego County District Attorney.  However, the trial court properly ruled that the prosecution could then admit evidence that the $15,000 was in connection with the witness protection program.  Trial counsel made the decision that it was not worth the risk.

     Trial counsel may have been "gun shy" to present any evidence that had anything to do with gangs.  However, trial counsels' perhaps unwarranted nervousness about all evidence touching upon gangs was not the fault of the trial court.  In this Court's Group

Three Order (Claim 18), the Court explained that with respect to Savocchio, the trial court ruled that the prosecution would be allowed to introduce evidence that Savocchio had lied about having problems with the EME.  The trial court did not rule that the prosecution could introduce evidence regarding Savocchio's actual dealings, if any, with the EME. Therefore, there was no danger that Savocchio's testimony would link Petitioner with gang activity.  This Court further explained that if trial counsel were confused about the scope of the impeachment allowed by the trial court's in limine ruling, trial counsel should have sought clarification.  This evidentiary ruling does not rise to the level of a constitutional violation.  See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995) (explaining that a state court's evidentiary ruling is not subject to federal habeas review unless it resulted in a violation of federal law "either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.").

The Court rejects Petitioner's claim that he was prejudiced by the prosecutor's numerous references during closing argument to Petitioner's alleged dangerousness.  In its Group Three Order (Claim 26), the Court held that there was no prosecutorial misconduct during closing argument.  Accordingly, the trial court did not commit error in overruling any objections to alleged prosecutorial misconduct that may have been made during closing argument.

Petitioner has failed to establish that the trial court's guilt-phase evidentiary rulings regarding gang-related evidence were erroneous and had "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 638.  Therefore, the California Supreme Court's rejection of Petitioner's claim regarding gang-related evidence during the guilty phase was not contrary to, or an unreasonable application of, clearly established federal law.

///

///

///

42

Petitioner's claim regarding gang references during the penalty phase also lacks merit.  During the testimony of Mr. Blasingame, a correctional officer who witnessed the events surrounding the assault of Richard Christiansen, Blasingame referred to a diagram of the yard that contained the initials "EME" to indicate where Mexican inmates were standing and where Petitioner went after his encounter with Christiansen.  Defense counsel did not object to the diagram or Blasingame's references to the EME.  On cross-examination, defense counsel even clarified that where Blasingame saw large groups of Mexican inmates, he placed "EME" on the diagram.  (RT 17350.)  The fact is that defense counsel made a tactical decision to allow references to gangs during the penalty phase.  During a conference outside the presence of the jury, defense counsel explained:

> I should make it clear, I think, as a matter of record, that as a tactical decision I think the defense has decided to present evidence in this regard because it is our position essentially that the – that the way in which the climate of fear was created by the evidence presented at the guilt phase I think is worse than simply fully presenting this issue to the jury and allowing the jury to decide what it will with a full understanding of the circumstances that existed in prison during the 70's and the early 1980's.

(RT 17281.)

In the Group Three Order, the Court held that trial counsels' decision to change strategy during the penalty phase was reasonable under Strickland (Claim 30).  Given defense counsels' deliberate strategy to allow gang references during the penalty phase, there was no trial court error in admitting the evidence, and Petitioner is not entitled to habeas relief on this claim.

## H.   Claim 42 - Defense Motions for Mistrial

Petitioner contends that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights when it denied five separate motions for mistrial.  As discussed below, Petitioner's claim, with respect to each of the five motions for mistrial, fails on the merits.

///

///

43

1    **1.  Denial of Mistrial After Inquiries Regarding Threats to Eduardo ("Lalo")**

2    **Sanchez**

3          On redirect, the prosecutor asked Sanchez whether he had received any threats

4    with respect to his testimony in the case.  (RT 13255.)  Defense counsel objected that the

5    question was improper and beyond the scope of examination.  (Id.)  Outside the

6    presence of the jury, the prosecutor made an offer of proof that a defense investigator

7    had told Sanchez something to the effect that he better tell the truth or a bus might run

8    over him some day.  (RT 13255-56.)  Defense counsel made a motion for mistrial.

9          Upon questioning outside the presence of the jury, Sanchez confirmed that on one

10   occasion, an investigator came up to him and indicated that something could happen to

11   him while he was waiting to catch a bus.  (RT 13261-62.)  The name of the investigator

12   was Paul.  (RT 13263-64.)  Sanchez told the investigator the same thing he testified to at

13   trial.  (Id.)  The investigator's threat did not make him afraid to tell the truth, and he has

14   told the truth.  (Id.)  Defense counsel explained that the investigator was Paul Pickering,

15   who was employed by Hector, not Ronaldo.  (RT 13265.)  The prosecutor asserted that

16   Pickering was, however, accompanied by Hart, Petitioner's investigator.  (RT 13266.)

17         The trial court concluded that the prosecutor asked the question about threats to

18   Sanchez in good faith.  (RT 13267.)  The court noted that from a legal standpoint, it did

19   not matter which investigator delivered the threat, and gave defense counsel the option

20   of keeping out the testimony and instructing the jury that the prosecutor's question was

21   not evidence.  (RT 13266.)  Defense counsel concluded that an admonition would not

22   cure the problem and chose to allow the testimony regarding Sanchez's encounter with

23   Paul Pickering.  (RT 13268.)

24         On further redirect, Sanchez stated that he was not afraid to testify regarding what

25   he knew about the case.  (RT 13270.)  On further recross, Sanchez testified that Paul

26   told him, "If you don't say the truth, when you – you can stay waiting for the bus and

27   something can happen to you."  (RT 13272.)  Sanchez explained that he was not afraid

28   at the time of the threat and is still not afraid to tell the truth.  (Id.)  On further redirect,

1  Sanchez said that he did not know that Paul was a defense investigator and confirmed

2  that Paul was accompanied by Eric Hart.  (RT 13274-76.)

3      On direct appeal, the California Supreme Court rejected the argument that the trial

4  court violated his constitutional rights by denying his motion for mistrial.  The California

5  Supreme Court explained:

6      The trial court ruled that the prosecutor had asked the question in good faith
       and denied the motion for mistrial, which defendant made on state law
7      grounds. It did not abuse its discretion. The record, described above, supports
       its conclusion that the prosecutor asked the question in good faith. Because
8      there was no prosecutorial misconduct as defined in state law, there was no
       basis for a finding of mistrial.

9  Ayala, 23 Cal. 4th at 284.

10

11     Petitioner has not demonstrated that the California Supreme Court's decision was

   contrary to or involved an unreasonable application of clearly established federal law.
12
   See Williams, 529 U.S. at 412-13.  The record shows that the prosecutor had a factual
13
   basis for asking the question regarding threats and did not commit misconduct.
14
   Furthermore, the trial court offered to exclude the testimony regarding Pickering's
15
   statement and to instruct the jury that the question was not evidence.  The exclusion of
16
   the testimony and the curative instruction would have minimized any damage that might
17
   have been done by the question.  Defense counsel's decision to delve into what
18
   Pickering said to Sanchez, as opposed to keeping out the evidence and having the jury
19
   instructed that the question was not evidence, was a tactical choice, not an unavoidable
20
   consequence of trial court error.
21
       Accordingly, the prosecutor's question regarding threats to Sanchez did not "so
22
   infect[ ] the trial with unfairness as to make the resulting conviction a denial of due
23
   process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  Similarly, the
24
   prosecutor's question did not have a "substantial or injurious effect in determining the
25
   jury's verdict."  Brecht, 507 U.S. at 637.  Therefore, Petitioner is not entitled to habeas
26
   relief on this claim.
27
   ///
28

45

## 2. <u>Denial of Mistrial After Detention of the Oteros</u>

On the first day of trial, defense counsel complained to the court that plain-clothed Sheriff's deputies were accosting people attempting to come into the courtroom.  (RT 11835-38.)  According to defense counsel, one woman, Mrs. Otero, was accosted by Deputies Apodaca and Roberson and was prevented from entering the courtroom.  (RT 11838, 11861.)  Upon examination by the court, Deputy Apodaca admitted that he approached Mr. and Mrs. Otero as they were walking out of the courtroom.  (RT 11863.)  The jury had just left the courtroom and there were members of the public present.  (RT 11864.)  Deputy Apodaca explained that he quietly identified himself to the Oteros and asked if he could speak to them down the hall.  (RT 11863.)  Apodaca requested identification and then Mr. Otero raised his voice a little.  (RT 11867.)  Apodaca went inside the courtroom to advise prosecutor Gloria Michaels of the situation.  (<u>Id.</u>)  Deputy Roberson told the bailiff not to let the Oteros enter the courtroom until the deputies received clarification from Ms. Michaels.  (<u>Id.</u>)  Ms. Michaels told the deputies that as long as the individuals passed through the metal dectector, they could go into the courtroom.  (RT 11866.)

Deputy Apodaca explained that he thought that the District Attorney's Office had authorized him to ask for identification.  (RT 11861.)  However, nobody from the District Attorney's Office or the Sheriff's Office ever said that he could ask for identification.  (RT 11862.)  He understood that his job was to provide perimeter security and look out for suspicious looking people.  (RT 11862.)  The Oteros were the first people the deputies had approached and asked for identification.  (RT 11866.)  The court emphasized that the deputies were not to approach members of the public or stop them from entering the courtroom.  (RT 11862.)

Defense counsel moved for mistrial, arguing that the jurors may very well have seen defense counsel communicating with the Oteros.  (RT 11868.)  Apparently, the Oteros were seated near defense counsel.  (<u>Id.</u>)  Defense counsel argued that the deputies' actions added to the "atmosphere of fear" that the prosecution was trying to

01cv0741

1    create.  (Id.)   The trial court denied the motion for mistrial.  (RT 11869.)

2         The next day, defense counsel asked the court to reconsider its ruling on the

3    motion for mistrial.  (RT 11884.)  Defense counsel offered the declaration of Mrs. Otero,

4    who apparently claimed that she was physically handled by one of the deputies.  (RT

5    11885.)  Defense counsel also represented that the deputies had told the Oteros and two

6    other individuals that certain seats were reserved and that they could not sit in them.  (RT

7    11886.)  Defense counsel argued that the deputies' actions were intimidating to

8    spectators and posed a real threat to Petitioner's right to a fair trial.  (Id.)  The

9    prosecution objected to the hearsay nature of the evidence presented by defense

10   counsel.  (Id.)  The court agreed that defense counsel would have to present the

11   witnesses for examination.  (RT 11887.)  Defense counsel indicated that they were

12   prepared to call Mrs. Otero and the other individuals who were told to move.  (RT 11888.)

13   The court responded, "If you desire to have that type of hearing to perfect your record,

14   schedule it on a Friday and subpoena the people."  (Id.)   There is no record of any

15   subsequent hearing.

16        The California Supreme Court held that the trial court did not abuse its discretion

17   in denying Petitioner's motion for mistrial.  The California Supreme Court explained:

18        The trial court was able to gauge the extent of the disruption of the
         proceedings and the effect on the jury, and found that nothing justified a
19        mistrial. On this record, we agree. The question is whether there is a
         reasonable likelihood that the incident prejudiced the jurors against
20        defendant. (See In re Hamilton (1999) 20 Cal.4th 273, 296, 84 Cal.Rptr.2d
         403, 975 P.2d 600.) We discern no such likelihood.
21
22   Ayala, 23 Cal. 4th at 285.

23        The California Supreme Court's decision was not unreasonable.  The record

     shows that there was one incident where Sheriff's deputies approached the Oteros and
24
     quietly requested identification.[1]  Jurors may or may not have seen the encounter.
25
     However, even assuming some jurors witnessed the incident, there was no reason for
26

27   _____

28        [1]  Defense counsel apparently never scheduled a hearing to present Mrs. Otero's
     testimony or the testimony of the other individuals who allegedly claimed that they were told
     to move from certain seats in the courtroom.

01cv0741

them to believe that the security measures were because Petitioner was dangerous or involved with dangerous people.  The security measures were not an inherently prejudicial practice, see Morgan v. Aispuro, 946 F.2d 1462, 1465 (9th Cir. 1991); King v. Rowland, 977 F.2d 1354,1358 (9th Cir. 1992), and, contrary to Petitioner's claims, nothing about the incident "single[d] out [Petitioner] as a particularly dangerous or guilty person."  (Petr's Mem. at 81.)

Furthermore, there is no evidence that the public was denied access to the trial.  The deputies asked only the Oteros for their identification.  Although the Oteros were initially denied entry to the courtroom during a recess, the situation was quickly rectified and they were allowed to enter the courtroom after going through the magnetometer.  (RT 11837.)  Thereafter, the court explicitly admonished the deputies not to approach or stop any other members of the public.  There is no evidence that Petitioner was denied his right to a public trial.

In sum, Petitioner has failed to show that the incident involving the Oteros denied him his right to a public trial or so infected the trial as to deny him due process.  See Donnelly, 416 U.S. at 643.  Therefore, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.  Williams, 529 U.S. at 412-13.

### 3.    Denial of Mistrial After Wrongful Admission of Evidence of Petitioner's Prior Criminality

Before Meza took the stand, he was admonished not to make any references to the Mexican Mafia or to the fact that Petitioner had been in prison.  (RT 14310-11.)  During direct examination, Meza testified that he knew Petitioner since 1973 or 1974 and knew Hector since 1975.  The following exchange then took place:

///

///

///

01cv0741

Q:  Can you describe for us, say how frequently you would come across the path of either – well, first of all, Ronaldo Ayala?  How frequently would you see him?"

A:  Dating that far back, it wouldn't be very often.  I'd hear a lot about him in prison and –

Ms. Semel: Your Honor

The Witness: – we didn't actually –

Ms. Semel: There's a motion at this time.

(RT 14368-69.)

Outside the presence of the jury, defense counsel moved for a mistrial on the ground that Meza had made a deliberate attempt to place Petitioner's status as a convicted felon before the jury.  (RT 14369.)  The prosecutor argued that Meza was referring to a time when he himself was in prison.  (RT 14370.)  Meza confirmed that this was the case, and the court denied the motion for mistrial.  The court gave defense counsel the option of having Meza's answer stricken or having Meza clarify his answer. (RT 14371.)  Defense counsel chose the latter option.  When the jury returned, the following testimony took place:

Q: Mr. Meza, when I was asking you some questions about how frequently you saw Mr. Ayala, were you talking about a time in about 1975 or '76 when you, yourself, were in prison?

A: Yes.  Uh-huh (affirmative).

Q: And was that as a result of a conviction for the crime of robbery?

A: Yes, it was.

Q: Now, with regard to your own contact with Mr. Ayala, let me ask you how frequently – and just stick to this particular question – how frequently, say from the time that you first met Hector Ayala did you come across him, actually, physically, see him, or do something physically with him?

A: 1980, '81.

(RT 14372.)

Petitioner contends that the error was not cured by Meza's subsequent testimony. According to Petitioner, Meza's subsequent explanation strengthened the allusion to

01cv0741

1  Petitioner's prior criminality, the obvious implication being that Meza came across

2  Petitioner or saw him in 1975 when they were both in prison.  The California Supreme

3  Court held otherwise:

> Even if Meza's initial volunteered and nonresponsive comment -"I'd hear a lot about [defendant] in prison" - was ambiguous, the prosecutor, at the court's instruction following its denial of defendant's mistrial motion, erased any ambiguity before the jury by asking Meza a question that made clear he was discussing events during his own confinement in prison. He made no suggestion that defendant was also in prison.  The claim is without merit, and the motion for mistrial was properly denied.

8  Ayala, 23 Cal. 4th at 285.

9      The California Supreme Court's decision was reasonable.  Just because Meza

10  heard about Petitioner while Meza was in prison does not mean that Petitioner was in

11  prison as well.  Similarly, it was unclear from Meza's initial answer whether his limited

12  physical encounters with Petitioner were during the same time period that Meza

13  frequently heard about Petitioner in prison.  It is possible that Meza saw Petitioner

14  infrequently *prior* to the time that Meza was incarcerated.  Therefore, the fact that Meza

15  was incarcerated was not evidence of Petitioner's criminal status.

16      In any event, Petitioner brought out the fact that he was on parole in his case to

17  show that he was subject to urine tests.  (Testimony of Parole Agent Williams, RT

18  14946.)  The Court gave a limiting instruction in regard to Petitioner's parole status.  (RT

19  14948.)

