1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

12   RONALDO MEDRANO AYALA,                      CASE NO. 01cv0741 BTM

13                          Petitioner,          **ORDER DENYING RESPONDENT'S**
                                                 **MOTION TO DISMISS GROUP FIVE**
14        vs.                                    **CLAIMS; GRANTING IN PART AND**
                                                 **DENYING IN PART RESPONDENT'S**
15                                               **MOTION FOR SUMMARY JUDGMENT;**
                                                 **DENYING PETITIONER'S MOTION FOR**
16   ROBERT L. AYERS, JR., Warden of             **SUMMARY JUDGMENT; AND GRANTING**
     California State Prison at San Quentin,     **IN PART AND DENYING IN PART**
17                                               **PETITIONER'S MOTION FOR AN**
                           Respondent.           **EVIDENTIARY HEARING**
18

19          Respondent has filed a motion for summary judgment on the Group Five Claims

20   (Claims 1-9, 12-16, and 69 of the Second Amended Petition).  Respondent has also filed a

21   motion to dismiss Claims 1, 3-9, 12-16, and 69 on the basis of state procedural bars.

22   Petitioner has filed a motion seeking summary judgment, or, in the alternative, for evidentiary

23   hearings on each of his Group Five claims.  Given the very extensive briefing and the nature

24   of the claims, the Court finds these motions fully suitable for decision on the papers without

25   oral argument.   For the reasons discussed below, Respondent's motion for summary

26   judgment is **GRANTED** in part and **DENIED** in part, Respondent's motion to dismiss is

27   **DENIED**, Petitioner's motion for summary judgment is **DENIED**, and Petitioner's motion for

28   an evidentiary hearing is **GRANTED** in part and **DENIED** in part.

# I. __BACKGROUND__

On October 12, 1988, Petitioner was convicted of three counts of first-degree murder in violation of California Penal Code ("CPC") § 187, one count of attempted murder in violation of CPC §§ 664 and 187, and one count of robbery and three counts of attempted robbery in violation of CPC §§ 664 and 211--each count with findings that he used a firearm in the commission of the crimes in violation of CPC § 12022.5.  Petitioner was also found guilty of the two special circumstance allegations, multiple murder under CPC § 190.2(a)(3) and murder in the commission of a robbery under CPC § 190.2(a)(17)(1).  On December 12, 1988, Petitioner was sentenced to death for each of the three murders.

On April 17, 1997, Petitioner filed his automatic appeal with the California Supreme Court, and filed a reply brief on April 27, 1998.  On July 23, 1998, Petitioner filed a habeas petition with the California Supreme Court.  On June 8, 2000, the California Supreme Court denied the appeal.  See People v. Ayala, 23 Cal. 4th 225 (2000).  On June 8, 2000, the California Supreme Court also summarily denied the habeas petition without comment. Subsequently, Petitioner filed a Petition for a Writ of Certiorari in the United States Supreme Court, which was denied on March 5, 2001.

On May 3, 2002, Petitioner filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court.  Shortly thereafter, the Court dismissed without prejudice certain claims presented in the Petition in order to permit Petitioner to exhaust those claims in state court.  The Court stayed the federal proceedings pending the exhaustion of state court remedies.

On September 23, 2002, Petitioner filed a First Amended Petition for a Writ of Habeas Corpus in the California Supreme Court.  On September 10, 2003, the California Supreme Court denied the petition.

On November 14, 2003, Petitioner filed his First Amended Petition for a Writ of Habeas Corpus in this case.  He subsequently filed a Second Amended Petition for a Writ of Habeas Corpus, the operative pleading in this action.

///

01cv0741

## II. **PROCEDURAL DEFAULT**

Respondent moves to dismiss Claims 1, 3-9, 12-16, and 69 on the basis they are procedurally defaulted.  When a state court's rejection of a federal claim is based on a violation of a state procedural rule that is adequate to support the judgment and independent of federal law, a habeas petitioner has procedurally defaulted his claim. Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  A state procedural rule is adequate if it has been "firmly established and regularly followed" by the state court. Ford v. Georgia, 498 U.S. 411, 424 (1991).  The procedural rule is independent if it is not "interwoven with the federal law."  Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  If a state procedural ground is an adequate and independent ground for dismissal, a federal court will not consider the merits of the claims unless a petitioner can show sufficient cause for the default and resulting prejudice, or show that a failure to consider the claims would result in a fundamental miscarriage of justice.  See Coleman, 501 U.S. at 750.

In the instant case, Petitioner filed his automatic appeal on April 17, 1997, and filed his first state habeas petition on July 23, 1998.  Petitioner then raised the contested claims in a second state (exhaustion) petition filed on September 23, 2002.  The September 10, 2003 California Supreme Court order denying the second state petition concluded that Claims 1, 3-9, 12-16, and 69 are "procedurally barred, separately and independently, as untimely.  In re Robbins, 18 Cal. 4th at 780-781 (1998); In re Clark, 5 Cal. 4th 750, 763-799 (1993)."  The court also found that Claims 1, 3-9, 12-16 and 69 are "procedurally barred, separately and independently, as successive.  In re Clark, 5 Cal. 4th at 767-768; In re Horowitz, 33 Cal. 2d 534, 546-547 (1949)."

The California Supreme Court additionally found Claims 7 and 15 "procedurally barred, separately and independently, as repetitive of a claim raised on appeal.  In re Harris, 5 Cal. 4th at 824-849; In re Waltreus, 62 Cal. 2d 218, 225 (1965)."  The court found Claims 1, 9 ("insofar as it asserts the prosecution violated the terms of a stipulation"), and 69 "procedurally barred, separately and independently, as pretermitted because they could have been, but were not, raised on appeal.  In re Harris, 5 Cal. 4th

01cv0741

813, 824-829; <u>In re Dixon</u> (1953) 41 Cal. 2d 756, 759."  Finally, the court found claim 6 ("insofar as it refers to the putative failure to disclose certain purportive information about Rafael Mendoza Lopez") to be procedurally barred because it was "raised and rejected in petitioner's first petition for writ of habeas corpus (<u>In re Ronaldo Medrano Ayala on Habeas Corpus</u> (S072059, petn. den. June 8, 2000).  (<u>In re Miller</u> (1941) 17 Cal. 2d 734, 735.)"  The California Supreme Court alternately denied all of the claims raised in the second exhaustion petition on the merits.

**A.    <u>Repetitive</u> (<u>In re Waltreus</u>)**

<u>Waltreus</u> provides that "in the absence of strong justification, any issue that was *actually* raised and rejected on appeal cannot be renewed in a petition for habeas corpus."  <u>In re Harris</u>, 5 Cal. 4th at 829.  In <u>Waltreus</u>, the California Supreme Court stated "habeas corpus ordinarily cannot serve as a second appeal."  <u>Waltreus</u>, 62 Cal. 2d at 225.

The Ninth Circuit has repeatedly held that the rule announced in <u>Waltreus</u> "is not sufficient to bar federal relief."  <u>Calderon v. United States District Court (Bean)</u>, 96 F.3d 1126, 1131 (9th Cir. 1996); <u>Maxwell v. Sumner</u>, 673 F.2d 1031, 1034-35 (9th Cir. 1982); <u>LaCrosse v. Kernan</u>, 244 F.3d, 702, 705 n.11 (9th Cir. 2001).  In <u>Forrest v. Vasquez</u>, 75 F.3d 562, 564 (9th Cir. 1996), the Ninth Circuit explained, "[A] <u>Waltreus</u> denial on state habeas has no bearing on [a habeas petitioner's] ability to raise a claim in federal court."  The Ninth Circuit reiterated this conclusion in <u>Hill v. Roe</u>, 321 F.3d 787, 798 (9th Cir. 2003), stating, "[t]he California Supreme Court's reliance on *In re Waltreus* does not bar federal review."

In accordance with Ninth Circuit precedent, the Court holds that the <u>Waltreus</u> rule is not sufficient to bar federal review of Petitioner's claims.

**B.    <u>Untimely and Successive</u> (<u>In re Robbins</u> and <u>In re Clark</u>)**

In their briefing on Respondent's Motion to Dismiss Group Three Claims based on

1  procedural bars, the parties relied upon the motion papers previously submitted in

2  support of the Group Two claims.  In the Court's Order dated September 27, 2007, the

3  Court conducted an analysis of the California Supreme Court's application of the

4  untimeliness and successiveness procedural bars  (In re Clark and In re Robbins) and

5  found that California's untimeliness and successiveness procedural bars were

6  inadequate to bar consideration of Petitioner's Group Three claims on the merits.  In the

7  Court's Order dated April 16, 2008, the Court noted that the parties, in briefing the Group

8  Four claims, again relied upon the papers submitted in support of the Group Two claims.

9  Therefore, the Court again concluded that the procedural bars imposed by the California

10  Supreme Court on the grounds of untimeliness and successiveness did not bar this Court

11  from considering the Group Four claims on the merits.

12          In the briefing filed in support of the motions on the Group Five claims, the parties

13  again rely primarily on the papers previously submitted in support of the Group Two

14  Motions.[1]  Therefore, in accordance with the Group Three and Group Four Orders, this

15  Court cannot conclude that the application of these procedural rules is sufficient to

16  prohibit the consideration of the Group Five claims on the merits.  The procedural bars

17  imposed by the California Supreme Court in its September 10, 2003 order on the

18  grounds of untimeliness and successiveness will not bar this Court from considering

19  those claims on the merits for the reasons set forth in the Court's September 27, 2007

20  Order.

21

22  **C.    Pretermitted (In re Dixon)**

23          As stated above, in their briefing on Respondent's Motion to Dismiss Group Four

24  Claims based on procedural bars, the parties relied primarily upon the motion papers

25  previously submitted in support of the Group Two claims.  In the Court's Order dated April

26  16, 2008, the Court conducted an analysis of the California Supreme Court's application

27

28          _____

          [1] Petitioner addresses procedural default in his Reply brief on the Group Five claims,
in which he largely reiterates the arguments previously raised in the Group Two pleadings.

01cv0741

of the pretermitted procedural bar (In re Dixon).  The Court found that the Dixon bar was

independent of federal law, and found that Petitioner had met his interim burden under

Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003), to challenge the adequacy of the

procedural bar by challenging the consistency of its application, but concluded that

Respondent had not met his ultimate burden under Bennett of proving the adequacy of

the procedural rule.  The Court held that the Dixon bar was not sufficient to prohibit the

consideration of the Group Four claims on their merits.

In the briefing filed in support of the motions on the Group Five claims, the parties

again rely primarily on the papers previously submitted in support of the Group Two

Motions.  Therefore, this Court cannot conclude that the application of the Dixon

procedural rule is sufficient to prohibit the consideration of Claims 1, 9, and 69 on the

merits.  For the reasons set forth in the Court's April 16, 2008 Order, the Dixon

procedural bars imposed by the California Supreme Court in its September 10, 2003

order will not bar this Court from considering those claims on the merits.

