# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALDO MEDRANO AYALA,<br><br>　　　　　　　　　Plaintiff,<br>　v.<br><br>MICHAEL MARTEL, Warden of the<br>California State Prison at San Quentin,,<br><br>　　　　　　　　　Defendant. | Case No. 01cv741 BTM(MDD)<br><br>**ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIM 76 AND DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT** |

Petitioner and Respondent have filed cross-motions for summary judgment as to Claim 76 of the Third Amended Petition for Writ of Habeas Corpus (the "Third Amended Petition"). For the reasons discussed below, Petitioner's motion is **DENIED** and Respondent's motion is **GRANTED**.

## I. BACKGROUND

On April 29, 2011, Petitioner filed his Third Amended Petition, which added Claim 76. In Claim 76, which is based on testimony and other evidence from the evidentiary hearing, Petitioner alleges that the prosecution violated his constitutional rights by failing to disclose consideration given to prosecution witness Juan Meza and by failing to correct Meza's false trial testimony on this topic.

At the trial in 1988, Meza explained that in 1987, he was arrested for possession for

sale of cocaine and other criminal violations. (RT 14623-31.) On March 24, 1987, Meza entered a plea of guilty to possession of cocaine for sale. (RT 14631.) In exchange for the guilty plea, the District Attorney's office dismissed the remaining charges and another pending case and agreed that the sentence in that case would run concurrently with the sentences in two probation violation cases. (RT 14623-28.) Under the plea agreement, Meza's maximum exposure was four years in state prison. (RT 14582.)

Prior to sentencing on the possession for sale conviction but after entering into the plea agreement, Meza spoke with the District Attorney's Office regarding his knowledge of Petitioner's involvement in the murders. (RT 1463.) Meza and the District Attorney's Office entered into an agreement regarding Meza's cooperation in connection with the investigation and prosecution of Petitioner. (RT 14637-40.)

At trial, Meza explained that in exchange for his cooperation, the District Attorney's Office agreed that after Meza testified at trial, they would seek his release under Cal. Penal Code § 1170(d). (RT 14638-39.) Meza testified that there was no promise that he would absolutely be released. (RT 14420). Meza recalled that Gloria Michaels from the District Attorney's Office attended the sentencing hearing in July 1987, and that he was sentenced under § 1170(d). (RT 14633.)

Meza testified that he understood that he was also going to get "witness protection benefits" for himself and his family in exchange for his cooperation. (RT 14639, 14419.) He also confirmed that his agreement with the District Attorney's Office provided that Meza's testimony would not be used against him in the course of any criminal action. (RT 14421.)

The written agreement between Meza and the District Attorney's Office was entered into evidence at trial. (RT 14420.) The written agreement with the District Attorney's Office is dated August 1, 1988, and provides that Meza is obligated to provide true information to law enforcement officers and testify fully and truthfully during court proceedings. (Pet. EH Ex. 327.) The agreement explains that Meza has "use and derivative use immunity," meaning that "nothing which Juan Manuel Meza says pursuant to this agreement can be used against him and nothing which is derived from information and testimony which he has

provided can be used against him." The agreement also provides that Meza and his wife will receive witness protection benefits. With respect to Meza's prison sentence, the agreement provides that the District Attorney's Office will ensure that Meza serves his prison sentence in a specified institution where reasonable measures can be taken to provide for his safety and that the District Attorney's Office will seek application to modify Meza's sentence for early release on parole immediately following his testimony.

At the evidentiary hearing in June, 2010, Meza testified that he had been given assurances from an unidentified person(s) that he would be released right after his testimony. (EHT 1971). He understood that after he testified, the District Attorney's Office would file a petition under Cal. Penal Code § 1170(d), the judge would recall his sentence, and he would be released. (EHT 1900, 1916).

At the evidentiary hearing, Meza also testified that he believed his immunity extended to any offenses he had committed while incarcerated at the CDC: "That's why I asked for the immunity, you know, just in case an old case or an old assault or a stabbing, whatever I did in the past, they wouldn't come back and recharge me for it." (EHT 1965.) Meza testified that Agent DeLaTorre with the SSU, along with Gloria Michaels and investigator Michael Rolan, came to talk to him in July of 1987. (EHT 1895-99.) Meza confirmed that DeLaTorre wanted to talk to him about CDC activities and testified that he believed that if anything "came up" while he was talking to DeLaTorre, he wouldn't be charged with those crimes. (EHT 1901.)

