# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALDO MEDRANO AYALA, | CASE NO. 01cv0741-BTM (MDD) |
| Petitioner, | DEATH PENALTY CASE |
| vs. | |
| | **ORDER DENYING HABEAS RELIEF ON CLAIMS 2, 4, 5, 8, 12, 18-20, 24, 35 AND 75** |
| KEVIN CHAPPELL, Warden of California State Prison at San Quentin, | |
| Respondent.[1] | |

Between March and November 2010, the Court held an evidentiary hearing on Claims 4, 5, 8, 12, 18-20, and 24 in the instant case based on findings the Court made under 28 U.S.C. § 2254(d) and (e)(2).  Closing arguments took place on January 18, 2011 and March 8, 2011.  On April 4, 2011, the Supreme Court issued a decision in Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388 (2011), which impacts the Court's prior findings and its consideration of those claims.  For the reasons discussed below, under either a 28 U.S.C. § 2254(d) review or a de novo review of Petitioner's claims,

---

[1] The Court notes that Kevin Chappell currently serves as the Warden of the California State Prison at San Quentin, and is thus Respondent to this federal habeas action. Accordingly, the Court **ORDERS** the Clerk to reflect this substitution in the case caption.

the Court **DENIES** habeas relief on Claims 4, 5, 8, 12, 18-20, 24.  Additionally, the Court **DENIES** relief on the previously deferred Claims 2 and 35 and **DENIES** Claim 75 without prejudice as premature.

## I. BACKGROUND

On October 12, 1988, Petitioner was convicted of three counts of first-degree murder in violation of California Penal Code ("CPC") § 187, one count of attempted murder in violation of CPC §§ 664 and 187, and one count of robbery and three counts of attempted robbery in violation of CPC §§ 664 and 211--each count accompanied by findings that he used a firearm in the commission of the crimes in violation of CPC § 12022.5.  The jury also found true both special circumstance allegations, multiple murder under CPC § 190.2(a)(3) and murder in the commission of a robbery under CPC § 190.2(a)(17)(1). Petitioner was sentenced to death for each of the three murders on December 12, 1988.

On April 17, 1997, Petitioner filed his automatic appeal with the California Supreme Court. On July 23, 1998, Petitioner filed a habeas petition with the California Supreme Court. On June 8, 2000, the California Supreme Court affirmed Petitioner's conviction and sentence. See People v. Ayala, 23 Cal. 4th 225 (2000).  On June 8, 2000, the California Supreme Court also summarily denied the habeas petition without comment. Subsequently, Petitioner filed a Petition for a Writ of Certiorari in the United States Supreme Court, which was denied on March 5, 2001.

On May 3, 2002, Petitioner filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court.  Shortly thereafter, the Court dismissed without prejudice certain claims presented in the Petition in order to permit Petitioner to exhaust those claims in state court.  The Court stayed the federal proceedings pending the exhaustion of state court remedies.

On September 23, 2002, Petitioner filed a First Amended Petition for a Writ of Habeas Corpus in the California Supreme Court.  On September 10, 2003, the California Supreme Court denied the petition.

01cv0741

1    On November 14, 2003, Petitioner filed his First Amended Petition for a Writ of
2    Habeas Corpus in this case.  He subsequently filed a Second Amended Petition for
3    a Writ of Habeas Corpus, and later, a Third Amended Petition, the operative pleading
4    in this action.[2]  On February 1, 2008, the Court ordered an evidentiary hearing on
5    Claims 18-20 and 24, and on June 9, 2009, the Court ordered an evidentiary hearing
6    on Claims 4-5, 8 and 12.  The hearing was held over twenty court days between
7    March 1, 2010 and November 15, 2010, which included testimony from nearly twenty
8    witnesses and the introduction of nearly 120 exhibits.  On December 13, 2010, the
9    parties submitted closing briefs, and on January 18, 2011 and March 8, 2011, the
10   Court heard closing arguments.

11                          **II.  PROCEDURAL DEFAULT**

12   In the instant case, Claims 2, 4, 5, 8, 12, 18-20, and 24 were denied by the
13   California Supreme Court both on procedural grounds and alternately "on the merits"
14   unaccompanied by a statement of reasoning.  In such a situation, the claims can be
15   found to be procedurally defaulted in this Court if the state procedural bars are
16   independent of federal law and adequate to support the judgment.  Harris v. Reed,
17   489 U.S. 255, 264 n. 10 (1989).

18   In an Order dated September 27, 2007, the Court held that under the test set
19   forth in Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003), Respondent had not met his
20   "ultimate burden" of proving the adequacy of the procedural rules relied on by the
21   California Supreme Court in the denial of claims 17-24, 27-26 and 68.  (See Doc. No.
22   235 at 10.)  Accordingly, the Court declined to conclude that the rules pertaining to the
23   untimeliness and successiveness procedural bars were sufficient to prohibit the
24   consideration of those claims on the merits.  (Id.)  In the Group Three Order, dated
25   February 1, 2008, the Court granted an evidentiary hearing on Claims 18-20 and 24.

26   _____

27   [2] Petitioner filed a Third Amended Petition on April 29, 2011 in order to add Claim 76, a claim based on prosecutorial misconduct, based in part on information brought forth at the evidentiary hearing.  (See Doc. No. 438.)  Claim 76 was denied on the merits in an order
28   dated March 12, 2012.  (See Doc. No. 462.)  Aside from the addition of Claim 76, the Second and Third Amended Petitions are substantively identical.

(Doc. No. 236.)

In the Group Five Order, dated June 9, 2009, the Court again declined to conclude that the rules pertaining to the untimeliness and sucessiveness procedural bars were sufficient to prohibit the consideration of Claims 1, 3-9, 12-16 and 69 on the merits.  (Doc. No. 287 at 7.)  The Court also declined to conclude that the rules pertaining to the Dixon bar were sufficient to preclude the consideration of Claims 1, 9, and 69 on the merits.  (Id.)  The Court went on to grant an evidentiary hearing on Claims 4, 5, 8 and 12, and deferred consideration of Claim 2 until after the conclusion of the evidentiary hearing.  (Id. at 43.)

The Supreme Court subsequently issued a decision in Walker v. Martin, 562 U.S. ___, 131 S. Ct. 1120 (2011). In Martin, the Supreme Court held that California's timeliness requirement for state habeas applications is an "adequate" ground to bar federal relief.  See 131 S.Ct. at 1131.  In light of this decision, it appears that procedural default is again at issue with respect to at least some of Petitioner's claims.

However, in prior briefs, Petitioner generally contended that he was able to establish cause and prejudice for any procedural default, and asserted that the Court's failure to consider those claims on appeal would constitute a miscarriage of justice. (See Group Two Reply [Doc. No. 125] at 46-80.)  Because the Court previously declined to impose procedural bars based on a Bennett analysis, the Court has never conducted a determination of whether Petitioner could establish cause and prejudice to excuse the default.  While several of the potentially defaulted claims have been denied on the merits in prior orders, the Court held an evidentiary hearing on Claims 4, 5, 8, 12, 18-20, and 24, which may be barred under state procedural default rules regarding timeliness unless Petitioner is able to establish cause and prejudice for the default, or demonstrate that the Court's failure to adjudicate the claims on the merits would result in a fundamental miscarriage of justice. The Court additionally notes that a determination of whether Petitioner could overcome the procedural default necessarily involves an examination of the merits of these claims.

1    Upon consideration, the Court declines to engage in the procedural default
2    analysis at this stage of the proceedings, as established precedent in this Circuit
3    instructs that a court's decision on the issue of procedural default is to be informed by
4    furthering "the interests of comity, federalism, and judicial efficiency."   Boyd v.
5    Thompson, 147 F.3d 1124, 1127 (9th Cir. 1998).  Where it is clear, as it is in the
6    instant case, that deciding the merits of a claim will prove to be less complicated and
7    time-consuming than adjudicating the issue of procedural default, a court may
8    exercise discretion in its management of the case to reject the claims on their merits
9    and decline to engage in a lengthy and involved analysis of procedural default.  See
10   Batchelor v. Cupp, 693 F.2d 859, 863-64 (9th Cir. 1982); see also Franklin v. Johnson,
11   290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more
12   complex than the merits issues presented by the appeal, so it may well make sense
13   in some instances to proceed to the merits if the result will be the same."), citing
14   Lambrix v. Singletary, 520 U.S. 518, 525 (1997).

15                              **III. Standard of Review**

16          The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides
17   that a federal court may not grant habeas relief to a state prisoner with respect to any
18   claim which has been adjudicated on the merits in the state court unless the state
19   court adjudication "resulted in a decision that was contrary to, or an unreasonable
20   application of, clearly established Federal law," or "was based on an unreasonable
21   determination of the facts in light of the evidence presented in the state court
22   proceeding."  28 U.S.C.A. § 2254(d) (West 2006).  While the California Supreme
23   Court denied Claims 2, 4, 5, 8, 12 ,18-20, 24, and 35 on the merits, the court did not
24   provide any reasoning for the denial on the merits of those claims (with the exception
25   of that portion of Claim 18 alleging that trial counsel were ineffective for failing to call
26   Richard Savocchio as a witness, which was raised on direct appeal, and denied in a
27   reasoned opinion).

28          Because there is no lower court decision on the merits of those claims,

01cv0741

1   Petitioner "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by
2   showing that 'there was no reasonable basis' for the California Supreme Court's
3   decision." Pinholster, 131 S.Ct. at 1402, quoting Harrington v. Richter, 131 S. Ct. 770,
4   784 (2011).   "Under § 2254(d), a habeas court must determine what argument or
5   theories . . . could have supported the state court's decision; and then it must ask
6   whether it is possible fairminded jurists could disagree that those arguments or
7   theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

8          If Petitioner can satisfy § 2254(d), or if § 2254(d) does not apply, the Court must
9   conduct a de novo review to determine whether Petitioner has established a federal
10  constitutional violation.   Fry v. Pliler, 551 U.S. 112, 119-22 (2007) (holding that
11  § 2254(d) "sets forth a precondition to the grant of habeas relief . . ., not an entitlement
12  to it."); see also Franz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc)
13  (holding that after concluding that a state court decision is objectively unreasonable
14  under § 2254(d), a federal habeas court must "review the substantive constitutionality
15  of the state custody de novo" in order to determine whether the petitioner suffered a
16  constitutional violation entitling him or her to habeas relief.)   In addition, "state court
17  judgments of conviction and sentence carry a presumption of finality and legality and
18  may be set aside only when a state prisoner carries his burden of proving that [his]
19  detention violates the fundamental liberties of the person, safeguarded against state
20  action by the Federal Constitution. Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005)
21  (en banc).

22  **A.     The Impact of Pinholster and Richter on this Court's Prior Orders**

23         The United States Supreme Court recently held that, for claims previously
24  decided on the merits by a state court, a federal habeas court's "review under
25  § 2254(d)(1) is limited to the record that was before the state court that adjudicated
26  the claim on the merits." Pinholster, 131 S.Ct. 1388, 1398. The Supreme Court also
27  noted that "[a]lthough state prisoners may sometimes submit new evidence in federal
28  court, AEDPA's statutory scheme is designed to strongly discourage them from doing

so." Id. at 1401.

Moreover, with respect to AEDPA review of an ineffective assistance of counsel claim, the Supreme Court recently reaffirmed that "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Richter, 131 S. Ct. at 785, citing Strickland v. Washington, 466 U.S. 668 (1984). The Supreme Court cautioned that "[f]ederal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 788.

In granting an evidentiary hearing in the February 1, 2008 and June 9, 2009 Orders, this Court relied in part on evidence submitted in support of the Group Three Claims, including the Supplemental Hart declaration, the Belter declaration, and the Ritt declaration.  These materials were not previously presented to the state court, which had before it the Exhaustion Petition/First Amended Petition ("Exh. Pet." or "FAP") and the original Hart Declaration dated September 17, 2002 ("Hart Decl." or "Ex. 1 to Exh. Pet.").  Because Pinholster was decided after the completion of the evidentiary hearing in this case and well after the issuance of the Group Three and Group Five Orders, and because the Court considered additional evidence not before the state court in issuing those Orders, the Court will re-evaluate these claims in two respects.

In an abundance of caution, the Court will proceed to: (1) re-address these claims under section 2254(d) (including Claim 18, which the Court previously found involved an unreasonable application of Strickland), based only upon the evidence presented to the California Supreme Court (pursuant to both Pinholster and Richter), and (2) alternately address these claims by performing a de novo review under Strickland, considering all of the evidence adduced at the evidentiary hearing. See Stokley v. Ryan, 659 F.3d 802, 809 (9th Cir. 2011) (in which the Ninth Circuit,

7

1   "[r]ecognizing that Pinholster dramatically changed the aperture for consideration of
2   new evidence, and further recognizing that this is a capital case, we believe it prudent
3   to consider alternate avenues for resolution," adjudicated a petitioner's claim by
4   alternately considering the resolution of the claim "if Pinholster applies" as well as "if
5   Pinholster does not apply.")

6   **B.     Ineffective Assistance of Counsel**

7          The bulk of the claims at issue at the evidentiary hearing are claims alleging
8   ineffective assistance of trial counsel.  To establish ineffective assistance of counsel,
9   a petitioner must demonstrate (1) that counsel "made errors so serious that counsel
10  was not functioning as the 'counsel' guaranteed the defendant by the Sixth
11  Amendment," and (2) that "the deficient performance prejudiced the defense."
12  Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1995), quoting Strickland, 466 U.S. at
13  687.

14         To establish deficient performance, the petitioner must demonstrate that the
15  representation he received "fell below an objective standard of reasonableness."
16  Strickland, 466 U.S. at 688. Moreover, due to the difficulties inherent in evaluating the
17  contested behavior from counsel's perspective at the time, there exists a strong
18  presumption that counsel's conduct "falls within the wide range of reasonable
19  professional assistance."  Id. at 689.   Thus, a petitioner must overcome the
20  presumption that the challenged action might be considered sound trial strategy.  Id.
21  at 689.

22         To establish prejudice, the petitioner must demonstrate that "there is a
23  reasonable probability that, but for counsel's unprofessional errors, the result of the
24  proceeding would have been different."  Id. at 694.  "A reasonable probability is a
25  probability sufficient to undermine confidence in the outcome."  Id.  In addition,
26  individual deficiencies that may not by themselves meet the Strickland prejudice
27  standard may, when considered cumulatively, constitute sufficient prejudice to justify
28  granting the writ.  Harris v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995).

# IV. DISCUSSION

As noted above, the Court held an evidentiary hearing on Claims 4, 5, 8, 12, 18-20, and 24.  In addition, the Court previously deferred consideration of Claims 2 and 35, as the resolution of those claims necessarily depended on the adjudication of the remainder of the claims in the Petition, and previously denied Claim 75 as premature. The Court will now consider each of these claims on the merits.

## A.   Evidentiary Hearing Claims

### 1.   Claims 18 and 19

In the Group Three Order, the Court granted an evidentiary hearing on Claim 18 with respect to trial counsel's failure to call Richard Savocchio, who purportedly could have testified at trial that Juan Meza, an important prosecution witness, told him that he did not know anything about the murders and was testifying in order to get his custodial time reduced.  The Court concluded that: (1) "the California Supreme Court's decision was an unreasonable application of Strickland" and (2) that although Savoccio's credibility could have been challenged with his lies about EME, his testimony, coupled with that of Raul Garcia (discussed in Claim 19), would have been powerful impeachment evidence against Meza.

The Court also granted an evidentiary hearing on Claim 19, in which Petitioner alleged that trial counsel was ineffective for failing to offer the testimony of Raul Garcia, who was willing to testify that Meza tried to get him involved in fabricating a story against Petitioner Ronaldo Ayala, and that Meza admitted he did not know anything about the murders.  The Court found that this deficiency, coupled with other identified deficiencies, amounted to a colorable claim of prejudice.

## A.   Application of § 2254(d) under Pinholster and Richter

In adjudicating Claim 18, this Court relied upon an August 11, 1988 interview of Savocchio by Papenhausen Investigations that was never presented to the state court.  (See Group Three Order [Doc. No. 236] at 29, citing Ex. O to Belter Decl.)  In that interview, Savocchio told investigator Jim Braxtan that he had known Meza since

1  the 1970's and that Meza admitted to him that he was lying about the Ayalas'
2  involvement in the murders because "they're going down anyways" and he planned
3  to "get something out of this." (Ex. O.) Savocchio told Braxtan that he did not have
4  any involvement in gangs. (Id.) While this information does not appear to add
5  anything substantive that was not already before the state court, in the form of
6  Savocchio's testimony at the 402 hearing before the trial court, in an abundance of
7  caution, the Court will not consider this document in re-evaluating Claim 18, as it was
8  not presented to the state court.