20      Meza's testimony that he heard about Petitioner while Meza was in prison did not

21  "so infect the trial with unfairness as to make the resulting conviction a denial of due

22  process."  Donnelly, 416 U.S. at 643.  Indeed, the jury later heard through the defense

23  that Ayala was on parole and would infer that he had been prison.  Therefore, Petitioner

24  is not entitled to habeas relief on this aspect of Claim 42.

25  ///

26  ///

27  ///

28  ///

50

1   **4.    Denial of Mistrial After Meza and Mendoza Were Housed Together in**

2   **the Same Protective Custody Unit**

3       On September 23, 1988, Mendoza told the prosecution that he would recant his

4   testimony.  (RT 16037.)  The next day, he gave his taped interview.  (RT 16037.)

5   Subsequently, Mendoza was placed in protective custody at the South Bay facility of the

6   San Diego County Jail.  Meza was also housed in the protective custody module of the

7   South Bay facility.  (RT 16573-54.)  On September 26, 1988, the prosecution informed

8   the Sheriff's Department that it was permissible for Mendoza and Meza to talk to each

9   other.  (RT 16551.)  Mendoza testified in rebuttal on September 29, 1988.  (RT 16329.)

10      On October 4, 1988, defense counsel moved to reopen its case based on their

11  discovery of Mendoza's housing arrangements.  (RT 16550.)  Defense counsel's motion

12  was based on Exhibit JJJJ, a document drafted by Deputy Sheriff Valdez that revealed

13  that someone with the prosecution gave permission for Mendoza and Meza to talk to

14  each other while in protective custody.  (RT 16551.)  Petitioner argued that by authorizing

15  Mendoza and Meza to talk to each other, the prosecution violated the court order

16  forbidding witnesses to discuss their testimony.  (RT 16551-52.)  Defense counsel

17  requested a mistrial or, in the alternative, permission to reopen its case and/or instruct

18  the jury regarding the effect of improper attempts to influence a witness's testimony.  (RT

19  16560.)

20      The prosecution pointed out that Mendoza's taped recantation took place before

21  he was placed in protective custody.  (RT 16553-54.)  The prosecution also explained

22  that the reason why both men were in the South Bay protective custody module was

23  because downtown San Diego's protective custody facility was not secure enough and

24  the El Cajon jail lacked protective custody housing.  (Id.)  In addition, the reason the

25  prosecution told the South Bay facility that Meza and Mendoza could interact was to

26  apprise the deputies that the men did not pose a danger to each other.  (Id.)

27  Furthermore, just because the men could interact did not mean that they were not still

28  bound by the court's order forbidding witnesses to discuss their testimony.   (Id.)

1    The trial court denied the defense motion, reasoning:

2        The court has no facts before it to show the scheme of the People to
     procure false testimony.  In point of fact this record would seem to speak to
3    just the opposite.  The taping occurred well before this memo [Ex. JJJJ].
     The reasons given for the placement certainly make sense in terms of
4    protecting inmates.

5    (RT 16562.)

6        At the penalty phase, the court allowed the defense to present evidence that Meza

7    and Mendoza were housed together.  Deputy Valdez testified that Mendoza was placed

8    in protective custody on September 26, 1988.  (RT 17924.)  At the time, there were two

9    other inmates in the four-cell protective custody module.  (RT 17924-26.)  Deputy Valdez

10   asked a representative of the District Attorney's Office whether Mendoza could speak

11   with the other inmates because Valdez had safety concerns.  (RT 17925.)  Valdez

12   explained that protective custody inmates are allowed out of their cells to watch

13   television.  If, however, the deputies have reason to believe that there is a conflict

14   between inmates, the inmates are released from their cells one at a time.  (RT 17931.)

15       On direct appeal, the California Supreme Court held that the trial court properly

16   denied Petitioner's motion to reopen and motion for mistrial.  The California Supreme

17   Court concluded that there was no prosecutorial misconduct and no irreparable damage

18   to Petitioner's right to a fair trial:

19       Defendant could produce no evidence that the prosecution enabled Mendoza
     and Meza to confer and tailor their testimony, or that of Mendoza, or that
20   Mendoza's testimony was altered as a result of his lodging in the South Bay
     jail. Nor was defendant denied any right to present a defense, or more
21   precisely, evidence relevant to the theory of his defense. Such a right does not
     require "the court [to] allow an unlimited inquiry into collateral matters," which
22   this surely was; rather, "the proffered evidence must have more than slight
     relevanc[e]." (*Ibid*.) Finally, because informing defendant of the two men's
23   confinement arrangement would not have created a reasonable probability of
     a different outcome, we discern no violation of the due process right to be
24   provided with favorable material evidence. Nor do we discern the denial of any
     right to a reliable guilt and penalty determination.
25
     Ayala, 23 Cal. 4th at 282.
26
27       The California Supreme Court's decision was reasonable. The prosecution had a

28   valid explanation for why Mendoza and Meza were housed together and why permission

1   was given for the two witnesses to interact.  This evidence supports the California

2   Supreme Court's conclusion that there was no prosecutorial misconduct.  Furthermore,

3   because Mendoza and Meza were not housed together until after Mendoza recanted his

4   former testimony, there was no evidence of collusion.

5        Petitioner argues that the fact that the prosecutor deliberately violated the court's

6   order that witnesses not discuss their testimony violated Petitioner's due process rights,

7   regardless of whether the violation had any effect on the trial.  Petitioner cites several

8   cases for the proposition that the violation of a court order in and of itself constitutes a

9   due process violation.  However, in each of these cases, the violation of the court order

10   had a negative impact on the defendant at trial.  See Smith v. Estelle, 445 F. Supp. 647

11   (D. Tex. 1977) (failure to disclose that psychiatrist was going to testify regarding the

12   defendant's "dangerousness" deprived defense of opportunity to effectively cross-

13   examine psychiatrist and to present their own experts); State v. Butler, 255 Conn. 828

14   (Conn. 2001) (prosecutor's improper remarks to the jury bolstered the credibility of the

15   government's witness, the only witness who tied defendant to the murder); United States

16   v. Andrews, 824 F. Supp. 1273 (N.D. Ill. 1993) (evidence that government witnesses

17   were able to communicate with each other and share information *before and during trial*

18   was Brady material that reflected on the credibility, bias, and reliability of the

19   government's witnesses).

20        In Petitioner's case, any violation of the trial court's order did not have an effect on

21   the trial proceedings.  Therefore, there was no due process violation, see Donnelly, 416

22   U.S. at 64, and Petitioner is not entitled to habeas relief on this claim.

23

24        **5.     Denial of Petitioner's Motion for Mistrial Based on Admission of**

25   **Mendoza Lopez's Recantation Testimony**

26        Petitioner claims that the trial court erred in denying the motion for mistrial he

27   made after learning that Mendoza was going to recant his prior testimony on rebuttal.

28   The California Supreme Court held that the trial court did not abuse its discretion in

denying the motion for mistrial:

> [Defense] counsel argued in essence that the jury would inevitably, in the course of the parties' examination of Mendoza on rebuttal, have to hear prejudicial evidence of his involvement with the Mexican Mafia. Counsel also argued that defense counsel might be required to testify, and that some of Mendoza's taped assertions impugned her integrity, so that counsel might have a conflict of interest in continuing to represent defendant. But as we have explained, *ante*, 96 Cal. Rptr. 2d at page 714, 1 P.3d at page 32, no references to the Mexican Mafia resulted. With regard to a possible conflict of interest, the motion was premature - Mendoza's taped statement did not inevitably require testimony that might create a conflict of interest. The court did not abuse its discretion in denying the motion for mistrial.

Ayala, 23 Cal. 4th at 285-86.

Petitioner has not demonstrated that the California Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law. Here, Petitioner argues that his motion should have been granted because the defense team based their entire defense strategy around the idea that gang references would not be before the jury, foregoing opportunities to impeach prosecution witnesses when there would be a risk of opening the door to the admission of gang evidence. According to Petitioner, the entire defense strategy was destroyed by Mendoza's recantation testimony. However, Petitioner does not cite to any federal authority establishing a right to a mistrial when defense counsel pursues a certain strategy that ends up falling short due to unforeseen events that are not the fault of the court or the prosecution. Cf., Edwards v. United States, 265 F.2d 909 (6th Cir. 1959) ("There is no warrant of course for relieving the accused of the consequences of what appears to have been a planned defense stratagem, by the device of condemning as 'clear error' of the trial court a seemingly calculated risk of defense counsel which happened not to achieve the intended result with the jury.")

Therefore, Petitioner is not entitled to habeas relief on this claim.

///

///

///

///

54

01cv0741

1   **I.      Claim 43 - Voluntariness of Meza's Testimony**

2           In this claim, Petitioner asserts the trial court erred in refusing to suppress the

3   unreliable and involuntary statements of Juan Meza, and to exclude his trial testimony.

4

5           **1.      Teague**

6           Respondent argues that "Petitioner fails to cite any existing authority entitling him

7   to an indefinite hearing to demonstrate a witness's testimony is coerced." (Resp.'s MTD

8   at 61.)  In response to the majority of Respondent's Teague assertions, Petitioner argues

9   that he "seeks to impose no new obligation on the state but simply asks the state to

10  implement federal constitutional guarantees as set forth in then-existing decisional law."

11  (Petr.'s Reply at 5.)

12          With respect to this claim, Petitioner explains that he "moved to exclude the trial

13  testimony of Meza on the ground that it was involuntary," and contends that the

14  admission of such evidence constituted a denial of his Fifth and Fourteenth Amendment

15  rights to a fair trial." (Pet. at 169.)  Although Petitioner asserts that the trial court erred in

16  curtailing his efforts during the 403 hearing to prove Meza's testimony was coerced, the

17  thrust of his claim is that of a due process violation arising from the admission of Meza's

18  testimony at trial.

19          Therefore, as with Claim 40, the Court reaches the determination that Petitioner

20  does not seek to apply a new law, but, rather seeks  to apply to the facts of his case

21  established law that an improper admission of evidence at trial may, in certain

22  circumstances, constitute a due process violation.  See, e.g., Payne v. Tennessee, 501

23  U.S. 808, 824 (1991).  Therefore, Petitioner's claim is not barred under Teague.

24

25          **2.      Merits**

26          In a pretrial motion, Petitioner moved to suppress statements and exclude trial

27  testimony by Meza on the ground that Meza's testimony was involuntary and was a

28  product of prosecutorial misconduct.  According to the defense, Chacon used the fact

1  that Meza was a Mexican Mafia drop-out to intimidate him and coerce him to testify

2  falsely.

3         The trial court held a hearing pursuant to Cal. Evid. Code § 403 to determine

4  whether Meza was testifying voluntarily.  At the hearing, Meza testified that in 1987, while

5  he was incarcerated in the Vista jail (for possession for sale of narcotics), he spoke to his

6  attorney David McKenzie about providing information about the homicides.  (RT 14224.)

7  Meza stated his attorney did not threaten him or coerce him to provide the information.

8  (Id.)  After the meeting with his attorney, he had about five meetings with Michael Rolan,

9  Gloria Michaels, Carlos Chacon, and his attorney.  (RT 14225.)  He was never

10  threatened by any of these people to provide information.  (RT 14227.)  Meza explained

11  that he was testifying voluntarily, not as a result of direct or implied threats by anyone.

12  (RT 14228.)  In exchange for Meza's truthful testimony, the DA's Office agreed to petition

13  the court for early release pursuant to Cal. Penal Code § 11770(d), provide use

14  immunity, and provide protection to Meza and his family.  (RT 14229-31.)

15         On cross-examination, the defense asked Meza about his relationship with

16  Chacon and Chacon's visits with Meza in jail over the years.  Meza testified that he had

17  known Chacon since 1965.  (RT 14235.)  After Meza was arrested in 1987, Chacon

18  came to see him in the South Bay jail.  (RT 14234.)  Meza was not aware that Chacon

19  kept a file on him.  (RT 14237.)

20         Meza testified that since 1983, he had seen Chacon about five or six times

21  (excluding the meetings with the DA's Office in 1987).  (RT 14247-48.)  Meza did not

22  recall specifically discussing the Mexican Mafia during these meetings although "maybe

23  names were dropped."  (RT 14244.)  Meza did not know that Chacon was involved with

24  gang investigations and did not discuss prison gangs during the visits.  (RT 14248-49.)

25  Meza became a member of the Mexican Mafia in 1978.  (RT 14251.)  The court

26  sustained the prosecution's objection to questions regarding when Meza was no longer a

27  member of the Mexican Mafia.  (RT 14252.)  However, Meza subsequently testified that

28  he was not in the Mexican Mafia in 1985 or 1984.  (RT 14254.)

01cv0741

Meza recalled that in or about May 1985, when he was in custody on a probation violation, he discussed the homicides and the Ayalas/Moreno with Chacon.  (RT 14257-59.)  He did not ask Chacon for help in connection with the probation violation.  (RT 14260.)  Chacon and Meza did not discuss the fact that Meza had dropped out of the Mexican Mafia and did not talk about what Chacon could do for him in that regard.  (RT 14261.)  Chacon did not offer to help him in anyway for the information.  (Id.)  Meza did not recall discussing what happens to Mexican Mafia drop-outs or Chacon expressing concern for his safety or offering protection.  (RT 14263.)

Meza recalled that Chacon visited him again later in 1985.  (RT 14265.)  Meza did not recall whether the homicides were discussed during this meeting.  (RT 14266.)  In 1986, Meza ran into Chacon on the street.  (RT 14268.)  During this encounter, they did not discuss the Mexican Mafia, the homicides, gangs, or people involved in gangs.  (RT 14268.)

In 1987, Meza contacted Chacon.  (RT 14267.)  At this time, Meza was in protective custody due to his status as an EME drop-out, and Meza discussed that arrangement with Chacon.  (RT14271.)  Chacon did not express concern for his safety.  (Id.)  During this meeting, Meza talked about Hector in connection with the homicides.  (RT 14273.)  Chacon did not ask Meza what he could do to help Meza with his criminal case.  (RT 14274.)  Meza talked to Chacon again about two weeks later.  (RT 14277-78.)  During this meeting, Chacon asked for information regarding prison gang activity and Meza provided him with the information.  (Id.)  Meza also provided information regarding the homicides and the Ayalas and Moreno.  (RT 14280-81.)

Meza testified that Chacon was present during the meetings with the DA's Office at Meza's request.  (RT 14283.)  Meza did not recall asking everyone to leave except for Chacon.  (RT 14284.)  Meza had not seen Chacon since July 1987.  (RT 14286.)

Meza denied asking the DA's office for anything in exchange for his testimony during the first, second, or third meeting.  (RT 1487-88.)  Since going to state prison in 1987, he met with the DA's office three times.  (RT 14285.)  The DA's office did not show

01cv0741

1   him reports or documents to help his recollection.  (RT 14267.)

2       The trial court imposed some limits on the scope of the defense's questioning of

3   Meza.  Defense counsel argued that Chacon's process of intimidation involved seeing

4   Meza whenever he was in jail, soliciting information from him, doing favors for him, and

5   letting him know what information Chacon had on him.  (RT 14238-39.)  Therefore,

6   defense counsel argued, it was necessary to inquire into the number of visits, what was

7   said in each visit, what threats were made, what promises were made, and what

8   information was extracted.  (Id.)  The court ruled that defense counsel could inquire

9   whether, as to any or all of the meetings between Chacon and Meza, there was

10  intimidation as to the content or conduct of the meetings.  However, the court cautioned,

11  "I'm not going to go through a discovery process or a deposition in terms of what they

12  discussed in all those instances.  If you can focus, and get to the issue of intimidation by

13  Detective Chacon, whether the Mexican Mafia is used as [a] source of intimidation, fine,

14  do it."  (RT 14241.)

15      Accordingly, the trial court sustained the prosecution's objections to general

16  questions regarding how many times Chacon saw Meza in jail and whether Chacon

17  visited Meza in jail in May 1985.  (RT 14236-37.)  Meza provided testimony regarding

18  both of these topics later in the hearing.  (RT 14247-48, 14257-59.)  The trial court also

19  sustained the prosecution's objection to a question regarding whether the names

20  "dropped" by Meza during the meetings with Chacon had any relation to the Mexican

21  Mafia and questions regarding when Meza left the Mexican Mafia.  (RT 14246, 14252-

22  54.)  Meza testified that he was no longer in the Mexican Mafia in 1984 or 1985.  (RT

23  14254.)