**D.     In re Miller**

In Miller, the California Supreme Court denied a habeas petition because a prior

petition filed in that court "was based on the same grounds set forth in the present

petition" and "no change in the facts or the law substantially affecting the rights of the

petitioner has been disclosed" in the interim.  Id., 17 Cal. 2d at 735.  In Kim v. Villalobos,

the Ninth Circuit stated that, by invoking Miller, the California Supreme Court was

effectively "denying the petition for the same reasons that it denied the previous one."

Id., 799 F.2d 1317, 1319 n.1 (9th Cir. 1986).  Miller does not constitute a procedural bar

to federal review.  See Ylst v. Nunnemaker, 501 U.S. 797, 804 n.3 (1991) ("Since a later

state decision based upon ineligibility for further state review neither rests upon

procedural default nor lifts a pre-existing procedural default, its effect on the availability of

federal habeas is nil.")

Accordingly, the Court holds that a citation to In re Miller is not sufficient to bar

01cv0741

1  federal review of Petitioner's claims.

2

3  **E.    Conclusion**

4          The Court finds that the <u>Waltreus</u> and <u>Miller</u> rules are not sufficient to bar federal

5  review of Claims 6, 7, and 15.  The Court further finds that Respondent has failed to carry

6  his ultimate burden of demonstrating that the untimeliness, successiveness, and

7  pretermitted (<u>Dixon</u>) bars are consistently applied.  Therefore, the Court cannot conclude

8  those procedural bars are sufficient to prohibit the consideration of Claims 1, 3-9, 12-16,

9  and 69 on the merits.  Accordingly, Respondent's motion to dismiss those claims on the

10 basis of procedural default is **DENIED**.

11

12                      **III.  TEAGUE V. LANE**

13          The United States Supreme Court, addressing perceived inconsistencies in its

14 prior retroactivity jurisprudence, held that "new" constitutional rules of criminal procedure

15 will not be applied retroactively to cases on collateral review unless they fall within two

16 narrow exceptions.  <u>Teague v. Lane</u>, 489 U.S. 288 (1989).  A new rule is one that "breaks

17 new ground or imposes a new obligation on the States or the Federal Government" or

18 one whose "result was not dictated by precedent existing at the time defendant's

19 conviction became final."  <u>Id.</u> at 301.   The two exceptions to the <u>Teague</u> rule are: (1)

20 rules placing certain kinds of private individual conduct beyond the power of the criminal

21 law to prohibit, and (2) procedures implicit in the concept of ordered liberty without which

22 the likelihood of an accurate conviction is seriously diminished.  <u>Penry v. Lynaugh</u>, 492

23 U.S. 302, 305 (1989), <u>abrogated on other grounds</u>, <u>Atkins v. Virginia</u>, 536 U.S. 304

24 (2002); <u>Graham v. Collins</u>, 506 U.S. 461, 478 (1993).

25          When the state *properly* argues that a "defendant seeks the benefit of a new rule

26 of constitutional law, the court must apply <u>Teague v. Lane</u> before considering the merits

27 of the claim."  <u>Caspari v. Bohlen</u>, 510 U.S. 383, 389 (1994).  Under <u>Teague</u>, habeas relief

28 is generally unavailable if it is based "on a rule announced after [a petitioner's] conviction

1  and sentence became final." Id. The first step in a Teague analysis, therefore, is to

2  determine whether a petitioner is seeking the benefit of a constitutional rule announced

3  after his or her conviction became final. Id. at 389-90.

4      In the Answer to the Second Amended Petition ("Answer"), Respondent asserts

5  the Teague bar for Claims 1-9, 12-16, and 69 - every claim in Group Five. Respondent's

6  argument on those claims consists solely of the general contention that "Petitioner has

7  not shown that the claim does not rest upon a new rule barred under Teague v. Lane."

8      The Ninth Circuit recently expressed its view on the duties placed on the state to

9  properly raise and plead a claim made under Teague:

10      If a state seriously wishes to press Teague upon us, at a minimum Teague
    should be identified as an issue (indeed the first issue) on appeal, the new rule
11      of constitutional law that falls within its proscription should be articulated, the
    reasons why such a rule would not have been compelled by existing precedent
12      should be explained with particular reference to the appropriate universe of
    precedent, and an argument should be made why the rule contended for is not
13      within one of Teague's exceptions.

14  Arredondo v. Ortiz, 365 F.3d 778, 781-782 (9th Cir. 2004).

15      Respondent merely references Teague in the Answer and fails to properly develop

16  his Teague argument with respect to any of the Group Five claims in the merits briefing.

17  The Ninth Circuit places the burden on the state to articulate and present this argument,

18  and Respondent's burden to raise and plead a Teague claim is not satisfied by little more

19  than a one-line citation to Teague. Therefore, the Court will not conduct an analysis on

20  whether Claims 1-9, 12-16, and 69 are barred under Teague v. Lane.

21

22  **IV. STANDARDS OF REVIEW**

23  **A.  Standard of Merits Review under AEDPA**

24      Title 28, United States Code, § 2254(a), sets forth the following scope of review for

25  federal habeas corpus claims:

26      The Supreme Court, a Justice thereof, a circuit judge, or a district court
    shall entertain an application for a writ of habeas corpus in behalf of a
27      person in custody pursuant to the judgment of a State court only on the
    ground that he is in custody in *violation of the Constitution or laws or*
28      *treaties of the United States.*

01cv0741

1  28 U.S.C. § 2254(a) (emphasis added).

2  In Lindh v. Murphy, 521 U.S. 320, 336 (1997), the United States Supreme Court

3  held that the new provisions of the Anti-terrorism and Effective Death Penalty Act of 1996

4  ("AEDPA") "generally apply only to cases filed after the Act became effective."  In capital

5  habeas actions, cases are typically commenced by the filing of requests for appointment

6  of counsel and stays of execution of the petitioners' death sentences.  Petitioner filed his

7  request for appointment of counsel and stay of execution on April 27, 2001 and filed his

8  petition with this Court on May 3, 2002.  AEDPA became effective on April 24, 1996,

9  when the President signed it into law.  See id.  Accordingly, AEDPA applies to this case.

10  Relevant to this case are the changes AEDPA rendered to 28 U.S.C. § 2254(d),

11  which now reads:

12  (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with

13  respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

14  (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

15  Federal law, as determined by the Supreme Court of the United States; or

16  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

17  evidence presented in the State court proceeding.

18  28 U.S.C.A. § 2254(d)(1)-(2).

19  A decision is "contrary to" clearly established law if it fails to apply the correct

20  controlling authority, or if it applies the controlling authority to a case involving facts

21  materially indistinguishable from those in a controlling case, but nonetheless reaches a

22  different result.  See Williams v. Taylor, 529 U.S. 362, 413 (2000).  A decision involves

23  an "unreasonable application" of federal law if "the state court identifies the correct

24  governing legal principle . . . but unreasonably applies that principle to the facts of the

25  prisoner's case."  Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004).

26  Even when the federal court undertakes an independent review of the record in

27  the absence of a reasoned state court decision, the federal court must "still defer to the

28  state court's ultimate decision."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  If

9

01cv0741

1  the state court decision does not furnish any analytical foundation, the review must focus

2  on Supreme Court cases to determine "whether the state court's resolution of the case

3  constituted an unreasonable application of clearly established federal law."  Greene v.

4  Lambert, 288 F.3d 1081, 1089 (9th Cir. 2001).  Federal courts also look to Ninth Circuit

5  law for persuasive authority in applying Supreme Court law, and to determine whether a

6  particular state court decision is an "unreasonable application" of Supreme Court

7  precedent.  Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

8          The Group Five Claims were each denied on the merits by the California Supreme

9  Court in the September 2003 Order which stated, "The petition for writ of habeas corpus

10  is denied.  All claims are denied on the merits."  Therefore, the Court will conduct an

11  independent review of the record with respect to these claims.  See Pirtle, 313 F.3d at

12  1167.

13

14  **B.      Standard for Evidentiary Hearing**

15          AEDPA also limited the circumstances under which district courts may grant an

16  evidentiary hearing.  Section 2254(e)(2) provides:

17              If the applicant has failed to develop the factual basis of a claim in
            State court proceedings, the court shall not hold an evidentiary hearing
18          unless the applicant shows that--
            (A) the claim relies on--
19                  (I)   a new rule of constitutional law, made retroactive to
            cases on collateral review by the Supreme Court, that was
20          previously unavailable; or
                    (ii) a factual predicate that could not have been
21          previously discovered through the exercise of due diligence;
            and
22          (B) the facts underlying the claim would be sufficient to
            establish by clear and convincing evidence that but for
23          constitutional error, no reasonable factfinder would have
            found the applicant guilty of the underlying offense.
24
        Under AEDPA, when determining whether to grant an evidentiary hearing, the
25
    district court must first ascertain whether the petitioner has failed to develop the factual
26
    basis of a claim in state court.  Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir.
27
    2005).  As explained by the Supreme Court:
28
            For state courts to have their rightful opportunity to adjudicate federal rights,

01cv0741

1
2
3
4

> the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.

Williams v. Taylor, 529 U.S. 420, 437 (2000).

5
6
7
8
9
10
11

If the petitioner has *not* failed to develop the facts in state court, an evidentiary hearing is required if: (1) the petitioner establishes a colorable claim for relief – i.e., petitioner alleges facts that, if proven, would entitle him to habeas relief; and (2) the petitioner did not receive a full and fair opportunity to develop those facts. Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005). The second requirement is met by a showing that:

12
13
14
15

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

16
17

Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

18
19

## V. DISCUSSION

20
21
22
23
24
25
26
27

The Group Five claims consist of allegations of prosecutorial misconduct at all stages of Petitioner's case - during pre-trial investigation and motions, the guilt and penalty phases of trial, and in post-trial proceedings. The Group Five claims also consist of allegations of Petitioner's actual innocence of the crimes, a lack of fundamental fairness in the trial proceedings, Brady violations, destruction of evidence, and threats and intimidation of Petitioner and witnesses. The Court incorporates the Group Three Order's overview of the evidence presented during the guilt and penalty phases of trial. (Doc. No. 236 at 15-28, 75-83.)

28

Petitioner seeks summary judgment and/or an evidentiary hearing on each of the

1  Group Five claims.  Respondent seeks summary judgment on each of the Group Five

2  claims.