## II. DISCUSSION

In Claim 76, which is based on Meza's testimony and other evidence presented at the evidentiary hearing, Petitioner claims that the prosecution violated his constitutional rights, including his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, by failing to disclose that (1) Meza was an opportunistic killer who likely killed in prison but nonetheless received a "free pass" for any and all criminal offenses committed while in the custody of the CDC; (2) Meza was essentially guaranteed an immediate release after he testified against

Petitioner, and the process to release him was set in motion a year prior to his testimony; (3) the prosecution had files, redacted immunity agreements, debriefing files and memoranda of the efforts taken to effectuate Meza's near immediate release; and (4) Meza had meetings with California Department of Corrections' SSU agent DeLaTorre regarding the scope of his immunity.  For the reasons discussed below, the Court finds that Claim 76 is unexhausted.  The Court also finds that no colorable claim has been stated and that the claim fails on the merits.

## A. Exhaustion

A petition for a writ of habeas corpus under 28 U.S.C. § 2254 shall not be granted unless it appears that (1) the petitioner has exhausted the remedies available in the state courts, or (2) there is an absence of available state corrective process; or (3) circumstances exist that render such process ineffective to protect the rights of the petitioner.  28 U.S.C. § 2254(b)(1).  To exhaust state judicial remedies, a petitioner must present the California Supreme Court (or the highest state court with jurisdiction over the claims) with a fair opportunity to rule on the merits of every issue raised in his or her federal habeas petition.  Granberry v. Greer, 481 U.S. 129, 133-34 (1987).

Petitioner and Respondent agree that Petitioner has not exhausted Claim 76.  Claim 76 was never presented to the California Supreme Court.

However, under 28 U.S.C. § 2554(b)(2), "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  A federal court may deny an unexhausted claim on the merits "only when it is perfectly clear that the applicant does not raise even a colorable federal claim."  Cassett v.Stewart, 406 F.3d 614, 624 (9th Cir. 2005).

As discussed below, the Court finds that Petitioner has not raised a colorable federal claim with respect to Claim 76 and therefore denies the claim on the merits.

///

///

**B. The Terms of the Immunity Agreement**

Petitioner claims that the prosecution failed to disclose the true scope of the immunity agreement and failed to correct Meza's trial testimony on the matter. According to Petitioner, the evidence adduced at the evidentiary hearing establishes that (1) the immunity agreement actually extended to any offenses Meza may have committed while in the custody of the CDC; and (2) Agent DeLaTorre "debriefed" Meza regarding events that occurred while Meza was incarcerated at the CDC in connection with the immunity agreement. (Third Amended Petition ¶ 728.)

However, it appears that Meza's belief that the immunity agreement extended to any acts he may have committed while in the custody of the CDC is based on his own confusion regarding the meaning of use and derivative immunity. Meza did not testify that anyone with the District Attorney's Office told him that the immunity agreement extended to any and all offenses committed by Meza while in the CDC. The written agreement provides for use and derivative use immunity with respect to information provided by Meza regarding the murder case and his trial testimony. There is no evidence of any other written agreement providing for broader immunity.

Furthermore, there is no evidence that Agent DeLaTorre "debriefed" Meza for purposes of the immunity agreement. During the evidentiary hearing, the following exchange occurred:

> **Mr. Belter:** And while you were talking with DeLaTorre, if anything else came up from the past – because he wanted to talk to you about CDC activities; right?
>
> **Meza:** Mm-hmm. Yes, sir.
>
> **Mr. Bellter:** So if anything else came up while you were talking to Delatorre, you wouldn't be charged with any of those things either.
>
> **Meza:** Yes.

(EHT 1901.) Meza does not say that DeLaTorre ever brought up the subject of immunity or indicated that anything Meza said about CDC activities would be covered by the immunity

agreement. In a declaration submitted by Respondent, DeLaTorre states that he was present at two interviews of Meza and arranged for Meza's transportation on one occasion, but never "debriefed" Meza, never discussed immunity with Meza, and was never present if or when anyone else discussed immunity with him. (DeLaTorre Decl. ¶¶ 2-6.)

Based on the facts presented to the Court, Meza may have mistakenly believed that his immunity extended to all of his CDC activities. However, there is no evidence that the prosecution gave Meza cause to believe that his immunity was that broad. There is also no evidence that the prosecution had any knowledge regarding Meza's belief. In fact, it is unclear whether Meza's belief dates back to the time of trial or whether his belief emerged more recently.