9       Based only on the evidence available to the state court, this Court again
10 concludes that the California Supreme Court's rejection of Claim 18 involved an
11 unreasonable application of Strickland, as the state court's reasons for rejecting this
12 claim (in which the state court found counsel's actions reasonable, stating that
13 declining to call Savocchio was necessary to avoid mention of EME or potentially
14 connect Petitioner to EME) still cannot be reconciled with the state court's rejection
15 of Petitioner's challenge to the trial court's in limine ruling on the gang issue (in which
16 the state court reasoned that impeachment of Savocchio would not link Petitioner to
17 EME). (See Doc. No. 236 at 29-30.) The Court did not conclude, and did not intend
18 to suggest in the Group Three Order, that the Strickland standard had also been
19 satisfied. Rather, the Court merely held that Petitioner had satisfied § 2254(d) and
20 that the Court was not precluded from holding a federal evidentiary hearing under
21 § 2254(e)(2), based on which record the Court would decide the merits. Fry, 551 U.S.
22 at 119-22 (holding that § 2254(d) "sets forth a precondition to the grant of habeas
23 relief . . ., not an entitlement to it."); Franz, 533 F.3d at 735-36 (holding that after
24 concluding that a state court decision is objectively unreasonable under § 2254(d), a
25 federal habeas court must "review the substantive constitutionality of the state custody
26 de novo" in order to determine whether the petitioner suffered a constitutional violation
27 entitling him or her to habeas relief.) The Court's ultimate determination with respect
28 to Strickland is addressed below.

10

1    In granting an evidentiary hearing on Claim 19, this Court relied on Ex. J to the

2  Ritt Declaration, which is the interview defense investigator Brenda Watton conducted

3  with Raul Garcia in August 1988 (also known as EH Ex. 1).  Petitioner alleged that

4  "Meza admitted to [Garcia] that he did not know anything about the murders and just

5  wanted to get his custodial time reduced" and that Meza "tried to get Garcia involved

6  in fabricating a story implicating Ronaldo and proposed various stories regarding how

7  they had inside information that Ronaldo had committed the murders." (Doc. No. 236

8  at 45, citing to Ex. J.)  The Court concluded that "[t]hese facts, if proven to be true,

9  support a prima facie case of deficient performance by trial counsel," which, in

10  conjunction with other potential deficiencies, raised a colorable claim of prejudice. (Id.

11  at 45-46.)

12    Under Pinholster, the Court can only consider the *evidence* before the state

13  court.  The state court was presented with generalized factual allegations asserting

14  that Meza had informed several individuals that he had concocted his testimony in

15  order to obtain a reduction in jail time, but Petitioner did not present the California

16  Supreme Court with the name Raul Garcia or the specifics of his statement.  In fact,

17  Garcia was not even named in the federal habeas case until the filing of the Group

18  Three Briefs in 2005.  In the First Amended Petition and Second Amended Petition,

19  Petitioner alleged that:

20       Counsel failed to impeach prosecution witness Juan Meza with, inter alia,
         the following evidence and/or testimony available to them . . . Meza had
21       confessed to numerous witnesses, including Richard Sovacchio [sic]
         among many others - known to Petitioner's counsel - that he had no idea
22       whether Petitioner had actually participated in the 43rd street murders
         and that he had put together his story with Detective Chacon in order to
23       arrange for an early release from prison.

24  (FAP at 101-02; SAP at 102-03.)

25    In state court, Petitioner alleged only (supported by, and parroting language

26  contained in, the original Hart declaration) that "Meza had confessed to numerous

27  witnesses, including Richard Sovacchio [sic] among many others - known to

28  Petitioner's counsel - that he had no idea whether Petitioner had actually participated

11

in the 43rd street murders and that he had put together his story with Detective Chacon in order to arrange for an early release from prison." (See Hart Decl. at ¶ 37; Exh. Pet. ¶ 263.)

Therefore, based only on the conclusory and unsupported evidence available to the state court, the Court cannot conclude that the California Supreme Court's rejection of Claim 19 was contrary to, or an unreasonable application of, Strickland. Given the lack of specificity or evidentiary support in the state record, Petitioner fails to demonstrate that the state court's rejection of the claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87. As set forth below, even if counsel's failure to present evidence in support of these allegations constituted deficient performance, or even if the state court's failure to develop the record was objectively unreasonable, and Petitioner could satisfy § 2254(d), he has still failed to demonstrate a federal constitutional violation under Strickland.

## B.   Evidence Adduced at the Evidentiary Hearing

Richard Savocchio stated that Meza admitted to him that he was lying about the Ayalas' involvement in the murders, stating that Meza informed him he "don't know nothing about it but I'm getting some time off." (EHT 90.) Savocchio denied gang affiliation, but prison records revealed "EME problems" in the form of a drug debt. Savocchio testified at a 402 hearing outside the presence of the jury at which he admitted lying about the gang problems in order to secure protective custody in prison. When the trial judge held that the prosecution could impeach Savocchio with the past lies, the defense decided not to call Savocchio to testify.  In her evidentiary hearing testimony, Ms. Semel, Petitioner's lead trial counsel, conceded that she was not only fearful of potential impeachment regarding the EME debt, but also what she considered to be the possibility of "opening the door" to other information about EME or prison gangs.  (EHT 367.)

1    In August 1988, Raul Garcia told defense investigator Brenda Watton that he

2 had been Meza's cellmate, and was approached by Meza and asked to participate in

3 creating testimony against the Ayalas in order to get a reduction in prison time.

4 Watton stated that she found Garcia credible, and relayed this belief to Petitioner's

5 counsel. Garcia was not called as a witness at trial. Neither Semel nor Boyce recall

6 the specific reason for failing to call Garcia, but Semel generally recalled that the fear

7 of introducing gang evidence was a likely reason. Garcia was a member of the Texas

8 Syndicate. Ms. Semel authored a pre-trial memo in which she indicated that "reading

9 between the lines," she had concerns about Garcia's relationship with Ayala. (EHT

10 Ex. 74.) Moreover, Semel conceded that as she did not recall reviewing Garcia's CDC

11 packet, she would have had concerns stemming from the fact that she did not know

12 everything potentially damaging that could be used to impeach him.

13    Trial counsel Semel stated that "I think it's fair to say it was the defense team's

14 belief that the intent of the prosecution was to try this case based on who the

15 defendants were or were alleged to be, rather than on what they were alleged to have

16 done." (EHT 356.)  She explained that the defense chose to pursue a strategy of

17 "exclusion of any references to gang member affiliation, membership, and to try the

18 case as best as possible based on the evidence of what occurred, with regard to the

19 homicides and attempted murder, rather than, for lack of a better word, guilt by

20 association." (EHT 362-63.)  While Ms. Semel did not recall witness by witness

21 reasons for not calling individuals, she stated that: "The general recollection is that it

22 was - - that it would have opened the door to the very thing that we had been

23 attempting to keep out, which is the prison gang affiliation/association becoming an

24 explicit and overriding factor in the trial." (EHT 380.) Similarly, Mr. Boyce, Petitioner's

25 second chair trial counsel, did not specifically recall why Richard Savocchio or Raul

26 Garcia were not called as witnesses. (EHT 232.)

27    Semel stated that "it's my recollection that the court ruled that if Mr. Savocchio

28 testified that he would be subject to cross examination about his contacts with,

1  knowledge of, involvement in statements about the EME or the Mexican Mafia." (EHT
2  350.)  Co-counsel Boyce stated that, "As I recall, Judge Jones ruled that the EME
3  affiliation would be referred to as group or association.  I can't recall now what he was
4  going to permit - - what term he was going to permit to be used in place of EME or
5  Mexican Mafia gang membership." (EHT 215.)

6      With respect to Raul Garcia, Brenda Watton interviewed him in 1988 and
7  recalled believing that he was a credible witness.  She recalled that she discussed her
8  belief with trial counsel. (EHT 1262, 1267, 1275, 1279.)  Meanwhile, in an August 19,
9  1988 memo, Semel wrote that Garcia "claims he was approached by Meza to make
10 up a story about the killings.  He knows Ronnie well.  My reading between the lines
11 is that this is possible B.S. and he is very impeachable re relationship with Ronnie."
12 (EH Ex. 125.)  Semel testified that she could not recall if she ever obtained Garcia's
13 CDC packet. (EHT 376.)

14      Strickland expert Mark Overland stated that counsel's performance was
15 deficient in: (1) failing to obtain prison records themselves rather than allowing the
16 prosecution to procure the records and (2) failing to obtain a ruling from the trial court
17 on the extent of impeachment that would be allowed for individual witnesses prior to
18 deciding whether to call those witnesses. (EHT 2160.)  He stated that California state
19
20
21
22
23
24
25
26
27
28

1   decisional law, under <u>Cardenas</u>[3] and <u>Munoz</u>,[4] would have limited impeachment to

2   terms such as "groups" and thus the failure to call witnesses for fear of this

3   impeachment was below the standard of care.

4        Overland also stated that the impeachment of Savocchio could have been

5   limited to "him owing a debt to a group associated with Mr. Ayala." (EHT 2158.)

6   However, Overland acknowledged that he did not know which witnesses defense

7   could, did, or did not get CDC packets for. (EHT 2172-74.) He also acknowledged

8   that outside knowledge (such as information Detective Chacon may have possessed)

9   was a defense concern, and agreed that concern was reasonable. (EHT 2181-82.)

10        **C.**   **<u>De Novo Review</u>**

11        Assuming Petitioner could satisfy § 2254(d) and the Court could consider all of

12   the evidence presented to this Court and/or adduced at the evidentiary hearing with

13   respect to Claims 18 and 19, Petitioner fails to demonstrate that counsel's decision

14   not to impeach Juan Meza with the testimony of Richard Savocchio and Raul Garcia

15   constituted prejudicially deficient performance.

16

---

17      [3] In <u>People v. Cardenas</u>, 31 Cal. 3d 897 (Cal. 1982), the California Supreme Court
held that a state "trial court abused its discretion by allowing the prosecution to introduce

18   evidence that appellant and his witnesses were affiliated with the El Monte Flores youth
gang." The Court found that while the evidence was relevant as to potential bias, the

19   probative value was limited because the prosecutor had already elicited that the defense
witnesses were each friends with the defendant, all resided in the same neighborhood, and

20   all were members of a Boys Club where they played basketball. <u>Id.</u> at 904. The state
supreme court found the evidence of common gang membership to be cumulative, of limited

21   probative value, and concluded that its admission "created a substantial danger of undue
prejudice" because it allowed the inference that the defendant "had a criminal disposition"

22   as a gang member due to the reputation and publicity regarding gangs and criminal activity.
<u>Id.</u> at 905. The evidence of gang membership, particularly when coupled with the

23   prosecutor's "broad inquiries suggesting that the gang was involved in criminal activity,"
resulted in prejudice. <u>Id.</u> at 906.

24

25      [4] In <u>People v. Munoz</u>, 157 Cal. App. 3d 999 (1984), the California Court of Appeal,
applying the <u>Cardenas</u> decision, upheld a trial court's decision to allow questioning of a

26   witness about youth gang membership by disallowing the use of the word "gang," and
allowing the use of terms such as "association," "group," or "club." <u>Id.</u> at 1010-11. The

27   <u>Munoz</u> Court indicated that, "[a]s a general proposition, '... a witness may, on cross-
examination, be asked about group membership he shares with a party to the action, on the

28   theory that such common membership is a factor that tends to impeach a witness' testimony
by establishing bias. . .'" <u>Id.</u> at 1012, quoting <u>In re Wing Y.</u>, 67 Cal. App. 3d 69, 76-77
(1977).

01cv0741

1    With respect to Mr. Overland's assertion that counsel's failure to obtain prison
2    records and witness-specific rulings prior to making a determination on whether to call
3    these witnesses constituted deficient performance, the record shows, at least with
4    respect to Savocchio, that defense counsel *was* aware of the contents of prison
5    records that reflected his troubles with EME. (RT 15475) (During questioning by the
6    prosecutor, Savocchio acknowledged that he and defense counsel Semel had
7    previously discussed entries in his prison records pertaining to his "EME problem.")
8    Moreover, counsel *had* obtained a ruling from the trial court on the impeachment that
9    would have been allowed with respect to Savocchio. (See RT 15488.)  After Semel
10   declined to call Savocchio, the trial court later expanded upon the basis for its ruling,
11   offering specific indications as to what sort of impeachment would be allowed. (RT
12   15488) (court's initial ruling and Semel's indication that she would not call Savocchio
13   as a witness); (RT 15522-23) (court's clarification).   Therefore, the record clearly
14   reflects that Semel's decision not to call Savocchio was made immediately after the
15   trial court's initial ruling on allowable impeachment.

16       Semel stated that "it's my recollection that the court ruled that if Mr. Savocchio
17   testified that he would be subject to cross examination about his contacts with,
18   knowledge of, involvement in statements about the EME or the Mexican Mafia." (EHT
19   350.)  The trial transcripts confirm this, indicating that the trial court ruled as follows:
20   "The purpose of the Court is certainly not to create a shield to stop impeachment of
21   witnesses.    Mr. Savocchio quite candidly acknowledges the accuracy of the
22   information.  He is a person that the jury needs to judge.  If he takes the stand, that
23   area will be opened." (RT 15488.)  The trial court's later clarification indicated that:

24       "[W]ith reference to Mr. Richard Ortiz Savocchio, the Court indicated that
         his answers to Mr. Woodward's inquiry in terms of information relayed to
25       the prison officials verified the fact that he in fact gave those answers.
         It seems to me that in light of the other information that has come in front
26       of this Court in terms of gang affiliation or possible gang affiliation of Mr.
         Ayala, then certainly in terms of him verifying the information, that opens
27       up the spector [sic] of bias, interest or other motive as a propellant for the
         testimony, if you will; and it was certainly with that in mind, then, that the
28       Court felt that his testimony would certainly open up to appropriate
         inquiry by the People the issue of whether or not he was testifying out of

1  bias, interest or other motive. . ."

2  (RT 15522-23.)  Therefore, even under Mr. Overland's analysis of the performance

3  prong, it appears that counsel's actions were informed and strategic with respect to

4  Savocchio, as the defense procured his records and obtained a ruling from the trial

5  court on the extent of allowable impeachment.

6  With respect to Raul Garcia, the record does not reflect that trial counsel

7  obtained Garcia's records, and Ms. Semel stated at the evidentiary hearing that she

8  could not recall if she ever obtained Garcia's CDC packet. (EHT 376.) It also appears

9  that trial counsel did not obtain a ruling, specific to Raul Garcia, on the extent of

10  impeachment that would have been allowed.

11  Despite counsel's apparent failure to obtain Garcia's prison records or a ruling

12  on allowable impeachment, evidence exists indicating that Semel harbored doubts

13  about his credibility and, aside from potential gang impeachment, felt Garcia was

14  nevertheless impeachable due to his close relationship with Petitioner.  While

15  investigator Brenda Watton interviewed Garcia in 1988, found him credible, and

16  communicated this to trial counsel, the Court was also provided with Semel's notes,

17  made contemporaneous to the trial, including her thoughts on calling Raul Garcia.

18  Ms. Semel stated that Garcia's account was "possible B.S." and that Garcia was

19  impeachable due to his "relationship with Ronnie." (EH Ex. 125.)

20  In any event, even if the Court were to agree that trial counsels' performance

21  were deficient for failing to call Savocchio and Garcia, in order to warrant relief,

22  Petitioner must also demonstrate a "reasonable probability" that the result of the

23  proceeding would have been different absent trial counsel's error. See Strickland, 466

24  U.S. at 689.  A "reasonable probability" is a "probability sufficient to undermine

25  confidence in the outcome." Id. at 694; Luna v. Cambra, 306 F.3d 954, 966 (9th Cir.

26  2002) (prejudice must be considered in light of the strength of the prosecution's case),

27  as amended, 311 F.3d 928.  In this case, assuming sanitization of gang references

28  (to "group" or "association" pursuant to Cardenas/Munoz), the Court concludes that

1   Petitioner was not prejudiced by counsel's failure to call these witnesses.

2         It is undisputed that Meza was an important witness against Petitioner.  Trial
3   counsel acknowledged a focus of their defense was the impeachment of Meza and
4   Castillo.  (See EHT 205, 329.)  The testimony of Garcia and Savocchio, calling into
5   question the veracity of Meza's statement and presenting a motive for Meza's
6   testimony against Petitioner, could have provided an additional avenue of
7   impeachment against Meza.

8         However, while Savocchio stated that he did not know Petitioner but knew
9   Meza,[5] Savocchio acknowledged that he had only spoken to Meza approximately six
10  times between 1974 and 1988. (EHT 86-88.) Regardless, when Meza and Savocchio
11  were incarcerated in the same institution, Savocchio approached Meza on the prison
12  yard, explaining, "I heard rumors about [Meza] making statements on some people,
13  and he said yes. And basically he said yes and that he didn't know anything about the
14  case and he was doing what the SSU wanted him to do." (EHT 88.)