24      Eventually, the court brought the hearing to a close, observing that it seemed that

25  defense counsel was on "a fishing expedition" and that Meza's testimony did not tie in to

26  the defense's offer of proof.  (RT 14294.)  Defense counsel objected that the trial court

27  had foreclosed pertinent areas of inquiry into the relationship between Chacon and Meza.

28  The trial court rejected defense counsel's claim that the court had tied the defense's

01cv0741

1    hands:

2          Miss Semel, you made an offer of proof with reference to Detective
     Chacon. It's somewhat interesting to the court that a part of my ruling in
3    this case has been to keep out of the hearing of jurors any gang affiliation.
     Your offer of proof went to the fact that gang affiliation would – or possibly
4    would show a motive in terms of intimidation in terms of Mr. Meza's
     testimony. It was with that idea in mind, and basically me thinking that
5    maybe if in fact there was talk about gangs, if in fact he provided
     information, these questions I allowed you to ask Miss Semel, then very
6    conceivably Detective Chacon might say, "Well, if you don't continue to
     provide the information, if you don't do what I ask that you do, then I'm
7    going to turn you to the wolves," basically intimidation for testimony.

8          I allowed that inquiry and it turned up absolutely nothing, this over
     the objection of the People, over the objection of the previous rulings of the
9    court that gang affiliation has absolutely nothing to do with the issues before
     the court; but certainly in terms of whether or not Mr. Meza's appearance is
10   voluntary, I allowed that inquiry.

11         You indicated a relationship between Mr. Meza and Detective
     Chacon that in and of itself some way would establish a – nonvoluntariness
12   of Mr. Meza's presence. With that offer of proof, I certainly have allowed
     you to establish the nature of that relationship, how often, when, whether or
13   not things were discussed concerning the Mexican Mafia, what was said by
     Detective Chacon ostensibly to procure the testimony. All of these things,
14   again over objection, I've allowed based on your offer of proof.

15         The answers that have been forthcoming certainly aren't prejudged
     by the court. The answers are the answers to those questions.
16
           Now I gather from your comment you want to go into detail as to
17   what was discussed in every conversation that occurred with Mr. Meza and
     any person that he happed to talk to; and you're absolutely correct, the
18   court is sustaining the objection. That won't happen.

19   (RT 14298-300.)

20         The California Supreme Court held that there was no merit to Petitioner's claim

21   that the trial court violated his rights under the Fifth and Fourteenth Amendments by

22   failing to give him an adequate opportunity to try to prove that the People coerced the

23   testimony Meza gave against him at trial. The state court reasoned:

24         [T]he record shows that he was able to question Meza about whether he had
     been coerced, and he denied that he had been. [¶] In People v. Badgett,
25   supra, 10 Cal.4th 330, 351, 41 Cal.Rptr.2d 635, 895 P.2d 877, we stated that
     "if the issue is not litigated below because the defendant has been precluded
26   by an erroneous ruling on standing from attempting to carry his burden of
     demonstrating that third party testimony is coerced, there will not be an
27   adequate record for the appellate court to review." Defendant asserts that this
     error occurred in his case. But the record shows that the trial court gave him
28   sufficient opportunity to show that Meza's testimony was coerced. Defense
     counsel was unable to establish any coercion in her examination of Meza, and

59

in fact she established the opposite.  The factual predicate of defendant's claim of constitutional error is faulty, and so the claim itself is unavailing.

Ayala, 23 Cal. 4th at 271.

The California Supreme Court's decision is supported by the record.  Defense counsel was given ample opportunity to question Meza regarding any direct or implied threats by Chacon.  Despite the latitude granted by the court, defense counsel was unable to prove that there was any coercion.  The 403 hearing was not for the purpose of giving the defense the opportunity to conduct discovery and test out their theories.  Therefore, the trial court did not err in placing limits on the defense's inquiry and ultimately bringing the hearing to a close.

The Court notes that even if the trial court erroneously limited the examination of Meza, there is no evidence offered by Petitioner that the answers would have countered Meza's own assertions of no coercion.  Any subtle inferences of coercion would not have precluded Meza's testimony, but, rather, would have been properly presented to the jury as part of the cross-examination.  Because there was no clear evidence that Meza's testimony was involuntary, there was no violation of due process by its admission.  The right of confrontation accorded Petitioner was the safeguard allowing the jury to determine whether Meza's testimony was truthful or coerced.   The rejection of this claim was not contrary to, or an unreasonable application of, federal law.  Therefore, Petitioner is not entitled to habeas relief on this claim.

**J.     Claim 44 - Statements of Deceased Witnesses**

Petitioner alleges that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights by denying his motion to admit testimony by private investigators Bill Papenhausen and Carlos Vasquez regarding statements made by deceased witnesses Ignacio Vejar and Arthur Castro.   Petitioner also alleges that if it were not for the prosecution's late filing of its notice of aggravating factors pursuant to Cal. Penal Code § 190.3, Vejar and Castro would have been alive to testify at trial.

In a pretrial motion in limine, Petitioner requested the court to admit statements

01cv0741

1   made by Vejar and Castro to defense investigators Papenhausen and Vasquez.

2   Petitioner submitted declarations by Papenhausen and Vasquez summarizing the

3   statements of the deceased witnesses.

4       Papenhausen explained that Castro was interviewed at Folsom State Prison by

5   himself and defense counsel.  According to Castro, he went to the body shop the day

6   before the homicides to purchase heroin from Dominguez.  (CT 4831-32.)  He had never

7   met Dominguez but was referred to him by a friend.  (Id.)  When he arrived at the body

8   shop, Castro heard arguing coming from the office area.  (CT 4832.)

9       Castro observed three men speaking in Spanish.  (CT 4832.)  The men initially

10   stopped talking when they saw Castro, but continued arguing, apparently thinking that

11   Castro did not speak Spanish.  Castro speaks Spanish fluently and understood that the

12   men were arguing about $20,000 or $40,000.  Castro went across the street and bought

13   a beer.  When he returned, he observed three males driving away in a large car with blue

14   and white Mexican plates.  Two of the men had been arguing with Dominguez in the

15   office.  All three were from the other side of the border - one was wearing a white

16   guyabera shirt.

17       After the three men left, Dominguez came of out of the garage and introduced

18   himself.  (CT 4832.)  Dominguez seemed irritated and angry.  Castro decided that he was

19   not going to deal with Dominguez but asked Dominguez if he could "try some stuff" out of

20   politeness.  Dominguez said that he did not have any.  Castro felt that the three male

21   Mexicans were Dominguez's "connection."  According to Papenhausen, Castro

22   accurately described Dominguez's office and Dominguez's physical appearance.  (CT

23   4833.)  Papenhausen reinterviewed Castro on March 21, 1988.  Castro provided

24   Papenhausen with the same information.

25       Vasquez declared that he and Robert Boyce interviewed Vejar on August 24,

26   1988.  (CT 4834.)  Vejar explained that on the date of the homicides, he drove his brother

27   Henry to work at the tire shop at about 8:00 or 9:00 in the morning.  Vejar returned to the

28   tire shop at about 6:00 p.m.  All the businesses appeared to be closed – the large

corrugated door of the body shop was shut.  Pelon and Bobby Garcia told Vejar that Henry had just left but would be back.  (CT 4835.)  Vejar sat down in front of the tire shop to wait for Henry.  During this time, Pelon went in and out of the ice cream truck and Vejar could hear a baseball game in the background.  Bobby Garcia came out of the ice cream truck and asked Vejar if he wanted a beer.  Vejar declined the beer but said that he would like an ice cream bar.  Garcia and Vejar went across the street to purchase an ice cream bar.

When Garcia and Vejar returned, Garcia left in the direction of the ice cream truck. (CT 4835.)  The ice cream truck was blocking Vejar's view of the body shop.  A short time later he heard a shot and saw Castillo run into the street and fall down.  Castillo was laying face down with his head pointed away from the body shop and was bleeding. Castillo remained in that position until the police and Vejar helped Castillo out of the street and over to the patrol car.

According to Vejar, ten to fifteen minutes passed from the first gun shot to the time Castillo was moved to the patrol car.  (CT 4835.)  Castillo told Vejar that he did not want to talk about what had happened.  (CT 4836.)  While the police officers, Vejar, and Castillo were standing near the police unit, they heard three shots from the garage area. (CT 4836.)  They did not see anyone running from the garage area.  Vejar suggested to the black officer that he go around the back to see if anyone was there.  The officer appeared hesitant and suggested opening the door.  Vejar and one of the officers began to open the garage door.  (CT 4837.)  When the garage door was partially open, they heard a sound and the officer dropped the door.  Vejar suggested that they try to open the door again.  While they were holding the door open, more police arrived and pulled Vejar away.  Vejar did not think "the ice cream truck boys" expected him to be present.

### 1. **State Court's Decision**

The California Supreme Court held that the trial court did not violate Petitioner's constitutional rights by refusing to admit the hearsay statements of Vejar and Castro.

62

1   The California Supreme Court also held that there was no merit to Petitioner's claim that

2   he was entitled to relief because improper delays on the prosecution's part caused the

3   unavailability of Vejar and Castro at trial.

4        The California Supreme Court explained:

5        The question presented in this claim is whether defendant had either a
         constitutional or a state law right to present exculpatory but unreliable hearsay
6        evidence that is not admissible under any statutory exception to the hearsay
         rule.  We hold that he did not.

7
         . . . .
8
         In denying defendant's motion to introduce the statements, the trial court
9        implied that they could be introduced if they showed aspects of
         "trustworthiness, or other indicia of reliability."  But it found that they did not
10       have such indicia.  The court also concluded that other witnesses had already
         provided evidence that Castillo did not want to discuss events immediately
11       after being shot and stabbed, and so Vejar's statement would be cumulative
         in that regard.
12
         Evidence Code section 1200, subdivision (b) provides that "Except as provided
13       by law, hearsay evidence is inadmissible," and the parties do not point to any
         provision of the Evidence Code that would provide an exception to the hearsay
14       rule for the purported witness statements.  But "'[l]aw' includes . . . decisional
         law" (Evid. Code, § 160), and California decisional law includes our own
15       comment that "exceptions to the hearsay rule are not limited to those
         enumerated in the Evidence Code; they may also be found in . . . decisional
16       law" (*In re Malinda S.* (1990) 51 Cal.3d 368, 376 [272 Cal.Rptr. 787, 795 P.2d
         1244]), and our affirmation of that principle in *In re Cindy L.* (1997) 17 Cal.4th
17       15, 26 [69 Cal.Rptr.2d 803, 947 P.2d 1340].

18       Nevertheless, defendant cites no law of this state, whether "constitutional,
         statutory, [or] decisional" (Evid. Code, § 160), that would have required the trial
19       court to permit the investigators to testify about Castro's and Vejar's
         statements.  He relies on *In re Carmen O.* (1994) 28 Cal.App.4th 908 [33
20       Cal.Rptr.2d 848].  *Carmen O.* applied the rule that the appellate courts of this
         state may recognize exceptions to the hearsay rule beyond those listed in the
21       Evidence Code.  It created an exception for the out-of-court statement of
         four-year-old Carmen O. that her father had sexually abused her.
22
         In *In re Cindy L.*, *supra,* 17 Cal.4th 15, we approved *Carmen O.*'s creation of
23       a judicially announced exception to the hearsay rule, and refined the rule
         ourselves.  But we warned that "in developing new exceptions to the hearsay
24       rule, courts must proceed with caution. The general rule that hearsay evidence
         is inadmissible because it is inherently unreliable is of venerable common law
25       pedigree." (*Id.* at p. 27.)  And we stated that appellate courts "may not create
         evidentiary exceptions in conflict with statute." ( *Id.* at p. 28.)  We approved of
26       the exception announced in Carmen O. because it was needed to effectively
         prosecute child sexual abuse cases with reticent, very young direct witnesses.
27       (See also *In re Lucero L.* (2000) 22 Cal.4th 1227, 1238-1239 [96 Cal.Rptr.2d
         56, 998 P.2d 1019] (plur. opn.).)

28
         There is, by contrast, no proper exception to the hearsay rule that would have

permitted defendant to introduce Castro's and Vejar's statements. There are no indicia of reliability surrounding those statements even remotely similar to those that have justified the exception for certain hearsay statements of very young children. Via cross-examination or further investigation the prosecutors might have discovered evidence, for example, that defendant had coerced Castro and Vejar into making them, just as they had introduced evidence that he induced Rafael Mendoza Lopez to perjure himself regarding the presence of Mexican men at the body shop on the day of the murders. Indeed, that part of Castro's statement referring to Mexican visitors buttressed aspects of Mendoza's initial testimony, which Mendoza himself later repudiated as having been fabricated at defendant's behest. Moreover, on cross-examination the prosecution could have questioned Castro about why Dominguez and the Mexican visitors would continue to discuss large sums of money in front of a total stranger, particularly if it involved sales of heroin, and about the basis for his view that they thought he could not understand Spanish. There was no state law error.

Defendant urges, as noted, that the trial court infringed on various constitutional guaranties when it barred the jury from hearing potentially exculpatory evidence. But it did not. "Few rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.] [But i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers v. Mississippi*, *supra*, 410 U.S. 284, 302 [93 S.Ct. 1038, 1049].) Thus, "[a] defendant does not have a constitutional right to the admission of unreliable hearsay statements." (*Com. v. Piper* (1997) 426 Mass. 8, 11 [686 N.E.2d 191, 194]; *accord*, *People v. Fudge* (1994) 7 Cal.4th 1075, 1123 [31 Cal.Rptr.2d 321, 875 P.2d 36].) Moreover, both we (*People v. Hawthorne* (1992) 4 Cal.4th 43, 56 [14 Cal.Rptr.2d 133, 841 P.2d 118]) and the United States Supreme Court (*United States v. Scheffer* (1998) 523 U.S. 303, 316 [118 S.Ct. 1261, 1268, 140 L.Ed.2d 413]) have explained that *Chambers* is closely tied to the facts and the Mississippi evidence law that it considered. *Chambers* is not authority for the result defendant urges here.

The foregoing principles were applied to a case with facts similar to the matter herein in *State v. Bunyan* (1998) 154 N.J. 261 [712 A.2d 1091].) In *Bunyan*, the defendant, convicted of murder, had sought to introduce the exculpatory hearsay statement of a witness who later died. The witness, shown a photograph of Bunyan out of court, told an investigator that he was not the killer. The witness refused to execute a written statement before dying. Moving for a new trial, Bunyan sought to introduce the investigator's affidavit memorializing his conversation with the witness. The New Jersey Supreme Court held that the statement was inadmissible hearsay under state law, and that relevant provisions of the federal Constitution (it emphasized the right to a fair trial) did not compel its consideration. "There is no 'particularized guarantee[ ] of [its] trustworthiness.' [Citation.] Her statement was not against her interests. She made it years after the crime occurred. After making her statement to a private investigator, [she] immediately threatened to disavow it. Additionally, . . . there will be no opportunity to cross-examine [her; she] is now deceased. And [her] statement . . . was not spontaneous. On the contrary, she gave it in response to questions posed by a private investigator defendant hired." (*State v. Bunyan*, *supra*, 154 N.J. 261, 271 [712 A.2d 1091, 1095-1096].)

Not all of these factors apply to the statements of Castro and Vejar. Castro's

statement may have been against his interest: he was admitting that he had gone to the body shop to buy heroin; but on the other hand, Papenhausen interviewed him in prison and double jeopardy might have barred any prosecution for Castro's act. As far as is known, neither witness disavowed his statement after making it; indeed, Papenhausen's affidavit declared that Castro later reaffirmed his statement. Nevertheless, other factors mentioned in Bunyan are significant: the statements were given to a person seeking exculpatory evidence, they were not spontaneous, and there was no opportunity for cross-examination. California has an interest "in ensuring that reliable evidence is presented to the trier of fact in a criminal trial." (*United States v. Scheffer*, *supra*, 523 U.S. 303, 309 [118 S.Ct. 1261, 1268].) Given the potential unreliability of Castro's and Vejar's statements and the evidence of defendant's attempt to supply false evidence to the jury that bore a similarity to Castro's statement, we are unable to discern any constitutional violation in the trial court's refusal to admit the investigators' accounts of those statements.