3

4  **A.    Claim 1 - Actual Innocence**

5        Petitioner alleges that he was falsely and wrongly convicted of the 43rd Street

6  murders, and that he is actually innocent.  Petitioner asserts that his conviction and

7  sentence therefore stand in violation of the Fifth, Sixth, Eighth and Fourteenth

8  Amendments.

9        In Herrera v. Collins, 506 U.S. 390 (1993), the United States Supreme Court

10  assumed without deciding that "in a capital case a truly persuasive demonstration of

11  'actual innocence' made after trial would render the execution of a defendant

12  unconstitutional, and warrant federal habeas relief if there were no state avenue open to

13  pursue such a claim."  Id. at 417.  In Herrera, the Supreme Court refrained from

14  announcing a standard for evaluating a freestanding innocence claim, but cautioned that

15  due to the anticipated frustration of the need for finality and burden on the court in the

16  case of a potential reversal and retrial, the threshold of such a claim would be

17  "extraordinarily high."  Id. at 418.  The Ninth Circuit later held that "a habeas petitioner

18  asserting a freestanding innocence claim must go beyond demonstrating doubt about his

19  guilt, and must affirmatively prove that he is probably innocent."  Carriger v. Stewart, 132

20  F.3d 463, 476 (9th Cir. 1997).

21        Petitioner asserts that his claim of innocence should be evaluated under the

22  standard articulated by the Supreme Court in Schlup v. Delo, 513 U.S. 298 (1995).  In

23  Schlup, the Supreme Court's decision centered on a reviewing court's ability to hear an

24  otherwise procedurally barred claim when the petitioner was able to demonstrate enough

25  evidence of innocence that there would be a "miscarriage of justice" if his constitutional

26  claims were not evaluated on the merits.  Id. at 315.  The Supreme Court explained that

27  the threshold showing to satisfy a "miscarriage of justice" exception is lower than the

28  "extraordinarily high" threshold necessary to assert a freestanding claim of actual

1   innocence under <u>Herrera</u>.  <u>Schlup</u>, 513 U.S. at 315-16.  The Court explained that the

2   <u>Schlup</u> "miscarriage of justice" exception applied only to the Court's ability to consider his

3   procedurally barred claims, and was not an independent basis for habeas relief.  <u>Id.</u> at

4   315.  In contrast, a freestanding innocence claim is not based on any underlying

5   constitutional error and is thus subject to a higher level of scrutiny.  <u>Id.</u> at 316; <u>see</u> <u>also</u>

6   <u>House v. Bell</u>, 547 U.S. 518, 554 (2006) ("The sequence of the Court's decisions in

7   <u>Herrera</u> and <u>Schlup</u>- first leaving unresolved the status of freestanding claims and then

8   establishing the gateway standard- implies at least that <u>Herrera</u> requires more convincing

9   proof of innocence than <u>Schlup</u>.")  Petitioner's claim has nothing to do with the

10  consideration of a procedurally barred claim.  Instead, Petitioner asserts that his actual

11  innocence is itself a basis for habeas relief.  Therefore, the claim cannot be evaluated

12  under <u>Schlup v. Delo</u>.[2]

13      Petitioner asserts that the bulk of the case against him was comprised of the false

14  and concocted testimony of Pete Castillo, Juan Meza and Bobby Garcia, as well as the

15  coerced recantation of Rafael Mendoza Lopez, and emphasizes that there is no physical

16  evidence corroborating any of the witnesses' testimony.  Petitioner alleges that trial

17  counsel failed to present impeachment witnesses at trial, including Richard Savocchio,

18  Raul Garcia and Johnny Mendez, whose testimony would have exposed the testimony of

19  Meza, Mendoza Lopez and Castillo as false and a product of government intimidation.

20  Petitioner argues that "[a]bsent the testimony of Juan Meza and Pedro Castillo there was

21  no evidence to support the conviction of Petitioner."  (Petitioner's Motion for Summary

22  Judgment ["Petr.'s MSJ"] at 47.)

23      The Ninth Circuit has held that post-conviction evidence whose sole function is to

24  "undercut the evidence presented at trial" is insufficient support for a freestanding claim

25  of actual innocence.  <u>Carriger</u>, 132 F.3d at 477.  The Court has considered each of

26  _____

27      [2] Petitioner also cites <u>Kuhlman v. Wilson</u>, 477 U.S. 436 (1986), and <u>Sawyer v. Whitley</u>, 505 U.S. 333 (1992) in support of his claim.  However, the holdings of these cases,

28  like <u>Schlup</u>, address the circumstances under which a habeas court may consider an otherwise procedurally barred claim, and do not apply to Petitioner's freestanding claim of actual innocence.

01cv0741

1   Petitioner's constitutional claims on the merits, and has granted an evidentiary hearing on

2   several claims in his federal petition.  Petitioner fails to offer any new evidence to

3   substantiate his claim of actual innocence, but merely reiterates the allegations made in

4   other claims in his federal petition, and fails to surmount the "extraordinarily high"

5   threshold contemplated by <u>Herrera</u>.

6        Petitioner also points to witness Tracy Pittman, who provided the police with a

7   description of two men who went to the body shop just before the shootings, was shown

8   photos of Petitioner and his brother, and said that neither of the two men she saw were

9   either Ronaldo or Hector Ayala.  However, this evidence is not newly discovered- Ms.

10  Pittman testified to these events at trial.  The jury heard her testimony, and nevertheless

11  voted to convict Petitioner.  The testimony of Ms. Pittman does not support a claim of

12  actual innocence.

13       Petitioner's allegations of perjured testimony, trial counsel's ineffective

14  performance, and the lack of physical evidence are addressed in other claims in the

15  instant petition, and serve at most only to undercut the evidence presented at trial, but do

16  not make a persuasive showing of actual innocence.  <u>See</u> <u>Herrera</u>, 506 U.S. at 417.

17  Accordingly, Petitioner's actual innocence claim fails on the merits, and the state court's

18  denial of this claim was neither contrary to nor an unreasonable application of clearly

19  established federal law.  <u>Williams</u>, 529 U.S. at 412-13.  Petitioner fails to establish facts

20  that, if proven, would entitle him to habeas relief on this claim, and is therefore not

21  entitled to an evidentiary hearing.  <u>See</u> <u>Earp</u>, 431 F.3d at 1167.

22

23  **B.    Claim 2 - Fundamental Fairness**

24       Petitioner asserts that his trial was infected by the ineffective assistance of

25  appointed counsel, multiple errors by the trial court, the trial court's failure to ensure due

26  process, and numerous acts of misconduct by the prosecution and the jury, and argues

27  that each of the errors "individually and cumulatively in whole and in part, caused

28  Petitioner prejudice."  (Second Am. Pet. ¶ 161.)  Petitioner alleges that his right to

1   fundamental fairness at trial, as guaranteed under the Fifth, Sixth, Eighth and Fourteenth
2   Amendments, was violated as a result of these errors.

3          Respondent maintains the claim is conclusory, and asserts that to the extent
4   Petitioner seeks to assert cumulative error, "he fails to show that there were any errors to
5   cumulate."  (Respondent's Motion to Dismiss ["Resp.'s MTD"] at 4.)  Petitioner maintains
6   that "[e]ven if these errors do not individually rise to the level of prejudice necessary for
7   the granting of the writ, taken as a whole the pattern of error resulted in an unfair trial and
8   requires that a new trial be granted, or at a minimum, that Petitioner's death sentence be
9   vacated."  (Petr.'s MSJ at 48.)

10          The Court has granted evidentiary hearings on several claims in this case, and the
11   resolution of those claims will impact the merits review of this claim.  Therefore, the Court
12   will consider this claim after the conclusion of the evidentiary hearing.  At this time, the
13   Court **DENIES WITHOUT PREJUDICE** Respondent's motion for summary judgment on
14   this claim, **DENIES WITHOUT PREJUDICE** Petitioner's motion for summary judgment
15   and **DENIES** Petitioner's motion for an evidentiary hearing.  Claim 2 shall be considered
16   on the merits after the conclusion of the evidentiary hearing.

17

18   **C.      Claim 3 - Biased and Improper Investigation of 43rd Street and Casas**
19          **Murders**

20          In Claim 3, Petitioner alleges that his constitutional rights to due process and equal
21   protection under the Fifth and Fourteenth Amendments, to a fair trial under the Sixth and
22   Fourteenth Amendments, and to a fair and non-arbitrary penalty determination under the
23   Eighth and Fourteenth Amendments, were violated because the investigations of the
24   43rd Street murders and Casas killing were not conducted in a fair and impartial manner.
25   Petitioner claims that "the treatment of Petitioner as part of that investigation revealed the
26   bias against Petitioner with which the police and the prosecution pursued their official
27   duties."  (Second Am. Pet. ¶ 163.)

28          Generally, the decision whether or not to prosecute rests in the discretion of the

01cv0741

1    prosecutor.  <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 364 (1978).  However, selectivity in

2    the enforcement of laws is subject to constitutional constraints and may not be based

3    upon an unjustifiable standard such as race, religion, or other arbitrary classification.  <u>Id.</u>

4    There is a presumption that prosecutorial decisions do not violate equal protection.

5    <u>United States v. Chemical Foundation, Inc.</u>, 272 U.S. 1, 14-15 (1926).  To overcome this

6    presumption, a criminal defendant must present "clear and convincing evidence to the

7    contrary."  <u>Id.</u>

8         Petitioner has not presented any facts establishing that the prosecution was based

9    on an impermissible motive.  In support of this claim, Petitioner relies on the same

10   evidence he submitted in support of Claim 24 of the Group Three Claims, namely

11   portions of the Hart Declaration and Supplemental Hart Declaration regarding Chacon's

12   alleged bias against the Ayalas, Chacon's immediate conclusion that the Ayalas had

13   committed the 43rd Street murders, and Chacon's interjection of himself into the

14   investigation of the case, including contact with crucial witnesses.  (Hart Decl. ¶¶ 8-17;

15   Supp. Hart Decl. ¶¶ 3-9.)  Although this evidence may show bias in connection with the

16   police investigation into the 43rd Street murders, it does not support the conclusion that

17   the *decision to prosecute* was based on unjustified standards.

18        As for bias in connection with the investigation of the murders, Petitioner does not

19   cite any authority for the proposition that the bias of an investigating officer, in and of

20   itself, rises to the level of a constitutional violation.[3]  Perhaps realizing the shortcomings

21   of this claim, in his Reply Brief Petitioner states that this claim actually concerns the use

22   of fraudulent evidence in connection with the improper investigation.  (Petr.'s Reply at

23   37.)  However, the claim as set forth in the Second Amended Petition is not couched as a

24   false evidence claim.  Furthermore, Petitioner has asserted separate claims for

25   Prosecutorial Misconduct by Failure to Disclose Consideration Given to Prosecution

26   Witnesses and Failure to Correct False Testimony by Prosecution Witnesses (Claim 8),

27   _____

28        [3] Claim 3 also alleges bias in the investigation of the Casas murder. However,
     Petitioner does not state any facts linking Chacon to the investigation of the Casas murder
     or otherwise establishing bias in connection with the investigation of the Casas murder.

01cv0741

False Evidence (Claim 12), Concocting the Testimony of Mendoza Lopez and Meza (Claim 15), and Failure to Disclose Material Exculpatory Evidence Regarding Detective Carlos Chacon (Claim 5).   Therefore, to the extent that Petitioner intends Claim 3 to cover false evidence and Brady violations, it is duplicative.

The state court's rejection of this claim was not contrary to, nor an unreasonable application of, clearly established federal law.  Williams, 529 U.S. at 412-13.  Petitioner is not entitled to habeas relief or an evidentiary hearing on this claim.  See Earp, 431 F.3d at 1167.