Under Brady v. Maryland, 373 U.S. 83, 87-88 (1983), the prosecution has a duty to disclose any evidence that is material and favorable to the accused. However, the government "has no obligation to produce information which it does not possess or of which it is unaware." Sanchez v. United States, 50 F.3d 1448, 1453 (9th Cir. 1995). Similarly, under Napue v. People of the State of Illinois, 360 U.S. 264, 269 (1959), the prosecution has a constitutional obligation to correct testimony whenever the prosecution *knows or should know* that testimony is false. Jackson v. Brown, 513 F.3d 1057, 1075 (9th Cir. 2008).

Because the facts do not establish that the prosecution knew or should have known that Meza believed that his immunity covered all of his CDC activities, the prosecution was under no obligation to produce evidence regarding Meza's belief or to correct Meza's trial testimony. Therefore, Petitioner is not entitled to habeas relief on this claim, and Respondent's motion for summary judgment on the claim is **GRANTED**. Petitioner's request for an evidentiary hearing on the claim is **DENIED**.

**C. Terms of Release**

Petitioner claims that the prosecution failed to disclose that Meza was "essentially guaranteed" an immediate release after he testified against Petitioner, and failed to disclose the facts and documents regarding efforts that had been undertaken to effectuate Meza's

near immediate release. As discussed below, the facts do not establish that Meza was actually promised an unconditional immediate release, nor does the evidence show that the prosecution knew that Meza believed his release after testifying was essentially guaranteed.

The written agreement between Meza and the District Attorney's Office provided that the District Attorney's Office would seek application to modify Meza's sentence for early release on parole immediately following his testimony. At the evidentiary hearing, Meza confirmed his understanding that following his testimony, the District Attorney's Office would file a petition under Cal. Penal Code § 1170(d) to have his sentence recalled by a judge. Meza did not testify that the prosecution promised him that the judge would definitely grant the petition. When asked the question, "You had been given assurances that you would be released right after your testimony; is that correct?," Meza answered, "Yes." (EHT 1971.) However, Meza could not recall who gave those assurances and did not specify what had been said. It is unclear whether Meza thought that his release was guaranteed or whether he just thought it was more than likely that the judge would grant the application.

Even assuming Meza believed that it was a certainty that he would be released immediately after testifying, there is no evidence that Meza conveyed his belief to the prosecution. There are no facts showing that the prosecution knew or should have known that Meza thought his release after testifying was guaranteed.

The fact that the process under § 1170(d) was initiated well before Meza testifed, as shown by the "Diagnostic Study and Recommendation by the California Department of Corrections under Provisions of Penal Code section 1170(d)," dated October 8, 1987, does not establish that any promises of unconditional and immediate release were made. Any efforts undertaken to prepare for Meza's release under § 1170(d) *in the event that the judge granted the application* are not inconsistent with the written agreement between Meza and the District Attorney's Office and Meza's trial testimony.

In sum, the facts do not establish that the prosecution guaranteed Meza's immediate release or knew that Meza believed that there was such a guarantee. Any documents regarding efforts undertaken prior to Meza's trial testimony to effectuate Meza's release

under § 1170(d) upon approval by the judge do not support Petitioner's claim.  Petitioner has not presented a colorable claim of a <u>Brady</u> or <u>Napue</u> violation.  Therefore, the Court **GRANTS** Respondent's motion for summary judgment on this claim, and **DENIES** Petitioner's request for an evidentiary hearing.[1]

### III. CONCLUSION

For the reasons discussed above, Respondent's motion for summary judgment as to Claim 76 is **GRANTED** and Petitioner's cross-motion is **DENIED**.  The Court will, in the final judgment, **DENY** a Certificate of Appealability on Claim 76.

**IT IS SO ORDERED.**

DATED:  March 12, 2012

BARRY TED MOSKOWITZ, Chief Judge
United States District Court

---

[1] After the instant cross-motions for summary judgment were submitted, Petitioner filed a Declaration of Elisabeth Semel, Esq., dated December 13, 2011, in which Ms. Semel states that the information regarding Meza's expectations regarding immediate release and the scope of his immunity was essential to the defense to impeach Meza.  Respondent filed a motion to strike the declaration because it was belatedly filed without leave of Court.  Although the Court **DENIES** Respondent's motion to strike, Ms. Semel's declaration does not have any effect on the Court's decision.  As discussed above, the facts do not support Petitioner's claim regarding broad immunity extending to all of Meza's CDC activities or a guarantee of immediate release.