15        Despite the mere handful of contacts between the two individuals over the prior
16  fifteen years, Savocchio stated that he and Meza had a conversation lasting perhaps
17  a minute or less, as follows:

18        I think I told him that people were talking about him, that he was telling
        on some people. [¶] And he said, you know, I can't remember the exact
19        words, but something to 'Yeah, and I don't know nothing about it, but I'm
        getting some time off,' and for some reason, three years rings a bell in
20        my head.  I don't know if he said that or if I heard that later, but he said
        something about getting the deal and that he didn't know anything about
21        the case and that they were going down anyways.

22  (EHT 90.)

23        Even if Savocchio had testified before the jury as to these alleged statements
24  by Meza, Savocchio could have been impeached with past statements he made to
25  prison officials, which he characterized as lies at the 402 hearing (see RT 15476-79),
26  but now states were actually the truth (see EHT 108, 132-37.)  At the evidentiary

27  _____

28        [5] Savocchio stated that Meza had fathered a child with one of Savocchio's cousins,
        a woman named Becky.  (See EHT 88.)

                                            18                                    01cv0741

hearing before this Court, Savocchio now states that he had been truthful when he told prison authorities that he was having problems with EME.  (EHT 108-09.) Savocchio acknowledged concerns about David Gallegos, an EME member and brother of Nick Gallegos, who Savocchio had taken $11,000 from in a "drug burn." (EHT 109-10.)

Under Cardenas/Munoz, it appears that Savocchio could have ultimately been impeached with the fact that he had problems with, or a debt to, a group of individuals associated with Petitioner, and that he was fearful.  He could also have been questioned about whether he was testifying out of bias, interest, or another motive, such as fear.  Moreover, at the 402 hearing, Savocchio admitted that he had previously lied to prison officials about fears he had about a group, and cross-examination on this point alone would have damaged Savocchio's credibility. Ultimately, whether or not this impeachment would have linked Petitioner with EME or the "group," it would have opened the door to questions about Savocchio's motivation for testifying, whether out of fear or to gain favor.

In addition to Savocchio's prior lies, his account lacked credibility, and the prosecutor could have effectively attacked the reasonableness of his account- that he approached Meza in the middle of a prison yard, a man he had only spoken to perhaps six times in nearly fifteen years, and almost without prompting, Meza admitted that he was giving false trial testimony against several individuals who were charged with a triple homicide, in order to obtain a sentence reduction.  The evidence adduced at the evidentiary hearing did nothing to undermine the conclusion that trial counsel were not ineffective in failing to call Richard Savocchio to testify.

Similarly, Raul Garcia, who grew up with both Ronaldo Ayala and Meza, states that he was incarcerated with Meza in South Bay in 1985, and defended Meza against some guys who planned to assault him. (EHT 957-60.) Garcia contends that Meza asked Garcia to join him in making up testimony against the Ayalas for a reduction in time, showing Garcia a newspaper and stating that they could get out if they wanted,

01cv0741

1  if they had some kind of knowledge. (EHT 963.) Garcia stated: "He goes, like, we can
2  just say we were there but we didn't do anything, something like that." (EHT 964.)
3  Garcia states that Meza proposed several different stories, including that they planned
4  the robbery at Garcia's home, or that they planned it at a meeting at a bar. (EHT 967.)
5  Garcia claims that Meza admitted to Garcia that he did not know anything about the
6  crime, but said it was an easy way to get a sentence reduction. (RT 969-70.)

7      As stated previously, Garcia could have been impeached with the fact that he,
8  per Semel's pre-trial memo, "knows Ronnie well," and was "very impeachable re
9  relationship with Ronnie." (EH Ex. 125.) Garcia was also potentially impeachable
10 through his membership in a group affiliated with Petitioner, as evidentiary hearing
11 testimony offered some indication, through Meza, that the Texas Syndicate may have
12 been allied with EME. (See EHT 1993-94.) In the Watton interview, Garcia
13 acknowledged that his prison jacket classified him as Texas Syndicate. (EH Ex. 74.)
14 Garcia stated that he "came from Hawaii for this trial and they told me I wasn't
15 needed." (EHT 965.)[6] It appears that Garcia could have been impeached with his
16 motive for testifying, given that Garcia acknowledged traveling from Hawaii sometime
17 in 1988 or 1989, at his own expense, specifically for the purpose of testifying at his
18 friend Ronaldo Ayala's trial. (See EHT 976; 992-93.)

19     Garcia also acknowledged that, at the time of the evidentiary hearing, he was
20 classified as an EME associate, but stated that it was a recent classification, and
21 attributed it to counsel contacting him about the instant habeas case. (EHT 1003-07;
22 1018). Additionally, Garcia stated that the conversation with Meza occurred in 1985,
23 yet he only first spoke to the defense in March 1988. (EHT 1021.)

24     Garcia also would have been impeached on the timing of his account. As

25

26     [6] There appears to be some question whether Garcia was available to testify at the
27 time he was living in Hawaii, as Garcia testified that he "wasn't supposed to be in Honolulu"
   and due to a roadblock in Tijuana "it came out that I had a parole violation." (EHT 981.) In
28 any event, the Court found that Garcia was, at a minimum, available as a witness between
   the date of his statement on August 9, 1988 through September 4, 1988, when he was
   paroled to San Diego. (EHT 2330.)

1  Respondent persuasively notes, Garcia stated that his contact with Meza occurred in
2  late 1985, after Garcia's transfer to South Bay on November 19, 1985, with Meza
3  wanting Garcia to assist him in making up a story to tell the police about the Ayala's
4  involvement in the crimes in order to reduce their time in custody.   (EH Ex. 74.)
5  Meanwhile, Chacon testified that Meza contacted him in October 1985, wanting to
6  have his parole violated, which would keep Meza in custody longer, in order to avoid
7  carrying out a contract at Hector Ayala's request to kill Pete Castillo, the only
8  prosecution eyewitness, who was out of custody at the time. (EHT 1556-57, 1646-50.)
9  Chacon made notes of this conversation, which took place on October 14, 1985.
10  (EHT 1557, EHT Ex. 1.)   Therefore, Garcia's testimony that Meza wanted to secure
11  an earlier release from custody conflicts with Detective Chacon's conversation with
12  Meza from a month earlier.   At the evidentiary hearing before this Court, Meza denied
13  receiving a note from Hector Ayala asking him to kill Pete Castillo. (EHT 1991.)   The
14  Court finds Chacon to be a credible witness, and does not find Raul Garcia credible.

15       In sum, as noted above, Savocchio and Garcia each had credibility problems
16  of their own. Savocchio admitted to prior lies about his problems with, and connection
17  to, EME.   Even were he questioned pursuant to Cardenas, Savocchio's testimony
18  opened the door to questions about his motivation for testifying, whether out of fear
19  or to gain favor, with people associated with Petitioner. The prior lies, and connection
20  to Petitioner, would have damaged Savocchio's credibility, and could have had a
21  negative reflection on Petitioner as well. Garcia had a strong connection to Petitioner,
22  and a potential connection to a "group," but a larger concern was the believability of
23  his statement. Semel herself wrote that Garcia's story was "possible B.S." Moreover,
24  as noted above, during the same time frame that Meza was allegedly concocting this
25  story about Petitioner (fall 1985) in order to obtain a sentence reduction, Detective
26  Chacon testified that Meza had contacted him about ways to remain in custody longer
27  to avoid carrying out a hit on Pete Castillo.

28       While Petitioner argues that sanitization was a viable strategy, that "the trial

court's ruling was limited to impeaching Mr. Savocchio with alleged lies to prison authorities," and that "under Cardenas and Munoz, the prosecution could not have brought in a parade of horribles," (see Pet. Closing at 51), the record reflects that sanitization was explicitly used with the testimony of Mendoza Lopez, in which the term "group" was used.  However, even before Mendoza Lopez took the stand, Ms. Semel recalled that "despite the use of soft language to describe gangs . . . despite the fact that it was not explicit . . . as the trial progressed, it became increasingly clear that the jury had to know, or believe, that Mr. Ayala had some affiliation with some sinister organization, whether they could identify it with the Mexican Mafia or not." (EHT 442.) Therefore, the viability of the sanitization strategy was not, as trial counsel acknowledges, without pitfalls.[7]

Finally, as Respondent correctly points out, even were Savocchio and Garcia called as impeachment witnesses, the "jury was unlikely to completely discount Meza's testimony," which was corroborated in other respects.  Meza accurately described that the weapons used included both a .22 and .38 caliber gun, and correctly stated that the Ayalas planned to take the robbery proceeds to "Topo" in Los Angeles.  The Ayalas were later arrested at the Los Angeles area home of Mrs. Gutierrez, the mother of Benjamin "Topo" Peters.  Moreover, Pete Castillo, the only eyewitness to the crimes, identified Petitioner as one of the killers, and Petitioner's own fingerprints were found on beer cans recovered from the crime scene.

Thus, while Savocchio and Garcia could have testified to impeach Meza's credibility, it is clear that each suffered from serious credibility issues of their own.  Moreover, it is clear that trial counsel's contemporaneous notes confirm that Garcia had problematic ties to Petitioner, and the trial record demonstrates that had Savocchio been called, his past lies and fear of a "group" would have been revealed

---

[7] The Court also notes that neither Savocchio nor Garcia appear to have been called as a witness in any of the three separate trials (Ronaldo Ayala, Hector Ayala, or Joseph Moreno) of the defendants accused of the murders.  (EHT 2272.)  This leads to an inference that either three sets of attorneys made the same alleged mistake in not calling Garcia, or all three made the same strategic decision.

1  to the jury.  In light of the evidence introduced at the hearing, the Court cannot
2  conclude that trial counsel's decision not to call Savocchio and Garcia constituted
3  prejudicially deficient performance.  Claims 18 and 19 fail on the merits under a de
4  novo review.

5      **2.**   **Claim 20**

6      The Court granted an evidentiary hearing with respect to Petitioner's contention
7  that trial counsel failed to impeach Pete Castillo with testimony indicating that he
8  solicited Juan Mendez to kill victim Zamora in the months prior to the murders.  In the
9  Group Three Order, the Court concluded:

10        Part of the defense strategy was urging the jury to suspect that
Castillo was lying to cover up his own involvement in the deaths.  If there
11  was evidence that Castillo asked Mendez to kill Zamora, trial counsel
should have cross-examined Castillo regarding his solicitation of the hit
12  and should have called Mendez as a witness if Castillo denied it.

13  (Doc. No. 236 at 48.)

14      While the Court specifically granted an evidentiary hearing only as to Mendez,
15  the Court also acknowledged that Petitioner alleged trial counsel failed to impeach
16  Castillo with the information that he "had, prior to the murders, solicited *two* different
17  witnesses to kill victim Zamora."  (Id. at 48 n.3) (emphasis added.)

18            **A.**   **Application of § 2254(d) under Pinholster and Richter**

19      In issuing the Group Three Order, which included Claim 20, the Court
20  considered several exhibits never presented to the California Supreme Court.  In
21  granting an evidentiary hearing on Claim 20, the Court specifically referred to the
22  Supplemental Hart Declaration, in which Hart stated that he had interviewed Mendez,
23  who informed him that Castillo had approached him to kill "Marco."  (Id. at 48.)

24      The claim and supporting evidence presented to the state court differed
25  significantly.  For instance, Johnny Mendez was never identified by name in the
26  exhaustion petition or in the original Hart declaration.  The original Hart Declaration,
27  which was presented to the California Supreme Court, simply stated: "Pete Castillo
28  was also an important prosecution witness.  I believe counsel failed to impeach

1  prosecution witness Pedro Castillo with, <u>inter alia</u>, the following evidence and/or
2  testimony available to them . . . That Castillo had, prior to the murders, solicited two
3  different witnesses to kill victim Zamora." (Hart Decl. at ¶¶ 24, 29.)

4       The First Amended Petition/Exhaustion Petition and Second Amended Petition,
5  each filed in federal court, alleged only that "Counsel failed to impeach prosecution
6  witness Pedro Castillo with, inter alia, the following evidence and/or testimony
7  available to them ... Castillo had, prior to the murders, solicited two different witnesses
8  to kill victim Zamora."  (Exh. Pet. at ¶ 267; SAP at ¶ 267.)  Mendez was not named
9  in the federal court habeas submissions until the filing of the Supplemental Hart
10  Declaration in April 2006. (<u>See</u> Doc. No. 196 ¶ 18.)

11       Under <u>Pinholster</u>, the Court can only consider the <i>evidence</i> before the state
12  court. In state court, Petitioner asserted only that Castillo had solicited two unnamed
13  witnesses to kill Zamora at some undefined time prior to the murders, accompanied
14  by the Hart declaration, which indicated that trial counsel had such information
15  available to them, but failed to use it to impeach Castillo.

16       This claim, as it was presented to the state supreme court, is vague,
17  unsupported and conclusory.  Given the fact that Petitioner failed to provide the
18  California Supreme Court with any facts to support his contention, such as the
19  identities of those solicited to kill Zamora, the time frame in which this occurred prior
20  to the crime, or the basis for Hart's statements, the Court cannot conclude that the
21  state supreme court's failure to develop the claim was unreasonable. <u>See</u> <u>People v.</u>
22  <u>Duvall</u>, 9 Cal. 4th 464, 474 (1995) ("To satisfy the initial burden of pleading adequate
23  grounds for relief, an application for habeas corpus must be made by petition . . . The
24  petition should both (i) state fully and with particularity the facts on which relief is
25  sought as well as (ii) include copies of reasonably available documentary evidence
26  supporting the claim, including pertinent portions of trial transcripts and affidavits or
27  declarations. 'Conclusory allegations made without any explanation of the basis for
28  the allegations do not warrant relief, let alone an evidentiary hearing.'") (internal

1   citations omitted).

2      Therefore, based only on the evidence before the state court, the Court cannot

3   conclude that the California Supreme Court's summary rejection of Claim 20 was

4   contrary to, or an unreasonable application of, <u>Strickland</u>, as Petitioner fails to

5   demonstrate that the state court's rejection of the claim "was so lacking in justification

6   that there was an error well understood and comprehended in existing law beyond any

7   possibility for fairminded disagreement." <u>Richter</u>, 131 S.Ct. 786-87.

8                    **B.   Evidence Adduced at the Evidentiary Hearing**

9      Juan Mendez stated to defense investigator Eric Hart that sometime in 1985,

10  Pete Castillo solicited him to kill someone named "Marco or Marcos."  (EHT 662.)

11  Over a period of several years, it appears that Mendez was interviewed at least five

12  times by several different defense investigators, and Mendez provided two

13  declarations in writing. It also appears that the details in Mendez's account changed

14  over time. However, the investigators who spoke to Mendez, including Oscar Legaspi,

15  Eric Hart, Paul Pickering and Bill Papenhausen, each expressed a belief in Mendez's

16  credibility.  Summarized below are the substance of Mendez's statements.

17     In July 1985, Mendez stated that he first met Pete Castillo through Ronaldo

18  Ayala and Chacho three years prior. (EH Ex. 252.) He recalled meeting Pete Castillo

19  in February 1985 in a park.  (<u>Id.</u>) Castillo asked about money, drugs, and whether

20  Mendez had a car/gun. (<u>Id.</u>) Castillo said he would give Mendez drugs and wanted

21  someone killed; Mendez recalled  the name "Beto."  (<u>Id.</u>)

22     In September 1985, Mendez again stated that he first met Castillo through

23  Ronaldo Ayala and Chacho. (EH Ex. 253.)  In February 1985, Castillo was having

24  difficulties with "Marcos" and said if Mendez "took care of it," he would give Mendez

25  some of the "action."  (<u>Id.</u>)  Mendez stated that Castillo gave him four balloons of

26  heroin. (EH Ex. 253.)  In October 1985 Mendez made a similar statement to the one

27  made in September.  (EH Ex. 256.)

28     In November 1985, Mendez was again consistent on when he first met Castillo.

He stated that they made contact in a park in February 1985. (EH Ex. 257.) At this interview, Mendez added that he was formally introduced to Ronaldo Ayala in San Quentin by George Reese, and thereafter "got to be friends with" Petitioner. (Id.)

In February 1987, Mendez stated that he first met Petitioner in Chino in 1977 or 1978 through George Reese, and met Chacho through Ronaldo Ayala at a taco shop. (EH Ex. 261.) Mendez saw Castillo in a park in Feburary 1985. (Id.) Castillo approached him, and Mendez stated that he had *never* met or spoken to Castillo prior to that time. (Id.) Castillo first spoke of people Mendez knew, then offered Mendez a cut of the drug business to "hit" Marco, gave him 2 balloons of heroin, and said he would set him up with a gun and car. (Id.)

In May 1987, Mendez admitted he had been EME affiliated since 1977 in Chino. (EH Ex. 263.) Mendez stated that he met Chacho in 1981, along with Castillo and Petitioner at a restaurant in National City. (Id.) Mendez was approached by Castillo in February 1985 at a park, where they had a conversation about a car, gun, and in which Castillo asked Mendez to take care of somebody.  Mendez was unsure if Castillo ever mentioned a name, and Bill Papenhausen's interview notes read: "He may have said Marcos or Beto.  But he is not sure." (Id.)  Semel's notes from the interview indicated that early in the interview, "Mendez was pretty sure Castillo never mentioned a name, but that later in the interview, Mendez stated that Castillo "might have said Marcos." (EH Ex. 265.) Castillo said he would supply a gun and car, gave Mendez four balloons of heroin and said there was more where that came from. (EH Ex. 263.) Mendez stated that he met Hector Ayala once in County Jail, and knew Ronaldo Ayala from Chino and San Quentin since 1977. (Id.)