Defendant also renews a claim that improper delays in bringing his case to trial caused the delay that in turn caused Castro and Vejar to become unavailable because of death. His claim is perfunctory, and he does not cite any statute, rule, or legal tenet that the prosecution may have violated. The claim is without merit.

Ayala, 23 Cal. 4th 266-70.


### 2.  **Merits**

The Court concludes that the California Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law.

Chambers v. Mississippi, 410 U.S. 284 (1973), did not generally hold that a defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence.  United States v. Scheffer, 523 U.S. 303, 316 (1998).  The ruling of Chambers was limited to the "facts and circumstances" of that particular case. Chambers, 410 U.S. at 300.

The facts and circumstances of this case are vastly different from those of Chambers.  The testimony in Chambers was "critical" to the defense because it established that someone else confessed to the murders.  Petitioner does not explain why the statements of Vejar, which did not reveal any remarkable information, were critical to the defense.  Petitioner argues that Castro's statements were invaluable because he saw three Mexican men, which was consistent with Castillo's initial claim that three Mexican men had committed the murders and Mendoza's testimony on direct that

01cv0741

he saw some Mexicans at the shop on the day of the killings.  However, Castro saw the men the day *before* the homicides.  Castro did not provide reasons for his conclusions that the men he saw were from across the border and were Dominguez's drug connection.  In addition, Castro did not provide any physical descriptions that would link the men he saw with the men described by Castillo.  Although Castro's statements might have helped the defense argue that Castillo and Mendoza were telling the truth the first time around, the evidence was not directly exculpatory.  See United States v. Fowlie, 24 F.3d 1059, 1069 (9th Cir. 1994) (distinguishing Chambers on the ground that the hearsay evidence in Chambers was directly exculpatory whereas the hearsay evidence at issue in the case before it had an attenuated connection to the defendant's innocence).

In addition, as reasoned by the California Supreme Court, there was insufficient indicia of reliability.  Vejar and Castro made their statements in response to questions by defense investigators.   There was no opportunity for cross-examination.  In addition, there was no substantial corroborating evidence.  The fact that Castro accurately described Dominguez and his office carries little significance; Castro could have gathered this information if he had visited the body shop at anytime or talked to someone else who was familiar with Dominguez and the shop.  There is no direct link between the three Mexican men Castro claims he saw the day before the homicides and the Mexicans described by Mendoza on direct or the three Mexicans initially described by Castillo.  Vejar's statements regarding the timing and sequence of events on the night of the homicides were contradicted by witnesses including Castillo, Officers Weston and McElroy, Miguel Lopez and Traci Pittman, whose testimony established that the police arrived on the scene after all of the gunshots had been fired.  Furthermore, according to the prosecution, a review of Castro's records revealed that Castro had 24 convictions, 16 of which were for felonies, and had used thirteen different aliases, six dates of birth, and five social security numbers.  (CT 4863.)  Thus, the reliability of his statements, especially without cross-examination, was clearly suspect.  Ultimately, there would have been a real risk that the jury would have believed that Castro, who was in prison, had similar fears as

Mendoza Lopez and therefore gave false seemingly helpful information to Petitioner's investigators.  If there was error in the preclusion of these statements, there was no prejudice.  The state court's adjudication of this aspect of Claim 44 was not contrary to, or an unreasonable application of, clearly established federal law.

With respect to Petitioner's argument of improper delay, Petitioner has failed to show that any delay caused by the prosecution was purposeful or a result of bad faith tactics.  Petitioner does not identify any legal authority establishing that in the absence of prosecutorial misconduct, the unforseen deaths of defense witnesses before trial is a ground for habeas relief.  Therefore, the state court's denial of this aspect of Claim 44 is not contrary to, or an unreasonable application of, federal law.

### K.   Claim 45 - Evidence of Collusion Between Meza and Mendoza Lopez

Petitioner alleges that the trial court's denial of his motion to reopen to present evidence of collusion between Mendoza and Meza violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

#### 1.   Merits

For the reasons discussed in connection with Claim 42 (denial of motion for mistrial based on the fact that Mendoza and Meza were housed together), supra, Petitioner is not entitled to habeas relief on this claim.  There was no showing that the housing of Meza and Mendoza in the same unit affected either witness's testimony.

### L.   Claim 46 - Excusal of Jurors Who Disfavored Capital Punlishment

Petitioner alleges that the trial court erred in improperly excluding from the venire three jurors who, while having reservations about capital punishment, remained able to perform their duties as instructed by the court, in violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

///

67

1    **1.    State Court's Decision**

2       The California Supreme Court considered this claim on direct appeal, rejecting it

3    as follows:

4       Defendant contends that the trial court violated the Fifth, Eighth, and
        Fourteenth Amendments to the United States Constitution when it excused
5       certain prospective jurors.  He claims that he received a lack of due process
        under the Fifth and Fourteenth Amendments and denial of his right to a
6       reliable penalty determination under the Eighth and Fourteenth Amendments.

7       A juror may be excused for cause based on his or her views concerning capital
        punishment only if they would prevent or substantially impair the performance
8       of the duties defined by the trial court's instructions and the juror's oath.  (*Ross
        v. Oklahoma* (1988) 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80
9       [speaking of the due process clause of the Fourteenth Amendment].)  As a
        general matter, "'the determinant is 'whether the juror's views about capital
10      punishment would prevent or impair the juror's ability to return a verdict of
        death *in the case before the juror.*'" [Citation.] If the prospective juror's
11      responses to voir dire questions are conflicting or equivocal, the trial court's
        determination of the juror's true state of mind is binding upon the reviewing
12      court." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1318-1319, 65 Cal.Rptr.2d
        145, P.2d 259.)
13
        On *Hovey* voir dire (*Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80-81, 168
14      Cal.Rptr. 128, 616 P.2d 1301), the trial court granted the prosecution's
        challenges to Prospective Jurors Marie B., Fidelia C., and Bertram E. for
15      cause.

16      When the trial court asked Marie B. if she would vote against a first degree
        murder verdict or find false a special circumstance allegation "just to avoid the
17      penalty issue," she stated, "I would have to avoid the penalty issue.  I do not
        believe in capital punishment and the death penalty."  In response to another
18      question, she stated that it would be "difficult" to impose the death penalty no
        matter what evidence was presented.
19
        On examination by counsel for the defendant, Marie B. retreated somewhat
20      from the implications of her initial comments, or gave answers inconsistent
        with them.  She clarified that she could find defendant guilty or not guilty
21      despite her opposition to the death penalty.  Still, she found the punishment
        "barbaric" and she "could not impose it."  In response to another question,
22      however, she stated that she could put aside her feelings and follow the
        court's instructions, even if she did not "believe I could be in favor of anyone
23      getting the death penalty."

24      But on further examination by the prosecutor, Marie B. agreed that the
        prosecution would be "wasting its time," in the prosecutor's words, to ask her
25      to return a verdict of death.

26      The trial court ruled in essence that Marie B.'s opposition to the death penalty
        either substantially impaired or entirely negated her ability to follow her oath
27      as a juror.

28      Fidelia C. also stated, in answer to the trial court's question, that it would be

difficult to impose the death penalty no matter what evidence was presented. On examination by counsel for defendant, the prospective juror wavered. She answered essentially in the affirmative leading questions about her ability to follow her oath. But then she volunteered that she did not "want to be part of a jury if it comes to a death penalty or life in prison," "because it is going to be in my conscience. I don't want to be the one who decides" on life or death. Counsel reverted to leading questions, and Fidelia C. stated that she thought she could follow the law.

Examined by the prosecutor, Fidelia C. gave inconsistent answers. She denied being in the group of people who would be so preoccupied with the question of penalty that she could not consider defendant's guilt or the truth of the special circumstance allegations. This answer came in answer to a compound question that asked her, in part, whether she could not sit on a death penalty case because she opposed the penalty. The nature of the question left her response ambiguous. In the next question, the prosecutor asked directly whether Fidelia C. would "want to decide" on life or death, and she said no, because she opposed capital punishment. But asked whether that feeling would "make it very difficult for you to return a verdict of death, no matter what you heard," she responded, "I don't know. I really don't know now."

The prosecutor continued. She asked her own series of leading questions, which generated equivocal answers. Defense counsel asked more questions, receiving more equivocal answers; the trial court could not hear one of them.

Finally, the trial court asked Fidelia C., "are you indicating . . . that assuming that you are at the penalty phase and assuming that in your heart you felt that death was the appropriate penalty, would you be able to come into court and voice a vote for the death penalty? Would you be able to do that?" She answered, "I don't think so, your Honor."

After hearing argument from both parties, the trial court ruled that Fidelia C. would be excused for cause. "It is painfully clear," the court explained, "that the notion of a death penalty verdict is something that she would be incapable of doing even if the evidence justifies that in her mind . . . Her whole demeanor is one of trepidation, fear and indeed extreme emotional pain just at the thought of being included on this particular jury. [¶] I think it is also clear . . . just during the first phase of the trial that she would be substantially impaired because of a preoccupation with maybe having to deal with the issue of the death penalty, that she could not be fair to the facts or to the parties."

Bertram E., who had served on approximately three juries, answered the court's questions by stating that he did not "believe in the death penalty . . . [¶] . . . [¶] [u]nder certain circumstances," and that he "would be prepared to say the person isn't guilty. I kind of feel the death penalty hasn't proved anything heretofore as far as being a deterrent to murder."

Questioned by counsel for defendant, Bertram E. retreated, stating that he could follow an instruction to consider guilt without contemplating punishment.

Bertram E. also stated that he was not automatically opposed to the death penalty. He could impose it in cases involving airplane hijacking with hostages or the sale of large amounts of narcotic drugs. With regard to murder *simpliciter,* he stated, "we have murdered other people because they have murdered somebody. That hasn't deterred it in the past . . . I don't think it will

01cv0741

deter [murder] in the future.  Consequently, I don't think that it's effective."  He also stated that if he were punished for murder, he would prefer execution to life imprisonment.

Informed by defense counsel that the case involved allegations of the sale of narcotics, and over the prosecution's objection that she was asking the prospective juror to prejudge the case, (an objection that the trial court later agreed was proper, but overruled anyway so as to obtain the most information possible), Bertram E. said that "you can't kill a person for having a few marijuana cigarettes in his pocket.  But if he had a couple hundred thousand...marijuana cigarettes in his possession, he's affecting that many people, cocaine, or heroin, or whatever.  Then I would come down much harder on that person . . . ."  Thus, he agreed in response to counsel's words, which are quoted in this sentence, that the involvement of a large quantity of drugs would be a "factor" that could lead him to impose "a more severe punishment."

The prosecutor then questioned Bertram E.  She asked him again whether he would avoid convicting defendant of a crime or finding true a special circumstance allegation that would make him death eligible.  Bertram E. hesitated, then said "I would have to say my answer is yes on that."  The prosecutor pointed out that the case was a murder case, not a drugs or hijacking case, and Bertram E. acknowledged that under that circumstance he would only vote for life imprisonment, even if he was able to consider the presence of drugs as a circumstance of the crimes during the penalty phase.  Counsel then argued whether Bertram E. should be excused for cause.  Defendant's counsel agreed that his answers were in "clear conflict" and "equivocal."

The trial court ruled that Bertram E. was "very clear that he . . . would not consider the death penalty" "for a triple homicide."  It ruled that the prospective juror did not have "an open mind," and that his ability to follow the law was "substantially impaired."

In excusing the prospective jurors for cause, the trial court ruled that they could not impose the death penalty against defendant even if they thought the evidence merited it.  That determination of their state of mind is binding on us.  State law required the court to excuse them, for they acknowledged their inability "to act with the 'entire impartiality' required of jurors."  (*People v. Balderas* (1985) 41 Cal.3d 144, 183 222 Cal.Rptr. 184, 711 P.2d 480; see now Code Civ. Proc., § 225, subd. (b)(1)(C) [same].)  There was no constitutional impediment to the exercise of state law, for their ability to perform their duties was at least substantially impaired – in fact their views prevented them from following the law.  The court did not deprive defendant of due process or violate any other constitutional guaranty by excusing the prospective jurors.

Ayala, 23 Cal. 4th at 257-261.

## 2.    **Merits**

The United States Supreme Court has held that a sentence of death cannot be upheld if the jury that imposed or recommended it was chosen by excluding prospective jurors who expressed opinions against the death penalty, but remained willing to follow

70

1    the law as instructed by the trial court.  Witherspoon v. Illinois, 391 U.S. 510, 522-23

2    (1968).  The Supreme Court further held that "a juror may not be challenged for cause

3    based on his views about capital punishment unless those views would prevent or

4    substantially impair the performance of his duties as a juror in accordance with his

5    instructions and his oath."  Adams v. Texas, 448 U.S. 38, 45 (1980); Wainwright v. Witt,

6    469 U.S. 412, 423 (1985) (affirming the Adams standard as the proper means by which

7    to evaluate a claim of juror exclusion due to his or her views on capital punishment).

8    Appellate review of a trial court's decision regarding issues arising from juror voir dire is

9    obligatorily deferential, as a "reviewing court, which analyzes only the transcripts from

10   voir dire, is not as well-positioned as the trial court to make credibility determinations."

11   Miller-El v. Cockrell, 537 U.S. 322, 339 (2003).

12        In response to an initial Hovey question posed by the trial court regarding whether

13   she would automatically vote not guilty or fail to find the special circumstances true to

14   avoid a penalty phase, Marie Brunner answered, "I would have to avoid the penalty issue.

15   I do not believe in capital punishment and the death penalty."  (RT 7423.)  While Ms.

16   Brunner affirmed that she could be fair on the guilt phase, when asked if she could

17   envision a situation in which the death penalty was justified, she replied, "Oh certainly,

18   but I – I could not impose it," and added, "I just feel it's barbaric, period." (RT 7425,

19   7427.)  Responding to further questions concerning her ability to follow the trial court's

20   instructions regarding capital punishment, Ms. Brunner maintained, "I would follow his

21   instructions. I would consider it, but I still don't believe I could be in favor of anyone

22   getting the death penalty."  (RT 7428.)

23        Ms. Brunner then agreed with the prosecutor, who queried whether he would be

24   wasting his time trying to convince her to vote for the death penalty, adding, "I do not

25   want to take that responsibility."  (RT 7429-30.)  Even after repeated questions on her

26   ability to impose the death penalty, Ms. Brunner stated in turn, "I do not want to take that

27   responsibility" and "I do not believe I could."  (RT 7430.)  During argument, defense

28   counsel voiced their concern regarding keeping jurors who could be fair in the guilt

phase, but appeared to concede Ms. Brunner's inability to be fair during the penalty

phase.  (RT 7431.)  Ultimately, the trial court concluded, "It's clear, in this court's opinion,

that she does in fact qualify for exclusion, or a challenge based on <u>Witherspoon</u> and

<u>Witt</u>."  (<u>Id</u>.)

Fidela Camero answered affirmatively the trial court's inquiry on whether her views

were such that it would be hard for her to vote for the death penalty no matter the

circumstances.  (RT 8340.)  Many of Ms. Camero's answers to the questions posed by

both the trial court and counsel were variations on "I think so," or "I don't know."  (RT

8342, 8344, 8345; 8346, 8347, 8348, 8354.)  However when Ms. Camero was asked if

she could have an open mind as to punishment, she answered, "But, well, I said earlier

that I don't want to be part of a jury if it comes to a death penalty or life in prison," adding,

"because it is going to be in my conscience.  I don't want to be the one who decides for a

person's life or something."  (RT 8344-45.)

Ms. Camero admitted that she was personally against the death penalty.  (RT

8347.)  She then informed the court that the prospect of being a juror on the trial "is

causing me a big problem at home, because I can't sleep."  (RT 8349.)  She stated, "I

have been thinking about it, you know, for a long time."  (<u>Id</u>.)  When asked if she could

return a death penalty verdict against the defendant in open court, Ms. Camero

responded, "I don't think I can face that."  (RT 8351.)  Ms. Camero said that she was

unsure if she could even handle sitting as a jury member for the guilt phase of trial:  "I

don't know if I can do that.  It would be so hard for me thinking of punishment."  (RT

8354.)