**D.   Claim 4- Wrongful Intimidation and Threats to Witnesses**

In Claim 4, Petitioner alleges that his rights to due process, equal protection, a fair trial, and an individualized penalty determination under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated as a result of the state's wrongful intimidation and threatening of witnesses.

Petitioner alleges that Detective Chacon "threatened, coerced and/or intimidated potential and actual witnesses, including but not limited to Rafael Mendoza Lopez, Joseph Moreno, Moreno's daughter, Gina Moreno, Tracy Pitman [sic], Jennifer [sic] Mendoza, Maria Soto, Sara Castro, Ochoa Hernandez, Richard Buchanan and Ishmael Maldonado, as well as Petitioner himself, whom Detective Chacon threatened to kill." (Second Am. Pet. ¶ 169.)  Furthermore, Petitioner alleges that Chacon falsely told a number of witnesses, including Tracy Pittman, that Petitioner was a member of the Mexican Mafia and that the witnesses were at risk of murder and/or physical harm at the hands of the Mexican Mafia.  (Second Am. Pet. ¶ 170.)

"It is well established that substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process." United States v. Vavages, 151 F.3d 1185, 1188 (9th Cir. 1998) (internal quotation marks omitted).  Thus, coercive or threatening behavior toward a potential witness may justify reversal of a defendant's conviction.  See Earp, 431 F.3d at 1170-71.

01cv0741

1   Other than Hart's statement that on information and belief, Chacon threatened

2   and/or intimidated Sara Castro and Ishmael Maldonado, Petitioner does not present any

3   evidence that these individuals were in fact threatened.  As for the alleged threats against

4   Tracy Pittman[4] and Javier Ochoa Hernandez, both of these witnesses testified for the

5   defense and Petitioner does not claim that their testimony would have been more

6   favorable absent the alleged threats.  Thus, Petitioner's claim fails as to these witnesses.

7   Petitioner's claim that Chacon threatened him is addressed in Claim 14.

8   With respect to Richard Buchanan, in Hart's original declaration, Hart stated on

9   information and belief that while Buchanan was at the county jail, Chacon attempted to

10  coerce Buchanan into falsely fingering Petitioner as the instigator of an attack Buchanan

11  had allegedly carried out against another inmate, Manuel Rebeles.  (Hart Decl. ¶ 20.)  In

12  support of his instant motion, Petitioner submitted a report of an interview of Buchanan

13  by investigator George Newman on April 7, 2006.  (Ex. C to Belter Decl. dated 7/29/08.)

14  During the interview, Buchanan claimed that Chacon and Deputy District Attorney Gloria

15  Michaels had put pressure on him to make up a story that he was an Eme hit man and

16  that Petitioner had ordered him to carry out a hit on Rebeles, a fellow inmate of

17  Buchanan's who had been stabbed.  Buchanan claimed that after he refused, Chacon

18  threatened to "bury" him.  Buchanan also stated that Chacon attempted to put pressure

19  on him to testify against the Ayalas by convincing Rebeles to falsely identify Buchanan as

20  his attacker.  According to Buchanan, Rebeles admitted on the stand that the police "fed"

21  him the story about Buchanan's involvement.  In addition, Buchanan claimed that

22  Rebeles was visited everyday by a man Buchanan is "pretty sure" was Chacon.  Even if

23  Buchanan's testimony is credited, Petitioner has not established that his due process

24  _____

25     [4]  Petitioner has presented evidence of threats against Pittman.  According to Hart,
    Pittman's father told Hart that in 1985, San Diego Detectives told him that the Eme had a
26  contract out to kill his daughter.  (Supp. Hart. Decl. ¶ 10.d.)  Pittman herself recalled that on
    one occasion an unidentified white male driving a black car pulled up next to her and told her
27  that she better not testify in the case, although there is no evidence that this man was
    associated with the police or the prosecution.  (Ex. F. to Belter Decl. dated 7/29/08.)  Pittman
28  explained that she was scared for her life and went into hiding until she was convinced to
    testify for the defense.  (Id.)

rights were violated.  Buchanan did not in fact testify against Petitioner.  Conversely,

Petitioner does not claim that he was going to call Buchanan as a defense witness in the

murder trial but was prevented from doing so.  Therefore, there was no government

interference with witness testimony.

As for Maria Soto, Petitioner relies on Hart's Supplemental Declaration, which

states:

> Maria Soto was an important witness (along with Ignacio Vehar and Ismael
> Maldonado), and before I first interviewed her, Chacon had for months paid
> her as a protected witness, which I learned by reviewing memos that reflected
> payments by Chacon. Maria Soto was an important witness because she links
> Tony Figueroa to the murders.  Soto was told by Pete Castillo and Tony
> Figueroa that a hit man by the name of Sosa was going to kill her if she
> testified.  Based on Chacon's relationship with Sosa and his threats to other
> witnesses, I took this threat to have eminated from him as well.  I discussed
> this issue with trial counsel and the tampering of witnesses, but I was
> precluded from following up on it.

(Hart Supp. Decl. ¶ 10.e.)   As discussed in the Court's Group Three Order, Hart's

conclusion that the threats toward Soto emanated from Chacon is purely speculative and

does not warrant an evidentiary hearing.

The Supplemental Hart Declaration also includes information regarding threats

directed towards Joe Moreno:

> b. As for Joe Moreno, when I first began working on the case, Moreno
> was wanted but had not been apprehended. At some point, he was
> apprehended and was later tried and exonerated in a subsequent trial. Before
> he had been apprehended, I interviewed Joe Moreno's daughter who told me
> that she had been approached by Detective Chacon, and that Chacon told her
> that Joe Moreno's life was in danger, but that if Joe surrendered and admitted
> he was involved in the killings then Chacon would make sure he would not be
> assassinated in jail.  Essentially, he tried to coerce her into obtaining a false
> confession from her father with threats of fear and intimidation.
>
> c. I also spoke many times with Joe Moreno's wife, Gina Moreno, who
> told me she had constantly been harassed by the police. She told me that at
> one point, the police had raided Joe's house and took items. Then, she said,
> Detective Chacon subsequently came to her house, holding pants and
> announced to her there's Joe's pants with blood on it, it's been tested and it
> was the blood of the victim. Gina was there with a family friend and they both
> openly laughed at Chacon.  The friend announced that the pants were his.
> Detective Chacon retreated and there was never any reference again to the
> pants.  It was apparently a clumsy effort by Chacon to frame or coerce Joe
> Moreno and, by extension, the Ayalas. I told trial counsel about my interview
> with Gina Moreno and that Ms. Moreno said she would testify to it.  Trial
> counsel did not use that information.

01cv0741

(Hart Supp. Decl. ¶ 10.)  These facts fall short of establishing a violation of Petitioner's due process rights.  Most significantly, Petitioner does not claim that he was going to call Joe Moreno as a defense witness.  It is unclear whether Moreno was even apprehended by the time of Petitioner's trial.  Therefore, Petitioner has not shown that the State interfered with his right to call Moreno as a defense witness.

Petitioner has a stronger claim with respect to the alleged intimidation of Rafael Mendoza Lopez.  Petitioner has submitted a report by Paul Pickering of his interview with Jenifer Mendoza, Mendoza Lopez's wife, on November 17, 1988 and November 23, 1988.  (Ex. K to Belter Decl. dated 7/22/05.)  According to the report, Jenifer explained that she had brought drugs to Mendoza Lopez while he was in prison so he could sell the drugs.  Jenifer claimed that Chacon called her when Mendoza Lopez refused to cooperate with him and threatened to bust her for her criminal activity.  Chacon allegedly said that "maybe it was time to take Jenifer off the street."  Jenifer said that Chacon really wanted to keep Petitioner in jail and told Jenifer that if she was taken off the streets, something would have to be done with her kids.  Jenifer also said that she thought Mendoza Lopez was told that he was on a 'hit list' and that Chacon could protect him and his family.

Petitioner has submitted additional evidence regarding the intimidation of Rafael Mendoza Lopez in connection with his instant motion.  Salvador Colabella was interviewed by investigator Newman on June 9, 2008.  (Ex. G to Belter Decl. dated 7/29/08.)  Colabella, who grew up knowing the Ayalas, Chacon, Meza, Mendoza Lopez, and Castillo, claims that on one occasion, he encountered Mendoza Lopez in the old San Diego County Central Jail.  Mendoza Lopez told Colabella that he had cooperated with the authorities regarding the Ayala matter because they had caught his wife smuggling heroin into prison and were going to prosecute her and take away her children.  Luis Garcia, who was also interviewed by Newman, stated that he "he heard that they (police) had told him they'd let her [Jenifer] go.  She'd been busted for dealing (drugs), and they traded her for his testimony."  (Ex. B to Belter Decl. dated 7/29/08.)  This evidence is

20

consistent with Jenifer Mendoza's claims.

In addition, Petitioner has submitted an investigator report summarizing Newman's interview of Mario Marin.  (Ex. A to Belter Decl. dated 7/29/08.)  Marin claimed that he initially was going to provide false testimony for the prosecution in Petitioner's case because the District Attorney was offering a lot of deals for testimony against the Ayalas. However, he decided that he would not lie in court.  Marin also stated that he and Mendoza Lopez were incarcerated together at the Central jail and later at the California Institute for Men.  During one encounter, Mendoza Lopez told Marin that he had lied in his testimony for the prosecution because when the authorities were bringing him to court, they told him that the Ayalas were going to have him killed.  In addition, they were offering him freedom.  According to Marin, Mendoza Lopez also admitted to him that he (Mendoza Lopez) was involved in killing Dominguez and that Mendoza Lopez and others had brought some guys up from Mexico to steal drugs from Dominguez.  Setting aside the issue of whether Mendoza Lopez was involved in the murders, Marin's statements support Petitioner's claim that Mendoza Lopez was intimidated into giving false testimony.  See Earp, 431 F.3d at 1170-71.

Respondent points out that Petitioner did not present the evidence regarding the threats/intimidation of Jenifer Mendoza and Rafael Mendoza Lopez to the state court. Respondent argues that Petitioner failed to develop the factual basis for his claim in state court and that, therefore, AEDPA's evidentiary hearing standard applies.  See 28 U.S.C. § 2254(e)(2).  The Court disagrees.  Although the state petition did not provide the details included in the evidence now before the Court, the state petition specifically asserted that Chacon had threatened and/or intimidated Jenifer Mendoza and Rafael Mendoza Lopez. (First Am. State Pet. ¶ 170.)  The state court had sufficient information before it to determine whether to allow the case to move forward.

The Court also rejects Respondent's argument that Petitioner's claim is unexhausted in light of this new evidence.  A claim remains exhausted provided any newly presented evidence does not "fundamentally alter the legal claim already

1  considered by the state court." <u>Vasquez v. Hillary</u>, 474 U.S. 254, 257 (1986).  This claim

2  is not fundamentally altered by the details Petitioner now provides.