In April 1988, Semel conducted an interview of Mendez, in which Mendez acknowledged that he first met Ronaldo Ayala in Chino in about 1980, and that they were introduced by George Reese. (EH Ex. 268.) Mendez stated that he next met Petitioner in 1983 in San Quentin, that they were close, and Semel noted that Petitioner "was sort of an advisor or mentor" based on Mendez's description. (Id.)

01cv0741

Sometime before April 1985, Mendez ran into Ronaldo Ayala at a restaurant, and was introduced to Chacho and Castillo. (Id.) Mendez stated that he and Ronaldo Ayala were not close on the streets. Mendez denied being an EME member, stating: "They asked me and I turned them down." (Id.) Mendez admitted having done favors for EME, and they for him. If asked whether he and Petitioner belonged to the same organization in prison, Mendez stated that his answer would be no. (Id.)

Investigator Eric Hart stated that he found Mendez very credible, and communicated this belief to Petitioner's trial counsel. (EHT 668.) Paul Pickering, an investigator for Hector Ayala, also recalls discussing Mendez's credibility with Hart and investigator Bill Papenhausen, and all three concurred that Mendez was credible. (1743-46.) Pickering stated that Mendez "would have made a great witness" but he was "just too deep in the gang stuff." (EHT 1741.) Mendez was not called as a defense witness by either defense team in the Ronaldo Ayala or Hector Ayala trials. (See EHT 1746-47.)

Semel did not specifically recall why she did not call Mendez to testify, stating "I think, given most of the decisions that we made in this case, it was probably . . . opening the door to allegations, evidence, regarding Mr. Ayala's involvement and other potential witnesses, including potentially Mr. Mendez, in prison gangs." (EHT 631-32.) Semel did recall investigators telling her their belief in his credibility. (EHT 635.)

A June 11, 1987 memo prepared by Ms. Semel and entitled "Trial Witness Evaluation" was introduced into evidence at the hearing and includes contemporaneous information and evaluations about witnesses. Semel made notations under Mendez's name, writing: "Too many inconsistencies: when & how he knew Chacho & Pete, whether Marcos mentioned. Can't explain how Pete found him in park. Close to Ronnie in prison. Attys think he is EME & prison violence history." (EH Ex. 123 at 16.) An entry regarding Mendez also appeared several pages later in the same memo, in which Semel noted that Mendez "is a close friend of Ronnie's from Quentin.

01cv0741

1 Knows Hector. Story is inconsistent re when & where he met Pete & Chacho; why he
2 was at park; how Castillo found him & whether Castillo named Marco. Admits his
3 jacket says he's EME. Too risky to testify." (Id. at 18.)

4       An August 19, 1988 memo regarding defense witnesses also includes an entry
5 on Mendez, in which Semel notes, "Bob has done OTP ["Order to Produce"]. Unlikely
6 we'll call him. May want to reconsider producing him." (EH Ex. 125.) Boyce recalled
7 preparing at least one OTP in the case, but did not specifically recall one on Mendez.
8 (EHT 236.) Boyce also acknowledged that records (including Semel's memo- EH Ex.
9 125) indicated that an OTP was done on Mendez, but similar to Semel, Boyce did not
10 recall why Mendez was ultimately not called to testify. (EHT 226, 236.)

11       Luis Garcia, who knew Ronaldo and Hector Ayala, as well as Pete Castillo,
12 testified at the hearing that Castillo approached him in February 1985 in the 30th
13 Street area. (EHT 873, 877, 894.) Castillo asked if Garcia wanted to do a job, as he
14 was "having trouble with somebody that was stepping on his toes." (EHT 877.)
15 Garcia said "I took it as he wanted somebody hurt." (EHT 878.) Garcia elaborated:

16     Well, I knew Pete Castillo; right? For stuff like stolen merchandise, what
    have you - - but as far as actually taking somebody out for him or to do
17     something like that for him . . . I did not think I could trust him like that, for
    something that serious. [¶] As far as maybe beating somebody up or of
18     that nature, maybe, you know, but as far as actually killing somebody, no.

19 (EHT 879-80.) Garcia stated that he did not personally know if Ronaldo Ayala is EME.
20 (EHT 888.) Garcia also stated that he had no idea who Castillo wanted hurt. (EHT
21 895.)

22       Petitioner maintains that several witnesses could corroborate Mendez's
23 statements against Castillo, and could testify to related matters concerning the case
24 against the Ayalas. For instance, Javier Frausto testified that he advised defense
25 investigators of his knowledge regarding Castillo's desire to take over Dominguez's
26 drug business. (EHT 163.) Frausto also testified that, when incarcerated at the San
27 Diego County Jail in 1988, he overheard a conversation between Jesus Aguilar and
28 Andy Sandoval, in which Sandoval stated that Aguilar would be helped on his case

if he gave a statement that he overheard the Ayalas admitting their involvement in the 43rd Street murders. (EHT 165-66.) Sandoval stated that an attorney would help Aguilar, and provided the name of Chacho's attorney. (EHT 166-67.)

Frausto noted that he grew up with Sal Colabella and Luis Garcia, and was not familiar with the EME. (EHT 169.) Frausto also stated that he was incarcerated at the county jail with Hector Ayala in 1988, and they spoke on occasion. (EHT 171-72.) When Frausto overheard the conversation in question, Aguilar was his cellmate. (EHT 173.) Frausto was "pretty sure" he heard Sandoval used the word "lie" to discuss making up a story, rather than discussing what Aguilar actually knew or heard. (EHT 175-78.) In the same conversation, Sandoval mentioned that people from down South had come up and committed the murders. (EHT 185.)

Mario Marin admitted that he gave a false statement to a District Attorney's office investigator in 1988, and stated that he was not called to testify at Petitioner's trial. (EHT 1103-05.) Similar to Aguilar's testimony, Marin explained that Andy Sandoval, also incarcerated, was encouraging people to make up stories about the Ayalas in order to get shortened sentences. Marin stated that he only made the false statement in order to get a transfer, after which he escaped, as he did not want to lie at trial. (EHT 1107-08.) Marin also accused the District Attorney's office of lying to him when they informed him that the EME was involved in the death of his brother, which came at the same time Marin was preparing to inform the defense about his prior lie. (EHT 1112.)

Marin also states that the defense investigator told him that the EME would not hold a grudge, and would let him on the jail "main line" if he didn't say anything. (EHT 1120.) Marin states that had he testified against the Ayalas, he would have been "hit, stabbed, shot or whatever." (EHT 1120.) Marin asserts that Pickering or Papenhausen was the defense investigator that lied to or threatened him by "basically" telling him that if he "said certain things that nothing would happen" to him. (EHT 1150-51.)

1   When Marin agreed to testify in 1987, he wanted a transfer out of fear and felt
2   danger would come from the Ayalas.  (EHT 1125.)  Marin told the DA what they
3   wanted to hear.  (EHT 1131.)  Marin only talked to the DA in order to get out of
4   custody and stated that he did not mind that he was telling lies, because he never
5   intended to testify. (EHT 1137.)  "My whole thing was to lie about it, escape from jail,
6   and that was it, you know."  (EHT 1138.)

7   Strickland expert Overland confirmed that he only offered an opinion on trial
8   counsels' failure to call Savocchio, Frausto, Raul Garcia, Aguilar, Buchanan and
9   Marin, and did not offer an opinion regarding trial counsel's failure to call Mendez or
10   Colabella.[8]  Overland explained that: "My opinion was limited to those based on the
11   information I received."  (EHT 2193.)

12   ### C.   De Novo Review

13   Petitioner argues, and Semel now states, that the deciding factor against calling
14   Mendez was likely the prison gang issue.  However, the evidence in the record reveals
15   several other relevant and rational reasons to decline to call Mendez.

16   As a related matter, Petitioner emphasizes that Mendez's statement "did not
17   come in a vacuum," and that witnesses corroborating his statements against Castillo,
18   such as Javier Frausto, Jesus Aguilar, and Sal Colabella were also willing to testify
19   to ancillary matters regarding Pete Castillo's dissatisfaction with his role in the drug
20   business and attempt to solicit someone to murder Marcos Zamora.

21   However, in the Group Three Order, the Court previously addressed Petitioner's
22   contention that trial counsel was ineffective for failing to call Luis Garcia (which was
23   raised as part of Claim 18).  Aside from the Court's finding that Petitioner failed to
24   exercise diligence to develop the factual basis of this claim, the Court concluded that
25   the contention failed on the merits.  (Doc. No. 236 at 34-35.)  The Court noted that
26   while Garcia "claims that Meza is lying and doesn't know anything about the

27

28   _____

[8] Sal Colabella told defense investigators that he arranged a meeting between Castillo and Mendez, which he thought was a drug deal.  (EH Ex. 125.)

01cv0741

1  homicides" and "makes an additional claim that in February 1985, Castillo asked him
2  if he knew anybody that could 'take someone out,'" that Garcia failed to identify who
3  Pete Castillo wanted to take out. (Id. at 36-37.) The Court also found Garcia to be a
4  "problematic witness" because he was "doing favors for the Ayalas," such as
5  conveying messages for them in prison. (Id. at 37.) The Court concluded that "calling
6  Garcia as a witness would have played into the prosecution's hands," who could have
7  "portrayed Garcia as yet another person who did whatever the Ayalas told him to do,
8  including lying." (Id.)

9       Similarly, Semel's decision (as well as the decision of Hector Ayala's defense
10  counsel) not to call Mendez appears to have been a reasonable, tactical decision
11  entitled to deference. Evidence contemporaneous to the time of trial, Semel's pre-trial
12  memo, indicates that she had multiple reasons for not calling him, including the
13  aforementioned inconsistencies, his relationship with Petitioner, his connection to the
14  EME, and his history of prison violence. (EH Ex. 123.) Even in light of the
15  corroborating witnesses Petitioner identifies here, Mendez was a problematic witness
16  due first and foremost to his changing account of events.[9] Even defense investigator
17  Paul Pickering conceded at the evidentiary hearing that Mendez's inconsistency about
18  when he first met Castillo and his relationship with Petitioner would have affected
19  Mendez's credibility. (EHT 1789-90, 1798.)

20       As stated earlier, even if Petitioner demonstrates that counsel's performance
21  was deficient, in order to prevail on the merits, Petitioner must also demonstrate a
22  "reasonable probability" that the result of the proceeding would have been different
23  absent trial counsel's error. See Strickland, 466 U.S. at 689.

24       Petitioner argues that Cardenas/Munoz could have been used to "insulate the
25  case" from "the prosecution simply using gang affiliation to smear the witnesses."

26

27       [9] The Court also notes that Mendez was not called as a witness at either the Hector
28  Ayala or Ronaldo Ayala trial. This leads to an inference that either two sets of attorneys
    made the same alleged mistake in not calling Mendez, or that both made the same strategic
    decision.

1  (Closing Brief at 61.)  It is true that Mendez's proposed testimony- that Pete Castillo
2  approached him two months before the 43rd Street murders, attempted to solicit
3  Mendez to kill someone, possibly Marcos, one of the three victims, would have (1)
4  damaged the credibility of Castillo, a victim and one of the main witnesses against
5  Petitioner, and (2) would have provided an alternate theory of the crime.  However,
6  even were the gang references sanitized under Cardenas and Munoz, Mendez would
7  have nevertheless been properly questioned on his friendship with Petitioner and his
8  affiliation or affinity with a "group" or "association" with which Petitioner belonged.  The
9  fact that Petitioner was evidently some type of "advisor or mentor" to Mendez would
10  have undoubtedly come out as well.

11      As noted earlier, the other significant problem with Mendez was the varying
12  inconsistencies in his statement over time. Most troubling was Mendez's periodic
13  inability to recall pertinent and central details, such as when or if he ever met Pete
14  Castillo prior to the February 1985 solicitation, whether Pete Castillo told him the
15  name of the individual he wanted killed, the name Castillo mentioned, and the amount
16  of drugs provided in partial payment.  Therefore, even if counsel were deficient for
17  failing to call Mendez, the Court cannot conclude that it resulted in prejudice to
18  Petitioner.  See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an
19  ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will
20  often be so, that course should be followed.")  Accordingly, even assuming Petitioner
21  could satisfy § 2254(d), under a de novo review Claim 20 fails on the merits.

22      **3.  Claim 24**

23      In Claim 24, the Court granted an evidentiary hearing on whether trial counsel
24  were ineffective in failing to present the following impeachment evidence regarding
25  Detective Chacon, which taken together would tend to show that Chacon was biased
26  against the Ayalas: (1) Detective Chacon told Hart that if the Ayalas ever got out of jail
27  he would kill them; (2) Detective Chacon had a personal relationship with the Sosa
28  family, some of whom were allegedly top-ranking members of the Nuestra Familia; (3)

1   Chacon immediately identified the Ayalas as the likely killers, inserted himself into the

2   investigation, had contact with nearly every single witness (particularly Mendoza

3   Lopez and Meza), and sat through the trial in its entirety.

4              **A.   Application of § 2254(d) under Pinholster and Richter**

5        In granting the evidentiary hearing, the Court relied on information provided in

6   ¶¶ 3, 5, 6, & 7 of the Supplemental Declaration of Eric Hart dated April 5, 2006, which

7   was filed in connection with the Group Three claims.  As noted, Petitioner's First

8   Amended Petition filed in the California Supreme Court was only accompanied by the

9   original Hart Declaration dated September 17, 2002.

10       In his original declaration, Hart stated that "on information and belief," Chacon

11  "developed a strong animus against the male members of Petitioner's family" as a

12  result of Mauro Gonzalez killing Chacon's friend, Eduardo Cruz, maintained a close

13  personal relationship with the Sosa family, immediately identified the Ayalas as the

14  likely killers, and had contact with nearly every single witness and sat through the trial

15  in its entirety. (Ex. 1 to Exh. Pet. ¶¶ 9, 11, 13, 14.)  However, this declaration did not

16  identify what sources Hart relied on to support his information and belief.  Claim 24 of

17  the Exhaustion Petition parrots the language in the Hart declaration.  (See Exh. Pet.

18  ¶ 302.)

19       The supplemental declaration provided more details as well as identifying the

20  source of Hart's information.  According to the supplemental declaration, Chacon's

21  bias against the Ayalas was apparent because Chacon told Hart that "if the Ayalas

22  ever got out of jail he would kill them." (Supp. Hart Decl. ¶ 3.)  Hart also declared that

23  Chacon "admitted to me with pride that he partied with the Sosas in the 1970's." (Id.

24  at ¶ 5.)  Hart clarified that he learned about Chacon immediately identifying the Ayalas

25  as the likely killers based upon his review of a half-page report obtained from "police

26  discovery." (Id. at ¶ 6.)  He also stated that Chacon himself bragged to Hart that he

27  turned to his partner on the night of the murders and said that the "Ayalas had to be

28  involved." (Id.)  Hart claimed Chacon made the same statement at a Public

                                        33

1  Defender's seminar he attended. (Id.)  Hart also explained that he learned that
2  Chacon had led the investigation into the murders, had sat through the trial in its
3  entirety, and had contact with nearly every single witness based on his review of
4  interview memos of these witnesses and his own interviews with these witnesses. (Id.
5  at ¶ 7.)

6      Based on the evidence that was available to the state court, the California
7  Supreme Court's denial of Petitioner's claim of ineffective assistance of counsel based
8  on failure to present evidence of Chacon's bias was not contrary to, or an
9  unreasonable application of, Strickland.  The statements in Hart's original declaration
10 were not supported by reference to any specific evidence, and do not provide factual
11 details indicating the basis for Hart's assertions.  The information could have been
12 based on rumor or Hart's personal beliefs and, thus, would not have had any
13 impeachment or evidentiary value.  Accordingly, the Court cannot conclude that the
14 state supreme court's failure to grant habeas relief, or to develop the claim further,
15 was unreasonable.  Richter, 131 S.Ct. at 786; Duvall, 9 Cal. 4th at 474.

16          **B.   Evidence Adduced at the Evidentiary Hearing**

17      Petitioner contends that Chacon told Hart that if the Ayalas were ever released
18 from jail, Chacon would kill them.  According to Hart's testimony, Chacon made this
19 statement in May or June 1990, after the conclusion of Petitioner's trial. (EHT 906.)

20      Chacon clarified that what he would have told Hart is that if the Ayalas were on
21 the streets, they would kill him, and he would probably kill them first. (EHT 1607.)
22 According to Chacon, during the trial, he learned that the Mexican Mafia had put a hit
23 out on his younger brother. (EHT 1606.)  As a result, he believed that if the Ayalas
24 were free to walk the streets, his life and the lives of his family members would be in
25 danger.  (Id.)  Chacon says that his statement was taken out of context by Hart. (EHT
26 1608.)