Defense counsel argued Ms. Camero's answers "were equivocal. They were not

absolute," and pointed out that jurors who equivocated on the other side of the death

penalty issue were allowed to stay on the panel.  (RT 8356.)  The trial court ultimately

disagreed, concluding:

> Clearly because a juror is conscientious or a juror believes this is, in
> fact, a serious case, that it is a case that involves a searching of the soul, if
> you will, does not exclude a juror, nor does it make a juror substantially
> impaired.  Miss Camero goes beyond that.  I think the answers are not

equivocal.

It is painfully clear that the notion of a death penalty verdict is something that she would be incapable of doing even if the evidence justifies that in her mind . . . . I think it is also clear in terms of substantial impairment just during the first phase of the trial that she would be substantially impaired because of a preoccupation with maybe having to deal with the issue of the death penalty, that she could not be fair to the facts or the parties.

Miss Camero is an excludable juror under the <u>Witt</u> standard as being substantially impaired.

(RT 8356-57.)

When asked whether he may consider voting not guilty or false as to the special circumstances during the guilt phase to avoid a potential penalty phase, Bertram Estwick stated, "If I were to be honest I would feel that I would have to consider the death penalty and maybe in that sense say, yes, I would be prepared to say the person isn't guilty. I kind of feel the death penalty hasn't proved anything heretofore as far as being a deterrent to murder." (RT 8879.) Despite this statement, Mr. Estwick affirmed he could follow the court's instructions during the first phase of trial. (RT 8883.) Mr. Estwick also believed the death penalty was justified in certain circumstances, such as hijacking and the sale of narcotics. (RT 8884-85.) When it came to imposing the death penalty for homicide, Mr. Estwick opined, "[t]he crime of murder, we have murdered other people because they murdered somebody. That hasn't deterred it in the past. We have been doing this since the beginning of time. I don't think it will deter in the future. Consequently, I don't think that it's effective. [¶] I believe that if I were accused of – if I had murdered someone, I do believe that I would prefer the death penalty rather than staying my whole lifetime in jail. I think that is more effective as far as murder." (RT 8885.)

When asked if he could have an open mind on punishment, Mr. Estwick admitted, "I'm afraid not." (RT 8887.) After counsel and the court engaged Mr. Estwick in a short discussion regarding aggravation, mitigation and other crimes that might justify the use of capital punishment, the prosecutor asked Mr. Estwick if he would automatically vote not guilty to avoid the penalty phase in a case that did not involve hijacking or major narcotic

trafficking, to which Mr. Estwick replied, "It's a hard question," and added, "I would have

to say my answer is yes on that." (RT 8892-93.) Mr. Estwick also agreed that trying to

convince him to vote for the death penalty in such a case would be a waste of the

prosecutor's time. (RT 8894.)

   After argument and discussion by the court and counsel, the trial court ultimately

concluded:

> I'm also firmly convinced that for a triple homicide, which is the case
> in this particular situation, his answers are unequivocal, that he is very clear
> that he not only would not vote, he would not consider the death penalty.
> Certainly he is not possessing of an open mind. It is clear from Mr.
> Estwick's position and his philosophy as he enunciated so clearly that he
> truly would hamper the constitutional scheme of the death penalty in
> California, and that he is, in fact, substantially impaired pursuant to which if
> not opposed to the death penalty in the Witherspoon standard, I think it
> might even reach that because his feelings for the death penalty only come
> to the fore if it is a hijacking or a major drug supplying-type scheme.
>
>    In any event, he is substantially impaired and will be excluded from
> this particular jury.

(RT 8896.)

   The United States Supreme Court explains that when reviewing habeas claims

based on alleged errors during voir dire, deference must be paid to the trial judge who

had the opportunity to observe the jurors first-hand:

> [M]any veniremen simply cannot be asked enough questions to reach the
> point where their bias has been made "unmistakably clear"; these
> veniremen may not know how they will react when faced with imposing the
> death sentence, or may be unable to articulate, or may wish to hide their
> true feelings. [Footnote omitted.] Despite this lack of clarity in the printed
> record, however, there will be situations where the trial judge is left with the
> definite impression that a prospective juror would be unable to faithfully and
> impartially apply the law. For reasons that will be developed more fully
> *infra*, this is why deference must be paid to the trial judge who sees and
> hears the juror.

Witt, 469 U.S. at 425-26. As observed by the Supreme Court, a trial judge's "power of

observation often proves the most accurate means of ascertaining the truth." Id. at 434.

///

///

///

///

1    The Court finds substantial support for the trial court and the California Supreme

2 Court's conclusions that prospective jurors Marie Brunner, Fidela Camero, and Bertram

3 Estwick were "substantially impaired" in their ability to perform as jurors due to their views

4 on the death penalty.  Id. at 433.  The California Supreme Court's determination that the

5 trial judge did not commit error in excusing these three prospective jurors was not

6 contrary to or an unreasonable application of federal law, nor was it based on an

7 unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  This claim does

8 not merit habeas relief.

9

10 **M.    Claim 47 - Denial of Challenges for Cause to Prospective Jurors**

11    In Claim 47, Petitioner alleges that the trial court erred in its refusal to excuse

12 certain prospective jurors from the venire for cause due to their actual bias against

13 Petitioner, and that the seating of one of the challenged jurors on Petitioner's jury, with

14 two additional challenged jurors seated as alternates, violated Petitioner's rights under

15 the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Petitioner's counsel only exercised

16 nine of the twenty allotted peremptory challenges.  When the Court asked counsel for her

17 tenth challenge, she stated, "The defense is satisfied with the jury as presently

18 constituted, your Honor."  (RT 11505.))

19

20    **1.    Procedural Bar**

21    In addition to invoking the procedural bars discussed in Section II, supra,

22 Respondent contends Claim 47 is procedurally barred because Petitioner did not exhaust

23 all his peremptory challenges and express dissatisfaction with the jury.  See People v.

24 Osband, 13 Cal. 4th 622, 670 (1996).  However, Petitioner maintains that his failure to

25 exhaust his peremptory challenges is not an absolute bar to the Court's consideration of

26 the merits of this claim, for "[t]o preserve a claim of error in the denial of a challenge for

27 cause, the defense must either exhaust its peremptory challenges and object to the jury

28 as finally constituted or justify the failure to do so."  People v. Kirkpatrick, 7 Cal. 4th 988,

1   1005 (1994).

2       The state court, in reviewing Petitioner's claim on appeal, held that by failing to

3   exhaust his peremptory challenges, Petitioner waived his claim that certain prospective

4   jurors should have been excused for cause.  Petitioner claims that he is able to justify his

5   failure to use the full complement of peremptory challenges and details the voir dire

6   process at his trial, listing the order in which the prospective jurors were drawn and

7   indicating how each side used their peremptory challenges.  Petitioner asserts that using

8   all twenty peremptory challenges would have resulted in a jury that included three jurors

9   who had previously been the subject of a defense challenge for cause, rather than the

10  one previously challenged juror that actually sat on his jury.

11      Rather than engage in a lengthy and intricate examination of the procedural bar,

12  the Court follows established precedent in this Circuit that allows a court to exercise

13  discretion and decide the merits of a claim if such a course proves to be less complicated

14  and less time-consuming than adjudicating the issue of procedural default.  See

15  Batchelor v. Cupp, 693 F.2d 859, 864 (9th Cir. 1982).

16

17      **2.   Teague**

18      Respondent maintains that this claim is partially Teague barred "because

19  [Petitioner] fails to demonstrate that a court's failure to remove a juror for cause violates

20  the federal Constitution, at least when the defense subsequently utilizes a peremptory

21  challenge to remove the juror."  (Resp.'s MTD at 93.)  Respondent does not assert that

22  the claim is Teague-barred as to James Cosgrove, who sat as a juror in Petitioner's case.

23  Accordingly, the Court will not conduct a Teague analysis with respect to Claim 42 as it

24  relates to Cosgrove.  The Constitution requires that a defendant be tried by a fair and

25  impartial jury that is comprised of members who will not automatically vote for the death

26  penalty, and will fairly consider the evidence offered in mitigation.  Morgan v. Illinois, 504

27  U.S. 719 (1992).

28      To the extent Petitioner asserts the trial court erred in denying challenges for

1    cause against members of the jury pool *who did not sit on Petitioner's trial jury*, the claim

2    is not cognizable on federal habeas review.  Any claims that the impartiality of the jury

3    was not properly determined must focus on the individuals who actually sat on the jury.

4    See Ross v. Oklahoma, 487 U.S. 81, 86 (1988).  The Court need not decide whether any

5    claim by Petitioner regarding potential jurors who did not end up on the jury is Teague-

6    barred because such claim simply fails on the merits.

7

8         **3.    State Court's Decision**

9         The California Supreme Court considered this claim on direct appeal, rejecting it

10   as follows:

11        Next, defendant contends that his rights under the Fifth, Sixth, Eighth, and
          Fourteenth Amendments to the United States Constitution and article I, section
12        16 of the California Constitution were violated by rulings that a number of
          prospective jurors need not be excused for cause.
13
          In defendant's view, the prospective jurors were predisposed in favor of the
14        death penalty without sufficient regard for the legal standards to be applied to
          facts that might eventually be presented – in other words, they could not be
15        impartial as to penalty – and should have been excused for cause.

16        Defendant concedes that he did not use all his peremptory challenges.
          Accordingly, he has waived his claim that the prospective jurors should have
17        been excused for cause.  (*People v. Osband* (1996) 13 Cal.4th 622, 670, 55
          Cal.Rptr.2d 26, 919 P.2d 640; *see also United States v. Martinez-Salazar*
18        (2000) 528 U.S. 304, 313-314, 120 S.Ct. 774, 780-781, 145 L.Ed.2d 792, 801-
          802.)  He now claims perfunctorily that he was dissatisfied with the jury, but
19        this "belated recitation" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1211, 14
          Cal.Rptr.2d 702, 842 P.2d 1), though understandable given his death
20        sentence, is insufficient (*ibid.*).  "To preserve a claim of trial court error in
          failing to remove a juror for bias in favor of the death penalty, a defendant
21        must either exhaust all peremptory challenges and express dissatisfaction with
          the jury ultimately selected or justify the failure to do so."  (*People v. Williams*
22        (1997) 16 Cal.4th 635, 667, 66 Cal.Rptr.2d 573, 941 P.2d 752.)  Defendant did
          not fulfill these requirements.  Rather, he told the trial court he was satisfied
23        with the jury as constituted, even though it included a juror whom he had
          previously challenged for cause.
24
          Defendant also urges that he has justified his failure to express dissatisfaction
25        with the jury as constituted because the trial court used the "struck jury"
          selection system rather than the "jury box" method.  He asserts that he
26        challenged approximately 30 jurors for cause because of their attitude toward
          either the death penalty or him, that most of those challenges were rejected,
27        that the number of peremptory challenges remaining when he indicated
          satisfaction with the jury was insufficient to purge the prospective jurors he had
28        challenged for cause, and therefore exhausting his "remaining eleven
          peremptories would result in an equally, if not more, unfavorable jury."  But we

have previously rejected the argument that the struck jury system permits exceptions to the exhaustion rule (*People v. Johnson, supra,* 3 Cal.4th 1183, 1211, 14 Cal.Rptr.2d 702, 842 P.2d 1), and we decline to reexamine our reasoning (accord, *People v. Osband, supra,* 13 Cal.4th 622, 670, 55 Cal.Rptr.2d 26, 919 P.2d 640).  Even if defendant had not explicitly said that he was satisfied with the jury, we would not be persuaded by his argument.  As we stated in *Johnson:* "'Regardless of the system of jury selection, a party's failure to exercise available peremptory challenges indicates relative satisfaction with the unchallenged jurors.  Having so indicated in this case, defendant cannot reasonably claim error.'" (*Johnson,* at pp. 1211-1212, 14 Cal.Rptr.2d 702, 842 P.2d 1.)

In any event, the jury's composition did not prejudice defendant in any way.  The parties agree that only one seated juror, James C., was the subject of a challenge for cause by defendant.  Our review of James C.'s Hovey voir dire testimony satisfies us that the trial court properly denied the challenge.  James C. initially testified that he favored imposing the death penalty in 80 percent of murder cases, though "if there were mitigating circumstances, I would take them into [account] and weigh them."  And he agreed that the death penalty was, in counsel's words, "justified" in the abstract for the killings of three people execution style.  But he also testified that he would follow instructions to impose life imprisonment if he found that the mitigating and aggravating evidence was in balance, and to impose the death penalty only if he found that the aggravating evidence substantially outweighed the mitigating.  He further testified that he would be receptive to mitigating evidence at the penalty phase even if the defendant had been convicted of three execution-style murders.  Following defendant's challenge for cause, the trial court ruled that James C.'s views on the death penalty did not substantially impair his ability to follow his oath as a juror.  The ruling was proper.

Ayala, 23 Cal. 4th at 261-62.

## 4. **Merits**

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961); Green v. White, 232 F.3d 671, 676 (9th Cir. 2000).  As stated earlier, any claims that the impartiality of the jury was not properly determined must focus on the individuals who actually sat on the jury.  See Ross, 487 U.S. at 86; Patton v. Yount, 467 U.S. 1025, 1037 (1984).

Petitioner alleges that the court erroneously allowed a large number of prospective jurors to remain on the panel, including prospective jurors Bautista, D'Amato, Micheletti, Wood (who served as an alternate juror), Siebuhr, Haskins, Beresford, Harshbarger, Salas, Owens, Davis (who served as an alternate juror), Hailand, McTaggart, Graham, Cosgrove (who actually sat as a juror), Stevens, and Barfield.  Petitioner claims that

1   these prospective jurors were allowed to remain in the jury venire despite a variety of

2   deficiencies, which included: pro-death penalty views resulting in impairment of their

3   ability to be impartial, an inability to be impartial on the issue of drugs, past work in law

4   enforcement, knowledge of prison gangs, an inability to accept the presumption of

5   defendant's innocence, an inability to accept the burden of proof in guilt and/or penalty

6   phases, a belief that the defendant should testify, being visibly uncomfortable with the

7   defendant's presence in court, and a reversal of the burden of proof in the penalty phase.

8         Essential to this Court's determination of the claim on the merits is that none of the

9   above jurors, except for Mr. Cosgrove, sat on the jury that deliberated.  Wood and Davis

10  sat as alternates but did not deliberate.  As previously stated, the relevant inquiry is

11  whether the individuals who actually sat on the jury and decided the case were biased.

12  See Ross, 487 U.S. at 86.  The Court previously considered the issue of Mr. Cosgrove's

13  bias in the Group Three Claims (Claim 34) and held that Mr. Cosgrove's presence on the

14  jury did not deprive Petitioner of a fair and impartial jury.

15        As noted in the Court's Group Three Order at pages 9-11, this Court cannot say

16  that the California Supreme Court unreasonably applied U.S. Supreme Court law in

17  holding that juror Cosgrove's "views on the death penalty did not substantially impair his

18  ability to follow his oath as a juror."  Ayala, 23 Cal. 4th at 261-62.  In Morgan v. Illinois,

19  504 U.S. 719, 729 (1992), the Supreme Court held that:

20        A juror who will automatically vote for the death penalty in every case will
       fail in good faith to consider the evidence of aggravating and mitigating
21        circumstances as the instructions require him to do. Indeed, because such
       a juror has already formed an opinion on the merits, the presence or
22        absence of either aggravating or mitigating circumstances is entirely
       irrelevant to such a juror. Therefore, based on the requirement of
23        impartiality embodied in the Due Process Clause of the Fourteenth
       Amendment, a capital defendant may challenge for cause any prospective
24        juror who maintains such views. If even one such juror is empaneled and
       the death sentence is imposed, the State is disentitled to execute the
25        sentence.

26  ///

27  ///

28  ///

1    It is clear from Cosgrove's voir dire that he was predisposed toward imposing the

2  death penalty (80% likely) for a conviction for murder.  Cosgrove did say that he would

3  take into account and weigh mitigating evidence.  He also stated he would follow the

4  court's instructions.  However, Cosgrove made it clear that he would be "predisposed

5  towards the death penalty."  (RT 9214.)