3          Thus, Petitioner is entitled to an evidentiary hearing if he has established a

4  colorable claim for relief.  <u>Earp</u>, 431 F.3d at 1167.  Although Petitioner does not present

5  direct evidence that Rafael Mendoza Lopez changed his testimony as a result of

6  threats/intimidation, Petitioner's evidence tends to support his claim and raises serious

7  questions regarding whether there was substantial governmental interference with

8  Mendoza Lopez's testimony.  Given the importance of Mendoza Lopez's testimony, if his

9  changed testimony was the result of threats and intimidation by Chacon, Chacon's

10  misconduct, when viewed in conjunction with other alleged prosecutorial misconduct

11  identified in this order, arguably substantially affected the jury's verdict.  <u>See</u> <u>Brecht v.</u>

12  <u>Abrahamson</u>, 507 U.S. 619, 637 (1993).  Therefore, Petitioner has made out a colorable

13  claim for relief and is entitled to an evidentiary hearing on this issue.  <u>See</u> <u>Earp</u>, 431 F.3d

14  at 1167.[5]

15

16  **E.     Claim 5- Failure to Disclose Brady Evidence Regarding Detective Chacon**

17          In Claim 5, Petitioner alleges that his Fifth, Sixth, Eighth, and Fourteenth

18  amendment rights were violated by the prosecution's failure to disclose material

19  exculpatory information to Petitioner's trial counsel regarding Detective Chacon.

20          Petitioner claims that the prosecution failed to disclose evidence of Chacon's bias

21  against the Ayalas, and the way Chacon interjected himself into the case and intimidated

22  witnesses.  (Hart Supp. Decl. ¶¶ 3-10.)  The Court analyzed the specific evidence of

23  Chacon's alleged bias and involvement in the case in connection with Claim 24

24  (Ineffective Assistance of Counsel - Impeachment of Chacon).  (<u>See</u> Doc. No. 236 at 58-

25  64.)  The specific evidence of intimidation of witnesses is set forth above in the Court's

26  discussion of Claim 3 (Wrongful Intimidation and Threats of Witnesses).

27  _____

28          [5]  While the evidence of alleged intimidation against Pittman, Ochoa, Hernandez, Buchanan, and Moreno may not make out a claim for relief, the testimony of these witnesses regarding the alleged threats may be admissible at the evidentiary hearing.  <u>See, e.g.</u>, Fed. R. Ev. 404(b).

22

01cv0741

1       Under Brady v. Maryland, 373 U.S. 83, 87-88 (1963), the prosecution has a duty to

2  disclose any evidence that is material and favorable to the accused.  A Brady violation is

3  material when "there is a reasonable probability that, had the evidence been disclosed to

4  the defense, the result of the proceeding would have been different."  United States v.

5  Bagley, 473 U.S. 667, 682 (1985).  A reasonable probability of a different result exists

6  "when the government's evidentiary suppression 'undermines confidence in the outcome

7  of the trial.'"  Kyles v. Whitley, 514 U.S. 419, 434-36 (1995) (quoting Bagley, 473 U.S. at

8  667.)

9       Respondent argues that Petitioner's claim fails because Petitioner does not allege

10  that the defense was unaware of the facts in question.  It is unclear exactly when Hart

11  learned of the various facts set forth in his declarations.  However, certain facts clearly

12  were not known until after trial.  Hart explains that he was retained by Petitioner's counsel

13  from August 1985 until December 1986.  (Hart Decl. ¶ 3.)  After that time, Hart continued

14  to work on Petitioner's case even though he was no longer retained by trial counsel.

15  (Hart Decl. ¶ 5.)  Hart continued to receive information from Petitioner's new investigators

16  and, after the conviction, continued to interview additional witnesses and compile

17  information.  (Id.)

18       Significant information learned by Hart after the trial includes (1) Chacon's

19  statement to Hart in 1990 that if the Ayalas ever got out of jail, Chacon would kill them

20  (Hart Supp. Decl. ¶ 3) and (2) Chacon's alleged threats toward Jenifer Mendoza, Rafael

21  Mendoza Lopez's wife (Hart Supp. Decl. ¶ 10.a).  Additionally, it appears that Hart may

22  not have known the full extent of Chacon's alleged connections with the Sosa family and

23  alleged bias against the Ayalas until after Petitioner was convicted.  It is unclear when

24  Hart learned about the alleged intimidation/threats directed toward Joe Moreno, Tracy

25  Pittman, and Richard Buchanan.

26       The combined evidence of Chacon's bias against the Ayalas, attempts by Chacon

27  and the police to intimidate Rafael Mendoza Lopez, and attempts by Chacon and the

28  police to intimidate other witnesses such as Pittman, Moreno, and Buchanan, could have

been used to shed doubt on the testimony of Rafael Mendoza Lopez as well as the

01cv0741

testimony of Meza, who admitted that he has known Chacon since he was young and
met with Chacon a number of times between the time of the murders and the time he
came forward with his version of events in 1987.  Given the importance of Meza and
Mendoza Lopez's testimony to the prosecution's case, the suppression of the evidence
described above arguably might undermine confidence in the outcome of Petitioner's
trial.  See Kyles, 514 U.S. at 434-36.

Accordingly, Petitioner has established a colorable Brady claim with respect to
evidence of Chacon's bias against the Ayalas, the attempted intimidation of Rafael
Mendoza Lopez, and the attempted intimidation of Moreno, Pittman, and/or Buchanan (to
the extent Hart did not know about this evidence until after trial).  Therefore, the Court
grants in part Petitioner's motion for an evidentiary hearing on this claim.

## F.    Claim 6 - Prosecutorial Misconduct- Brady evidence regarding Jailhouse Informants

In Claim 6, Petitioner claims that his constitutional rights were violated by the
prosecution's failure to disclose material evidence to the defense regarding the
prosecution's use of jailhouse informants – namely, Juan Meza, Rafael Mendoza Lopez,
Glen Albrecht and Walter Lewis – with histories of misrepresentations and known gang
affiliations.

With respect to Meza, Petitioner argues that the prosecution failed to disclose
Meza's long history as a prosecution informant and the fact that Meza previously denied
having any personal knowledge of the 43rd street murders.  As discussed in the Court's
Group Three Order (See Doc. No. 236 at 44), Meza's history as an informant would not
necessarily have helped the defense case because the evidence could be interpreted as
establishing Meza's reliability as an informant.  As for Meza's purported prior denial of
knowledge regarding the 43rd street murders, Petitioner relies on Meza's statements to
Hart in 1986.  (Hart. Supp Decl. ¶ 8.)  However, as already discussed, whether or not
Meza knew that Hart was an investigator for the defense, Meza probably had good
reasons to be cautious about admitting knowledge of the murders and admitting that he

01cv0741

1    was cooperating with the authorities.  (Doc. No. 236 at 61.)  Therefore, Meza's denial of

2    knowledge to Hart is insignificant.  Although Hart states on information and belief that

3    Chacon initially learned from Meza and/or others that Meza did not have personal

4    knowledge regarding the murders (Hart Decl. ¶ 15), Hart does not point to any facts

5    supporting his "information and belief."

6            Petitioner claims that the prosecution represented that Rafael Mendoza Lopez had

7    "no gang affiliation" when, in actuality, he was affiliated with the Mexican Mafia.  It is

8    actually unclear whether Mendoza Lopez was affiliated with the Mexican Mafia.

9    According to his file, he once belonged to the "Logan Heights" street gang and had

10   knowledge regarding activities of the Southern Hispanic (SUR) gang.  (Ex. I to Belter

11   Decl. dated 7/22/05.)  At any rate, even if Mendoza Lopez was somehow affiliated with

12   the Mexican Mafia, Petitioner fails to establish how he was prejudiced by the

13   prosecution's alleged failure to disclose this information.  In his reply brief, Petitioner

14   argues that information regarding Mendoza Lopez's affiliation with the Mexican Mafia

15   could have been used to impeach him and "demonstrate his motive for flipping."  (Petr.'s

16   Reply at 47.)  The Court does not follow the logic of Petitioner's argument.  If anything,

17   Petitioner's alleged affiliation with the Mexican Mafia would *support* his story that he

18   originally testified for the defense because he was afraid of being killed by members of

19   the "Southern group." (RT 16355, 16381-82.)  Petitioner fails to demonstrate that this

20   evidence was material to his case, and the claim fails on the merits.  See Bagley, 473

21   U.S. at 682.

22           It appears that Petitioner has abandoned this claim as it relates to Glen Albrecht

23   and Walter Lewis, as Petitioner's briefs do not address this aspect of the claim.

24   Moreover, defense counsel cross-examined Albrecht about his history as a jailhouse

25   informant.  (RT 17590-95.)  Defense counsel also cross-examined Lewis about his

26   affiliation with the Aryan Brotherhood and the fact that he had begun informing on other

27   inmates in 1986.  (RT 17668, 17686.)

28           The state court's denial of this claim was not contrary to, nor did it involve an

01cv0741

1   unreasonable application of, clearly established federal law.  Therefore, Petitioner is not

2   entitled to habeas relief on this claim.

3

4   **G.     Claim 7- Prosecutorial Misconduct- Injection of Allegations of Gang**

5           **Affiliations at Trial and Vouching**

6           In Claim 7, Petitioner alleges that his constitutional rights were violated because

7   the prosecution improperly attempted to inject gang issues into the trial during both the

8   guilty and penalty phases of the trial.  For the reasons discussed below, Petitioner is not

9   entitled to relief on this claim.

10          **1.     Guilt Phase**

11          Petitioner argues that during closing argument, the prosecutor made numerous

12  references to witnesses' fear of Petitioner and his "group," thereby improperly invoking

13  racial prejudice and anti-gang bias.

14          The California Supreme Court, on direct appeal, rejected Petitioner's contention

15  that the prosecutor engaged in misconduct with respect to the closing argument:

16          Next, defendant contends that counsel were ineffective for failing to ask the
            trial court to assign misconduct to references to his gang membership during
17          the prosecution's closing argument. Again, however, the record belies his
            claim.  The prosecutor, in attempting to bolster or weaken the credibility of
18          Juan Manuel Meza, Pedro Castillo, Eduardo Sanchez Galdan, and Rafael
            Mendoza Lopez, argued that all were afraid of defendant and, to provide a
19          representative example of the prosecutor's wording, "those people who
            associated with the defendant"-a fear that accounted for aspects of their
20          testimony.  He carefully avoided referring to the Mexican Mafia or any other
            gang by name.  The argument was proper, and there was no basis on which
21          counsel should have asked the trial court for a ruling against it.  (Moreover, in
            the case of the prosecutor's reference to Sanchez, counsel did ask the court
22          to cure harm he felt arose from the prosecutor's impugning Sanchez's
            credibility on the basis of his fear. There was no occasion at that point to
23          object to any reference to gangs, however, because there was none.)