27      Hart's notes of his interview with Chacon support Chacon's recollection of his
28 statement.  The notes indicate, "Said if Ayalas got out they would kill him so he would

01cv0741

1  get them before they got him." (EH Ex. BW.) Hart admits that his written reports
2  would be more reliable than his memory. (EHT 917.)

3      With respect to Petitioner's allegation that Chacon had a personal relationship
4  with the Sosa family, top-ranking members of the Nuestra Familia, Chaon confirmed
5  the familial connection. According to Chacon, his half-brother, Arturo Gaitan, married
6  the sister of a Nuestra Familia gang member, Julio Sosa. (EHT 1481.) Chacon was
7  in high school when they got married. (EHT 1484.) Chacon says that he attended
8  family gatherings where the Sosa brothers were also in attendance. (EHT 1484.)
9  However, he denies that his relationship with the Sosa family made him feel any
10 particular way about the Mexican Mafia. (EHT 1603.) According to Chacon, he put
11 members of both gangs in prison and utilized members of both gangs to gather
12 intelligence.

13     Petitioner also alleged that Chacon's bias was demonstrated through the fact
14 that he immediately identified the Ayalas as the likely killers and inserted himself into
15 the investigation. Chacon testified that around the time of the murders, he had
16 received information from informants/sources that the Ayalas and Meza were hanging
17 out together and involved in drug-related robberies around town. (EHT 1627.) The
18 "Red Book" entry dated April 29, 1985, indicates that the names of the Ayalas and
19 Meza were provided to homicide. (EH Ex. 1.) The entry notes that these individuals
20 have been known to hang out and/or live in the immediate area, and two of these
21 suspects "were also suspects of committing a similar M.O. type homicide in the
22 September of 1982."

23     Chacon thought the 43rd street murders were similar to the murders of Mauro
24 Gonzalez, the brother-in-law of the Ayalas, and Tony Ferugia. (EHT 1610, 1627.)
25 Both sets of murders involved "torture," stabbing, and the use of duct tape.

26     Although the Ayalas weren't arrested for the murders of Gonzalez and Ferugia,
27 Chacon believes that the Ayalas were responsible. Barbara Ayala, Gonzalez's wife
28 and Petitioner's sister, told Chacon that on the day he was murdered, Gonzalez called

1   Barbara and said he was at a bar in National City with Ronaldo and Hector Ayala and
2   that he would come home shortly. (EHT 1616.) That was the last time she talked to
3   Gonzalez. According to Chacon, Gonzalez was ripping off Mexican Mafia drug
4   connections. (EHT 1618.) Chacon believed the Ayalas were involved in the murders
5   because when the homicide team collected a trash bag that was used to contain the
6   blood of Gonzalez, the trash bag was found to contain a dry cleaning receipt with
7   Ronaldo Ayala's name on it. (EHT 1613.)

8       No evidence was introduced establishing that Chacon "led" the investigation into
9   the 43rd street murders or overstepped the boundaries of his role as an Intelligence
10  Unit Detective. Hart admitted that he himself did not sit through Petitioner's trial and
11  did not know whether Detective Chacon was at trial every day or whether Chacon
12  actually had contact with nearly every single witness. (EHT 1057.)

13              **C.   De Novo Review**

14      The evidence adduced at the evidentiary hearing does not support Petitioner's
15  claim that Chacon had a preexisting bias against the Ayalas, which motivated Chacon
16  to pin the murders on the Ayalas and insert himself into the case. Instead, the
17  evidence shows that Chacon had reasons for suspecting the Ayalas.

18      Chacon's full statement to Hart about killing the Ayalas if they were on the street
19  shows that Chacon believed he would have to kill the Ayalas to defend himself and
20  his family members from being murdered. The full statement, as opposed to the
21  abbreviated statement in the Supplemental Hart Declaration, is not evidence of a long-
22  standing hatred of the Ayalas. Furthermore, the statement is related to threats of
23  violence by the Ayalas. Therefore, the defense would not have wanted to bring out
24  Detective Chacon's feelings about the Petitioner and his brother.

25      The information about Detective Chacon's family ties with the Sosas does not,
26  in and of itself, show that Detective Chacon was biased against the Ayalas. There is
27  no evidence that Chacon had a close relationship with the Sosas that would render
28  him biased against all members of the Mexican Mafia. Moreover, had the defense

1   attempted to show bias due to Chacon's involvement in the case or immediate
2   suspicion of the Ayalas, the foundation for Chacon's suspicion would have been
3   introduced, and that evidence would have been extremely prejudicial to the defense.

4       The fact that Chacon identified Meza, who Chacon had known since childhood
5   (EHT 1474) in addition to the Ayalas, lends credence to Chacon's claim that he based
6   the identification in part on information from street sources regarding the Ayalas' and
7   Meza's street activity.   Chacon's belief that the Ayalas had killed Gonzalez and that
8   there were similarities between Gonzalez's murder and the 43rd Street murders is
9   reflected in the "Red Book" entry.   Whether Chacon's belief was supported by
10  sufficient evidence is irrelevant.   The issue is why Chacon immediately suspected the
11  Ayalas, and the evidence shows that it was because of Chacon's beliefs regarding the
12  Ayalas' prior criminal activity.   This evidence would have been very damaging to the
13  defense.

14      As for Chacon's contacts with important witnesses, as discussed in connection
15  with Claim 4, Petitioner has not established that Chacon intimidated Mendoza Lopez
16  into changing his testimony.[10]   Nor has Petitioner shown that Chacon improperly
17  influenced Meza.   Meza did not testify as to any threats or intimidation by Chacon.
18  Chacon himself testified that Meza provided him with information regarding his
19  assigned role in the murders as early as 1985.   (EHT 1654-57.)   However, because
20  Meza did not want to talk to the authorities about the murders at that point in time,
21  Chacon did not pass on the information.   (Id.)   Chacon did, however, pass on
22  information provided by Meza that Hector Ayala had asked him to kill Castillo.   (EHT
23  1647.)   This information was recorded in the "Red Book."   (Pet. Ex. 1.)   This evidence
24  tends to show that any intimidation felt by Meza did not originate from Chacon.

25

26      [10] As noted in the Court's Group Three Order, Petitioner did not make any showing
    that trial counsel had knowledge, prior to the end of the guilt phase, of any threats and
27  intimidation of Jenifer Mendoza, Joe Moreno, Gina Moreno, Tracy Pittman, Maria Soto, Sara
    Castro or Richard Buchanan. At the evidentiary hearing, Ms. Semel testified that she did not
28  recall obtaining information that these witnesses had been intimidated or threatened by
    Chacon. (EHT 561-62.) Therefore, Petitioner cannot show that trial counsel was ineffective
    in failing to present such evidence.

In sum, the evidence introduced at the hearing does not demonstrate that Chacon was biased against Petitioner.  Petitioner fails to demonstrate that counsel's failure to present this evidence at trial constituted ineffective assistance.  Claim 24 fails on the merits under a de novo review.

### 4.   Claims 4, 8, and 12

With respect to Claims 4 (wrongful intimidation and threats to witnesses), 8 (prosecutorial misconduct - failure to disclose consideration given to witnesses and to correct false testimony), and 12 (introduction of false evidence), the Court granted an evidentiary hearing as to whether Rafael Mendoza Lopez changed his testimony as a result of threats by Chacon directed toward Mendoza Lopez and/or his wife, Jenifer Mendoza.  Although the Court denied Claims 4, 8, and 12 to the extent that they alleged intimidation of Tracy Pittman, Javier Ochoa Hernandez, Richard Buchanan, Maria Soto, Joe Moreno, and Gina Moreno, the Court noted that evidence regarding threats directed toward these witnesses may be admissible at the evidentiary hearing.

As previously outlined in the Court's Group Three Order, the defense strategy focused on discrediting Pete Castillo and Juan Meza, and shifting the blame to Castillo and two other men who were seen in the area at the time of the murders.  (Doc. No. 236 at 22-26.)  Rafael Mendoza Lopez testified for the defense that Castillo sold drugs from the shop where the murders took place, and that on the day of the murders Mendoza Lopez met Castillo at the shop, where Castillo showed him guns and said he was waiting for some people from Mexico.  (Id. at 24.)  After the close of the defense case, the prosecution recalled Mendoza Lopez on rebuttal, who then testified that although he went to the shop that day, he did not see guns and did not see strangers who looked like they were from Mexico, but saw Ronaldo and Hector Ayala at the shop.  (Id. at 26.)  He testified that Ronaldo Ayala had asked him to deny seeing the Ayalas at the shop and to shift the blame to Castillo by saying that he saw Castillo with the guns and to make it sound like Castillo had hired Mexicans from across the

1  border to carry out the hit. (Id. at 27.) Mendoza Lopez said that he lied for Ronaldo
2  Ayala because he did not want to "get killed or anything." (Id.) He testified that he
3  decided to tell the truth on rebuttal because he never wanted to help Petitioner in the
4  first place, and because after he had testified for the defense "these people" called his
5  wife and wanted her to take drugs to someone in prison, which made him realize that
6  "they" did not respect him. (Id.) Mendoza Lopez also testified that he believed
7  Ronaldo Ayala had influence over what other people in the "southern group" might do
8  to him, and that the only reason "they" had not stabbed or killed him was so that he
9  could testify for Petitioner. (Id.)

10          **A.    Application of § 2254(d) under Pinholster and Richter**

11          Again, the Exhaustion Petition relied on the original Hart Declaration. In that
12  declaration, Hart stated that in the course of his investigation of the 43rd Street
13  murders, "I learned that Detective Chacon threatened, coerced, manipulated and/or
14  intimidated potential and actual witnesses, including but not limited to, Rafael
15  Mendoza-Lopez, Joseph Moreno, Moreno's daughter, Gina Moreno, Tracy Pitman,
16  Jennifer Mendoza, Maria Soto, Sara Castro, Ochoa Hernandez, and Richard
17  Buchanan, as well as Petitioner himself, whom Detective Chacon threatened to kill."
18  (Hart Decl. ¶ 18; see also Exh. Pet. ¶¶ 169, 174.)

19          The original declaration also stated: "I learned that Detective Chacon falsely and
20  maliciously told a number of witnesses including Tracy Pitman (through her parents)
21  and others, that Petitioner was a member of the Mexican Mafia and that the Mexican
22  Mafia had issued 'contracts' to kill various witnesses, or that these witnesses were at
23  risk of murder and/or physical harm at the hands of the Mexican Mafia." (Hart Decl.
24  ¶ 19; Exh. Pet. ¶ 170.)

25          With respect to Richard Buchanan, the original declaration stated: "On
26  information and belief, among the witnesses whom Detective Chacon attempted to
27  intimidate and coerce was Richard Buchanan. While at county jail, Buchanan
28  allegedly assaulted another inmate, Manuel Rebeles, who was an informant and

associate of Detective Chacon's.  Detective Chacon attempted to coerce Buchanan into falsely fingering Petitioner as the instigator of the attack on Rebeles.  Buchanan refused."  (Hart Decl. ¶ 20.)

The original declaration also stated that Hart learned that after Mendoza Lopez testified, Detective Chacon met with and threatened Jenifer Mendoza that he would see that she was prosecuted for smuggling drugs to Mendoza Lopez, resulting in her children being taken away from her, unless she convinced Mendoza Lopez to change his testimony.  (Hart Decl. ¶ 48.)

In connection with the Group Five briefing, Petitioner submitted additional evidence which was not presented to the state court.  On the issue of alleged intimidation of Mendoza-Lopez, Petitioner submitted the following new evidence:

- Declaration of Paul Pickering dated April 5, 2006, and a report of interviews of Jenifer Mendoza by Paul Pickering on November 17, 1988 and November 23, 1988 (Ex. K to Belter Decl. dated 7/22/05.)  According to the report, Jenifer said that Chacon called her when Rafael Mendoza Lopez ["Rafa"] wouldn't agree to do what Chacon wanted.  Chacon told her to convince Rafa to talk to the D.A.  She said that Chacon became angry and said, "maybe it was time to take Jenifer off the street."  Chacon also allegedly said that if he took her off the streets, something would need to be done with her kids.  Jenifer also thought that Mendoza Lopez was told that he was on a "hit list" and that Chacon could protect him and his family.

- A report of an interview of Salvador Colabella by George Michael Newman on June 9, 2008.  (Ex. G to Belter Decl. dated 7/29/08.)  Colabella said that once when he was in the old San Diego County Central Jail, Mendoza Lopez sat down next to Colabella, who was waiting for an escort to a visit.  Mendoza Lopez told Colabella that he had cooperated on the Ayala case because they had caught his wife smuggling drugs into prison and were going to prosecute her and take away her children.  Mendoza Lopez said he traded his testimony for his wife not getting into trouble.

- Report of an interview of Luis Garcia by Newman on May 2, 2006.  (Ex. B to Belter Decl. dated 7/29/08.)  In the interview, Garcia said "it was the fact of Rafa's wife dealing drugs that might have been the major inducement causing Rafa to 'roll over' during the Ayala trials."  Garcia stated that he "heard that they (police) had told him they'd let her go.  She'd been busted for dealing (drugs) and they traded her for his testimony."

- Report of interview of Mario Marin by Newman on June 3, 2008.  (Ex. A to Belter Decl. dated 7/29/08)  Marin claims that he was

initially involved as a cooperating witness against the Ayalas because the DA's office was offering a lot of deals. He says that at a later point he escaped from Descanso Detention Facility because he knew he had lied and did not want to testify. Marin claims that around this time, his brother was killed and the authorities told him it was the EME that had done it. He refused to see Petitioner's attorney who came to see him because of what he had been told. According to Marin, Mendoza Lopez told him that he had lied in his testimony for the prosecution, "Because when they were bringing him to court they told him that they (the Ayalas) were going to have him killed." Also, Mendoza Lopez was offered freedom. Marin adds that Mendoza Lopez told him that he was involved in killing Dominguez and that he and others had brought some guys up from Mexico who were going to rip Dominguez off for drugs.

The Group Five Briefing also included new evidence regarding Richard Buchanan, a report of an April 7, 2006 interview of Buchanan by defense investigator Newman. (Ex. C to Belter Decl. dated 7/29/08.) In that report, Buchanan claimed that Chacon and DA Gloria Michaels had tried to pressure him to say that he was an EME hit man and that Petitioner had ordered him to hit Manuel Rebeles, a fellow inmate (associated with the Nuestra Familia, a rival rang to the EME) who had been stabbed. (Id.) Buchanan says that someone he is pretty sure was Chacon visited Rebeles every day. (Id.) When Buchanan refused to "confess," Chacon got mad and threatened to "bury" him. (Id.) According to Buchanan, Rebeles admitted that the police fed him the story about Buchanan being the attacker. (Id.)

The new evidence strengthened Petitioner's claims considerably. The original Hart declaration was sparse on details and did not specify the sources of Hart's information. Hart made allegations based on "information and belief," or alleged that he "learned" of facts without disclosing from whom or how he learned of them. Considering the shortcomings of the original Hart Declaration, the Court cannot say, based on the evidence that was before the state supreme court, that the state court's denial of Claims 4, 8, and 12 was contrary to, or an unreasonable application of federal law.

**B.  Evidence Adduced at the Evidentiary Hearing**

Chacon testified that his sources provided him with information indicating that

01cv0741

Mendoza Lopez was going to be used to provide an alibi for the Ayalas, which led to his belief that Mendoza Lopez had lied on the stand. (EHT 1680.) Chacon says he also learned from sources in Donovan State Prison that Jenifer was involved in drug activity and Mendoza Lopez was being pressured to give the EME a cut of his sales. (EHT 1678.)

After Mendoza Lopez's testimony at trial for the defense, Chacon contacted DA Michaels, explained that he thought Mendoza Lopez had lied, and asked to see Mendoza Lopez in jail. (EHT 1680.) Michaels gave Chacon permission and Chacon visited Mendoza Lopez the evening after he gave his testimony. (EHT 1577, 1680.) Chacon explained that he wanted to see if Mendoza Lopez would break down if confronted with the truth - that is, that the EME were going to kill Mendoza Lopez, put Jenifer on the streets and force her to smuggle drugs, whether he testified or not. (EHT 1681.) According to Chacon, his sources told him that the EME had put pressure on Mendoza Lopez to get Jenifer to smuggle in larger quantities of heroin. (EHT 1582.) When she refused, the Mexican Mafia told him that if she refused, they would kill him and still force her to continue bringing in drugs. (EHT 1583.)

When Chacon confronted Mendoza Lopez with the facts,  Mendoza Lopez broke down crying and said that he already knew, but was hoping that they wouldn't kill him. (EHT 1579.) He said, "They told me I would be back in the car," but he knew the truth - that they would still kill him. (EHT 1683.) Mendoza Lopez asked Chacon if he could help him and protect his family. (EHT 1682.) Mendoza Lopez said that two men from EME had already visited Jenifer and that he was concerned for her welfare. (EHT 1713.)