6    The parties have not directed the Court to any case where the court held that a

7  juror's predisposition for or against imposition of the death penalty violates the Supreme

8  Court's holding in Morgan that a juror who would "automatically" vote for death is

9  substantially impaired in his ability to perform his duties as a juror in accordance with the

10  instructions and his oath.  The Court does note, however, the similar circumstances

11  before the Court in United States v. Fulks, 454 F.3d 410 (4th Cir. 2006).  In Fulks, juror

12  Goehring stated that he would automatically impose the death penalty for a conviction for

13  intentional murder.  He later qualified his answer in response to a question from the

14  defense as to whether he would consider the defendant's background.  Goehring said

15  such circumstances would weigh into his decision but that 90 per cent of the time, unless

16  there was outrageous abuse in the defendant's background, he would vote for the death

17  penalty.

18    On appeal from his federal death sentence, the Court of Appeals for the Fourth

19  Circuit rejected the argument that Goehring was not qualified, given his predisposition, to

20  sit as a juror in a death penalty case.  The court reasoned:

21    Although the issue may be close, the court did not abuse its discretion in
      qualifying Goehring to serve on Fulks's jury.  As we have recognized,
22    Morgan only requires the exclusion of jurors who would categorically reject
      any mitigating evidence offered by the defendant.  See Tipton, 90 F.3d at
23    878; see also Yeatts v. Angelone, 166 F.3d 255, 265 (4th Cir.1999)
      (observing that only those jurors who would fail to consider mitigating
24    evidence must be removed for cause).  Although Goehring initially advised
      defense counsel that he would automatically impose the death penalty on
25    any defendant who committed a knowing and intentional murder, he also
      repeatedly asserted that he would consider mitigating evidence.
26    Nevertheless, according to Fulks, Goehring's statement that he would vote
      for the death penalty "90 percent of the time" belies the truth of his
27    assertions that he would consider mitigating evidence and demonstrates a
      strong predisposition toward imposing the death penalty.  We agree with
28    Fulks that Goehring's "90 percent" statement reveals that only a strong case
      for mitigation would convince him that a convicted murderer deserves

1
2
3
4
5

> mercy.  That fact alone, however, did not require his exclusion, for although a juror must be willing and able to consider mitigating evidence, he is entitled to "determine the weight to be given" to any such evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).  Taken as a whole, Goehring's statements demonstrate that he was willing to consider the mitigating evidence that Fulks could muster. That he might not accord such evidence as much weight as his fellow jurors did not render his qualification by the court an abuse of discretion.

Id. at 428-29.

6
7
8
9
10
11
12
13
14
15
16

Although Cosgrove appeared more likely to consider mitigating evidence than Goehring, Cosgrove was clearly predisposed toward imposing the death penalty. However, the question is not whether this court would have disqualified Cosgrove had it presided over the trial.  Rather, the narrow scope of review is whether the California Supreme Court's decision that Cosgrove was not substantially impaired was an unreasonable application of Morgan and Wainwright v. Witt, 469 U.S. 412 (1985). Certainly, the court in Fulks would not so hold. While reasonable judges may disagree on whether Cosgrove was substantially impaired, the Court cannot find that the California Supreme Court's decision was unreasonable. See Williams, 529 U.S. at 410-11.

Therefore, Petitioner is not entitled to relief on this claim.

17
18

**N.    Claim 48 - Number of Peremptory Challenges**

19
20
21
22
23
24

Claim 48 alleges that the trial court erred in refusing to grant Petitioner twenty-six peremptory challenges, granting him only twenty, in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments, in addition to violating Cal. Penal Code § 3, an ex post facto prohibition which precludes retroactive application of amendments or additions to the penalty code unless expressly declared, and Article I, § 10, clause 1 of the United States Constitution.

25
26
27
28

**1.    Teague**

Respondent argues that this claim is barred as a new rule "because there is no controlling authority prohibiting the reduction of peremptory challenges after the commission of a crime."  (Resp.'s MTD at 97; Resp.'s Opp. at 25; Resp.'s Reply at 24.)

01cv0741

1    The Court could construe this claim narrowly and conclude that it is barred as a "new

2    rule" because Petitioner asks the Court to hold that the Constitution prohibits the

3    reduction of peremptory challenges after the commission of a crime, a result that was not

4    dictated by precedent at the time Petitioner's conviction was finalized.  However, the

5    Court again defers to the Ninth Circuit's unwillingness to require a Petitioner to present a

6    case "involving identical facts, circumstances and legal issues" in order to clear the

7    Teague threshold, Keating, 191 F.3d at 1061 n.11, and takes the more sensible

8    approach of concluding that Petitioner does not seek to impose a new rule, but, rather,

9    seeks to apply to the facts of his case established standards regarding ex post facto

10   laws.  Accordingly, the Court will review this claim on the merits.

11

12        **2.    Merits**

13        The United States Constitution provides that "[n]o State shall . . . pass any . . . ex

14   post facto Law."  Art. I, § 10.  The United States Supreme Court has held that for a law to

15   violate the provision against ex post facto laws, the contested measure must be

16   retrospective, and must disadvantage the accused.  Weaver v. Graham, 450 U.S. 24, 29

17   (1981).  The Supreme Court clarified that there is no ex post facto violation if the change

18   in question is merely procedural and does not alter a substantive right.  Id. at 29 n. 12.

19        Petitioner states that at the time of the crimes for which he was charged and

20   convicted (April 26, 1985), California law provided that a defendant in a capital case was

21   to receive twenty-six (26) peremptory challenges on voir dire.  Cal. Penal Code § 1070.

22   Before Petitioner's case was called for trial on April 15, 1988, this section of the Penal

23   Code was amended, and the number of peremptory challenges in a capital case was

24   decreased to twenty, effective January 1, 1988.  Accordingly, in pre-trial proceedings, the

25   trial court stated that each side would have twenty peremptory challenges for voir dire at

26   Petitioner's trial.  Petitioner filed a motion requesting twenty-six challenges and asserting

27   an ex post facto violation.  (CT 3577-89.)  The trial court denied the motion.  (RT 5980.)

28        The United States Supreme Court has repeatedly concluded that peremptory

01cv0741

challenges are not of a constitutional dimension.  See United States v. Martinez-Salazar, 528 U.S. 304, 311 (2000); Ross, 487 U.S. at 88; Gray v. Mississippi, 481 U.S. 648, 663 (1987).  Peremptory challenges are a "necessary part of trial by jury."  Swain v. Alabama, 380 U.S. 202, 219 (1965).  See also Georgia v. McCollum, 505 U.S. 42, 57 (1992). However, because peremptory challenges are not required by the Constitution, "it is for the State to determine the number of peremptory challenges allowed and to define their purpose and their manner of exercise."  Ross, 487 U.S. at 89.  The Ninth Circuit explains that "[n]either the number of peremptory challenges nor the manner of their exercise is constitutionally secured," but recognizes that the peremptory challenge is "one of the most important rights secured to the accused.'"  United States v. Turner, 558 F.2d 535, 538 (9th Cir. 1977) (quoting Stilson v. United States, 250 U.S. 538, 589 (1919)).

The change in Cal. Penal Code § 1070 between the time of Petitioner's charged offense and his trial did not effect a change in any substantial right because peremptory challenges are not a substantial right guaranteed by the Constitution.  Moreover, Petitioner has not demonstrated any prejudice resulting from the trial court's refusal to grant him the additional six peremptory challenges, especially in light of Petitioner's failure to use the twenty peremptory challenges he was granted under California law. Brecht, 507 U.S. at 638.  The state court's determination that the trial judge did not commit error in denying Petitioner's motion for the additional peremptory challenges was not contrary to, or an unreasonable application of federal law, nor was it based on an unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  Petitioner is not entitled to habeas relief on this claim.

**O.    Claim 49 - Testimony of Family Members at Penalty Phase**

Claim 49 alleges that the trial court erred in refusing to allow the defense to present evidence during penalty phase proceedings of the impact Petitioner's death would have on his family members, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

01cv0741

**1.**     **Teague**

Respondent argues that the claim is barred under Teague because "there is no existing authority that requires a state to admit evidence of the effect of an execution on third parties." (Resp.'s MTD at 99.)   In Washington v. Texas 388 U.S. 14 (1967), the United States Supreme Court held that testimony relevant and material to the defense is essential to a defendant's right to a fair trial, but acknowledged its holding did not extend to allowing the defense to put on any evidence he chooses. Id. at 23. In Lockett v. Ohio, 438 U.S. 586, 604 (1978), the Supreme Court noted that "any aspect of the defendant's character or record" is potentially relevant mitigation evidence. Here, however, Petitioner does not claim that the trial court disallowed family member testimony that would have enlightened the jury to any aspect of the defendant's character or record. Rather, Petitioner asserts a constitutional violation arising from the trial court disallowing evidence of the impact of an execution on Petitioner's family and loved ones.

Granting relief on this claim would impermissibly create a new rule of federal criminal procedure, one whose "result was not dictated by precedent existing at the time defendant's conviction became final." Teague, 489 U.S. at 301. Furthermore, Petitioner's proposed rule does not satisfy either exception to Teague. See Penry, 492 U.S. at 305; Graham, 506 U.S. at 478. However, even assuming this claim would not be barred under Teague, it is without merit for the reasons set forth below.

**2.**     **Merits**

The United States Supreme Court has held that a capital case jury must make an "*individualized* determination" on the penalty issue based "on the character of the individual and the circumstances of the crime." Zant v. Stephens, 462 U.S. 862, 879 (1983) (emphasis in original). To this end, the Supreme Court has held it of importance to the constitutional guarantee of a fair trial that "the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the

01cv0741

1   defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604.

2   In addition, the state cannot preclude a sentencer from considering "any relevant

3   mitigating evidence" offered to support a sentence less than death. Eddings v.

4   Oklahoma, 455 U.S. 104, 114 (1982).

5       The United States Supreme Court decision in Booth v. Maryland, 482 U.S. 496

6   (1987), in effect at the time of Petitioner's trial, specifically prohibited the admission of

7   victim impact statements at the penalty phase of trial.  A later decision, Payne v.

8   Tennessee, 501 U.S. 808 (1991), overruled Booth, holding that the "impact of the murder

9   on the victim's family is relevant to the jury's decision as to whether or not the death

10  penalty should be imposed." Id. at 827.

11      Petitioner argues that (1) members of his family were set to testify on the effect

12  Petitioner's death would have on them; (2) the trial court refused to allow the defense to

13  ask questions on this topic; and (3) pursuant to Cal. Penal Code §190.3, Petitioner

14  should have been allowed to present this evidence in mitigation.  However, Petitioner

15  fails to substantiate this claim with even a modicum of case law or evidence (i.e., citations

16  to the transcript where the trial court allegedly prevented counsel from eliciting the

17  contested testimony or declarations from family members regarding the substance of

18  their desired testimony).  Petitioner does not even apprise the Court of the identity of the

19  family members who would have testified on his behalf.

20      Upon examination of the record, it appears that the trial court did prohibit defense

21  counsel from asking Petitioner's family members any direct questions regarding the

22  impact Petitioner's death would have on them.  (RT 18317, 18228.)  However, the court

23  allowed witnesses, for example Petitioner's sister, to "speak to the characteristics of your

24  brother that you feel the jury should know about." (RT 18228.)  The trial court explained

25  that although direct questions regarding the impact Petitioner's execution would have on

26  family members were impermissible, defense counsel could ask open-ended questions

27  regarding witnesses' thoughts about Petitioner:

28                  I've given counsel the leeway, and in all candor she asked the
                question today in terms of what this particular witness would like to tell this

85                                                                                      01cv0741

1    jury in a very open-ended way about his uncle, the redeeming things, if you
will, about his uncle. And I think that is the appropriate way to get into it,
2    and I've certainly allowed that.

3  (RT 18820.)

4       In response to defense counsel's argument that their questions regarding the

5  impact of an execution on the family members were designed to illuminate qualities of the

6  defendant, the trial court explained:

7       Sure. And I think this is something you need to bring out if you can,
Mr. Boyce; But that's one reason why I allowed the open-ended question.
8    "He's sensitive. He's been there for me," all of those things I think are
legitimate and you can bring them out.

9

10       To elicit that – for example, that he has a daughter that's going to
miss him and – a whole lot which came out with another witness gets into
the parameters of <u>Booth</u>, but I don't know how better to give you an open-
11    ended opportunity than the open-ended question I've allowed you to ask.

12       I would agree that we have a problem with <u>Booth</u> the way the
previous question was focused, but even if you want to lead a little bit, you
13    know, "He's been kind and I'm going to miss the kindness; He's given me
advice; He's been an advisor or whatever," I don't – you know, it's all "k"
14    factors.

15  (RT 18821.)

16       State law allows that family members may offer testimony on the impact an

17  execution would have on them "if by doing so they illuminate some positive quality of the

18  defendant's background or character." <u>People v. Ochoa</u>, 19 Cal. 4th 353, 445 (1998).

19  <u>See also People v. Carter</u>, 30 Cal. 4th 1166, 1205 (2003). As discussed above, although

20  defense counsel could not ask direct questions about the impact Petitioner's execution

21  would have on family members, defense counsel were free to elicit testimony regarding

22  Petitioner's positive qualities through open-ended inquiries. The details of how

23  Petitioner's execution would impact his family members do not, on their own, bear upon

24  either the circumstances of the capital crime or the character and background of

25  Petitioner. Therefore, the trial court's ruling was not an abuse of discretion, and the court

26  did not err in foreclosing Petitioner's desired inquiry during the penalty phase

27  proceedings. Finally, even if there was error, Petitioner was not prejudiced. His family

28  members, including Barbara Ayala Moreno, Ernestina Meyer, Marjorie Suarez, Richard

Suarez, and Rita Jenkins, testified about their relationship with Petitioner. It would be apparent to the jury that Petitioner's death would impact them. Failure to bring out what was obvious did not affect the jury's decision to impose the death penalty.

Petitioner has not demonstrated that the California Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law. Williams, 529 U.S. at 412-13. Petitioner is not entitled to habeas relief on this claim.

**P.    Claim 50 - Phone Call from Mexico to Castillo**

In Claim 50, Petitioner alleges that the trial court erroneously allowed the prosecution to present rebuttal evidence regarding a telephone call intended for another "Pedro Castillo" that Castillo received while recovering in the hospital. Petitioner contends that the trial court violated his rights to a fair trial and cross-examination under the Sixth and Fourteenth Amendments, to a fair and individualized determination of penalty in violation of the Eighth and Fourteenth Amendments, and to due process under the Fifth and Fourteenth Amendments.

**1.    State Court's Decision**

The California Supreme Court rejected Petitioner's claim that the trial court violated his Eighth and Fourteenth Amendment rights by allowing the prosecution to present rebuttal evidence regarding the telephone call from Mexico. The California Supreme Court's decision provides, in relevant part:

> When Pedro Castillo was in the hospital, he received a phone call from Mexico. The caller said that she was trying to reach a Pedro Castillo, whom she believed to be in that hospital. Castillo testified that the caller was trying to reach someone with the same name either in the next bed or at least on the same floor.
>
> To challenge the veracity of Castillo's testimony and suggest his involvement with a Mexican heroin connection, the defense introduced evidence that there was no other patient named Pedro Castillo in that hospital at that time.
>
> In rebuttal, after the trial court overruled defendant's objection of improper rebuttal and improper failure to disclose to him certain evidence regarding the

01cv0741

phone call, the prosecution called Castillo's wife Maria, who had answered the call. Maria Castillo testified that the caller was a Benita Gonzalez, and that she was looking for her son, a different Pedro Castillo. At the telephone operator's request, she wrote down Gonzalez's name and phone number in an address book, and she gave that information to the prosecution about six months before she testified.

After Maria Castillo testified, defendant moved to bar any further rebuttal testimony on the question of the phone call from Mexico. Again the grounds for his motion were improper rebuttal and improper failure to disclose evidence regarding the phone call. [Footnote omitted.]

The trial court denied the motions. It ruled explicitly that the prosecution had not violated its discovery orders, and also ruled implicitly that further testimony would not constitute, in a categorical sense, improper rebuttal.

The prosecution evidently gave notice that it intended to call Ernesto Castillo, the brother-in-law of Benita Gonzalez, to testify about her phone call from Mexico. In response to the trial court's request that the prosecution explain why Gonzalez herself was not testifying, it called Louis Richard Velasquez to testify at an *in limine* hearing about the authorities' investigation of the phone call.