24          The prosecutor, referring to certain witnesses, argued that "[t]hose people who
            now are willing to come forward have done so, and they have taken a
25          substantial risk . . ." and acted "at great peril to themselves." Defendant also
            finds fault with this remark and claims ineffective assistance of counsel for
26          failing to request an assignment of misconduct. In our view, however, the
            prosecutor was asking the jurors to take note of others' courage and not shirk
27          their own responsibility - in fact his following remarks so show. We discern no
            deficient performance by counsel in failing to object to these remarks; they
28          were proper argument.

                                            26

*Ayala*, 23 Cal. 4th at 286-87.

In Claim 26 of the Second Amended Petitioner before this Court, Petitioner again asserts that his counsel was ineffective for failing to object to prosecution misconduct during closing argument.  In the Court's Group Three Order, the Court held that Petitioner was not entitled to habeas relief on this claim.  In reaching this conclusion, the Court analyzed the portions of the closing argument to which Petitioner objects and found that there was no prosecutorial misconduct.  (See Doc. No. 236 at 66-70.)  Claim 7 fails for the same reasons as enunciated in connection with Claim 26.

To the extent Petitioner claims that the prosecution engaged in misconduct by eliciting testimony touching upon witnesses' fear of Petitioner and/or his affiliates, the Court addressed this issue in connection with Claim 41 of the Group Four Claims.  (See Doc. No. 247 at 39-43).  As explained by the Court in the Group Four Order, the prosecution properly elicited this testimony to explain, among other things, (1) why Castillo did not identify the Ayalas and Moreno immediately; (2) why Meza did not go along with the Ayalas' proposed plan and was receiving protection from the state; and (3) why Rafael Mendoza Lopez initially lied on the stand.  See also *Ayala*, 23 Cal. 4th at 277 (explaining that "[t]here was no error" in presenting sanitized evidence regarding witnesses' fear of Petitioner and his associates because such evidence  "affected the witnesses' credibility.")

## 2.  Penalty Phase

Petitioner claims that the prosecution made improper attempts to inject gang issues into the trial by instructing Kenneth Blasingame to write the word "EME" to designate where Petitioner went to stand after the assault on Richard Christiansen.  Petitioner also points to the prosecution's questioning of Alex Macugay and Richard Christiansen regarding prison gang activity.

This claim fails because, as discussed in connection with Claim 41 of the Group Four Claims, defense counsel announced the defense's tactical decision to allow references to gangs during the penalty phase of the trial.  Defense counsel reasoned:

01cv0741

1
2
3
4

        I should make it clear, I think, as a matter of record, that as a tactical decision I think the defense has decided to present evidence in this regard because it is our position essentially that the – that the way in which the climate of fear was created by the evidence presented at the guilt phase I think is worse than simply fully presenting this issue to the jury and allowing the jury to decide what it will with a full understanding of the circumstances that existed in prison during the 70's and the early 1980's.

5   (RT 17281.)

6         Given defense counsel's express choice to present evidence regarding gangs in

7   prison, it was not improper for the prosecution itself to bring up the issue of gangs.

8   Because the state court's denial of this claim was neither contrary to, nor an

9   unreasonable application of, clearly established federal law, relief is not warranted on this

10   claim.  See Williams, 529 U.S. at 412-13.

11

12   **H.**    **Claim 8- Prosecutorial Misconduct- Failure to Disclose Consideration Given**

13           **to Witnesses and to Correct False Testimony**

14         In Claim 8, Petitioner alleges that his constitutional rights were violated by (1) the

15   prosecution's failure to disclose material information to Petitioner's trial counsel relating

16   to payments and inducements made to prosecution witnesses who testified against

17   Petitioner at the guilt and penalty phases of his trial, and (2) the prosecution's failure to

18   correct the false testimony by prosecution witnesses Meza, Mendoza Lopez, Castillo,

19   Garcia, Albrecht, and Lewis and/or the false impression created by the testimony of some

20   of these witnesses concerning such payments and consideration.

21

22       **1.  Rafael Mendoza Lopez**

23   With respect to Meza, Petitioner relies on the following evidence:

24   •     CDC documents revealed that Mendoza Lopez was a jailhouse informant

25          who had previously testified against inmates in exchange for favors from

26          the state.  (Hart Decl. ¶ 53.)

27   •     In an effort to convince Mendoza Lopez to testify on behalf of the

28          prosecution, Mendoza Lopez's wife had been threatened by Detective

1          Chacon with imprisonment shortly after Mendoza Lopez testified favorably

2          to Petitioner.  (Pickering Decl. ¶ 9; Belter Decl. dated 7/29/08, Exs A, B, G.)

3      •   According to prison documents, Mendoza Lopez had strong ties to prison

4          gangs.

5        The Court has already determined that Petitioner has failed to establish that the

6 information regarding Mendoza Lopez's informant history and his ties to prison gangs

7 would have helped the defense in any significant way.  (See Doc. No. 236 at 55-56.)  As

8 discussed in the Court's Group Three Order, Petitioner's assertion that Chacon

9 threatened to reveal Mendoza Lopez's informant status if he failed to cooperate is based

10 on pure speculation; Petitioner has not presented any evidence establishing a nexus

11 between Mendoza Lopez's informant history and his recantation.  In the absence of

12 materiality, any failure by the prosecution to reveal information regarding Mendoza

13 Lopez's informant history and/or ties to prison gangs does not constitute a <u>Brady</u>

14 violation.  See <u>Bagley</u>, 473 U.S. at 682.

15        The evidence regarding Chacon's threats toward Jenifer Mendoza is discussed

16 above in connection with Claim 4.  The Court granted an evidentiary hearing on Claim 4

17 as it pertains to Jenifer Mendoza and Rafael Mendoza Lopez.  This claim overlaps with

18 Claim 4 in that the evidentiary hearing may reveal that Rafael Mendoza Lopez gave false

19 testimony for the prosecution as a result of threats and/or intimidation of his wife and/or

20 himself.  Because the alleged threats emanated from a police officer(s), it does not

21 matter that the prosecutors may not actually have known that the testimony was false.

22 See <u>Jackson v. Brown</u>, 513 F.3d 1057, 1074-75 (9th Cir. 2008) (explaining that the

23 constitutional prohibition on the "knowing" use of perjured testimony applies when any of

24 the State's representatives, including police, would know the testimony was false).

25 Accordingly, the Court grants an evidentiary hearing on this claim as it relates to the

26 falsity of Rafael Mendoza Lopez's testimony as a result of threats/intimidation.

27

28

**2. <u>Pedro Castillo</u>**

Petitioner alleges that the prosecution knew of, but did not disclose, inconsistencies between Castillo's pretrial statements and his trial testimony, including his purported fear of the Mexican Mafia.  However, Petitioner does not support this general allegation with specific evidence regarding what statements Castillo made and how they were inconsistent with his trial testimony.  The Court notes that trial counsel impeached Petitioner with various inconsistencies between this trial testimony and prior testimony at preliminary hearings as well as his statements to the police.  Specifically, trial counsel impeached Castillo with the fact that in 1985, Castillo answered "No" to the question, "Any reason why you wouldn't have told the people in the ambulance exactly what happened."  (RT 12429-31.)  Petitioner does not identify any other inconsistencies that were not known to trial counsel, were known to but not disclosed by the prosecution, and were material.

Petitioner also alleges that the prosecution did not reveal that Castillo had complained about not receiving adequate cash payments prior to trial and that, after said complaints, increased and regular monthly payments commenced.  However, Petitioner does not present any evidence in support of this allegation.  Moreover, it does not appear that this information, if true, would have had any bearing on the trial.  As pointed out by Respondent, defense counsel chose not to cross-examine Castillo regarding his payments because they did not want to raise the issue of Castillo's participation in the witness protection program.  Thus, any evidence that Castillo wanted his payments increased would not have made a difference in the defense case.

Petitioner is not entitled to habeas relief on this claim as it relates to Castillo.

**3. <u>Juan Meza</u>**

Petitioner alleges that the prosecution knew and did not disclose additional information that: (a) Juan Meza had a long term friendship with Detective Chacon because the two grew up together; (b) Detective Chacon had met Meza beginning in

01cv0741

1985 regarding the alleged 43rd Street murders; (c) Meza and/or others had told
Detective Chacon at or about that time that Meza did not have any knowledge of the 43rd
Street murders, or of Petitioner's involvement in those murders; (d) that Chacon and
Meza had made up the story about the Ayalas' involvement in the murders; (e) that in the
years preceding the trial Meza had received favors and/or sweetheart deals for a number
of criminal offenses, and (f) that said consideration had been engineered by Detective
Chacon.

As discussed in connection with Claim 19, Meza admitted that he had known
Chacon since he was young and trusted him.  (RT 14538.)  Chacon apparently did talk to
Meza in 1985 about the killings.  However, according to Chacon, Meza told Chacon that
he was aware of the killings and their reason because he had spoken to the Ayalas
before and after the murders and that he was to have provided the guns for the killings.
(Ex. R to Belter Decl. dated 7/22/05.)  Although Petitioner claims that Chacon knew that
Meza did not have knowledge of the 43rd Street murders or Petitioner's involvement in
the murders, Petitioner has not presented any specific evidence supporting this claim.

Furthermore, Petitioner has not presented any evidence of "sweetheart deals" or
favors engineered by Detective Chacon.  Evidence was presented at trial regarding the
fact that Meza would be receiving protection for his family, use immunity, and, potentially,
early release from custody.  (RT 14419-21; 14579-83.)  Trial counsel proffered that in
1986, when Meza was arrested for simple possession, Chacon called the District
Attorney's Office and asked that he be given a concurrent sentence because he had
been providing information.  (RT 14540-61.)  However, trial counsel obviously already
had this information.

As for Petitioner's claim that Chacon and Meza made up the story about the
Ayalas' involvement in the murders, as discussed below in connection with Claim 12,
Petitioner has not alleged facts establishing that Chacon and Meza concocted Meza's
testimony or that the prosecution was otherwise aware that Meza's testimony was false.
Therefore, Petitioner is not entitled to habeas relief on this claim as it relates to Meza.

### 4. Remaining Witnesses

Petitioner has not presented any evidence of suppressed information regarding payments/consideration received by Roberto Garcia, Albrecht, or Lewis. Therefore, Petitioner is not entitled to habeas relief on this claim as it relates to these individuals.

### I.   Claim 9- Prosecutorial Misconduct Regarding Petitioner's Alleged Participation in the Pantry Robbery

In Claim 9, Petitioner alleges that his constitutional rights were violated by the prosecution's misconduct in improperly and untruthfully misleading Petitioner into stipulating to an unadjudicated robbery of a store called the Pantry. Petitioner has declined to pursue this claim. (See Petr.'s MSJ at 85.)

### J.   Claim 12- Introduction of False Evidence

In Claim 12, Petitioner alleges that his constitutional rights were violated because the key testimony introduced against him in the guilt phase – i.e., the testimony of Pedro Castillo, Roberto Garcia, Juan Meza and Rafael Mendoza Lopez – was false. Petitioner also alleges that the testimony of Walter Lewis and Glen Albrecht introduced against him in the penalty phase was false.