Chacon also believed he had a duty to tell Jenifer that she was the target of a threat. (EHT1681.) He recalled visiting her soon after talking to Mendoza Lopez. Chacon told her that she and her kids were in danger, and Jenifer confirmed that she had already been visited by members of the EME. (EHT 1580.) Chacon stated that he was not trying to scare her, and noted that she was already scared. (EHT 1689.)

42                    01cv0741

1   He denied threatening that something bad was going to happen if she did not get
2   Mendoza Lopez to tell the truth. (EHT 1688.)  He denied threatening to take her off
3   the streets and have her kids taken away. (EHT 1688.)

4          Rafael Mendoza Lopez testified that he saw the Ayalas after they were arrested,
5   after Luis Garcia, a Mexican Mafia member, told Mendoza Lopez that Petitioner
6   wanted to see them. (EHT 714.)  During the visit, Ronaldo Ayala showed him a note,
7   which mentioned a defense investigator, described the weapons, and instructed
8   Mendoza Lopez to blame Castillo. (EHT 730.)  After that, Mendoza Lopez started
9   making up lies. (EHT 715.)  Mendoza Lopez explains that he wanted to be "in good
10  standing" with those guys because if he did not help, "they would f____ have me
11  killed, right?" (EHT 716.)  Mendoza Lopez had to try to "run" with the EME because
12  they were in prison and on the streets.

13         After Mendoza Lopez testified for the defense, he was taken to South Bay
14  County Jail and was awaiting a return to Donovan. (EHT 756-57.)  Mendoza Lopez
15  testified that Chacon came to visit and told him, "We know you lied in court." (EHT
16  756.)  Chacon asked him why he was helping them out when they were just going to
17  use him and get rid of him. (Id.)  Mendoza Lopez said he was not pressured to testify
18  against Ronaldo Ayala, but instead was getting fed up with the Mexican Mafia. (EHT
19  757, 765.)  The straw that broke the camel's back was that while he was in South Bay,
20  someone called up Jenifer and told her to pick up drugs and take it to someone in
21  Donovan. (EHT 766-67.)  Mendoza Lopez was angry and told Jenifer not to talk to
22  them anymore.  He was upset that he was lying for the Mexican Mafia, and they
23  weren't showing him any respect or loyalty.  That is what "tripped the trigger," rather
24  than threats by Chacon or anyone else. (EHT 767.)

25         Mendoza Lopez, consistent with Chacon's account, stated that he immediately
26  admitted to lying. (EHT 760.)  He stated that Chacon did not threaten that he and his
27  family would be harmed unless Chacon protected them. (EHT 778.)  Mendoza Lopez
28  also denies that Chacon ever threatened to arrest Jenifer or take their kids away.

1   (EHT 793-94.)

2       Mendoza Lopez stated that he did not tell Mario Marin or anyone else that he
3   had lied for the prosecution. (EHT 790.)  At the hearing, he gave equivocal answers
4   with respect to whether Chacon knew about his informant status and whether he was
5   afraid his informant status would be revealed. (EHT 765.)  He said: "I guess.  I don't
6   know," when asked if Chacon would have had that information.  He similarly first
7   responded: "I don't know," and then: "I guess" when pressed regarding whether he felt
8   there was a possibility he would be put in the cross hairs if that information came out.
9   (Id.)  Mendoza Lopez testified that his rebuttal testimony at trial was 100% true.  (EHT
10  794.)

11      Jenifer Mendoza testified that she was aware that Mendoza Lopez went to visit
12  Ronaldo Ayala in jail.  She testified that Petitioner asked Mendoza Lopez to "alibi" him
13  by pointing the finger at the surviving victim.  Mendoza Lopez communicated this
14  information to Jenifer about a half hour after the visit to Petitioner. (EHT 1206-07.)
15  Jenifer testified that she thinks Chacon contacted her by phone prior to Mendoza
16  Lopez's rebuttal testimony but after Chacon had already talked to Mendoza Lopez.
17  (EHT 1185, 1188.)  Chacon told her that Mendoza Lopez was going to take the stand
18  and testify against the Ayalas and warned that there might be problems. (EHT 1188.)

19      Jenifer denied Chacon said that he was going to take her off the streets
20  because she was smuggling drugs into prison. (EHT 1190.)  He did not threaten to
21  take her kids away from her. (Id.)   Jenifer did not have the impression that Chacon
22  was going to save her family from a hit list. (EHT 1229.)  Jenifer denied almost
23  everything in the Pickering report. (See Ex. K to Belter Decl. dated 7/22/05; EH Ex.
24  W.)  For instance, she denied that Chacon threatened her that he would take her off
25  the street and that something would have to be done with her children, and denied
26  telling Pickering that Chacon made those statements. (EHT 1200-01, 1204.)  She
27  denied telling Pickering that Chacon said that he really wanted to keep Petitioner in
28  jail. (EHT 1203.)  Chacon did not try to get Jenifer to convince Mendoza Lopez to talk

to the DA. (EHT 1200.)  Jenifer denied telling Pickering that she was involved in smuggling drugs into prison. (EHT 1199, 1202.)  She explained that she would not want to implicate herself in any criminal activity and denied that she ever smuggled drugs into Donovan State Prison. (EHT 1223.)

Jenifer testified that she did not talk to Mendoza Lopez about his change in testimony beforehand. (EHT 1209.)  She added that Mendoza Lopez never told her that Chacon pressured or threatened him, and said that Mendoza Lopez told her that his rebuttal testimony for the prosecution was the truth. (EHT 1210.)

In 2009, during an interview with the AG's investigator, Jenifer said that the SSU and some police officers came to her house and told her they had uncovered a hit list with her family on it. (EHT 1216-17, citing EH Ex. V[11] at 4.)  In that interview, she said that they were coming to her house to get Mendoza Lopez to change his testimony and that Chacon was trying to go through her to get Mendoza Lopez to turn. (EHT 1220-21, 1226, citing EH Ex. V at 6.)  However, at the evidentiary hearing, she said she wasn't threatened by anyone. (EHT 1221-22.)  She also said that she was confused about the timing of events and that Mendoza Lopez testified for the prosecution before she even knew he was testifying. (EHT 1221-22, 1239, 1241.)  She stated that she is not sure whether the visits were before or after Mendoza Lopez gave his statement to the DA's office and Chacon. (EHT 1231-32, 1234-35, 1237.)  At any rate, she testified that she did not communicate any information to Mendoza Lopez and did not talk to him before he testified on rebuttal. (EHT 1235, 1239.)

Mario Marin testified that he talked to Mendoza Lopez when he was preparing to testify.[12] (EHT 1114.)  Marin learned from Mendoza Lopez that the DA had "turned"

---

[11] Exhibit V, the 2009 interview of Jenifer Mendoza by the Attorney General's office, was admitted into evidence, limited to the portions that were discussed with Jenifer Mendoza at the evidentiary hearing. (See EHT 1251.)  Accordingly, the Court has limited its consideration of Exhibit V to the portions in evidence.

[12] Marin states that when the prosecution wanted to call him to testify, Marin informed defense counsel that he had previously lied and intended to tell the truth about his prior lies about Petitioner in court. (EHT 1113.)

01cv0741

Mendoza Lopez by saying that they had intercepted a kite that said that Mendoza Lopez was going to get killed. (EHT 1116.)  Prior to telling Newman this information in 2008, he does not recall telling anyone else.  (EHT 1144.)

However, Marin admitted to his history of telling different stories to different people and lying to the prosecution as well as the defense.  He provided information to help himself.  (EHT 1147, 1162.)  Marin claims that as a result of his agreement to cooperate with the DA's office against the Ayalas, he got a year at Descanco instead of a four-year sentence in prison.  (EHT 1107.)  He ended up escaping from Descanco because he did not want to testify against the Ayalas.  (EHT 1108.)  Marin confirms that at one point he was going to tell the defense lawyers that he was making up stories about the Ayalas, but then he did not because DA Gloria Michaels told him that the Mexican Mafia might have been involved in the killing of his brother.  (EHT 1112.)

In 1987, Marin told DA investigator Rolan that Ronaldo Ayala had asked him to stab someone and provided him with a knife to do it.  (EH Ex. AS.)  At the evidentiary hearing, Marin said that it was not Ronaldo Ayala who asked him to do that.  (EHT 1126.)  Marin also told Rolan that he wanted to be relocated because he thought his life was in danger from the Ayalas.  (EHT 1125.)   At the evidentiary hearing, Marin conceded that was what he thought at the time.  (Id.)  Marin had also told Rolan that the Ayalas were "top rank" in the Mexican Mafia and that the other inmates were scared of them because they did not want to get "hit," but now claims that he was just telling the prosecution what they wanted to hear.  (EHT 1130-31.)  Marin now denies that Hector told him to say that Tommy Abbott and/or Sandoval were lying about the murders.  (EHT 1128-30, 1133.)

Marin stated it was true that Petitioner sent him a kite in 1988, telling him that if he needed anything "like toothpaste," to let him know.  (EHT 1127.)  Marin confirmed that a defense investigator told him once that if he did not say anything, the Mexican Mafia would hold no grudges, and he could go back to the "mainline."  (EHT 1120.)  He knew that if, in contrast, he said something: "I would have got hit, stabbed, shot,

1  or whatever."  (Id.) He admitted to writing a letter to DA Gloria Michaels (see EH Ex.

2  AO), complaining that the defense private investigators were trying to get him to testify

3  by implying that there will be no contract on his life and everything will be ok if he

4  helped them.  He also complained to Lt. LaMarque about defense investigators

5  attempting to coerce his testimony.  (See EH Ex. AP.)

6       Luis Garcia did not deny that he encouraged Mendoza Lopez to go talk to

7  Petitioner after his arrest. (EHT 891.) He had a vague recollection of that but said he

8  could not be sure. (EHT 876, 892.) Garcia did not have any personal knowledge of

9  Jenifer Mendoza smuggling drugs into any of the institutions. (EHT 875.) He did not

10  testify regarding knowledge that Mendoza Lopez changed his testimony to keep

11  Jenifer from being prosecuted.  He also denied being affiliated with the EME but

12  admitted that he had been validated as an EME member by the Department of

13  Corrections. (EHT 880.)

14       At the evidentiary hearing, Richard Buchanan testified that his statements in

15  the Newman report (Ex. C to Belter Decl. dated 7/29/08; EH Ex. AV) were true. (See

16  EH Ex. 337.)[13] Although at the time of his evidentiary hearing testimony, Buchanan

17  acknowledged that he did not have an independent recollection of Chacon visiting

18  Rebeles everyday.  (Id.)

19       Buchanan was validated as an EME member. (Id.) He denied being a member

20  although he did not deny associating with them. (Id.) When asked if he did favors for

21  Ayala, he responded: "Not that I recall."  (Id.)  Yet, prior to his evidentiary hearing

22  testimony, Buchanan asked counsel for Petitioner if Ronaldo Ayala was in agreement

23  with Buchanan participating in the deposition.  (Id.)

24       **C.    De Novo Review**

25       The evidence that came out at the evidentiary hearing does not support

26  Petitioner's claim that Mendoza Lopez gave false testimony against the Ayalas as a

27

28       [13] Ex. 337 was the taped deposition of Richard Buchanan, which was admitted into evidence as an exhibit. (EHT 2039.)

1  result of threats and intimidation.  The evidence does not establish that Chacon or any
2  other member of the prosecution threatened or intimidated Mendoza Lopez, Jenifer
3  Mendoza, Richard Buchanan, or any other witness.[14]

4      Chacon, Mendoza Lopez, and Jenifer Mendoza agree that there were no
5  threats directed toward Mendoza Lopez or Jenifer, and that Mendoza Lopez was
6  telling the truth when he testified for the prosecution.  Jenifer remembers Mendoza
7  Lopez telling her shortly after he visited Petitioner in jail that Petitioner asked Mendoza
8  Lopez to "alibi" him by pointing the finger at Castillo.

9      Both Chacon and Mendoza Lopez testified regarding how Mendoza Lopez knew
10  that he was being used by the Mexican Mafia and admitted to lying immediately upon
11  being confronted by Chacon with the truth.  Mendoza Lopez explained how he was fed
12  up with the Mexican Mafia and was particularly upset that they were not respecting
13  him by asking Jenifer to smuggle drugs to someone else in Donovan.  Chacon also
14  heard that Jenifer was smuggling drugs into prison and that the Mexican Mafia was
15  attempting to use her to smuggle in more drugs.  Jenifer Mendoza denied ever
16  smuggling drugs or being asked to do so after her husband testified for the defense,
17  but it is understandable why someone in her position would be reluctant to admit to
18  any involvement in criminal activity.

19      According to Mendoza Lopez, the Mexican Mafia's attempt to use his wife to
20  smuggle drugs was the straw that broke the camel's back.  This incident, not any
21  threats or intimidation, motivated him to tell the truth. Mendoza Lopez's evidentiary
22  hearing testimony about the reasons prompting his recantation are consistent with the
23  statements he made at trial twenty-two years earlier.  During his rebuttal testimony at
24  trial, the following exchange occurred:

25

26      [14] In Petitioner's Post-Evidentiary Hearing Brief, he argues that the prosecution failed
27  to disclose that Meza received benefits including a free pass for any and all criminal offenses
    committed while in the custody of the CDC and a guarantee of immediate release after
    testifying against Petitioner.  This claim was not included in the Second Amended Petition
28  and was added as Claim 76 in the Third Amended Petition.  In an order dated March 12,
    2012, the Court granted Respondent's motion for summary judgment on Claim 76.

1
2

Q:    And what is it that happened after your testimony that made you
      decide to come forward today?

3
4
5
6

A:    Because I - - I felt I didn't really want to come and help him out in
      the first place.  I never thought it was even - - I even told the
      attorneys I never thought it was going to come this far, you know,
      where I had to come and testify or nothing.  But, you know, after
      I testified and these people started calling my wife, you know, they
      wanted her - - told her, you know, that I had put him in a spot.
      They wanted her to go visit somebody else in prison to take them
      drugs and - -

7

Ms. Semel:  Your Honor.

8
9
10

The Witness:     - - so I told them - - I started thinking, "Man, I do
                 these guys all these favors," you know, "and they
                 don't show me no kind of respect," you know.  The
                 only reason I never got hit was because I was coming
                 to court for them - -

11

(RT 16355-56.)  At the evidentiary hearing, Mendoza Lopez stated as follows:

12
13
14

I was mad because during that time when I came and testified, right,
during the time when I came and testified, on Ronnie's behalf, I was in
the county jail in South Bay and some idiot called my wife to tell her to
pick up some dope and take it to somebody else in Donovan.  Right?

15

And my wife told me, "What kind of friends do you have?  They
want me to go visit" so and so.

16
17

And I said, "You know what? Hang up that phone and don't call
them.  Don't talk to them." That's why I was mad.  That's why I did that.

18
19

Because I said, "You know what? These m_____ f_____ ain't got
no" - - I'm sorry about that.  "These people have no respect or loyalty to
nobody, man."

20
21

I'm over here trying to bury myself implicating myself with these
idiots, the Mexican Mafia, that I have no part of it, but I'm associating
myself with and lying for them, and they are over here calling my wife to
go visit somebody else.

22
23

What kind of respect is that?  You know what I mean?  So that's
why I did it, man.  That's why I was fed up with all of that.  You know?

24
25

That's what tripped the trigger, not because Chacon was
threatening me or anybody else was threatening.   Nobody ever
threatened me to testify against Ronnie.  I did it on my own.  Okay?

26

(EHT 766-67.)

27
28

The trial record shows that Mendoza Lopez testified for the defense on
Wednesday, September 14, 1988.  On Wednesday, September 28, 1988, Prosecutor

01cv0741

1   Woodward informed the court that: "I had requested that Chacon talk to this witness"

2   and that the interview took place on "Friday of last week," followed by "an interview

3   with us on Saturday." (RT 16233.) Therefore, it is evident from the record that

4   Mendoza Lopez would have had sufficient time to speak with Jenifer, find out about

5   EME's attempts to use her to smuggle drugs into prison, and become motivated to

6   recant his testimony between his defense testimony on September 14th and his

7   September 23rd interview with Chacon.

8        Petitioner also suggests that Mendoza Lopez was worried about Chacon using

9   his informant status against him. However, a review of the evidentiary hearing

10  testimony reveals that Mendoza Lopez was unsure whether Chacon had knowledge

11  regarding his informant status and did not seem to have a specific recollection of

12  being concerned about that information getting out. Mendoza Lopez insisted he was

13  not pressured to testify against Petitioner.