The clerk's transcript shows that Velasquez, an investigator for the district attorney's office, had interviewed Benita Gonzalez by telephone call to Ciudad de Valles, San Luis Potosí State, Mexico, on November 24, 1986. He prepared a written report on the call two days later. The report said that Gonzalez was trying to call her brother-in-law, the different Pedro Castillo, who she said was elsewhere in the United States.

At the in limine hearing, Velasquez stated that he had recently tried to locate Gonzalez but without success, for she had left her husband and her residence in Ciudad de Valles. Velasquez reached Gonzalez's estranged husband, Plutarco Castillo, who referred him to his brother, Ernesto Castillo.

The prosecution brought Ernesto Castillo (also possibly known as Ernesto Castillo Reyna) from Mexico. He testified before the jury that he was retired from his post of Commandant of the Police of San Luis Potosí State. He confirmed that his brother Pedro Castillo was in the United States in 1985, but he did not know where. He provided a photograph of his brother Pedro, and a birth certificate showing that his brother was born in 1951 in San Ciro de Acosta, San Luis Potosí, Mexico. At closing argument, the prosecution argued without refutation from the defense that there were two Pedro Castillos, that the person in the photograph Ernesto Castillo supplied was "clearly not the same fellow" as the prosecution's witness, and that the phone call was a coincidence.

Defendant renews the claims he raised at trial: the testimony was improper rebuttal, and the prosecution violated the trial court's discovery orders in failing to alert him to Velasquez's memorialized evidence. He also claims that the failure to disclose it amounted to a violation of the due process clause of the Fourteenth Amendment to the United States Constitution.

Before trial, the trial court had ordered the prosecution to disclose "[a]ll notes or memoranda, handwritten or typed, by an investigating officer, peace officer, or deputy district attorney of their conversations with any witness which is

01cv0741

relevant to said witnesses' credibility or upon the issues of defendants' guilt or innocence of the crimes or special circumstances charged in the complaint filed herein." The order is reasonably read as continuing in nature.

Nevertheless, we disagree with defendant that the prosecution was required to disclose Velasquez's November 26, 1986, memorandum. We turn first to his constitutional claim.

As is well known, the due process clause of the Fourteenth Amendment to the United States Constitution creates a duty in the prosecution to disclose certain evidence to a defendant. (See, e.g., *United States v. Bagley* (1985) 473 U.S. 667, 674-677 [105 S.Ct. 3375, 3379-3381, 87 L.Ed.2d 481].) The evidence, however, must be both "favorable" to the defendant and " 'material' " to either guilt or penalty. (Id. at p. 674 [105 S.Ct. at p. 3379].) Favorable evidence is evidence that the defense could use either to impeach the state's witnesses or to exculpate the accused. (Id. at p. 676 [105 S.Ct. at p. 3380].) "Bagley held that . . . favorable evidence is material, and constitutional error results from its suppression . . ., 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*Kyles v. Whitley* (1995) 514 U.S. 419, 433-434 [115 S.Ct. 1555, 1565, 131 L.Ed.2d 490].) A "reasonable probability" is one sufficient to "undermine[ ] confidence in the outcome." (*United States v. Bagley*, *supra*, 473 U.S. at p. 678 [105 S.Ct. at p. 3381].)

Because there is no reasonable probability that had the evidence been disclosed to the defense the outcome would have differed, there was no due process violation. The question of the Mexican phone call was utterly ancillary to the question of defendant's guilt of three murders and to any question regarding penalty. The trial court opined that "this whole area is collateral," and we agree. Even as a distraction, it was insignificant.

We next discuss defendant's state law claim. We do not believe that the trial court's order was violated. "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The entire question of the phone call from Mexico was of no consequence to the verdict in this case. To repeat: the matter was utterly collateral. We therefore reject defendant's claim. [Footnote omitted.]

Ayala, 23 Cal. 4th at 277-80.

///

///

///

///

///

///

///

///

89

01cv0741

2.    **Merits**

The California Supreme Court's decision was not contrary to or based on an unreasonable application of clearly established federal law.  As pointed out by the California Supreme Court, there was no violation of Brady v. Maryland, 373 U.S. 83 (1963), because there was no reasonable probability that had the evidence been disclosed to the defense, the outcome would have been different.

This court does disagree with the trial court and the California Supreme Court as to whether there was a violation of the trial court's discovery order.  Initially, there was no need to disclose the information regarding the phone call because it did not relate to guilt or credibility of a witness.  However, once the issue of the phone call was brought out upon cross-examination of Castillo, the prosecution's information was relevant to Castillo's credibility, albeit, to show that he was not lying.  As the California Supreme Court noted, the duty to disclose was continuing.  Nevertheless, the whole issue was collateral, and if there was error in admitting the evidence, it was harmless and had no effect on the verdict.

There is no merit to Petitioner's claim that he was deprived of his right to cross-examination under the Sixth and Fourteenth Amendments.  Petitioner had every opportunity to cross-examine Castillo as well as Maria Castillo and Ernesto Castillo. Although Petitioner's cross-examination on the issue of the telephone call ultimately was not very effective due to the rebuttal evidence, there was no violation of Petitioner's right to cross-examination.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (a defendant is guaranteed the right to cross-examination, "not cross-examination that is effective in whatever way, and to whatever extent, a defendant might wish.")  The state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.

Q.    **Claim 67 - Requests to Unseal Portions of the Record**

Claim 67 alleges that the trial court erroneously denied a post-trial motion to

1  review previously sealed portions of the record, consisting of in camera proceedings

2  concerning informants who testified at the guilt and penalty phases of trial, in violation of

3  his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  Petitioner also

4  asserts that "[t]his court must not only review these materials to determine if the trial court

5  erred in failing to disclose the documents to Petitioner's trial counsel, but should also

6  permit Petitioner's present counsel to review the materials to provide additional guidance

7  to the Court regarding the importance of particular items to Petitioner."  (Pet. at 206.)

8

9      1.   **Teague**

10  Petitioner asserts that his state appellate counsel was erroneously denied access

11  to sealed proceedings relating to informants who were witnesses at Petitioner's trial, in

12  violation of his Sixth, Eighth and Fourteenth Amendment rights.  Respondent contends

13  that the claim is barred because "the essence of Petitioner's claim is an attack upon the

14  state's post-conviction review process," and the claim "would require this Court to

15  announce a new rule allowing Petitioner to attack a state court post-conviction review."

16  (Resp.'s MTD at 108.)  Respondent explains that Ninth Circuit law is clear that "[A]

17  petition alleging errors in the state post-conviction review process is not addressable

18  through habeas corpus proceedings."  Franzen v. Brinkman, 877 F.2d 26, 26 (9th Cir.

19  1989) (per curiam).

20  Petitioner counters that Respondent's argument is devoid of substance and that

21  Respondent has waived his Teague argument by his failure to cite relevant authority.  In

22  addition, Petitioner asserts that this claim "is based upon his appellate right to review the

23  record and his Sixth Amendment right to the effective assistance of trial and appellate

24  counsel."  (Petr's Reply at 62-63.)

25  The United States Supreme Court has held that a decision is not new if "it has

26  simply applied a well-established constitutional principle to govern a case which is closely

27  analogous to those which have been previously considered in the prior case law."  Penry,

28  492 U.S. at 314.  The Supreme Court has also held that the record of trial proceedings

must be sufficient to permit adequate and efficient appellate review.  See Griffin v. Illinois,

351 U.S. 12, 20 (1956).  However, granting Petitioner a right of access to sealed trial

proceedings is not compelled by the existing Supreme Court precedent guaranteeing a

petitioner an adequate appellate record.  Petitioner's proposed rule indeed "breaks new

ground or imposes a new obligation on the State or the Federal Government," and,

therefore, the Court's remaining inquiry is whether either exception to Teague applies to

this "new" rule.  Id. at 301.

A rule granting a federal habeas petitioner access to documents sealed at trial

does not place private individual conduct beyond the power of the criminal law to prohibit,

nor can this rule be considered of a "watershed" nature.  Id. at 311.  See also Penry, 492

U.S. at 305; Graham, 506 U.S. at 478.  Granting Petitioner relief on this claim, that is,

access to the sealed ex parte trial proceedings, would result in the creation of a new rule

of criminal procedure which does not fall under either of the exceptions to Teague.

However, even assuming this claim would not be barred under Teague, it is without merit

for the reasons set forth below.

### 2.    State Court's Decision

The California Supreme Court considered this claim on direct appeal, rejecting it

as follows:

> Defendant contends that the trial court violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and state law, when it denied his postjudgment motion, filed July 18, 1991, to unseal certain portions of the record on appeal.  The court ruled in essence, in a tentative decision and order filed September 18, 1991, that apparently became final, that it lacked the authority to do so.
>
> There was no constitutional violation.  (People v. Price (1991) 1 Cal.4th 324, 495-494 [3 Cal.Rptr.2d 106, 821 P.2d 610].)  Nor was there a violation of state law.  (Ibid.)  Indeed, rule 39.51(b) of the California Rules of Court, put into effect March 1, 1997, provides: "All transcripts of in camera proceedings shall be sealed and copies provided only to the reviewing court and to counsel for those parties present at the proceedings."  (Italics added.)  Rule 33.5(b), put into effect July 1, 1990, has the same effect.

Ayala, 23 Cal. 4th at 303.

### 3.   Merits

In post-trial proceedings, Petitioner moved the court to unseal portions of the trial record.  On July 29, 1991, Petitioner filed a motion to review sealed transcripts. (Lodgment No. 58.)  In that motion, state appellate counsel requested authorization to review the transcripts from in camera hearings at which either defense counsel, the prosecution, or both parties were excluded from attending.  (Aug. RT 1955-61.)  On August 7, 1991, the Attorney General's office filed an Opposition.  (Aug. RT 1964.) Petitioner filed a Reply on August 20, 1991 and a Supplemental Reply on August 27, 1991.  (Aug. RT 1973, 1981.)

The trial court issued a tentative decision and order on September 18, 1991, concluding that it lacked jurisdiction to do anything other than augment the record.  (Aug. CT 1984.)  The trial court held that "even if the Court had the jurisdiction to do this post trial review, there is no factual or legal authority presented by defendant AYALA which would justify such a review" of the sealed hearings regarding confidential informants and materials reviewed for discovery.  (Aug. RT 1985.)

Petitioner contends that the trial court erred in failing to disclose these sealed documents to trial counsel and that the state court erred in not permitting counsel to review the records pursuant to Rule 39.5 of the California Rules of Court and Cal. Penal Code § 109.7.  Petitioner additionally notes that "any Brady material included in what was withheld from trial counsel is an ongoing violation of that doctrine."  (Petr's Reply at 63.)

Notwithstanding the Teague bar, the Court finds Petitioner's claim also fails on the merits.  In Pennsylvania v. Ritchie, 480 U.S. 39 (1987), the Supreme Court held that a defendant's right to a fair trial and the government's interest in protecting confidential information were secured by submitting the records in question to the trial court for an in camera review.  In so holding, the Supreme Court specifically noted that an "advocate's eye," that is, review of the documents by the defendant's attorney rather than in camera by the court, was not necessary to ensure a defendant's right to a fair trial.  Id. at 60. Significantly, the Court also noted "[d]efense counsel has no constitutional right to

01cv0741

1    conduct his own search of the States' files to argue relevance."  Id. at 59.

2         In Alderman v. United States, 394 U.S. 165 (1969), the Supreme Court held, on

3    direct appeal, that an in camera review by the trial court of electronic surveillance

4    material obtained without probable cause was inadequate considering the complexity of

5    the case and the large volume of documents.  However, in Alderman, the Supreme Court

6    distinguished the facts in that case from other situations involving sealed proceedings,

7    stating "[i]n both the volume of material to be examined and the complexity and difficulty

8    of the judgments involved, cases involving electronic surveillance will probably differ

9    markedly from those situations in the criminal law where in camera procedures have

10   been found acceptable to some extent."  Id. at 182 n. 14.  Finally, Alderman was a Fourth

11   Amendment exclusionary rule case involving the fruits of an illegal search, and disclosure

12   was limited to conversations that actually included the defendant or took place on his

13   premises.  Id. at 185.  At issue here are law enforcement and correctional department

14   files that the trial court ruled were either not relevant or privileged.  Furthermore, the

15   continued sealing of these materials was upheld by the California Supreme Court.

16        The trial court sealed these materials on privilege asserted by either the

17   prosecutor, the City Attorney, or the Attorney General representing other various

18   agencies, and Petitioner has not shown that the state court's denial of access to those

19   files was objectively unreasonable.  In addition, Petitioner has failed to demonstrate that

20   the refusal of the state court to provide appellate counsel with access to the sealed

21   proceedings caused Petitioner to receive constitutionally ineffective assistance of

22   appellate counsel.  Strickland, 466 U.S. at 687.  The mere fact that appellate counsel

23   was unable to directly review the documents does not establish any constitutional

24   violation that would entitle Petitioner to habeas relief.  Ritchie, 480 U.S. at 60.  Petitioner

25   has not demonstrated that the California Supreme Court's adjudication of this claim was

26   contrary to, or involved an unreasonable application of, clearly established federal law.

27   Williams, 529 U.S. at 412-13.

28        Petitioner argues that as an alternative to public release of the documents, "this

1   Court should carefully examine the alternative of allowing habeas counsel to review the

2   transcripts and/or documents under orders not to disclose, to Petitioner or any other

3   person, any previously unknown information thereby acquired."  (Pet. at 207.)  In support

4   of this proposition, Petitioner cites to three cases:  United States v. Anderson, 509 F.2d

5   724 (9th Cir. 1975); United States v. Ordonez, 722 F.2d 530 (9th Cir. 1983); and United

6   States v. De Los Santos, 819 F.2d 94 (5th Cir. 1987).  All three of these cases are

7   distinguishable.

8       All three cases cited by Petitioner were direct appeals that involved a defendant's

9   request for disclosure of the identity of an informant.  In contrast, Petitioner in this case

10  seeks review of sealed files that are much greater in scope.  Additionally, Petitioner is not

11  directly appealing a trial court's decision, but, rather, is challenging the state court's

12  rejection of his claim that the trial court erred in refusing to allow counsel access to

13  sealed documents.  Moreover, in Anderson, the Ninth Circuit ultimately rejected the

14  defendant's claims of error, holding that the trial judge exercises discretion whether to

15  allow defense counsel or a defendant to be present at an in camera hearing regarding an

16  informant and that the trial judge's decision will be reversed only if it "constitutes an

17  abuse of discretion or constitutional error."  Id. at 730.  In De Los Santos, the Fifth Circuit

18  agreed with Anderson's holding that the exclusion of the defendant and defense attorney

19  from a pre-trial hearing at which an informant's identity was revealed did not violate the

20  Confrontation Clause.  Id. at 97.  In Ordonez, the Ninth Circuit granted relief in the form of

21  disclosure of an informant's information, holding that the inadequacy of the record made

22  it impossible to determine if the district court had balanced the interests of the parties

23  according to the requirements of Rovario v. United States, 353 U.S. 53 (1957).  In

24  Rovario, the Supreme Court held that in determining whether the identity of an informant

25  should be disclosed to the defense, a trial court must balance the individual's right to

26  prepare his defense against the public's interest in protecting the flow of information.  Id.

27  at 62.  Here, however, Petitioner seeks access to sealed files which contain not only

28  informant files, but also work-product as well as files the trial court deemed not relevant.

The cases cited by Petitioner do not support his position that the denial of access to the documents at issue violated his constitutional rights. Accordingly, this claim is denied on the merits.

Petitioner seeks to have this Court examine the sealed in camera proceedings to determine whether any exculpatory information was withheld from him. He also seeks access to the materials. As noted above, Petitioner has no right of access to properly sealed records. Nevertheless, the Court treats his request as one for discovery of the sealed proceedings. See, e.g., Murdoch v. Castro, 365 F.3d 699, 706 (9th Cir. 2004.) The parties are ordered to appear before the Court on **June 3, 2008 at 4:00 p.m.** to discuss the discovery request. The Court has not been provided with a list of the sealed proceedings. Therefore, counsel for Petitioner and Respondent shall file with the Court a joint list of the sealed proceedings and a generalized statement of why they were sealed, one week prior to the hearing.

**R.    Claim 70 - Juror Misconduct**

Claim 70 alleges that juror misconduct violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. Specifically, Petitioner alleges that the jury concluded he was guilty prior to beginning any deliberations.