As explained by the Supreme Court:

> [I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

Napue v. People of the State of Illinois, 360 U.S. 264, 269 (1959) (internal citations omitted). Napue applies whenever the prosecution "knew or should have known that the testimony was false" - thus, if the police are aware of evidence that a witness's testimony is false, the prosecution is deemed to have knowledge of the falsity of the testimony. Jackson, 514 F.3d at 1075 (quoting Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005)).

01cv0741

1

**1. <u>Pedro Castillo</u>**

2   In support of his claim that Castillo's testimony was false, Petitioner relies on the

3   same evidence presented in support of Claim 20 (Failure to Adequately Investigate and

4   Impeach Pedro Castillo).  In the Court's Group Three Order, the Court analyzed the

5   evidence and found that, for the most part, the evidence was insufficient to establish that

6   Castillo could have been impeached in any significant way.  (<u>See</u> Doc. No. 236 at 46-50.)

7   However, the Court granted an evidentiary hearing on Claim 20 as it relates to evidence

8   that Castillo solicited Johnny Mendez to kill Zamora.

9   Although the Court granted an evidentiary hearing in connection with Claim 20,

10   Petitioner is not entitled to an evidentiary hearing on this claim.  Petitioner presents no

11   facts establishing that the police or the prosecution *knew or should have known* about

12   Castillo's purported attempt to hire Mendez to kill Zamora.  Therefore, Petitioner has not

13   established a <u>Napue</u> violation as to Castillo and is not entitled to an evidentiary hearing or

14   habeas relief. [6]

15

16   **2. <u>Roberto Garcia</u>**

17   In support of his claim that Roberto Garcia's testimony was false, Petitioner relies

18   on the same evidence presented in support of Claim 21 (Failure to Adequately

19   Investigate and to Impeach Robert Garcia).  The Court analyzed the evidence in the

20   Court's Group Three Order (<u>See</u> Doc. No. 236 at 50-52), and found that it did not tend to

21   show that Garcia was lying or involved in the murders.  Therefore, the Court denied

22   habeas relief on Claim 21.  For the same reasons, the Court finds that Petitioner has

23   failed to demonstrate that there was a <u>Napue</u> violation as to Garcia.

24   ///

25   ///

26

27   [6]   Although Claim 12 is pled as a false evidence claim, Petitioner's briefs discuss
28   <u>Brady</u> as well.  Setting aside exhaustion and variance issues, the <u>Brady</u> claims would fail for
the same reasons as the <u>Napue</u> claims – insufficient evidence that the police or prosecution
knew of evidence indicating that the testimony at issue was false.

01cv0741

### 3. <u>Juan Meza</u>

With respect to Juan Meza, Petitioner relies on the same evidence submitted in support of Claim 19 (Failure to Adequately Investigate and to Impeach Juan Meza). The Court analyzed the evidence in the Court's Group Three Order. (<u>See</u> Doc. No. 236 at 43-46.) For the reasons discussed in the Group Three Order, the evidence regarding Meza's history as a prosecution informant, his relationship with Detective Chacon, and his encounters with Detective Chacon beginning in mid-1985, do not establish that Meza's testimony was concocted. Similarly, whether Meza was ever actually a member of the Mexican Mafia does not have any bearing on the truthfulness of Meza's testimony.

The Court granted an evidentiary hearing on Claim 19 as to (1) evidence that Meza admitted to Richard Savocchio that he was lying about the Ayalas' involvement in the murders, and (2) evidence that Petitioner approached Raul Garcia about fabricating a story implicating Petitioner in the murders. However, Petitioner has not presented any facts establishing that the police or prosecution knew or should have known about Savocchio or Garcia.

In his original declaration, Hart stated:

> Meza had confessed to numerous witnesses, including Richard Sovacchio among many others – known to Petitioner's counsel – that he had no idea whether Petitioner had actually participated in the 43rd street murders and that he had put together his story with Detective Chacon in order to arrange for an early release from prison.

(Hart Decl. ¶ 37.) However, the investigator's report of the interview with Savocchio does not make any mention of Chacon or police involvement with Meza's alleged fabrication of stories implicating the Ayalas. (Ex. O to Belter Decl. dated 7/22/05.)

Due to the lack of evidence establishing that Chacon and Meza worked together to concoct a false story, Petitioner has not established that the prosecution knew or should have known about Meza's alleged false testimony. Therefore, Petitioner is not entitled to an evidentiary hearing or habeas relief on this claim.

///

///

34

01cv0741

### 4. <u>Rafael Mendoza Lopez</u>

The Court has granted an evidentiary hearing on Claims 4 and 8 with respect to Chacon's alleged threats toward Jenifer Mendoza.  As discussed above, Petitioner's claim that Mendoza Lopez's testimony was false overlaps with Claim 4 in that the evidentiary hearing may reveal evidence that Mendoza Lopez gave false testimony for the prosecution as a result of threats and/or intimidation of his wife and/or himself. Because the purported threats came from a member(s) of the police department, the prosecution would be deemed to have had knowledge that the testimony was false.  <u>See</u> <u>Jackson</u>, 513 F.3d at 1074-75.  Accordingly, the Court grants an evidentiary hearing on this claim as it relates to the falsity of Rafael Mendoza Lopez's testimony as a result of threats/intimidation.  The other evidence upon which Petitioner relies to establish the falsity of Mendoza Lopez's testimony does not support Petitioner's claim for the reasons set forth in the Court's discussion of Claim 22 (Impeachment of Rafael Mendoza Lopez). (<u>See</u> Doc. No. 236 at 53-57.)

### 5. <u>Walter Lewis & Glen Albrecht</u>

It appears that Petitioner has abandoned the claim as it pertains to Lewis and Albrecht.  (Petitioner previously withdrew Claim 28 regarding trial counsel's alleged failure to investigate and present defenses to and/or evidence in mitigation of the unadjudicated Casas murder charge).  No facts have been presented establishing that their testimony was false.  Therefore, Petitioner is not entitled to relief on this claim as it relates to Lewis and Albrecht.

### K.    <u>Claim 13- Destruction of Evidence</u>

Petitioner alleges that the prosecution assisted in the destruction of a pair of pants worn by Pedro Castillo on the night of the homicides, which could have been used in his defense at trial.  Petitioner asserts that the prosecution's actions resulted in a violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

01cv0741

1    Pedro Castillo was shot and stabbed on the night of the murders but survived, and

2 was a key prosecution witness.  At trial, Pedro Castillo testified that he was shot when

3 attempting to escape, and that when running from the body shop he felt a sting on his

4 back about waist-level.  (RT 12077).  Petitioner alleges that Castillo was shot at close

5 range, not in an escape attempt, and asserts that an examination of Castillo's pants by

6 ballistics and forensic experts could have demonstrated how far Castillo was from the

7 shooter, which may have supported a finding that Castillo's testimony was false.  (Petr.'s

8 Reply at 56.)

9    The Supreme Court has clearly stated that "unless a criminal defendant can show

10 bad faith on the part of the police, failure to preserve potentially useful evidence does not

11 constitute a denial of due process of law."  Arizona v. Youngblood, 488 U.S. 51, 58

12 (1988).  Clearly established law dictates that the duty to preserve evidence pertains only

13 to material evidence, which "must both possess an exculpatory value that was apparent

14 before the evidence was destroyed, and be of such a nature that the defendant would be

15 unable to obtain comparable evidence by other reasonably available means."  California

16 v. Trombetta, 467 U.S. 479, 489 (1984).

17    At the hospital, Castillo's belongings were gathered and given to Detective Padillo,

18 who turned several items over to Detectives Carey and Avery, the evidence technicians.

19 (RT 13154-55; 13176-77.)  Padillo did not examine the contents of the bag prior to

20 turning it over to the evidence techs.  (Id.)  However, Castillo's pants were not among the

21 inventory items, and Petitioner asserts that the pants were turned over to Castillo's wife

22 Maria at the hospital.  Maria Castillo first stated that Detective Padillo gave her the

23 clothing, but later stated that a hospital nurse gave her the clothes, and Detective Padillo

24 turned over her husband's wallet.

25    Investigator Hart declares on information and belief that Detective Padillo gave the

26 pants to Maria Castillo, who he expected to destroy or "lose" the pants. (Supp. Hart Decl.

27 ¶ 11.)  Hart states that he interviewed Castillo's wife around the time of the trial, who said

28 that Detective Padillo gave her the pants, and they were gone.  (Id.)  Hart claims that the

1   evidence shows that Castillo could not have been shot in the way he claimed, stating:

2       "I took some reports of the physical evidence- including Castillo's medical
        records- to a doctor- Dr. Mark Schechter- not a ballistics expert, but someone
3       whom I trusted with medical experience.  I met with him in Del Mar to discuss
        Pete Castillo's contention about how he claimed to have been shot.  After
4       reviewing the records, Dr. Schechter told me that, based on his review of the
        records, Castillo couldn't have been shot the way he said.  He was shot in the
5       side and the bullet traveled diagonally and downward through his body."

6   (Id.)

7       The declaration is based on speculation and hearsay.  The Court previously held

8   that "[t]he declaration does not reveal what information Dr. Schechter was given, what Dr.

9   Schechter's qualifications were, or what Dr. Schechter's exact findings were."  (Doc. No.

10  236 at 49.)  Hart concedes that Dr. Schechter was not a ballistics expert.  Petitioner

11  asserts that the pants were destroyed before they could have been tested to determine if

12  there was stippling or gunpowder, which would have gone against Castillo's testimony

13  about how far away he was when shot.  However, there is no reason to believe that the

14  pants were of any material evidentiary value to the defense.  See Trombetta, 467 U.S. at

15  489.  Petitioner also fails to demonstrate that the police acted in bad faith by failing to

16  preserve the pants.  Moreover, "[t]he mere failure to preserve evidence which *could* have

17  been subjected to tests which *might* have exonerated the defendant does not constitute a

18  due process violation."  United States v. Hernandez, 109 F.3d 1450, 1455 (9th Cir. 1997)

19  (emphasis added).

20      Petitioner also requests an evidentiary hearing on this claim, stating that a hearing

21  "would reveal whether the officers who gathered the disputed evidence and chose to

22  release it to Castillo's wife considered the evidence relevant to the investigation, and

23  whether they even inquired of the police investigators and prosecutors whether they

24  should preserve the evidence."  (Petr.'s Reply at 56.)  Petitioner fails to demonstrate a

25  colorable basis for his allegations of constitutional error, and Petitioner's speculation on

26  potential results of testing on Castillo's pants are not a sufficient basis for an evidentiary

27  hearing.  Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995); see also Baja v.

28  Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999).