14       Jenifer was somewhat confused about when the SSU and police officers came

15  to her house and when she talked to Chacon. (EHT 1239-43.) Although in 2009 she

16  seemed to think that the authorities were trying to get her to persuade Mendoza Lopez

17  to change his testimony, she admits now that she is unsure about the timing of events

18  and whether the authorities intended for her to pass along information to Mendoza

19  Lopez about how the Mexican Mafia worked. (EHT 1230-33, citing EH Ex. V at 4;

20  EHT 1236-38.) Now she says that she did not talk to Mendoza Lopez before he

21  actually testified for the prosecution and that he took the stand before she even knew

22  that he was testifying. (EHT 1235.) Both in the 2009 interview and at the evidentiary

23  hearing, Jenifer was firm in repeatedly denying that Chacon threatened to take her off

24  the streets or to take away her children. (EHT 1190, 1200-01, 1203-04, 1220-21,

25  citing EH Ex. V at 6.)

26       Jenifer's recollection of authorities coming to her house would be consistent

27  with Chacon's testimony that he visited Jenifer soon after Mendoza Lopez admitted

28  the truth because he was concerned for her safety. It would make sense for the

50                                          01cv0741

1  authorities to then brief Jenifer regarding how the Mexican Mafia operates and what
2  to look out for.

3        The Court finds Jenifer Mendoza to be a credible witness. While her chronology
4  of events was admittedly shaky, the Court acknowledges that at the time of the
5  evidentiary hearing she was testifying to events that had occurred nearly twenty-two
6  years ago (and twenty-one years prior to the date of the interview with the Attorney
7  General's office).   Moreover, despite the fact that the statute of limitations on a
8  potential prosecution for drug dealing would have expired years before, it is
9  understandable why Jenifer would be reluctant to admit to past active involvement in
10 drug dealing, given that she is employed as a registered nurse. (EHT 1880.) At the
11 evidentiary hearing, Jenifer stated, with respect to Pickering's report, "the only thing
12 that I could tell you that I do remember discussing was the tennis ball incident." (EHT
13 1230.) Earlier in her evidentiary hearing testimony, Jenifer stated that she was asked
14 to drive Rudy to the jail, that a tennis ball was involved, but that she "didn't know
15 specifically" the purpose of that visit.   (EHT 1192-93.)   However, Jenifer has
16 consistently and repeatedly denied that Chacon threatened her in any way in order to
17 get her husband to change his testimony.   The Court finds those denials to be
18 credible.

19       Pickering's report is troubling in its internal inconsistencies, and its direct
20 contradiction to Jenifer Mendoza's testimony. Jenifer denies telling Pickering most of
21 what is set forth in the report of the two interviews in November 1988. Setting aside
22 Jenifer's denials, it seems unlikely that Jenifer would have admitted to Pickering, a
23 stranger, that she was smuggling drugs into prison. This is especially so considering
24 that even Pickering acknowledged that Jenifer was "guarded" in her responses during
25 the first interview and reluctant to talk, and that the interview was approximately ten
26 minutes long.  Yet, Pickering nevertheless asserts that Jenifer related the details of
27 the tennis ball incident during his initial interview with her. (EHT 1808-09; EH Ex. W.)
28 At the evidentiary hearing, Pickering stated with respect to the first interview that "we

contacted her the first time and she was frenzied, wouldn't talk to us, until she had talked to Rafa." (EHT 1765.)

Even if Jenifer told Pickering that Chacon had threatened her to get Mendoza Lopez to change his testimony, the Court finds that she may have said it in order to provide cover to her husband, and as an alternate reason for his rebuttal testimony. Ultimately, even had defense counsel called Jenifer as a witness with respect to the alleged threats detailed in the Pickering report, she also had a conversation with her husband prior to his defense testimony in which he told her that: "Ronnie was asking him to alibi him, to alibi Ronnie, for those murders," and that Mendoza Lopez "was supposed to point the finger at the surviving victim to be the trigger man of the other two." (EHT 1206-08.) Thus, had the defense called Jenifer to testify that Mendoza Lopez's rebuttal testimony was recently fabricated due to threats by Chacon, Jenifer's testimony on this point would have been admissible at trial as a prior consistent statement, as it was made well before Mendoza Lopez agreed to testify for the prosecution on rebuttal. See Cal. Ev. Code § 791(b).

With respect to Petitioner's allegation that Chacon threatened Mendoza Lopez by telling him that he and his family were in danger and would be killed by the EME, Mendoza Lopez clearly stated that even if Chacon had made such statements, they did not constitute force or pressure because Mendoza Lopez already knew that information. (See EHT 771-74.) Mendoza Lopez stated that: "No, I didn't feel pressure. I told the truth to whatever extreme it went to. Whether it was to protecting myself or if I was going to get killed, I knew I was already done and washed up and I was telling the truth. Okay?" (EHT 768.)

Marin was not a credible witness. He essentially admits to lying whenever it benefits him. His credibility is especially damaged by that fact that in 1987 Marin believed that his life was in danger from the Ayalas, and Marin admits that at some point a defense investigator impliedly threatened him by saying that if he did not say anything (against the Ayalas), the Mexican Mafia would hold no grudges and he could

01cv0741

1   go back on the mainline. (EHT 1119-20.) Furthermore, Marin did not tell anyone
2   about his alleged conversation with Mendoza Lopez prior to his interview with
3   Newman. (EHT 1144.) Mendoza Lopez denies ever telling Marin that he had lied.
4   (EHT 790.)

5          Richard Buchanan's testimony also lacks credibility. He seemed less than
6   forthright about his relationship with the Ayalas. Tellingly, when asked whether he had
7   done favors for the Ayalas, he responded: "Not that I recall." (Ex. 337.) He did not
8   flatly deny that he had done favors for them. Also, Buchanan asked Petitioner's
9   counsel if Ronaldo Ayala was in agreement with Buchanan participating in the
10  deposition, indicating that Buchanan was anxious not to do anything against
11  Petitioner's wishes. (Id.) Chacon does not remember contacting Buchanan or
12  meeting him. (EHT 1676-77.)

13         Finally, the Court finds the evidentiary hearing testimony of Rafael Mendoza
14  Lopez to be credible. Nearly twenty-two years after his trial testimony, Mendoza
15  Lopez maintains that his initial defense testimony was concocted at the request and
16  for the benefit of Petitioner, and maintains that his rebuttal testimony was and is the
17  truth. Moreover, Mendoza Lopez asserted at the evidentiary hearing that he was not
18  threatened by Chacon into changing his testimony, instead stating, consistent with his
19  testimony on rebuttal, that he was motivated to change his testimony by actions of the
20  EME in contacting his wife to smuggle drugs into prison thereby failing to show him
21  any respect.

22         At the time of his evidentiary hearing testimony, Mendoza Lopez was
23  incarcerated with an expected release in 2016, and expressed fears about being
24  transferred to Chino en route back to his current prison, because "[t]hat place is
25  polluted with gangs." (EHT 800-04.) Given these concerns, it appears Mendoza
26  Lopez could have been motivated to recant his rebuttal testimony in order to help the
27  EME. Yet, Mendoza Lopez maintained that his rebuttal testimony was the truth.
28  ///

1    ///

2    ///

3    ///

4    ///

5    ///

6         In sum, the Court finds that Chacon, Jenifer Mendoza and Rafael Mendoza

7    Lopez were credible witnesses, each who testified that there were no threats or

8    intimidation by Chacon in attempting to get Mendoza Lopez to change his trial

9    testimony. Thus, the evidence does not establish that Chacon and/or the prosecution

10   intimidated Rafael Mendoza Lopez or any other witness. Petitioner has not shown

11   that Mendoza Lopez gave false testimony as a result of threats directed toward him

12   or his wife.   Therefore, even considering the new evidence brought out at the

13   evidentiary hearing, Claims 4, 8, and 12 fail on the merits under a de novo review.

14        **5.    Claim 5**

15        In Claim 5, Petitioner alleged that his constitutional rights were violated by the

16   prosecution's failure to disclose evidence to Petitioner's trial counsel regarding

17   Detective Chacon, in violation of Brady v. Maryland, 373 U.S. 83 (1963). The Court

18   granted an evidentiary hearing with respect to evidence of Chacon's bias against the

19   Ayalas and the attempted intimidation of Rafael Mendoza Lopez via threats to Jenifer.

20   The evidentiary hearing was granted on the basis of the new evidence submitted in

21   connection with Claims 24, 4, 8, and 12.

22        As previously discussed, under Pinholster, these new facts would not be

23   considered by the Court in conducting a § 2254(d) analysis. For the same reasons

24   that it was not contrary to, or an unreasonable application of, federal law for the

25   California Supreme Court to deny Claims 24, 4, 8, and 12 based on the meager facts

26   before it, the state court's denial of Claim 5 was objectively reasonable.

27        Even if the Court were to consider the evidence brought out at the evidentiary

28   hearing, the Court would still hold that Petitioner is not entitled to relief. As discussed

1  above, the evidence did not establish that Chacon had a hatred or bias against the

2  Ayalas.   Chacon's statement that he would kill the Ayalas if they ever got out of jail

3  was taken out of context. Chacon's statement was referring to his belief that the

4  Ayalas would try to kill him and his family and his need for self-defense.  Although

5  Chacon admitted to a familial relationship with the Sosas, there is no evidence that

6  this relationship caused Chacon to be biased against the Ayalas. Chacon immediately

7  identified the Ayalas as suspects because of information he had regarding crimes the

8  Ayalas and Meza were committing in the area and his belief that the murders bore a

9  similarity to the murder of Maruo Gonzalez, in which Chacon believed the Ayalas were

10 involved.

11        With respect to the intimidation of witnesses, as discussed above, the evidence

12 did not establish that Mendoza Lopez, Jenifer Mendoza, or Buchanan were threatened

13 or intimidated by Chacon or any member of the prosecution.  The evidence shows that

14 Mendoza Lopez changed his testimony of his own accord due to his anger that the

15 Mexican Mafia was trying to get Jenifer to continue to smuggle drugs into prison and

16 was showing Mendoza Lopez neither respect nor loyalty.  The evidence corroborates

17 that Mendoza Lopez was telling the truth when he testified on rebuttal.

18        Accordingly, even considering the evidence adduced at the evidentiary hearing,

19 Petitioner has not established that the prosecution failed to disclose material evidence

20 favorable to Petitioner. Brady, 373 U.S. at 87-88.  Therefore, Petitioner is not entitled

21 to habeas relief on this claim under a de novo review.

22        **6.   Conclusion Re: Evidentiary Hearing Claims**

23        As discussed above, Richard Savocchio and Raul Garcia could have provided

24 impeachment evidence against Juan Meza, but each could have himself been

25 impeached with prior inconsistent statements, prior lies to prison officials (Savocchio),

26 inconsistencies in the timing of their account (Garcia), connections to a "group," and

27 in the case of Raul Garcia, even Semel was of the belief that his account was

28 "possible B.S." Meanwhile, Juan Mendez could have provided impeachment evidence

1  against Pete Castillo, but Mendez had given multiple statements containing a variety
2  of inconsistencies, he was associated with EME, and Semel's own notes indicated that
3  he was "a close friend of Ronnie's from prison" and opined that he was "too risky to
4  testify."

5       Even under a de novo review, "the relevant inquiry under Strickland is not what
6  defense counsel could have pursued, but rather whether the choices made by defense
7  counsel were reasonable." Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir. 1998),
8  citing Strickland, 466 U.S. at 690.  Here, defense counsel was faced with a choice
9  between pursing potential impeachment witnesses that had a myriad of credibility
10  issues of their own, or pursing the course that was ultimately taken: (1) impeaching
11  the testimony of Pete Castillo and Juan Meza, and (2) raising questions about
12  Castillo's possible involvement in the crime, aided by the testimony of Rafael Mendoza
13  Lopez.  With respect to the latter part of the strategy, obviously Mendoza Lopez's
14  recantation and rebuttal testimony impacted the success of that strategy, but the Court
15  cannot conclude that Semel's choice to continue pursuing the strategy was
16  unreasonable.

17       After Mendoza Lopez recanted, Semel expressed concerns about the potential
18  introduction of the gang issue, stating; "it seems from reading Mr. Mendoza's
19  statement that we are on the threshold of that in a way perhaps we never have been
20  before.  It changes the entire focus of the trial, the direction of the trial, and the
21  strategy of the defense, perhaps - - well, irreversibly so; and it affects, when one looks
22  back, a number of strategic decisions the defense has made." (RT 16242.)  Semel
23  also indicated that "[h]ad we known that it was going to come in with regard to Mr.
24  Mendoza, we would have tried this case completely differently." (Id.) Yet, despite her
25  assertion that she would have tried the case differently had she known of Mendoza
26  Lopez's recantation at the outset, it is evident that counsel's conduct was reasonable.
27  As detailed below, even without Mendoza Lopez's testimony, a defense theory
28  asserting Castillo's potential involvement in the crime found support in the trial

01cv0741

1   evidence, and Semel's decision to continue to pursue that strategy was a tactical

2   decision and "falls within the wide range of reasonable professional assistance."

3   Strickland, 466 U.S. at 688.

4          For instance, Semel argued that "from the moment that Castillo opened his

5   mouth in the street, he began to weave a very tangled web, and as the years have

6   passed, he finds himself inextricably caught inside of it." (RT 16693.)  Semel pointed

7   out Castillo's prior repeated lies denying his involvement in and knowledge of drug

8   trafficking activities at the body shop, and pointed out that Castillo's name was found

9   at the top of drug lists recovered from the garage. (RT 16694-96.)  Semel argued that

10  even after Castillo acknowledged his involvement, he portrayed himself as merely an

11  "errand boy" who had scant knowledge of the drug activities.  (RT 16702.)

12         Semel also emphasized that while Castillo asserted the victims' mouths had not

13  been taped, he initially described the victims as "gagged." (RT 16712.)  Semel noted

14  that the victims were found with duct tape over their mouths, and asserted that

15  Castillo's account of a verbal exchange between the Ayalas and Dominguez could not

16  be explained given the evidence.  (RT 16714.)  Semel also pointed out that Castillo

17  originally told police that the duct tape belonged to him, arguing that at that early point

18  in the investigation, Castillo reasonably feared that his fingerprints could have been

19  found on the tape and needed an explanation.  (Id.)

20         In implicating Castillo as involved in the crimes, Semel noted that Castillo had

21  been stabbed with a Buck knife that was later found at the scene, the same kind of

22  knife that Castillo once owned and later lost.  (RT 16715.)  Semel also contested

23  Castillo's claims that he was robbed, pointing out that he made no mention of a

24  robbery in his initial taped interview.  (RT 16701.)  Later, when Castillo claimed he was

25  robbed, Semel argued that Castillo was inconsistent on which pocket contained the

26  money that was stolen.  (RT 16716.)  Semel also noted a number of problems

27  concerning Castillo's testimony about tow trucks in the auto body lot, the functioning

28  of the garage door, and Castillo's claims that he blacked out that evening.  (RT 16720-

1 ∥ 27.)  Semel also emphasized that Castillo's initial suspect description of three male

2 ∥ Mexicans in their 20's was corroborated in part by Traci Pittman, who saw two male

3 ∥ Mexicans in their 20's shortly before the crime. (RT 16728-29.)  Semel also noted

4 ∥ that, while in the hospital, Castillo received a call from Mexico, which he claimed was

5 ∥ for a different Pete Castillo. (RT 16728.)  Finally, Semel argued that Castillo's

6 ∥ involvement or association with the true perpetrators was indicated by the fact that

7 ∥ when first questioned by the police at the scene of the crime, Castillo said he was not

8 ∥ saying anything until his attorney was present. (RT 16728.)  Semel then argued:

9

10

11

12
I think all that must be said, when one looks at the internal conflicts in Mr. Castillo's testimony as I have gone through the events of the 26th of April and particularly Mr. Castillo's continued denials with regard to his involvement in drugs at the shop, is a serious question is raised that cannot be answered: Was Mr. Castillo involved in what occurred on the 26th of April 1985?

13

14
And the District Attorney mentioned the accomplice instruction to you, ladies and gentlemen, suggested that somehow the defense might argue that Mr. Meza was an accomplice. Not at all.

15

16

17
From the perspective of the defense- And I will talk about this a bit more later - that instruction is offered in regard to Mr. Castillo. And if you have a doubt that Mr. Castillo has yet to tell you the truth about what happened on the 26th of April, then you do indeed have a doubt as to whether Ronaldo Ayala is the perpetrator of those killings.

18 ∥ (RT 16733.)

19 ∥         Ultimately, Petitioner fails to demonstrate that a defense strategy that would

20 ∥ have allowed all of the impeachment evidence, and evidence of "groups" or

21 ∥ "associations," connected to Petitioner as was Mendoza Lopez, would have been any

22 ∥ more effective than the impeachment and implication of Castillo that counsel ultimately

23 ∥ pursued at trial. "A disagreement with counsel's tactical decisions does not provide

24 ∥ the basis for declaring that the representation was constitutionally deficient." Raley

25 ∥ v. Ylst, 470 F.3d 792, 799 (9th Cir. 2006), citing United States v. Mayo, 646 F.2d 369,

26 ∥ 375 (9th Cir. 1981) (en banc).  Indeed, given the evidence before the Court

27 ∥ concerning the credibility of Savocchio, Garcia and Mendez, the strategy Petitioner

28 ∥ now advocates might have proven worse. At any rate, Petitioner has not shown that

01cv0741

1  the choices made by defense counsel were not reasonable strategic decisions, or that
2  they resulted in prejudice to Petitioner.