Petitioner 's claims is based on the following facts. During the early stages of the guilt phase, while counsel were conferring with the judge, a female juror was heard remarking, "This is the best jury he'll ever get." The juror's remark resulted in laughter from a large portion of the jury, and the bailiff admonished the jurors to refrain from making any further remarks of that type.

As this Court previously held in denying relief on Claim 36, brought as a part of the Group Three Claims, Petitioner provides no evidence to support his conclusions that the jury made a premature conclusion as to Petitioner's guilt. The Supreme Court has held that under the Constitution, a criminal defendant is guaranteed a fair trial with "a jury capable and willing to decide the case solely on the evidence before it." McDonough

1    Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith v.

2    Phillips, 455 U.S. 209, 217 (1982)).  While the actual "presence of a biased juror cannot

3    be harmless," Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998), and requires a

4    reversal and new trial without a showing of prejudice, the courts have not held that the

5    failure to investigate potential juror bias presents any such structural error.  United States

6    v. Dutkel, 192 F.3d 893, 899 n.4 (9th Cir. 1999).  The courts have also held that it is

7    paramount "not that jurors keep silent with each other about the case but that each juror

8    keep an open mind until the case has been submitted to the jury."  Davis v. Woodford,

9    384 F.3d 628, 653 (9th Cir. 1994) (quoting United States v. Klee, 494 F.2d 394, 396 (9th

10   Cir. 1974)).

11       Petitioner presents no evidence to suggest that any of the jurors relied on extrinsic

12   statements or evidence in reaching a verdict or that any juror reached a determination on

13   defendant's guilt or innocence prematurely.  The bare statement of the female juror and

14   the ensuing laughter fall far short of demonstrating that any juror had prejudged the case

15   "to the extent that he has not received a fair trial."  Anderson v. Calderon, 232 F.3d 1053,

16   1099 (9th Cir. 2000).  Petitioner has not established that the California Supreme Court's

17   rejection of this claim was contrary to, or involved an unreasonable application of, clearly

18   established federal law,  Williams, 529 U.S. at 412-13, and this claim does not merit

19   relief.

20

21   **S.    Claim 71 - Underrepresentation of Groups in Jury Venire**

22       Claim 71 alleges that the trial court erred in denying Petitioner's challenge to the

23   composition of the jury venire based on the underrepresentation of Hispanics and

24   younger adults in the jury pool, in violation of his rights under the Fifth, Sixth, Eighth and

25   Fourteenth Amendments.

26   ///

27   ///

28   ///

### 1.   Teague

Respondent asserts the claim is Teague barred to the extent that Petitioner argues that the young constitute a distinctive class under the test established in Duren v. Missouri, 439 U.S. 357 (1979).  However, Petitioner's allegations are governed by well-established Supreme Court jurisprudence that guarantees a criminal defendant the right to a fair and an impartial jury from a fair cross-section of the community.  Despite Respondent's claim to the contrary, Petitioner is seeking relief under a rule of constitutional law that was established by the United States Supreme Court in Duren v. Missouri, 439 U.S. 357 (1979), which was announced long before Petitioner's judgment became final in March 2001.

Even if Petitioner does not seek to apply a decision creating a new rule, "it is necessary to inquire whether granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent." Stringer, 503 U.S. at 228.  This is not such a case.  Petitioner is not attempting to apply the rule in a novel setting or to novel facts, he is simply advocating the application of a long-established rule of criminal procedure regarding the constitution of a jury venire to a different group of individuals contained in that venire.  As stated previously, the Ninth Circuit has been unwilling to require a Petitioner to present a case "involving identical facts, circumstances and legal issues" in order to clear the Teague threshold.  Keating, 191 F.3d at 1061 n.11.

### 2.   State Court's Decision

The California Supreme Court considered this claim on direct appeal, denying it as follows:

> Defendant, who is Hispanic, contends that underrepresentation of Hispanics in the jury pool violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution.  (*Batson v. Kentucky* (1986) 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69; *People v. Wheeler* (1978) 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748.)  He brought the same claim at trial, but the trial court rejected it.

The claim is without merit.

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren v. Missouri* (1979) 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579.)

Defendant satisfies the first of these requirements. "Whether characterized on the basis of a Spanish surname or self-identification, Hispanics are a cognizable population..." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1154, 64 Cal.Rptr.2d 892, 938 P.2d 950.)

Defendant cannot establish a prima facie case of systematic exclusion of Hispanics merely by presenting statistical evidence of underrepresentation in the jury pool, venire, or panel. He must show that any underrrepresentation "is the result of an improper feature of the jury-selection process." (*People v. Howard* (1992) 1 Cal.4th 1132, 1160, 5 Cal.Rptr.2d 268, 824 P.2d 1315.) The parties stipulated to use the prior testimony of the San Diego County coordinator of jury services. That individual had testified that every year the commissioner's office compiles the names of all registered voters and persons with a California driver's license or an identification card onto a source list, which contains 2.5 million people. The county then uses a "sophisticated random sampling" technique to draw names from the source list to create a master list of 350,000 people, from which in turn individuals are summoned via a "second sophisticated random sampling" to form a venire.

The foregoing method does not discriminate on the basis of ethnicity or national origin. (*People v. Ramos, supra,* 15 Cal.4th 1133, 1156, 64 Cal.Rptr.2d 892, 938 P.2d 950.) Hence, defendant has not shown that the jury selection process contained an "improper feature" (*People v. Howard, supra,* 1 Cal.4th 1132, 1160, 5 Cal.Rptr.2d 268, 824 P.2d 1315).

Defendant also claims that underrepresentation of the young violated his Sixth and Fourteenth Amendment rights. With regard to young people, the trial court ruled that the young are not a cognizable group, but even if it were, there was no improper exclusion of them in the jury-selection process.

"California courts have not been receptive to the argument that age alone identifies a distinctive or cognizable group within the meaning of [the representative cross-section] rule." (*People v. McCoy* (1995) 40 Cal.App.4th 778, 783, 47 Cal.Rptr.2d 599 [citing cases].) We need not decide, however, whether peremptory challenges on the basis of age violate the strictures of *Batson* or *Wheeler*; defendant simply does not persuade, any more than he does regarding Hispanic jurors, that the young were improperly excluded under the jury-selection system in place. As the People observe, aside from a mention of statistical disparity in the presence of young people as a result of the jury-selection process, a factor that does not by itself establish systematic exclusion, the only fault defendant finds with the process is that the master list of the jury pool was only updated annually, so that those who turned 18 during the year would not be included and some 18-year-olds would turn 19. We do not believe that amounts to systematic exclusion. In order to avoid that effect or a similar one, the master list would have to be updated daily. The law does

01cv0741

1    not require such diligence.

2    <u>Ayala</u>, 23 Cal. 4th at 256-57.

3

4         **3.      <u>Merits</u>**

5         Under the Sixth Amendment to the United States Constitution, a criminal

6    defendant has the right to a jury trial with an impartial jury selected from a representative

7    cross-section of the community.  <u>Taylor v. Louisiana</u>, 419 U.S. 522 (1975).  There exists

8    a well-established three-part test to determine whether there has been a violation of the

9    constitutional guarantee to a jury comprised of a fair cross-section of the community.

10   The United States Supreme Court has held:

11            In order to establish a prima facie violation of the fair-cross section
              requirement, the defendant must show (1) that the group alleged to be
12            excluded is a "distinctive" group in the community; (2) that the representation
              of this group in veniries from which juries are selected is not fair and
13            reasonable in relation to the number of such persons in the community; and
              (3) that this underrepresentation is due to systematic exclusion of the group
14            in the jury-selection process.

15   <u>Duren</u>, 439 U.S. at 364.

16        If a defendant is able to make a prima facie showing under <u>Duren</u>, the burden will

17   shift to the state to justify the infraction by a "demonstration that attainment of a fair cross

18   section is incompatible with a significant state interest."  <u>Thomas v. Borg</u>, 159 F.3d 1147,

19   1150 (9th Cir. 1998).

20        In an evidentiary hearing before the trial court, the parties stipulated to the

21   testimony previously presented in the <u>Samayoa</u> case.  <u>People v. Samayoa</u>, San Diego

22   Superior Court Case No. CR 84618.  (RT 6222.)  Both Petitioner and his brother Hector

23   Ayala joined in the challenge to the composition of the jury venire, and counsel for both

24   defendants were present at the hearing.  There were several witnesses in that case

25   whose testimony pertains to the allegations contained in this claim.

26        Geraldine Stevens, Coordinator for Jury Services, testified on the procedures San

27   Diego County used in compiling the jury pool venire list.  Stevens explained that

28   prospective jurors were sent an initial summons, and if they did not respond, they were

1   also sent two subsequent notices by regular mail and a final summons by certified mail.

2        Dr. John Weeks compared the amount of Hispanic jurors to the number of

3   Hispanic residents in San Diego County at the time of trial.  Dr. Weeks undertook a

4   statistical analysis, and found that while Hispanics comprised 12.3% of the jury eligible

5   population in San Diego County, they comprised only 10.7% of the actual jury duty

6   venire.  Dr. Weeks calculated the "absolute disparity," a measure of the difference

7   between the proportion of Hispanics in society and the proportion of Hispanics

8   represented in the jury venire list.  Dr. Weeks concluded that the absolute disparity of

9   1.6% found in this case was not a "statistically significant" figure given the size of the

10  sample.  Accordingly, the trial court concluded that while Hispanics were a cognizable

11  group, Petitioner had failed to show an underrepresentation of Hispanics in the venire

12  sufficient to demonstrate any constitutional violation.  (RT 6357.)

13       The Ninth Circuit has held that "[t]he second prong of the Duren test requires

14  proof, typically statistical data, that the jury pool does not adequately represent the

15  distinctive group in relation to the number of such persons in the community."  United

16  States v. Esquivel, 88 F.3d 722, 726 (9th Cir. 1996).  The courts use an absolute

17  disparity analysis, as the trial court did in Petitioner's case, to determine whether a

18  defendant meets this second prong.  United States v. Sanchez-Lopez, 879 F.2d 541, 547

19  (9th Cir. 1989).

20       The Ninth Circuit has repeatedly rejected claims of underrepresentation in cases

21  where the absolute disparity was significantly greater than the 1.6% absolute disparity

22  found in the instant case.  United States v. Potter, 552 F.2d 901, 905-06 (9th Cir. 1977)

23  (2.7%); United States v. Kleifgen, 557 F.2d 1293, 1296-97 (9th Cir. 1977) (2.7%);

24  Thomas, 159 F.3d at 1151 (5%); Esquivel, 88 F.3d at 727 (4.9%); United States v.

25  Suttiswad, 696 F.2d 645, 749 (9th Cir. 1982) (7.7%).

26       Although Petitioner's claim regarding the underrepresentation of Hispanics meets

27  the first prong of the Duren test, see Castaneda v. Partida, 430 U.S. 482, 495 (1977),

28  Petitioner fails to demonstrate an underrepresentation of Hispanics in the San Diego jury

1   venire and systematic exclusion of Hispanics in the jury selection process.  Thus,

2   Petitioner fails to establish a violation of his constitutional rights as articulated by Taylor v.

3   Louisiana.

4         The three-part test of Duren also applies to Petitioner's claim that he was denied

5   his rights under the Sixth and Fourteenth Amendments as a result of the

6   underrepresentation of the young in the jury venire.  United States v. Fletcher, 965 F.2d

7   781, 782 (9th Cir. 1992).  To demonstrate that the young constitute a "distinctive" group,

8   Dr. Paul Strand conducted a study comparing the attitudes of young people, defined as

9   those between the ages of 18 and 24, to those of older people.  Dr. Strand opined that

10  the differences in the survey responses between youth and non-youth supported the

11  conclusion that young people were a cognizable group.  Dr. Strand also found that the

12  differences in responses in many instances appeared to be unique vis-a-vis other groups

13  such that their perspective was not represented by any other group.  Dr. Weeks agreed

14  with Dr. Strand, testifying that young people were a distinctive group.

15        To demonstrate that the young were underrepresented in San Diego County

16  venires in 1987 and 1988, Petitioner relied on the testimony of Dr. Weeks.  Dr. Weeks

17  opined that in 1987 and 1988 respectively, there was a 13.7 and 13.9 percentage point

18  absolute disparity between the number of 18 to 24-year-olds in San Diego County and

19  those who were jury eligible during those years

20        Finally, Dr. Weeks opined that there were two systemic flaws in the jury system:

21  (1) there was a two-month time lag between the receipt of voter registration records from

22  the DMV and the creation by the Jury Commissioner of the master list; and (2) the Jury

23  Commissioner did not update the master list during the year.

24        The trial court found that young people were not a cognizable group.  (RT 6357-

25  59.)  The trial court further found that even if young people constituted a cognizable

26  group, they had not been systematically excluded from the venires.  (RT 6359.)

27        Applying the first prong of the Duren test, Petitioner has not demonstrated that

28  young persons are a distinctive group.  The Ninth Circuit has found on several occasions

102

that young persons are not a cognizable group, and Petitioner has not provided the Court with any evidence that distinguishes the instant case from precedent.  United States v. Kleifgen, 557 F.2d 1293, 1296 (9th Cir. 1977) ("young adults" are not a cognizable group); United States v. Potter, 552 F.2d 901, 905 (9th Cir. 1977) (young persons, between the ages of 18 and 34, are not a cognizable group); United States v. Ross, 486 F.2d 1213, 1217 (9th Cir. 1971) (persons between ages of 21 and 24 are not a distinct group); United States v. Fletcher, 965 F.2d 781, 782-83 (9th Cir. 1992) (college students are not a distinctive group).

Even assuming that the young constitute a distinctive group, Petitioner fails to establish the third prong of the Duren test – i.e., that any underrepresentation of 18 to 24-year-olds in the San Diego County jury venire was a result of systematic exclusion.  A disproportionate exclusion of a distinctive group is not unconstitutional unless it is systematic.  Randolph v. State of California, 380 F.3d 1133, 1141 (9th Cir. 2004); United States v. Rodriguez-Lara, 421 F.2d 932, 945 (9th Cir. 2005).  Circumstances where courts have found systematic exclusion include (a) a jury selection system which allowed women to opt-out of service more easily than men (Duren, 439 U.S. at 370); (b) a computer error resulted in individuals from two largely racial and ethnic minority regions being excluded from the jury venire (United States v. Jackman, 46 F.3d 1240, 1246-47 (2d Cir. 1995); and (c) where jurors were selected based on wholly subjective criteria (Gibson v. Zant, 705 F.2d 1543, 1548-49 (11th Cir. 1983)).

Petitioner fails to demonstrate that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that the decision was based on an unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  This claim does not merit habeas relief.

///

///

///

///

01cv0741

## VI.  CONCLUSION

For the reasons discussed above, Respondent's motion to dismiss the Group Four Claims on procedural bar grounds (In re Clark, In re Robbins, In re Waltreus, In re Dixon) is **DENIED**.  Respondent's motion to dismiss the Group Four Claims pursuant to Teague v. Lane is **GRANTED** in part and **DENIED** in part.

Petitioner's Motion for Summary Judgment and/ or Evidentiary Hearing is **DENIED** as to all claims.  Respondent's Motion for Summary Judgment on the Group Four Claims is **GRANTED**.  The Court will, in the final judgment, **GRANT** a Certificate of Appealability ("COA") on Claims 37, 39, 41, 43, 44 (as to the exclusion of Castro's statement), 47 (as to juror Cosgrove only), and 49 and **DENY** a Certificate of Appealability on Claims 10, 11, 38, 40, 42, 44 (as to the exclusion of Vejar's statement), 45, 46, 47 (as to all jurors other than Cosgrove), 48, 50, 70, and 71.

Counsel for the parties shall appear before the Court on **June 3, 2008 at 4:00 p.m.** to discuss the aforementioned discovery concerning the sealed proceedings. Counsel for Petitioner shall appear telephonically given that they are located in the Central District of California.  One week prior to the hearing, counsel for Petitioner and Respondent shall file with the Court a joint list of the sealed proceedings and a generalized statement of why they were sealed.

**IT IS SO ORDERED.**

DATED:  April 16, 2008

_Barry Ted Moskowitz_
Honorable Barry Ted Moskowitz
United States District Judge

104