01cv0741

1   Additionally, Petitioner fails to establish the evidence was material to his case, or

2   that the police acted in bad faith in turning the pants over to Castillo's wife, and therefore

3   cannot prevail on the merits.  See Trombetta,  467 U.S. at 489; see also Youngblood,

4   488 U.S. at 58.  The state court's denial of this claim was neither contrary to nor an

5   unreasonable application of clearly established federal law.  See Williams, 529 U.S. at

6   412-13.  Petitioner is not entitled to relief on Claim 13.

7

8   **L.      Claim 14- Threats and Intimidation of Petitioner**

9   Petitioner alleges that the prosecution, primarily Detective Carlos Chacon,

10  engaged in threats and intimidation of Petitioner and other witnesses, violating his rights

11  under the Fifth, Sixth, Eighth and Fourteenth Amendments.  The allegations of threats

12  against other prospective or testifying defense witnesses (such as Richard Buchanan)

13  are addressed in Claim 4 of this Order.  The merits discussion of this claim will address

14  allegations of threats against and the attempted intimidation of Petitioner.

15  Petitioner alleges that Detective Chacon and the prosecution engaged in a

16  campaign of intimidation and threats against him.  In his declaration, Hart states that

17  Detective Chacon escorted Petitioner from Los Angeles, where he had been arrested, to

18  San Diego.  (Supp. Hart Decl. ¶ 18.)  Petitioner was handcuffed and placed in Detective

19  Chacon's car, and during the trip Chacon placed his gun against Petitioner's head and

20  threatened to kill him.  (Id.)

21  Hart also states that Petitioner was at one time placed, shackled and chained, with

22  Manuel Rebeles, who was not restrained.   Hart states that Rebeles was an alleged

23  member of Nuestra Familia, an informant, and an associate of Chacon.  Rebeles

24  attacked Petitioner, who defended himself.  Petitioner appeared before the jury shortly

25  after this incident with scratches and bruises.  While an incident between Richard

26  Buchanan and Rebeles is mentioned in the Hart declaration, there is no mention of any

27  altercation between Rebeles and Petitioner.  The Court finds no reference to this incident

28  in any supporting exhibits or declarations.

1    Petitioner also alleges that the prosecution tried to get him to be an informant in

2  exchange for a reduced sentence.  Petitioner refused, and the state attempted to

3  intimidate him by informing his defense counsel that he was the target of a hit by the

4  Mexican Mafia.  Petitioner also alleges that while he was in the San Diego jail, he was

5  placed in a cell alone with Julio Sosa, a member of the Nuestra Familia, a rival gang to

6  the Mexican Mafia, on two separate occasions.  Petitioner was restrained with handcuffs

7  and shackles and Sosa was left unchained.  The Hart declaration does mention that

8  Chacon had a close relationship with the Sosa family, and that Julio Sosa allegedly

9  became a police informant.  (Supp. Hart Decl. ¶ 11.)  However, Petitioner does not offer

10  any documentary support for these alleged incidents, the incidents are not mentioned in

11  the Hart declaration, and the Court finds no reference to them in any supporting exhibits

12  or witness declarations.

13    Petitioner "concedes that support for this claim is currently thin insamuch as

14  Petitioner does not assert that the intimidation tactics of the prosecution is the sole

15  reason he did not testify in his own defense."  (Petr.'s Reply at 57.)  Petitioner does not

16  allege that any of the incidents actually intimidated him.  Petitioner does assert prejudice

17  from the altercation with Rebeles, as Petitioner appeared before the jury with scratches

18  and bruises, possibly "implying a predisposition for violence."  However, Petitioner does

19  not even offer his own declaration in support of any of these allegations, and there is no

20  documentary support for the Rebeles incident.  The Hart declaration states that one

21  incident, Chacon's threat of Petitioner, occurred "on information and belief," but again

22  fails to allege any resulting prejudice.  These largely unsupported and conclusory

23  allegations, and the thin assertion of potential prejudice, do not assert a colorable claim

24  for relief and are insufficient to warrant an evidentiary hearing.  See Earp, 431 F.3d at

25  1167.

26    Ultimately, Petitioner fails to demonstrate that the alleged constitutional violations

27  arising from the threats and intimidation of Petitioner had a "substantial or injurious effect

28  or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 631

01cv0741

n.7 (1993).  Therefore, Petitioner's claim fails on the merits.  The state court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  See Williams, 529 U.S. at 412-13.

## M.    Claim 15- Concocting Testimony of Meza and Mendoza Lopez

In Claim 15, Petitioner alleges that his constitutional rights were violated in that the prosecution intentionally placed critical witnesses Mendoza Lopez and Meza together in order to ensure that their stories were consistent, and misrepresented to the Court the reasons for placing the men together.

The evidence in support of this claim was analyzed in connection with Claim 42. (See Doc. No. 247 at 51-53.)  In Claim 42, Petitioner alleged that the trial court erred in denying Petitioner's motions to reopen and for mistrial, which were based on the defense's discovery that prior to Mendoza Lopez's rebuttal testimony, Mendoza Lopez and Meza were both housed in the protective custody module of the South Bay facility of the San Diego County Jail.  The Court denied the claim and held that the California Supreme Court was reasonable in concluding:

> Defendant could produce no evidence that the prosecution enabled Mendoza and Meza to confer and tailor their testimony, or that of Mendoza, or that Mendoza's testimony was altered as a result of his lodging in the South Bay jail.  Nor was defendant denied any right to present a defense, or more precisely, evidence relevant to the theory of his defense. Such a right does not require "the court [to] allow an unlimited inquiry into collateral matters," which this surely was; rather, "the proffered evidence must have more than slight relevanc[e]." (Ibid.) Finally, because informing defendant of the two men's confinement arrangement would not have created a reasonable probability of a different outcome, we discern no violation of the due process right to be provided with favorable material evidence. Nor do we discern the denial of any right to a reliable guilt and penalty determination.

Ayala, 23 Cal. 4th at 282.

As discussed in the Group Four Order, the prosecution had a valid explanation for why Mendoza and Meza were housed together (because the downtown San Diego's protective custody facility was not secure enough and the El Cajon jail lacked protective custody housing) and why permission was given for the men to interact (to apprise the

01cv0741

1   deputies that the men did not pose a danger to each other).  Most importantly, Mendoza

2   Lopez's taped recantation took place *before* he was placed in protective custody.

3          The facts alleged by Petitioner do not establish that there was prosecutorial

4   misconduct or collusion between Mendoza Lopez and Meza.  Therefore, Petitioner is not

5   entitled to an evidentiary hearing or habeas relief on this claim.

6

7   **N.    Claim 16- Improper Surveillance of Defense Team and Violation of the**

8          **Attorney-Client Privilege**

9          Petitioner alleges that Detective Chacon improperly surveilled and obtained

10  information about his defense team and witnesses before and during the trial.

11         This claim is based largely on the statement of Investigator Eric Hart that he

12  believes Chacon improperly obtained information about the defense during the trial

13  proceedings.  Petitioner also offers the report of an interview with Mario Marin, conducted

14  in June 2008 by Investigator George Newman at the Vista Jail.  In the interview, Marin

15  stated that when members of the Ayala defense team came to the jail to talk to

16  witnesses, the prosecution would know it, and stated that he "and other cooperating

17  witnesses were heavily monitored and whenever anyone presumed to be associated with

18  the defense had contact with them, they were subsequently approached by prosecution

19  agents, who demanded to know what had been discussed, what the witnesses had told

20  them, etc."  (Ex. A to Belter Decl. dated 6/3/08.)

21         Petitioner concedes the evidence in support of this claim is thin, but maintains

22  that, "in light of Detective Chacon's comments to Eric Hart, Mr. Hart believes that the

23  defense team may have been surveilled," and Petitioner requests discovery on the claim.

24  (Petr.'s Reply at 62.)  The Court finds no reference to any comments by Carlos Chacon

25  on this subject in any of the supporting declarations or exhibits attached to the instant

26  petition or merits briefing.  Hart's allegations that the defense team or witnesses may

27  have been surveilled is made without any detailed allegations or supporting facts, only on

28  "information and belief."  (Hart Decl. ¶ 21.)  Marin admits that he gave evidence on the

1   Ayalas to the prosecution, and his statements demonstrate only that the prosecution may

2   have been monitoring the jail visitation logs of their cooperating witnesses.  Marin's

3   statements do nothing to substantiate Petitioner's claims that the defense team or

4   defense witnesses were being monitored by Chacon or the prosecution.

5        This claim lacks factual support, and Petitioner fails to assert that the alleged

6   surveillance was prejudicial to his case.  The unsupported and conclusory allegations,

7   and the lack of any demonstration of prejudice, are insufficient to warrant an evidentiary

8   hearing or discovery on this claim.  See Earp, 431 F.3d at 1167.

9        Petitioner also fails to demonstrate that the alleged constitutional violations arising

10  from the threats and intimidation of Petitioner had a "substantial or injurious effect or

11  influence in determining the jury's verdict."  Brecht, 507 U.S. at 631 n.7.  Therefore, this

12  claim also fails on the merits.  The state court's denial of this claim was neither contrary

13  to nor an unreasonable application of clearly established federal law.  See Williams, 529

14  U.S. at 412-13.

15

16  **O.    Claim 69- Petitioner's Purported Waiver of his Rights Regarding the Pantry**

17  **Robbery was Obtained Unconstitutionally**

18       In Claim 69, Petitioner alleges that his constitutional right to confront witnesses

19  against him was violated when he stipulated to participating in an unadjudicated robbery

20  based on false representations by the prosecution, and the wavier of his right to cross-

21  examine witnesses was not knowing, intelligent, and voluntary.  Petitioner has declined to

22  pursue this claim.

23

24                      **VI.  CONCLUSION**

25       For the reasons discussed above, Respondent's motion to dismiss the Group Five

26  Claims on procedural bar grounds (In re Clark, In re Robbins, In re Waltreus, In re Dixon)

27  is **DENIED**.  Respondent's motion for summary judgment [281] is **GRANTED IN PART**

28  and **DENIED IN PART**.  The motion is **GRANTED** as to Claims 1, 3, 6, 7, 9, 13, 14, 15,

01cv0741

16 and 69.  Respondent's motion for summary judgment is **DENIED** as to Claims 2 and 5 and **GRANTED IN PART** and **DENIED IN PART** as to Claims 4, 8, and 12.  Petitioner's motion for summary judgment [263] is **DENIED**.  Petitioner's motion for evidentiary hearing is **GRANTED IN PART** and **DENIED IN PART**.  The Court will hold an evidentiary hearing in connection with Claims 4, 5, 8, and 12 on the issues identified in this Order.

The Court will, in the final judgment, **GRANT** a Certificate of Appealability ("COA") on Claims 1, 4, 6, 7 (as to guilt phase only), and 8, and **DENY** a Certificate of Appealability on Claims 3, 7 (as to the penalty phase only), 9, 12 (as to the parts of the Claim for which summary judgment was granted herein), 13, 14, 15, 16 and 69.

**IT IS SO ORDERED.**

DATED:  June 9, 2009

Honorable Barry Ted Moskowitz
United States District Judge

01cv0741