3      With respect to the remainder of the claims at issue at the evidentiary hearing,
4  the evidence does not establish that counsel was ineffective for failing to impeach
5  Detective Chacon on the issue of bias, nor does it demonstrate that Chacon or the
6  prosecution attempted to intimidate Mendoza Lopez or any other witness.  Petitioner
7  also fails to demonstrate that the prosecution failed to disclose Brady evidence
8  regarding Detective Chacon. The state supreme court's rejection of these claims was
9  not contrary to, or an unreasonable application of, clearly established federal law, and
10 they fail even under a de novo review.

11 **B.    Previously Deferred Claims**

12     **1.    Claim 2**

13     In Claim 2, Petitioner asserts that his trial was infected by the ineffective
14 assistance of counsel, multiple errors by the trial court, the trial court's failure to
15 ensure due process, and numerous acts of misconduct by the prosecution and the
16 jury, and argues that each of the errors "individually and cumulatively in whole and in
17 part, caused Petitioner prejudice." (Third Amended Petition ["TAP"] ¶ 161.) Petitioner
18 alleges that his right to fundamental fairness at trial, as guaranteed under the Fifth,
19 Sixth, Eighth and Fourteenth Amendments, was violated as a result of these errors.

20     In the Group Five Order, issued June 9, 2009, the Court reasoned that because
21 an evidentiary hearing had been ordered on several claims, the Court would defer
22 consideration of the merits of Claim 2 until after the conclusion of the evidentiary
23 hearing.  (Doc. No. 287 at 15.)

24     Reviewing courts have acknowledged the possibility that in some cases, "[t]he
25 cumulative effect of multiple errors can violate due process even where no single error
26 rises to the level of a constitutional violation or would independently warrant reversal."
27 Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi,
28 410 U.S. 284, 290 n.3 (1973).  However, as discussed in the adjudication of the other

1   claims contained in the Petition, Petitioner has failed to demonstrate error of a
2   constitutional dimension occurred in his case.   Accordingly, "there is nothing to
3   accumulate to a level of a constitutional violation."   Mancuso v. Olivarez, 292 F.3d
4   939, 957 (9th Cir. 2002).

5        Thus, based on an independent review of the state record, the Court cannot
6   conclude that the California Supreme Court's rejection of this claim was an objectively
7   unreasonable application of clearly established federal law, nor that it was based on
8   an unreasonable determination of the facts.   Claim 2 does not merit habeas relief.

9        **2.   Claim 35**

10       In Claim 35, Petitioner alleges that appellate counsel was ineffective in his
11  failure to investigate, research, prepare and present numerous issues during the
12  appeal in state court.  In the merits briefing for the Group Three claims, Petitioner, for
13  the first time, specifically cited to thirty-two separate claims which he contends should
14  have been presented to the state court.

15       The thirty-two claims that Petitioner contends should have been raised on
16  appeal are Claim 75 (from Group One), Claims 55-66 (from Group Two), Claim 68
17  (from Group Three), Claims 10-11, 48-49, 67, and 70 (from Group Four) and Claims
18  2-3, 5-6, 8-9, 12-16, and 69 (from Group Five).[15]

19       At that time, Petitioner acknowledged that he had not fully briefed Claim 35 on
20  the merits, explaining that, "Although the claims for which Petitioner claims IAAC
21  [Ineffective Assistance of Appellate Counsel] are specifically listed, Petitioner has not
22  exhaustively discussed the merits of these claims, or provided full factual support for
23  them at this time, believing that [to] do so would be premature until the Court first rules
24  on the underlying claims." (Pet. Mem. of P. & A. at 120.)

25       In the Group Three Order dated February 1, 2008, the Court denied the claim
26  without prejudice, stating that it would "consider this claim when it has been fully
27  briefed on the merits," and permitting the parties to include the claim in their Group

28  _____

        [15] In his motion papers, Petitioner erroneously identifies Claim 15 as Claim 11.

1  Five motions.  (Doc. No. 236 at 87.)

2        Due process guarantees effective assistance of counsel on appeal where the

3  state provides a criminal appeal as of right.  Evitts v. Lucey, 469 U.S. 387, 401 (1985).

4  However, when filing an appeal, "counsel had no constitutional obligation to raise

5  every non-frivolous issue requested by the defendant."  Miller v. Keeney, 882 F.2d

6  1428, 1434 (9th Cir. 1989), citing Jones v. Barnes, 463 U.S. 645, 751-54 (1983).

7               **A.**   **Exhaustion**

8        Respondent argues that when originally presented in the federal Petition, the

9  claim was broad and conclusory. (Doc. No. 161 at 35.)  With Petitioner now providing

10  the court with a detailed list and supporting argument regarding the claims appellate

11  counsel failed to assert on appeal, Respondent maintains that the claim has been

12  rendered unexhausted.  (Id.)

13        To exhaust state remedies, a petitioner must "fairly present" the substance of

14  his claim to the state court.  Baldwin v. Reese, 541 U.S. 27, 29 (2004), citing Duncan

15  v. Henry, 513 U.S. 364, 365-66 (1995); Vasquez v. Hillary, 474 U.S. 254, 257 (1986).

16  A fair presentation means that the state court must have had the opportunity to apply

17  controlling legal principles to the facts bearing upon the claim.  Picard v. Connor, 404

18  U.S. 270, 278 (1971).  The Ninth Circuit has held that "[a] thorough description of the

19  operative facts before the highest state court is a necessary prerequisite" for providing

20  that court a fair opportunity to hear a claim.  Kelly v. Small, 315 F.3d 1063, 1069 (9th

21  Cir. 2003), overruled on other grounds by Robbins v. Carey, 481 F.3d 1143, 1149 (9th

22  Cir. 2007).  A petitioner can develop additional facts supporting a particular claim on

23  federal habeas as long as the factual and legal basis of that claim was previously

24  presented to the state court.  Moorman v. Schriro, 426 F.3d 1044, 1056 (9th Cir.

25  2005).  The Ninth Circuit has elaborated that "[t]his does not mean, however, that a

26  petitioner who presented any ineffective assistance of counsel claim below can later

27  add unrelated alleged instances of counsel's ineffectiveness to his claim."  Id., citing

28  Carriger v. Lewis, 971 F.2d 328, 333 (9th Cir. 1992) (en banc).

01cv0741

1    Petitioner presented an ineffective assistance of appellate counsel claim to the

2    state supreme court in an amended habeas petition on September 20, 2002.  In this

3    appeal, Petitioner made a broad argument, claiming that:

4         Should the Court determine that any claims herein were not
          adequately presented on appeal or by way of Petitioner's previous state
5         habeas, Petitioner submits that such failure was as the result of the
          above unconstitutional deprivation of effective assistance of appellate
6         counsel.

7    (Exh. Pet. at ¶ 383.)

8    Petitioner was long aware which claims state appellate counsel had and had not

9    raised on automatic appeal and in state habeas proceedings.  Indeed, there is nothing

10   that prevented Petitioner from pleading this claim with the same specificity on state

11   habeas that he now utilizes here.

12   The Court finds that the specific pleading of errors on the thirty-one separate

13   sub-claims of Claim 35 does in fact constitute new material that places the claim in a

14   "significantly different and stronger evidentiary posture" from the claim considered by

15   the state courts. Aiken v. Spaulding, 841 F.2d 881, 884 n. 3 (9th Cir. 1988).  This is

16   because Petitioner only pled a very broad and generalized ineffective assistance of

17   appellate counsel claim in the state court, and now adds numerous specific instances

18   of counsel's alleged errors.  Petitioner did not fairly present the factual and legal basis

19   of this claim to the state court. Moormann, 426 F.3d at 1056.  This claim remains

20   unexhausted.

21   Yet notwithstanding the total-exhaustion rule in Rose v. Lundy, 455 U.S. 509

22   (1982), federal district courts have the discretion to deny a habeas petition on the

23   merits despite a petitioner's failure to fully exhaust state judicial remedies. See 28

24   U.S.C. § 2254(b)(2); Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999).

25   Additionally, this Court has the ability to deem Petitioner's claims exhausted

26   when "a return to state court for exhaustion would be futile." Phillips v. Woodford, 267

27   F.3d 966, 974 (9th Cir. 2001).  Considering the procedural posture of this case, the

28   California Supreme Court would likely deny this claim on procedural timeliness and

1  successiveness grounds because Petitioner failed to raise the claim in earlier state
2  appeals. See Walker, 131 S.Ct. at 1125-31, citing In re Robbins, 18 Cal. 4th 770, 787
3  (1998); In re Clark, 5 Cal. 4th 750, 765 n. 5 (1993).

4      Moreover, as previously stated, the Ninth Circuit has instructed that a court's
5  decision on the issue of procedural default is to be informed by furthering "the
6  interests of comity, federalism, and judicial efficiency." Boyd v. Thompson, 147 F.3d
7  1124, 1127 (9th Cir. 1998). As such, "because [Petitioner's] claim fails on the merits,"
8  here, these interests "are better served by addressing the claim on the merits."
9  Walters v. Maass, 45 F.3d 1355, 1360 n. 6 (9th Cir. 1995).

10     For these reasons, the Court will address the merits of this claim.

11          **B.    Merits**

12     Claim 75 is the only claim from Group One that Petitioner contends state
13  counsel erred in failing to raise on appeal. Claim 75, which alleges that lethal injection
14  constitutes cruel and unusual punishment, was denied without prejudice as premature
15  in an Order dated June 13, 2005. (See Doc. No. 147.) As the Court noted in that
16  order,

17     At this juncture, Petitioner's claim implicates jurisprudential concerns
18     similar to those involved in ripeness. The Ninth Circuit has previously
       suggested that a constitutional challenge to a specific method of
19     execution becomes ripe when that method is chosen. LaGrand v.
       Stewart, 170 F.3d 1158, 1159 (9th Cir. 1999). However, the method,
20     procedures, and protocols can change over time.

21  (Doc. No. 147 at 19.) In that Order, this Court also noted that "the Department of
22  Correction execution protocols may change during the pendency of this case." (Id.)
23  Indeed, the three-drug execution protocol was found to "result[] in an undue and
24  unnecessary risk of an Eighth Amendment violation," noting that a single-drug
25  anesthetic method "would eliminate any constitutional concerns, subject only to the
26  implementation of adequate, verifiable procedures to ensure that the inmate actually
27  receives a fatal dose of the anesthetic." See Morales v. Tilton, 465 F.Supp.2d 972,
28  983 (N.D. Cal. 2006). The protocol has since been revised and enjoined from

1    implementation, then again revised and promulgated as a regulation; despite these

2    actions, the Northern District of California recently noted that "California at this

3    juncture lacks a lethal-injection protocol that is valid under state law." Morales v. Cate,

4    2012 WL 5878383, at *3 (N.D. Cal. Nov. 21, 2012.)  In any event, as this claim

5    continues to present concerns akin to ripeness due to these continual changes to the

6    protocol, state appellate counsel could not have been ineffective for failing to raise the

7    claim on direct appeal over a decade ago. See Jones v. Smith, 231 F.3d 1227, 1239

8    n.8 (9th Cir. 2000) (because claim did not provide grounds for reversal, appellate

9    counsel's failure to raise issue did not constitute ineffective assistance.)

10          Petitioner's motions for summary judgment or an evidentiary hearing on claims

11   55-66 (Group Two claims) were denied by this court in an Order dated September 30,

12   2005.  The court found that Petitioner was not entitled to habeas relief on any of those

13   claims.  Therefore, appellate counsel's decision against raising these non-meritorious

14   claims in prior state appeals cannot be considered ineffective assistance of counsel.

15   Petitioner must show that counsel's actions fell below an objective standard of

16   reasonableness and that there is a reasonable probability that, but for these errors,

17   Petitioner would have prevailed on appeal. Strickland, 466 U.S. at 688, 694; United

18   States v. Birtle, 792 F.2d 846, 849 (9th Cir. 1986).

19          Claim 68 (Group Three) also involves an allegation of ineffective assistance of

20   counsel.  In evaluating appellate counsel's failure to raise ineffective assistance of

21   counsel issues, the Ninth Circuit has stated:

22                 With respect to Petitioner's dissatisfaction with the performance of
             appellate counsel insofar as counsel did not attack the adequacy of trial
23           counsel's performance, we are satisfied that appellate counsel's failure
             to do so did not constitute error.  As discussed earlier, trial counsel's
24           performance, though not error-free, did not fall below the Strickland
             standard.  Thus, Petitioner was not prejudiced by appellate counsel's
25           decision not to raise issues that had no merit.

26   Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991.)

27          Petitioner has not shown resultant prejudice from trial counsels' alleged error

28   as stated in Claim 68.  Petitioner has failed to show that counsel's actions fell below

64                                                                   01cv0741

1  an objective standard of reasonableness and that there is a reasonable probability
2  that, but for these errors, Petitioner would have prevailed on appeal. Strickland, 466
3  U.S. at 688, 694; Birtle, 792 F.2d at 849.  Appellate counsel's decision to pursue
4  other, more potentially meritorious claims on appeal cannot be faulted and the failure
5  to raise claim 68 did not prejudice Petitioner.

6      Similarly, appellate counsel's failure to raise the Group Four claims on appeal
7  (Claims 10-11, 48-49, 67, and 70) did not result in any prejudice to Petitioner.  In the
8  Group Four Order, this Court denied each of those claims on the merits. (See Doc.
9  No. 247 at 104.)  As such, appellate counsel's failure to raise those arguments did not
10 constitute prejudicially deficient performance. See Baumann v. United States, 692
11 F.2d 565, 572 (9th Cir. 1982) ("The failure to raise a meritless legal argument does not
12 constitute ineffective assistance of counsel.")  Neither has Petitioner  demonstrated
13 that appellate counsel's failure to raise the Group Five Claims on appeal constituted
14 ineffective assistance of counsel.  As reasoned above, the Court has denied each of
15 these claims on the merits.  Accordingly, appellate counsel's failure to raise those
16 arguments did not constitute prejudicially deficient performance. See Baumann, 692
17 F.2d at 572.

18     In sum, Petitioner fails to demonstrate that appellate counsel's failure to raise
19 these issues on appeal constitutes an error so serious that "there is a reasonable
20 probability that, but for counsel's unprofessional errors, the result of the proceeding
21 would have been different." Strickland, 466 U.S. at 694.  Accordingly, this claim fails
22 on the merits.

23     **3.    Claim 67**

24     In Claim 67, Petitioner alleged that the trial court erroneously denied a post-trial
25 motion to review previously sealed portions of the record and requested that federal
26 habeas counsel be permitted to review the materials to determine if any exculpatory
27 material had been withheld.  In the Group Three Order, the Court denied the trial court
28 error claim on the merits and treated Petitioner's request as one for discovery, setting

1  a hearing regarding the discovery.  (See Doc. No. 96.)  After the hearing, the Court

2  reviewed portions of the transcripts cited by the parties in a joint list submitted in

3  connection with the discovery proceedings and in an Order dated September 29,

4  2008, concluded as follows:

> The transcripts confirm that the trial court reviewed sealed files including "Red Books," produced some items to Petitioner, and concluded that other items were not discoverable.  However, it is unclear from the transcripts exactly what documents were withheld from production and whether these documents are even part of the court's record.   [¶] Because the documents that were the subject of the in camera reviews are not before the Court, the Court **GRANTS IN PART** Petitioner's motion for discovery of the sealed proceedings. Petitioner may seek to have the sealed files subpoenaed and presented to this Court for in camera review.   Notice of any such subpoena shall be given to Respondent's counsel.   If Petitioner locates the sealed documents, Petitioner may move this Court to review the documents and reevaluate Claim 67.

12  (Doc. No. 280.)  To date, Petitioner has not moved this Court to review documents in

13  connection with Claim 67 or to reevaluate the claim.  Accordingly, Claim 67 remains

14  denied on the merits.

15      **4.   Claim 75**

16      Claim 75, as discussed above with respect to Claim 35, alleges that lethal

17  injection constitutes cruel and unusual punishment.  The claim was denied without

18  prejudice in an Order dated June 13, 2005.  (See Doc. No. 147.)  As discussed above,

19  because this claim continues to present concerns akin to ripeness, the Court again

20  denies the claim as premature.

21                      **V.  CONCLUSION**

22      For the reasons discussed above, Claims 2, 4, 5, 8, 12, 18-20, 24, 35, and 67

23  are **DENIED** on the merits.  Claim 75 is **DENIED** as premature.  The Court will, in the

24  final judgment, **GRANT** a Certificate of Appealability ("COA") on Claims 2, 4, 5, 8, 12,

25  18, 19, 20, and 67, and **DENY** a Certificate of Appealability on Claims 24, 35 and 75.

26  **IT IS SO ORDERED.**

27  DATED: March 27, 2013

28         5:22 PM

Honorable Barry Ted Moskowitz
United States District Judge